## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Derrick**[1] through and with his next friend and mother **Tina**, **Walter** through and with his next friend and mother **Janeva**, **Thomas** through his next friend and mother **Michelle**, and **Sean** through his next friend and grandmother **Andrea**, on behalf of themselves and others similarly situated.<br><br>        **Plaintiffs,**<br><br>  **v.**<br><br>**Glen Mills Schools; Teresa D. Miller, Secretary of the Pennsylvania Department of Human Services** in her individual capacity; **Theodore Dallas, former Secretary of the Department of Human Services** in his individual capacity; **Cathy Utz, Deputy Secretary for the Office of Children, Youth, and Families** in her individual capacity; **Pedro A. Rivera, Secretary of Education of the Pennsylvania Department of Education** in his official capacity; **Pennsylvania Department of Education; Chester County Intermediate Unit; Randy Ireson, former Executive Director of Glen Mills Schools; Andre Walker; Robert Taylor; Sean Doe; Chris Doe 1; Chris Doe 2; John Does 1 – 20**<br><br>        **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Civil Action No.<br>_____<br><br>COMPLAINT—CLASS ACTION |

## COMPLAINT

---

[1] This Complaint uses pseudonyms to protect the privacy and safety of named Plaintiffs, who are all minor children, and their parents or guardians.

**INTRODUCTION**

1.      Glen Mills Schools ("Glen Mills"), located in Delaware County, Pennsylvania, was established in the 19th century as a residential facility for youth. For decades, the facility accepted youth who were adjudicated delinquent and committed to Glen Mills by state or local juvenile justice systems across the country. At one time home to as many as 1,000 boys, the facility today sits empty, as the last remaining youth were ordered removed from the facility by the Pennsylvania Department of Human Services ("PA-DHS") on March 25, 2019, and Glen Mills licenses were revoked on April 8, 2019. According to an Emergency Removal Order[2] issued by PA-DHS Office of Children, Youth and Families ("OCYF"), OCYF found that "Glen Mills failed to protect the youth entrusted to its care, placed youth at risk of serious physical injury, permitted youth to sustain physical injuries by their acts and failure to act and Glen Mills engages in a culture that instills fear in youth through coercion and intimidation." OCYF continued, "As a result, we find that youth placed at Glen Mills are at imminent risk and their safety is in jeopardy."

2.      This lawsuit is filed on behalf of the hundreds of youth who suffered at the hands of Glen Mills leadership and staff. Instead of receiving

---

[2] ("OCYF Removal Order"). Attached hereto as Exhibit A.

any treatment or services, as required by the Pennsylvania Juvenile Act as a condition for their involuntary commitment at Glen Mills and in violation of their constitutional and legal rights, these youth were subjected to extreme and sustained physical violence and psychological abuse and deprived of an education. This shocking abuse had an especially dire impact upon Black youth, who were disproportionately sent to Glen Mills, and students with disabilities whose educational rights were ignored.

3.      Glen Mills prided itself on being the oldest "reform school" in the country, touting its 800-acre picturesque campus, rigorous athletics, "world-class" education, and sociological approach to rehabilitation based on "peer pressure and group confrontation" including its "Battling Bulls" accountability hierarchy.[3] Yet, lurking inside its storied halls was a culture of malicious and sadistic abuse carried out by Glen Mills "Counselors" and other staff who assaulted youth through punching, shoving, choking, beating with objects, and otherwise harming youth, Glen Mills counselors who authorized and encouraged youth to beat up other youth, Glen Mills counselors who failed to intervene when youth beat up other youth—subjecting youth at Glen Mills to a constant fear of abuse. Glen Mills leadership through their policies and practices created this culture of abuse, then ignored the medical and

---

[3] THE GLEN MILLS SCHOOLS, http://www.glenmillsschool.org/ (last visited Apr. 10, 2019).

educational needs of youth. Glen Mills leadership and staff took all measures to suppress the stories of violence and neglect and protect the school's reputation—intimidating youth and their families into silence.

4.      Sadly, this barbaric abuse continued unchecked due to the Pennsylvania Department of Human Service's callous disregard for the safety and well-being of the youth in its care. PA-DHS licenses, oversees, and regulates child residential facilities as defined by 55 Pa. Code Ch. 3800 to protect the health, safety and well-being of youth receiving care in a child residential facility. Despite 18 publicly-documented incidents of abuse by Glen Mills staff between March 2014 and January 2017 alone—equating to six documented instances of serious documented staff-on-youth abuse per year, not once did officials at PA-DHS take meaningful steps to protect youth at Glen Mills. It was not until March 2019, that PA-DHS issued its OCYF Removal Order to remove all students from Glen Mills. PA-DHS did not revoke the licenses of the facilities until April 8, 2019. The failure of officials at PA-DHS to provide sufficient oversight of Glen Mills and their continued licensing of the facility despite Glen Mills' continued violations of the minimum standards of Chapter 3800 placed Plaintiffs and all Class Members perpetually in harm's way.

5.    In addition to persistent physical and emotional abuse, Plaintiffs' general and special education rights were also routinely violated. School-aged youth were offered nothing more than a GED book or required to sit quietly in front of a computer in a self-directed limited credit recovery program while the hope of a meaningful high school diploma slipped away. Plaintiffs—including those with disabilities who are entitled to special education services—were placed as "secondary ungraded" students in a one-size-fits-all substandard online credit-recovery program. This program provided only minimal hours of instruction, limited curriculum, and no live instruction. The education program at Glen Mills deprived students with disabilities of their legally-protected interest in a free and appropriate public education.

6.    Officials at the Pennsylvania Department of Education ("PDE") and the Chester County Intermediate Unit ("CCIU") allowed Glen Mills' education program to operate in the shadows, turning a blind eye to its flagrant violations of youths' education rights. As the State Education Agency ("SEA"), PDE is responsible for providing for the public education of children in the Commonwealth, including ensuring a free, appropriate, public education for children with disabilities, but has failed to fulfill its duties and deprived the youth at Glen Mills of a legally compliant education to which they are entitled. Similarly, CCIU, as a local educational agency, contracted with Glen Mills as a private residential rehabilitative institution ("PRRI")

to provide educational services to children placed in an institution through juvenile court as part of a rehabilitative program. Yet, the CCIU failed to oversee or be involved in education in any way. In addition, the CCIU also served as the local educational agency charged with providing a free appropriate public education for students with disabilities and yet routinely failed to participate in the special education process or fulfill its duties under federal and state disability laws.

7.    The acts and omissions of all Defendants in this case are reminiscent of the darkest times—real or imagined—in our history of the maltreatment of youth. If it is true that the soul of a nation is revealed through its treatment of its children, the souls of Glen Mills leadership and staff, and of the many complicit state officials, reflect, by analogy, the worst versions of ourselves as a society. The rampant infliction of physical, emotional, and psychological damage on hundreds of youth and their families, along with the deprivation of educational services, have caused youth at Glen Mills to suffer myriad, life-altering consequences, including lifelong trauma and a greater likelihood of permanent educational disruption which can lead to challenging futures defined by unemployment, homelessness, and incarceration.

8.    Plaintiffs bring this civil rights class action to seek redress for these violations of their constitutional, legal and common law rights.

## JURISDICTION AND VENUE

9.      The claims in this action arise under the Eighth Amendment to the United States Constitution, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as enforced through 42 U.S.C. § 1983; the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, including 34 C.F.R. § 300.149; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 701 *et seq.*; and the Pennsylvania Public School Code of 1949, 71 P.S. § 352(a), 24 P.S. § 13-1306, 24 P.S. § 9-914.1-A, *et seq.* Pendent state claims also arise under Pennsylvania common law.

10.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). This Court has the authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

11.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 42 U.S.C. § 1983.

12.     Plaintiffs' claims for compensatory and punitive damages are authorized by 18 U.S.C. § 1964 and 42 U.S.C. § 1983.

13.     Plaintiffs' claims for costs are authorized by Fed. R. Civ. P. 54(d)(1).

14.     Plaintiffs' claims for attorneys' fees are authorized by 42 U.S.C. §§ 1983 and 1988(b).

15.     This Court may exercise supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367.

16.     Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because the events that give rise to this action occurred in Glen Mills, Pennsylvania, within the Eastern District of Pennsylvania.

**PARTIES**

**Named Plaintiffs and Next Friends**

17.     Plaintiff Derrick is a 15-year-old student with qualifying disabilities and the son of his next friend Tina of Tobyhanna in Monroe County, Pennsylvania. Derrick is a "child with a disability" under the IDEA, an "individual with a disability" under Section 504 and the ADA, and a "protected handicapped student" under Chapter 15 of the Pennsylvania School Code. 20 U.S.C. §§ 1401(3); 22 Pa. Code § 14-101; 29 U.S.C. § 794(a); 34 C.F.R. § 104.3(j); 42 U.S.C. § 12102(1). Derrick was placed at Glen Mills in March 2018 by a Monroe County juvenile court judge and remained there until March 2019. At Glen Mills, Derrick suffered and witnessed severe physical abuse at the hands of staff and other youth. Derrick was denied access to a legally compliant public education and only received limited

online credit recovery. Derrick was denied a free appropriate public education and was discriminated against based on his disabilities.

18.    Plaintiff Tina is the parent of Derrick and a "parent" within the meaning of IDEA, 20 U.S.C. § 1401(23). While her son was at Glen Mills, Tina was denied her right to meaningfully participate in Derrick's educational planning and the special education process.

19.    Plaintiff Walter is a 17-year-old student with qualifying disabilities and the son of next friend Janeva of Camden County, New Jersey. Walter is a "child with a disability" under the IDEA, an "individual with a disability" under Section 504 and the ADA, and a "protected handicapped student" under Chapter 15 of the Pennsylvania School Code. 20 U.S.C. §§ 1401(3); 22 Pa. Code § 14-101; 29 U.S.C. § 794(a); 34 C.F.R. § 104.3(j); 42 U.S.C. § 12102(1). Walter was placed at Glen Mills in March 2018 by a Philadelphia County juvenile court judge and remained there until March 2019 at which time he was transferred to another residential placement. At Glen Mills, Walter suffered and witnessed severe physical abuse at the hands of staff and other youth. Walter was denied access to a legally compliant public education and only received limited time to review GED materials. Walter was denied a free appropriate public education and was discriminated against based on his disability.

20.     Plaintiff Janeva is the parent of Walter and a "parent" within the meaning of IDEA, 20 U.S.C. § 1401(23). While her son was at Glen Mills, Janeva was denied her right to meaningfully participate in Derrick's educational planning and the special education process.

21.     Plaintiff Thomas is a 16-year-old student suspected of being a student with a disability pursuant to the IDEA, 20 U.S.C. § 1401(3), and the son of next friend Michelle of Philadelphia in Philadelphia County, Pennsylvania. Thomas was placed at Glen Mills in May 2018 by a Philadelphia County juvenile court judge and remained there until March 2019. At Glen Mills, Thomas suffered and witnessed severe physical abuse at the hands of staff. Thomas was denied access to a legally compliant free public education and only received limited credit recovery.

22.     Plaintiff Sean is a 16-year-old student and the grandson of next friend Andrea of Berwick, Pennsylvania. Sean was placed at Glen Mills in February 2019 by a Luzerne County juvenile court judge and remained there until March 2019. At Glen Mills, Sean suffered severe physical abuse at the hands of another youth and witnessed staff abusing other youth. Sean also suffered extreme medical neglect. Sean was denied access to a legally compliant free public education.

**Glen Mills Defendants**

23.     Defendant Glen Mills is a registered non-profit (non-stock) Pennsylvania corporation, with its headquarters and principal place of business

located at 185 Glen Mills Road, Glen Mills, Pennsylvania 19342, in Delaware County.

24.    Glen Mills was licensed as a residential facility pursuant to 55 Pa. Code § 3800.11 by PA-DHS. Institutions like Glen Mills receive a Certificate of Compliance from PA-DHS if they follow all applicable statutes, ordinances and regulations.

25.    Glen Mills is registered as a PRRI, a facility that provides "educational services as part of a total rehabilitative package" required in conjunction with the court placement of a child pursuant to a contractual agreement with a local education agency or intermediate unit which is funded, at least in part, through contractual agreements with the county of which each child is a resident. 24 P.S. § 9-914.1-A(c). Educational services are defined as "direct expenditures for instruction and the administration of the instructional program." *Id.*

26.    Glen Mills is also registered with PDE as a Nonpublic Nonlicensed Day School operated by a "bona fide church or other religious body." 24 P.S. § 13-1327(b). The Pennsylvania School Code, Section 13-Pupils & Attendance, 24 P.S. § 13-1327, requires a school operated by or under the authority of a bona fide religious institution be registered with the Department of Education by filing a notarized Affidavit/Certificate of Nonpublic Non-licensed Day School Operated by

a Bona Fide Church or Other Religious Body in Pennsylvania[4] which attests that the

school provides 990 hours of instruction and otherwise complies with provisions of

the Pennsylvania School Code and attests that specific courses are offered. *Id.* at 13-

1327(b)(1) and (2); 22 Pa Code § 4.71.

27.    Glen Mills received federal financial assistance to provide educational

services to children with disabilities and as a recipient of federal assistance is subject

to the ADA and Section 504. 29 U.S.C. § 794(a); 22 Pa. Code § 15.3; 42 U.S.C. §

12131. Glen Mills received a variety of federal, state, and local government funding.

It had contracts with multiple jurisdictions nationwide. Those contracts often

required the sending jurisdiction to pay for the placement of youth at Glen Mills.

28.    Defendant Dr. Randy Ireson was Executive Director of Glen Mills from

2013 until he stepped down, "for health reasons," on February 28, 2019—eight days

after the *Philadelphia Inquirer* ran an article entitled "Beaten, then silenced: At the

oldest U.S. reform school leaders have hidden a long history of violence." ("Feb.

2019 *Inquirer* article") [5] As the Executive Director, Dr. Ireson was responsible for

---

[4] PDE, AFFIDAVIT/CERTIFICATE OF NONPUBLIC , NON-LICENSED DAY SCHOOL OPERATED BY A
BONA FIDE CHURCH OR OTHER RELIGIOUS BODY IN PENNSYLVANIA, (Rev. 2015) [hereinafter
AFFIDAVIT],                        https://www.education.pa.gov/Documents/K-12/Nonpublic-
Private%20Schools/Opening%20a%20Private%20or%20Nonpublic%20School/Affidavit%20of
%20Nonpublic%20Nonlicensed%20Day.pdf.
[5] Lisa Gartner, *Beaten, Then Silenced: At the Oldest U.S. Reform School for Boys, Leaders of the
Prestigious Glen Mills Schools in Pennsylvania Have Hidden a Long History of Violence*, THE
INQUIRER (Feb. 20, 2019), https://www.philly.com/crime/a/glen-mills-schools-pa-abuse-juvenile-
investigation-20190220.html. Attached hereto as Exhibit B.

all aspects of the management and supervision of Glen Mills' day-to-day operations. Dr. Ireson resides on campus at Glen Mills, 185 Glen Mills Road, Glen Mills, Pennsylvania 19342, in Delaware County.

29.     John Does 1-6 were members of the Glen Mills Leadership Team and respectively supervised the six different departments at the school. Together with Defendant Ireson, John Does 1-6 developed and enforced policies and procedures that led to violence against youth at Glen Mills. Defendant Ireson and John Does 1-6 (together, "Glen Mills Leadership") knew of the violence that counselors and staff carried out against youth at Glen Mills and failed to stop it.

30.     Glen Mills staff Defendants Andre Walker, Robert Taylor, Chris Doe 1, Chris Doe 2, Sean Doe and John Does 7-12 were counselors and other staff members who physically assaulted Named Plaintiffs Derrick, Walter, and Thomas at Glen Mills. Glen Mills staff Defendants John Does 13-20 failed to provide adequate treatment and food to plaintiff Sean.

31.     Glen Mills served an exclusively public function and at all times Glen Mills, Glen Mills Leadership, and Glen Mills staff Defendants acted under color of state law.

**PA-DHS Defendants**

32.     Defendant Teresa D. Miller has been the Secretary of the PA-DHS since on or about August 2017 and is sued solely in her individual capacity.

Defendant Miller directly and indirectly controls and is responsible for PA-DHS's child welfare and juvenile justice policies and practices. Secretary Miller maintains her principal office at 625 Forster Street, Harrisburg, PA 17120.

33.    Defendant Theodore Dallas was Secretary of PA-DHS from the period of June 2015 until on or about August 2017 and is sued solely in his individual capacity. Former Secretary Dallas was on medical leave from June 2017 to August 2017. Defendant Dallas directly and indirectly controlled and was responsible for PA-DHS's child welfare and juvenile justice policies and practices during the period he was Secretary of PA-DHS. Former Secretary Dallas is now President and Chief Operations Officer at Merakey Foundation, the corporate headquarters for which is located at 620 E. Germantown Pike, Lafayette Hill, PA 19444.

34.    Defendant Cathy Utz has been the Deputy Secretary for OCYF within PA-DHS during the relevant time period and is sued in her individual capacity. Defendant Utz was directly and indirectly responsible for the OCYF child welfare and juvenile justice practices during the relevant time period. Deputy Secretary Utz maintains her principal office at 625 Forster Street, Harrisburg, PA 17120.

**Education Defendants**

35.    Defendant CCIU is one of Pennsylvania's 29 intermediate units, a regional educational service agency established under sections 901-A-924-A of the School Code, 24 P. S. §§ 9-901-A-9-924-A, which provides educational services to

participating school districts as part of the public school system of the Commonwealth. *See* 24 P.S. § 9-901-A. The CCIU is authorized to contract with private residential rehabilitative institutions like Glen Mills for educational services provided to children as part of a rehabilitative program in conjunction with a juvenile court placement pursuant 42 Pa. Cons. Stat. Ann. § 6352 (relating to juvenile matters). The CCIU, as a public entity and local educational authority, receives federal financial assistance and is subject to the IDEA, ADA and Section 504. 20 U.S.C. § 1413; 29 U.S.C. § 794(a); 22 Pa. Code § 15.3; 42 U.S.C. § 12131. The CCIU operates as the local educational agency ("LEA") for Glen Mills under the IDEA and state law and is required to comply with all applicable state and federal education laws. The CCIU's headquarters and principal place of business is located at 455 Boot Road, Downingtown, Pennsylvania 19335.

36.     Defendant PDE has the power and responsibility to "administer all of the laws of this Commonwealth with regard to the establishment, maintenance, and conduct of the public schools." 71 P.S. § 352(a). This power includes ensuring compliance with applicable laws, prescribing courses of study, administering testing, establishing academic standards, requiring and receiving reports from school districts, classifying schools, and enforcing the rights of students. The mission of PDE is to academically prepare children and adults to succeed as productive citizens and to ensure that the technical support, resources and opportunities are in place for

all students to receive a high-quality education. PDE is the executive agency responsible for providing an adequate education system for all children in Pennsylvania, including members of the Plaintiff Class and Subclass defined herein. As the state education agency, PDE is responsible for ensuring a free, appropriate, public education for all students with disabilities in accordance with the IDEA and Chapters 14 of the State Board Regulations. PDE provides general supervision over all public schools, school districts, intermediate units, and other public education agencies to ensure that all students have access to a public education, students with a disability receive a FAPE, and that IDEA Parents participate in the special education process and have the benefits of a system of procedural safeguards. 20 U.S.C. §1412(11)(A). The Bureau of Special Education ("BSE") within PDE monitors all school districts, charter schools, intermediate units and students attending other school programs statewide to ensure that they are complying with federal and state special education regulations and improving performance outcomes of students with disabilities. PDE administers the process governing the application, licensing, and certification of schools, the monitoring of all schools, districts, and intermediate units, as well as contracts with school districts and intermediate units for educational services provided by private residential rehabilitative institutions like Glen Mills. PDE has an office located at 333 Market Street Harrisburg, Pennsylvania 17126.

37.    Defendant Pedro A. Rivera is the Secretary of Education of PDE and is sued solely in his official capacity. The Secretary of Education is the head of the Department of Education and chief executive officer of the State Board of Education and is responsible for delivering and improving education services to the children of the Commonwealth. Pursuant to Article IV, Section 1 of the Pennsylvania Constitution, the Secretary is a member of the executive department of the Commonwealth and is appointed by and serves at the pleasure of the governor with the advice and consent of the Senate. Secretary Rivera maintains his principal office at 333 Market Street, Harrisburg, PA 17126.

## CLASS ACTION ALLEGATIONS

38.    Plaintiffs bring this suit individually and as a class action pursuant to Rule 23(a), (b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of all similarly-situated individuals.

39.    The General Class is defined as all youth and young adults who were adjudicated delinquent and were placed by state or local juvenile justice systems at Glen Mills located in Glen Mills, Pennsylvania at any time in the past two years prior to the date of filing of this complaint, or who were placed by state or local juvenile justice systems at Glen Mills at any time and turned 18 within two years of the date of filing of this complaint, or were placed by state or local juvenile justice

systems at the Glen Mills School at any time and have not yet turned 18, and the parents of those youth and young adults.

40.    The Education Subclass is defined as all class members who, while at Glen Mills, were deprived of an education in accordance with the requirements of the Pennsylvania School Code.

41.    The Special Education Subclass is defined as all class members who were identified as children with disabilities as defined by the Individuals with Disabilities in Education Act ("IDEA"), specifically 34 C.F.R. § 300.8, prior to placement at Glen Mills.

42.    The Suspected-To-Be-Eligible Special Education Subclass is defined as all class members suspected of being students with disabilities who were never identified and/or evaluated while at Glen Mills as required by the IDEA, specifically 20 U.S.C. § 1412(a)(3) and 34 C.F.R. § 300.111(a).

43.    The Special Education Parent Subclass is defined as all parent class members whose children were placed at Glen Mills and are identified as children with disabilities as defined by IDEA, specifically 34 C.F.R. § 300.30(a).

44.    The Disability Subclass is defined as all class members placed at Glen Mills who have qualifying disabilities as defined under Section 504 and the ADA, specifically 42 U.S. Code § 12102.

45.    The individual named Plaintiffs' claims are typical of the claims of all members of the class, because they all were confined at Glen Mills and subjected to a policy and practice of systematic abuse by staff or other youth, witnessed abuse of youth by staff, subjected to a culture of intimidation and humiliation, subjected to a policy and practice of inadequate medical care, and did not receive an adequate education. Plaintiffs and all members of each class similarly suffered harm arising from Defendants' actions and inaction. All Class members were subjected to the pervasive culture of violence at Glen Mills. Defendants acted or refused to act on grounds generally applicable to all Class members.

46.    Common questions of law and fact exist as to all members of each class. These common legal and factual questions include:

a.    Whether Glen Mills Defendants' policies, practices, and custom of excessive force violate the Eighth or Fourteenth Amendments to the U.S. Constitution, or affirmative duties under state law and regulations.

b.    The extent of Defendants' knowledge of or deliberate indifference to the policy, practice, custom, and pattern of abuse and intimidation at Glen Mills.

c.  Whether PA-DHS Defendants' policies, practices, and customs failed to satisfy the agency's affirmative duty to protect Plaintiffs from an unreasonable risk of physical and emotional harm.

d.  Whether PDE, CCIU, and Glen Mills Defendants as a policy, practice, or custom deprived Plaintiffs of their statutory property interest in a free public education in violation of Plaintiffs' right to Procedural Due Process and Equal Protection under the Fourteenth Amendment of the U.S. Constitution.

e.  Whether Defendants PDE, CCIU, and Glen Mills as a policy, practice, or custom failed to fulfill their legal obligations to Plaintiffs with qualifying disabilities to be free from discrimination based on disability.

f.  Whether Defendants CCIU and Glen Mills deprived Plaintiffs' of their right to a public education under Pennsylvania state law.

g.  Whether Defendants PDE and CCIU's policies, practices, and customs created a system which deprived students with disabilities of their rights under the IDEA, including their right to a free, appropriate, public education.

h.  Whether Plaintiffs are entitled to the compensatory education services, injunctive and equitable relief, and damages they seek.

47.    Each class is so numerous as to render joinder impracticable. Hundreds of youth, at a minimum, were placed at Glen Mills in the relevant time period and endured systemic abuse and denial of education.

48.    A class action is the best available method for adjudicating these legal issues because individual litigation of these claims would be impracticable, and unduly burdensome to the courts.

49.    The named Plaintiffs, their representatives, and Class counsel will fairly and adequately represent the interests of the Class. The named Plaintiffs and their representatives have no interests in this matter that are antagonistic to other Class Members. Class counsel have many years of experience in children's civil rights and class action litigation.

50.    Plaintiffs seek common declaratory and injunctive relief from the Court finding violations of the relevant laws and requiring Defendants PDE, Chester County IU, and Glen Mills to provide compensatory education services.

51.    This suit may be maintained as a class action pursuant to Rules 23(a), 23(b)(2) and (b)(3), Federal Rules of Civil Procedure, because all of the above factors of numerosity, commonality, typicality, and adequacy are present and common questions of law and fact predominate over any questions affecting only individual members of the class. A class action is superior to other available methods of the fair and efficient adjudication of this litigation.

52.    Class treatment under Fed. R. Civ. P. 23(b)(2) is appropriate because the relief sought against Defendants PDE, Secretary Pedro Rivera, the Chester County Intermediate Unit, and Glen Mills Schools consists of declaratory and injunctive relief with respect to the Education, Special Education, Suspected-To-Be-Eligible Special Education and Disability Subclass members. By failing to provide an appropriate, legally compliant education Defendants have acted or refused to act on grounds that apply generally to these Subclasses. Prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct. Adjudications with respect to the rights of individual class members, would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

## FACTUAL ALLEGATIONS

## I.    THE ABUSIVE ENVIRONMENT OF GLEN MILLS

53.    Youth were involuntarily placed at Glen Mills by court orders from various jurisdictions in Pennsylvania and elsewhere in the country when they were judicially adjudicated delinquent pursuant to 42 Pa. Cons. Stat. Ann. § 6302 or other state juvenile court acts. During their placement youth were in the physical custody of Glen Mills. They could not leave Glen Mills without permission from the

institution and were otherwise detained. Upon information and belief, a small number of youth were voluntarily sent to Glen Mills by their parents. These youth are not included in the General Class.

54.    Plaintiffs' experiences with abuse at Glen Mills are indicative of the culture of violence that pervades the entire institution. This culture of violence included almost daily violence by Glen Mills staff on youth, Glen Mills staff encouraging youth to fight other youth, Glen Mills Leadership Defendants' failure to properly train, discipline, and supervise staff and Glen Mills Leadership Defendants' and staff members' failure to properly supervise youth to ensure protection from abuse.

55.    The primary "rehabilitative" accountability program at Glen Mills was a program referred to as the "Battling Bulls." The Battling Bulls program was designed as a reward-based hierarchy: youth were supposed to gain status for positive behavior or good grades and move down for poor behavior or bad grades. Those who have higher status received benefits. These benefits included but are not limited to home visits, extended time on the phone, and general recognition from staff and youth. The highest status in the Battling Bulls hierarchy is "Executive" status. Students are given the low status of being on "Concern" when staff believe they may run away, or when staff allege they are exhibiting problematic behaviors.

56.    Yet, the Battling Bulls hierarchy contributed to the culture of malicious and sadistic violence at Glen Mills. Youth were encouraged to confront their peers for perceived rule violations, which led to fear, intimidation, and physical violence between youth. Having "Bull" status was typically required for a youth to be deemed to have successfully completed the Glen Mills program and be eligible for discharge. As such, losing Bull status could mean a youth had to endure the abuse at Glen Mills even longer.

57.    Glen Mills staff also used the Battling Bull system to incentivize youth fights by offering youth higher status in exchange for fighting a youth with whom the staff is having a problem. Students with Executive Bull status would especially be told to assault other students with lower Bull Status at the behest of staff.

58.    Glen Mills staff also incentivized fighting among youth through a practice called "putting a cheeseburger [or other food item]" over a youth's head, where youth are given a cheeseburger or other food rewards for beating up the youth who is designated as having the food over their head.

59.    The youth assaults encouraged by Glen Mills staff normalized the culture of violence at Glen Mills, taught youth that violence was an appropriate response to conflict, and placed youth in constant danger of physical attack from their peers.

24

60.    Youth routinely suffered physical abuse from staff. Glen Mills staff slapped youth in the face to embarrass them. Other Glen Mills staff worked in unison assaulting or "jumping" a targeted youth simultaneously. A physical restraint, or a "P.R.," was used as a euphemism by Glen Mills staff and youth for physical violence against youth at Glen Mills. P.R.s occurred regularly. Glen Mills staff held youth in tight physical restraints that allowed them to inflict pain without hitting youth. Assaults by Glen Mills staff have resulted in broken arms, broken jaw, body blows, and black eyes. Glen Mills staff have also thrown tables and chairs at youth.

61.    Staff assaults on youth often focus primarily on the torso or other hidden areas. Glen Mills Counselors would avoid punching youth in visible areas, like the face, that can show bruising during family visits. This allowed Glen Mills staff to hide injuries or tell families that injuries were the results of Glen Mills' sports program and not from physical abuse.

62.    Townhouse was a daily ritual that was steeped in Glen Mills' abusive traditions. Each unit convened for Townhouse four times a day. During Townhouse, all youth returned to their units to be counted by staff. Violent incidents occurred from staff on youth and between youth during Townhouse.

63.    The OCYF Removal Order documents numerous instances of physical abuse by Glen Mills staff, such as choking, punching, and pushing youth against a wall. The OCYF Removal Order notes:

Based on interviews conducted with youth currently and formally (sic) placed at Glen Mills, the department determined that residents have been and continue to be subjected to physical harm as a result of being slapped, punched, and stricken by staff. In addition, youth are encouraged by staff to engage in physical altercations with peers that has resulted in injuries to youth and staff have failed to intervene in these altercations. . . .

Glen Mills operates under a culture of intimidation . . .

. . . .

These findings verify that Glen Mills failed to protect the youth entrusted to its care, placed youth at risk of serious physical injury, permitted youth to sustain physical injuries by their acts and failure to act and Glen Mills engages in a culture that instills fear in youth through coercion and intimidation. As a result, we find that youth placed at Glen Mills are at imminent risk and their safety is in jeopardy.

(Exhibit A at A5-6).

64.    At all relevant times, Glen Mills Leadership knew of the daily violence by Glen Mills staff members on youth and created a custom, policy, and practice that fostered and promoted such abuse and allowed it to continue unchecked. The Feb. 2019 *Inquirer* article explains how some boys were so fearful, they resorted to slipping notes under Defendant Ireson's door. One note to Ireson from August 2, 2017 describes serious abuse and fear: "He be saying he will punch us in the face and choke us till we fall asleep and can't wake up, to me that sound like death. . . I want to tell my parents and probation officer how Glen Mills is really like. Help us please Randy please," the boy implored. (Exhibit B at B15-18).

26

65. Glen Mills staff and Leadership also failed to provide youth with adequate medical treatment after they were abused. Upon information and belief, Glen Mills and Glen Mills Leadership created a policy, practice, or custom of denying appropriate medical treatment to youth. The OCYF Removal Order concluded "staff at Glen Mills have failed to seek necessary medical treatment for youth as a result of injuries sustained during altercations with both staff and their peers." (Exhibit A at A5).

66. Upon information and belief, there was also insufficient mental health staffing and counseling at Glen Mills, and youth did not receive adequate treatment to address their mental health needs, including the trauma of the pervasive culture of violence they endured at Glen Mills.

67. Glen Mills staff and Leadership also failed to properly supervise youth and to maintain proper staffing ratios to ensure a safe environment. For example, one afternoon Hayes Hall ("Hayes") had only five staff members supervising 49 youth, in violation of 55 Pa. Code § 3800.55(a). *See* OCYF Removal Order (Exhibit A at A6).

68. Upon information and belief, Glen Mills Leadership recruited many staff from local football programs regardless of their qualifications for working with youth in a juvenile justice facility.

69.    Glen Mills Leadership failed to properly train staff to ensure they were appropriately interacting with youth and were equipped to keep youth safe from violence.

70.    The violence at Glen Mills routinely led to youth picking up new charges. For example, when youth tried to run away from the violence, they received escape charges. If they fought back in self-defense, they would receive charges for harassment or assault, which could lengthen the amount of time a youth spent at Glen Mills.

71.    Youth at Glen Mills also understood that if they spoke out about what was happening, they could lose their Bull status and extend their placement at Glen Mills. While Glen Mills had a formalized grievance procedure, youth were intimidated and discouraged from grieving. Glen Mills staff publicly assaulted youth as intimidation. Other times a youth's injury would be held out as a reason why youth should behave, not talk back, or not grieve. Those who "spoke out" were vulnerable to having their Battling Bull status downgraded. Other rewards, such as weekend or holiday passes, could have been taken away. Youth could be moved around to different units as well, placing them in unfamiliar environments with youth they did not know. In addition, youth were penalized educationally by being deprived of access to reading assistance and Glen Mills career and technical training courses.

72.    Glen Mills staff often punished entire units when a youth attempted to utilize the grievance procedure. As a result, groups of youth were assaulted for the complaints of another youth.

73.    Staff labeled those who complain or grieve as "snitches." The practices of harming all the youth for the complaints of one, and assaulting youth for grieving, resulted in youth at Glen Mills fearing physical assaults as a result of a filing a grievance. Youth understood a clear threat from staff that "what happens on the unit, stays on the unit."

74.    Glen Mills perpetuated a code of silence not only by targeting youth but also by threatening to or actually terminating any staff who reported abuse. One staff member who witnessed other staff beating a youth with a metal chair, was encouraged by another staff member to "keep it gangster" and not report the abuse. A supervisor also instructed the staff person not to report the abuse. When the staff person did report the abuse to ChildLine, Glen Mills Leadership effectively isolated him and, subsequently, terminated him.

75.    In order to maintain Glen Mills' reputation as a high caliber rehabilitative facility, Glen Mills staff coerced youth into lying to any outside auditors or investigators. For example, youth were coerced into modifying their behavior. Youth were told to smile and wave at PA-DHS representatives, not to complain, and praise the institution.

76.    If youth did not portray Glen Mills favorably they would be reprimanded. The youth placed at Glen Mills understood this to mean they would be severely assaulted for making Glen Mills look bad to anyone outside the institution.

77.    Glen Mills Leadership knew of the violence at the facility and that their Battling Bulls system, hiring, training, and other policies created the culture of abuse, yet failed to stop it.

78.    The Feb. 2019 *Inquirer* article discussed the culture of silence and abuse at Glen Mills:

> Serious violence is both an everyday occurrence and an open secret at Glen Mills, and has been for decades, an Inquirer investigation has found. Internal documents, court records, incident reports, and more than 40 interviews with students, staff, and others show top leaders turn a blind eye to the beatings and insulate themselves from reports while failing to properly vet or train the school's counselors.

> When students and their families try to report these attacks, the Inquirer found, Glen Mills Staff uses the school's prestige as a weapon: They say Glen Mills is as good as it gets, and that if students complain, they'll be shipped off to a state-run facility crowded with boys who are mentally ill or have committed sex offenses.

> To keep teens quiet, counselors and supervisors threaten the boys with longer sentences, claiming that if they went to another placement, their time would restart. Other Glen Mills staffers have hidden students until their bruises disappear.

(Exhibit B at B2-3).

79.    In response to the Feb. 2019 *Inquirer* article, Glen Mills staff and Leadership informed youth at Glen Mills that they were not allowed to speak to outsiders about what goes on within Glen Mills. Youth were reminded that if they discussed Glen Mills in a negative manner to those outside the institution, they would be reprimanded. Youth placed at Glen Mills understood this to mean they would be severely assaulted.

80.    Glen Mills Leadership and Staff informed youth at Glen Mills when an investigation was announced and people would be coming through Glen Mills asking questions. Glen Mills Leadership and Staff instructed youth throughout the institution not to complain and told them they would face discipline for speaking out. Youth understood this to mean they would be severely assaulted.

81.    After the Feb. 2019 *Inquirer* article appeared, Glen Mills Leadership and Staff established new visitation and phone call protocols. For example, Glen Mills staff monitored youth phone calls to family members, further hindering youth from being able to safely speak out about violence at the facility.

82.    Many youth returned from Glen Mills still terrified to speak out about the abuse they endured and witnessed. One youth expressed concern that Glen Mills staff and Leadership "know where we live."

83.    On April 8, 2019 all 14 of Glen Mills' licenses were revoked by PA-DHS. In a letter to Glen Mills, PA-DHS cited "gross incompetence, negligence, and

misconduct in operating the facilities," and "mistreatment and abuse of children in care" as the reasoning for the license revocation.

## II.    PLAINTIFFS' FACTS

### A.    Facts as to Plaintiff Derrick through and with his next friend and mother Tina

84.    Derrick was a student at Glen Mills from March 2018 to March 2019.

85.    Derrick is diagnosed with Attention-Deficit, Hyperactivity Disorder ("ADHD") and is currently eligible for an Individualized Education Program ("IEP") under the disability categories of Emotional Disturbance and Other Health Impairment.

86.    Derrick is a "child with a disability" under the IDEA and an "individual with a disability" under Section 504. 20 U.S.C. § 1401(3); 22 Pa. Code § 14-101; 29 U.S.C. § 794(a); 34 C.F.R. § 104.3(j).

87.    During the 2017-2018 school year, Derrick was a student in the Pocono Mountain School District and attended Colonial Academy. Due to the severity of his disabilities, Derrick received specialized instruction, weekly individual counseling, and daily group counseling as a related service in addition to specially designed instruction.

88.    On or about September 2017, Derrick was adjudicated delinquent and placed on probation for one year. In March 2018, Derrick was placed at Glen Mills for violating his probation.

89.     At a March 2018 adjudicatory hearing, the juvenile court judge rejected Derrick's counsel's proposal that would have allowed Derrick to remain at home, and instead placed him at Glen Mills for the purpose of obtaining diagnosis and treatment for his behavior issues.

90.     When Derrick first entered Glen Mills, he did not access any education until his third week because no one explained to him how to access the computer-based credit recovery program. Despite Derrick's need for specialized educational services detailed in his IEP, Glen Mills required Derrick to participate in a computer-based credit recovery program, which was not differentiated and did not accommodate for his disabilities. In addition, Derrick received live reading assistance for only one hour each week, the same and sole intervention offered to other students with disabilities.

91.     When he participated in the computer-based credit recovery program, Derrick did not receive instruction or other support from a teacher. Derrick felt he could not learn on the computer. He failed many tests and did not meet the program expectations. It took Derrick nine months to complete his first quarter in the computer program.

92.     At least four times, Derrick's laptop was broken and he was not provided a substitute laptop. During this time, he could not access any education for

multiple days at a time. When Derrick's parents asked staff about the broken laptop, staff suggested that they could donate a laptop to the program.

93.    In June, after Derrick had been at Glen Mills for more than three months, Glen Mills' Special Education Director, Rema Pikes, contacted Tina by phone to convene an IEP meeting. Ms. Pikes reported that another Glen Mills staff member also was in the room, but that staff person did not identify herself. There was no representative from the CCIU or any other person present. During the phone call, they did not discuss Derrick's need for specially designed instruction, Glen Mills' reading remediation, or its use of restraints.

94.    Over one week later, Tina received Derrick's revised IEP from Glen Mills which did not reflect concerns she had raised on the prior phone call and did not include any modifications for the computer-based program. In fact, the IEP did not even mention that Derrick would receive instruction through the computer-based program. She was surprised to see that it included an IEP created over two years earlier that was no longer valid. She was also shocked and upset to read a document attached to the IEP about Glen Mills' behavior interventions that detailed the use of physical restraints. She did not agree with the use of physical restraints with Derrick.

95.    The IEP did not include an LEA representative or a signature from someone from the CCIU.

96.    The Glen Mills IEP drastically cut vital educational services that had been previously necessary for Derrick's appropriate education, including counseling, academic instruction, social-emotional instruction, and behavioral interventions. None of this had been discussed on the call with Glen Mills. The IEP lists annual goals in math reasoning, algebraic equations, reading comprehension, writing, and behavior.

97.    Derrick's Glen Mills IEP states, "He will participate fully in the regular classroom with a highly structured learning environment."

98.    Although the IEP noted that Derrick required a positive behavior support plan, it only included a "School-Wide Behavior Support Plan" that was not individualized to Derrick and developed as a result of a functional behavior assessment. This plan details the use of physical restraint by Glen Mills.

99.    Despite the fact that Tina visited her son weekly, no valid IEP meeting was ever convened and his academic and behavioral issues remained unaddressed.

100.   After the unilateral creation of the IEP at Glen Mills, Derrick did not receive the services, including the goals, detailed in the IEP plan. Derrick did not receive any individualized counseling. In addition, Glen Mills did not make any modifications to the on-line credit recovery program.

101.   Tina did not receive specific progress monitoring regarding his IEP goals. The progress reports that they did receive simply stated, "not making progress" or "making steady progress."

102.   Neither Ms. Pikes nor any other staff member or member of the CCIU contacted Tina to schedule an IEP meeting again while Derrick was placed at Glen Mills. Tina never received any contact of any nature from the CCIU.

103.   In July 2018, Andre Walker requested to meet with Tina. He showed her Derrick's grades and told her that Derrick would not be able to leave Glen Mills with the grades that he had.

104.   At no time while Derrick attended Glen Mills did the school or CCIU develop an individualized Positive Behavior Support Plan, despite Derrick's long history of requiring this support and his frequent behavior incidents involving staff and other youth at his previous schools.

105.   For months at a time Glen Mills designated Derrick as a student on Concern status and did not allow him to attend vocational programming or the special education resource room.

106.   After more than nine months at Glen Mills, a staff member removed Derrick from the computer-based credit recovery program and provided him with packets of worksheets to complete his coursework. She told him, "This will be better

for you." Derrick did not receive any instruction and was responsible to work independently through the packets.

107.   Derrick did not receive all the courses and hours of instruction required by state law.

108.   Derrick was also physically abused by staff and other students throughout his time at Glen Mills.

109.   Derrick was originally placed in Jefferson Fillmore Hall ("Jefferson" or "Fillmore"). During the two months that Derrick lived in Fillmore, he was punched by unit staff (John Doe 7) on three different occasions, including an incident when he was pulled out of bed and punched in the middle of the night.

110.   One night, Derrick was punched in the middle of the night while asleep in Fillmore. He then realized there were more than a dozen other boys in the room. The boys were beating up his roommate, who was screaming for help. Derrick tried to help his roommate, but eventually was forced to run out of the room and the building to get away from the abuse. When staff found Derrick, he received a charge for attempting to run away.

111.   Staff never came to protect Derrick and his roommate while they were in the unit being physically assaulted by other youth, even though his roommate was screaming so loudly everyone in the unit was able to hear they needed help.

112.    Derrick was next transferred to Jackson Hall ("Jackson"), where the physical abuse continued. For example, a Jackson staff member named Andre Walker head butted Derrick five times because Derrick did not "shut up" when asked.

113.    Derrick also faced physical abuse outside of his units. For example, one day in the cafeteria, he was tightly restrained by four staff members (John Does 8-11) who forcefully held him down on a chair, simply because Derrick had refused to tie his shoes. One staff member was pushing painfully on his leg, while another staffer threatened to pull the chair out from under him.

114.    Derrick was even assaulted in the classroom. After breaking up a fight between Derrick and another youth, a staff member (John Doe 12) grabbed Derrick and slammed him on a desk, pushed the desk over, and dragged Derrick across the floor. The staff member hit Derrick's mouth with his knees. Afterwards, Derrick experienced back pain from the assault.

115.    Following this incident, Rema Pikes contacted Tina to notify her that Derrick was "restrained" in school by a staff member. Ms. Pikes requested that Tina waive an IEP meeting to discuss the restraint. Tina did not agree with the waiver and requested that the IEP meeting be scheduled so that she could attend. Ms. Pikes stated that they would consider their phone call the meeting. Tina did not receive any contact from the CCIU.

116.    Despite the number of assaults and injuries Derrick suffered he has rarely been seen by medical staff at Glen Mills. Despite their repeated requests, Derrick's parents have been denied Derrick's medical records from Glen Mills.

117.    Derrick witnessed over 200 fights among other youth while he was at Glen Mills. While Derrick was housed in Hayes, he heard that a group in his hall of kids assaulted another youth by tying him up and hitting him with a belt. Staff did not protect youth during these fights. Upon information and belief, Hayes was later closed due to the excessive fights between youth.

118.    When Derrick was at Glen Mills, he did not want to speak out about the abuse he experienced and witnessed. Derrick received threats from Glen Mills staff about not speaking out. He was informed that speaking out and discussing injuries were the reason he remained in Glen Mills. Various staff members approached his parents warning them not to speak out. His parents were also told that their inquiries about Derrick's treatment were the sole cause for Derrick remaining at Glen Mills.

119.    The above repeated threats to Derrick and his family caused him to fear utilizing the Glen Mills grievance procedure. Derrick was too afraid to request medical attention or inform staff of the physical abuse he endured.

120.    During Derrick's placement at Glen Mills, Tina witnessed a significant personality and demeanor change in Derrick. Tina witnessed Derrick become

reserved and quiet, secretive, and disengaged. Tina witnessed bruising and suspicious injuries on Derrick.

121.    After the Feb. 2019 *Inquirer* article detailed abuses at Glen Mills (Exhibit B), Derrick was told by staff to "stop talking." The counselor informed him that his father was causing problems too.

122.    After the Feb. 2019 *Inquirer* article's publication, Glen Mills staff listened in on Derrick's personal calls. Additionally, Derrick's parents were always required to have a Glen Mills counselor present in the room while visiting. Counselors stood within hearing distance and stared at Derrick during the visitations.

123.    As Derrick thinks back to his Glen Mills experience, he is very upset about all the abuse he and his peers suffered. He wishes he could have done more to protect his Glen Mills peers from the abuses.

**B.    Facts as to Plaintiff Walter through and with his next friend and mother Janeva**

124.    Walter is a "child with a disability" under the IDEA, an "individual with a disability" under Section 504 and the ADA, and a "protected handicapped student" under Chapter 15 of the Pennsylvania School Code. 20 U.S.C. § 1401(3); 22 Pa. Code § 14-101; 29 U.S.C. § 794(a); 34 C.F.R. § 104.3(j); 42 U.S.C. § 12102(1). He is eligible to receive special education and related services through an IEP under the disability category of Other Health Impaired.

125.   During the 2017-2018 school year, Walter attended a private school for students with disabilities due to the significant impact of his disability on his education. After years of struggling in school, Walter was making progress with full-time special education instruction and counseling as a related service due to his emotional dis-regulation and behavior.

126.   In March 2018, Walter was sent to Glen Mills School and assigned to Jefferson. He was sixteen years old.

127.   Walter's mother, Janeva, was never consulted at all about the education provided to Walter at Glen Mills.

128.   Despite the required services in Walter's IEP, the only education initially offered him was a limited computer-based credit recovery program that failed to differentiate instruction or accommodate his disabilities and included no live instruction. Walter told Glen Mills staff that he could not learn in this matter and refused to participate in the computer-based program.

129.   Walter was disciplined and placed on Concern status for articulating his education needs and refusing to participate in the computer program. Glen Mills failed to provide any educational intervention or alternative instruction for Walter. Instead, Glen Mills staff let him sit without any education services for two months.

130.   When Walter was on Concern, he was not allowed to leave his unit to access the special education resource room or vocational programming. During his

time at Glen Mills, Walter was enrolled in Culinary Arts, Automotive Technology, and Automotive Body. He frequently was not allowed to participate in these programs because of discipline.

131.   After two months in the violent environment at Glen Mills, on or around April 26, 2018, Walter took a metal pin from a weight machine to use for self-defense. When Sean (Sean Doe), a unit staff member, found the metal pin on the unit, he violently assaulted Walter. Sean hit Walter with the metal pin and slapped him. Sean threw Walter against the refrigerator in Jefferson so hard that the refrigerator was dented from impact with Walter's head. Other staff and youth were present and watched this assault. Walter was provided no medical attention following the assault—no concussion check and no medication for pain.

132.   Following the incident where Walter's head was slammed into a refrigerator, the staff ordered all of the youth on the unit to line up. Chris (Chris Doe 1), a unit staff member, grabbed Walter by the throat, squeezed his Adam's apple and choked him. Walter could not breathe and thought he was going to die.

133.   On May 3, 2018, terrified and desperate to escape from the violence at Glen Mills, Walter and another youth attempted to run away from the campus. Staff pursued the youth. Staff supervisor Robert Taylor chased Walter and dragged him through thorn bushes which resulted in a long laceration on his lower back. Walter received no medical attention for his injury and now carries a long scar.

134.   When Walter was brought back to Jefferson, staff supervisor Robert Taylor violently assaulted Walter while two other staff supervisors stood by and watched, threatening Walter not to fight back. Walter was provided no medical attention for his injuries.

135.   Walter received an additional delinquency charge for this incident.

136.   On or around May 4, 2018, Walter was transferred to Hayes. Walter remained on Concern. When Walter was on Concern, he was not able to participate in his vocational program.

137.   Walter resisted participating in the "Battling Bulls" requirement to "confront" other youth because he knew it could and did often lead to fights between youth.

138.   After the severe abuse he suffered on and around May 3, 2018, Walter committed himself to "staying out of the way" of certain staff that were most violent because Walter wasn't trying to "commit suicide" by "getting in their way." He tried to stay off his unit—and away from the counselors—as much as possible by working in the cafeteria. Upon information and belief, youth were not appropriately paid for their work on the Glen Mills campus.

139.   But it was not possible to avoid witnessing the many physical restraints. Walter witnessed more than 30 P.R.s against other youth that included staff slapping, punching, choking, and otherwise harming other youth. In one instance,

Walter witnessed a staff member stomp with his foot on a youth's jaw with such force that it resulted in a large, swollen hematoma.

140.   In another instance, Walter witnessed a staff member take a youth into a closet after an altercation. He heard the youth screaming in the closet and then he came out limping. Other assaults included staff punching youth in the face.

141.   Once on the Hayes unit, Walter, then age 16, began a GED program because he was told that it was the only alternative to the computer-based credit recovery program. Glen Mills did not obtain Janeva's consent for him to participate in the GED program.

142.   In the GED program, Walter worked out of GED workbooks that were not differentiated and did not accommodate for his disabilities. Some of the workbooks were several years old. He received no live instruction from teachers. Walter did not receive instruction in accordance with the goals in his IEP.

143.   Walter did not receive all the courses and hours of instruction required by state law either through the computer-based credit recovery program or the GED program.

144.   On or around May 3, 2018, three months after his arrival at the placement, Glen Mills convened an IEP meeting to draft Walter's IEP. Walter's mother, Janeva was not invited to participate in the meeting by phone and did not receive a copy of the unilaterally-created IEP. The CCIU did not contact her. She

was not aware that they had revised her son's IEP until she received a progress report dated July 18, 2018. For each of the goals, Walter's progress was described as "Making steady progress."

145.   In November 2018, Walter completed his "independent study" with GED workbooks. Glen Mills provided no education services—neither GED classes nor classes for course credit—from November 2018 through March 2019.

146.   Glen Mills either administered Walter the GED exam contrary to state law, as Walter was then 17 years old and continuously enrolled in school with no court order directing that he take the GED, or Glen Mills misled Walter into thinking he was taking the GED exam on three occasions but provided only a practice GED exam. *See* 22 Pa. Code § 4.72(b). Walter has not passed the exam and does not have a GED.

147.   During the time he was at the institution, Walter never received individual counseling in accordance with the IEP developed by Glen Mills.

148.   At no time while Walter attended Glen Mills did the CCIU conduct a functional behavior assessment and develop a Positive Behavior Support Plan despite his long history of requiring this support and having had multiple behavior incidents involving staff and other youth.

149.   On November 13, 2018, Walter woke up to find his roommate on top of him with his hands around his throat. He fought back against his roommate in

self-defense. Staff did not protect Walter from this attack and were not aware that it occurred until the boys left their room for help.

150.   The following day, Glen Mills revoked Walter's home pass for Thanksgiving due to the incident and he remained on Concern. In addition, Walter was moved to McKinley Hall ("McKinley").

151.   A Glen Mills Counselor called Janeva to report the incident the next day and explained that Walter was not the instigator. He said that Walter would go to the doctor later due to his injuries. The following day, a Glen Mills Counselor contacted her to tell her that Walter lost his home pass for Thanksgiving due to the incident. Later, Walter's home pass was restored and Janeva is not aware of the reason for the change.

152.   Janeva witnessed a significant personality and demeanor change in Walter during his time at Glen Mills. Janeva witnessed Walter become reserved and quiet, secretive, and disengaged. Janeva witnessed Walter's manifestations of trauma. For example, on a home visit Walter refused to leave Janeva's bed. Janeva witnessed Walter's psychological breakdown when he refused to go back to Glen Mills and feared for his family's safety should Glen Mills staff ever find out where he lived.

153.   Walter was discharged from Glen Mills in March 2019 when Philadelphia removed all of their youth from Glen Mills, and transferred by the court

to another residential institution for adjudicated youth in Pennsylvania where he currently remains. Walter left Glen Mills with no GED and no certainty if he will have any transferable credits for his full year of effort while he was placed at Glen Mills.

### C.   Facts as to Thomas through his next friend and mother Michelle

154.   Thomas was a student at Glen Mills from May 2018 to March 2019.

155.   Thomas was placed at Glen Mills on May 8, 2018 after an adjudication of delinquency in Philadelphia. He was fifteen years old.

156.   When he arrived at Glen Mills, Thomas was placed in Van Buren Hall ("Van Buren"). As a youth on Van Buren, Thomas was expected to participate in a computer-based credit recovery program on the unit. Youth remain inside Van Buren to complete the program. The unit staff, or "Counselors," are the only staff available when youth participate in the credit recovery program. On information and belief, none or almost none of the staff are licensed teachers.

157.   Thomas told Glen Mills staff that he could not learn on a computer-based program. He had previous experience with online learning and did not believe that he could meet the objectives of the course using a computer-based program. He was not given any other option for his learning.

158.   Michelle contacted Glen Mills to notify them that Thomas would not be successful with a computer-based program. The staff member with whom she spoke told her that there was a teacher to assist with the computer-based program.

159.   Michelle also requested that Glen Mills provide Thomas with an IEP. She was told that all students are evaluated when they arrive at Glen Mills. She believed that this evaluation was for an IEP.

160.   Approximately one month after Thomas entered Glen Mills, Michelle received his Individual Service Plan. She believed this was an IEP.

161.   Thomas found the computer-based credit recovery system very difficult. The tutorials consisted of reading passages that often did not align with the summative assessments. Thomas failed many of the tests.

162.   The unit staff did not help Thomas learn the credit recovery material. When asked for assistance, unit staff would provide answers for the tests. Thomas understood that staff changed his test grades so that it appeared that he passed. Thomas did not believe that he was learning while he completed the credit recovery program.

163.   Although Thomas was in his ninth-grade year when he entered Glen Mills, he was given eleventh grade work at Glen Mills. Thomas does not know why that grade level assignment was made.

164.   Michelle received reports of Thomas's grades while he was at Glen Mills. The reports indicated that he was passing his classes with As, Bs, and Cs. When Thomas was discharged from Glen Mills, she was surprised to learn that his grades were lower and that he received two Fs instead of the grades reported earlier.

165.   In nine months at Glen Mills, Thomas accumulated 6.5 credits. This placed him behind his peers.

166.   Throughout his time at Glen Mills, Thomas did not receive all the courses and hours of instruction required by state law.

167.   Thomas was on Concern for his first month on Van Buren. While on Concern, Thomas was not allowed to participate in a Career Technical Education ("CTE") program. Thomas selected Print for his CTE program, which consisted of printing business cards and worksheets. While on Concern he was not able to leave Van Buren.

168.   Thomas achieved his "status" while on Van Buren. He was no longer designated as a Concern student and had moved up the Glen Mills Battling Bulls hierarchy. In order to achieve his Battling Bulls "status," he was given a "Confront" task to ensure that other youth on the unit were not loud. He was instructed to "confront" youth and tell them to be quiet on the unit when they were loud.

169.   Thomas witnessed physical abuse by staff while he was at Glen Mills.

170.   On Van Buren, staff would instigate fights with youth by swearing at them. Staff members would also slap, hit, or punch youth. Thomas witnessed that this physical abuse was provoked by staff.

171.   Thomas witnessed physical abuse during Townhouse.

172.   Thomas was physically abused by staff during Townhouse when he was at Glen Mills.

173.   In October 2018, Thomas was getting a snack during Townhouse. Thomas bumped into a staff member, Chris (Chris Doe 2), who then responded by hitting him in the eye. Thomas hit back in self-defense and Chris jumped on top of him and hit him a second time.

174.   As a result of Chris' physical assault, Thomas had a black eye. He did not receive medical attention for his injuries until the following day.

175.   As a result of the incident, Thomas received another delinquency charge, he was placed on Concern, and he lost his opportunity for a home pass.

176.   Thomas was transferred to Tyler Hall ("Tyler") after the incident. On information and belief, Chris remained a staff member on Van Buren.

177.   As with Van Buren, Thomas observed physical abuse from staff in Tyler.

178.   While in Tyler, Thomas continued to work on the credit recovery program on the unit. The students in Tyler do attend a classroom, but the unit staff

is the only staff available when the students complete the credit recovery program. On information and belief, none or almost none of the unit staff are licensed teachers.

179.    Thomas was not able to earn a home pass until December.

180.    While Thomas was at Glen Mills, Michelle suspected that Thomas was in danger. Michelle frequently attempted to contact the staff at Glen Mills due to her worries about Thomas. She found that it was extremely difficult to speak with anyone. When she spoke with Thomas, she could tell that there was someone listening to their call. After one visit at the end of August, she received a note written by Thomas requesting her to "call up here every day" and to "start coming up there once a week." She was worried that Thomas was not safe.

181.    On March 5, 2019, Thomas was discharged from Glen Mills.

182.    Michelle observed that Thomas's behavior had changed since he entered Glen Mills. Thomas was fearful and watchful of his surroundings. He was reserved.

**D.    Facts as to Plaintiff Sean through his next friend and grandmother Andrea**

183.    Sean was a student at Glen Mills from February 2019 to March 2019.

184.    Sean was placed at Glen Mills on February 7, 2019 after an adjudication of delinquency in Luzerne County. He was sixteen years old.

185.    When he arrived at Glen Mills, Sean was placed in Jackson. Although youth on Jackson participated in a computer-based credit recovery program on the

unit, Sean was never provided with a computer. Without any computer to access the credit recovery program, Sean would sleep while the other students were completing the online modules. The unit staff would discipline Sean for sleeping.

186.   Eventually, the unit staff provided him with worksheets and told him, "You don't have to do any of this." Sean did not access any education for the month he was placed at Glen Mills.

187.   During the month, Sean was on Concern status and was not able to leave the unit. As a result, he was not able to access any vocational programming.

188.   Sean did not receive all the courses and hours of instruction required by state law.

189.   On Jackson, Sean witnessed daily verbal abuse of youth. Staff members would threaten to commit P.R.s on youth in Jackson as a means of control for talking back, talking when they were not supposed to, and general low-level misbehavior. Threats of P.R. meant that youth would be hit if they did not stop misbehaving.

190.    Sean was trusted as a "buddy" to escort youth from programs to programs. On one occasion a staffer asked Sean, and another youth, to escort a third youth the staffer was holding. When the third youth insisted that he would not go with Sean and his partner, the staff told the third youth, "You better go with them or I will fuck you up."

191.    During his entire stay at Glen Mills, Sean witnessed verbal abuse of youth daily. He also witnessed the daily degradation of staffers insulting, intimidating, or commenting on youth's families. There was no repercussion to staff or youth for this humiliating and damaging treatment.

192.    Sean also witnessed physical abuse from Glen Mills staff. One night, Sean woke up to the noise of slamming. When Sean looked around the corner to investigate he witnessed a staff slamming a youth against a wall.

193.    Sean's most frightening experience at Glen Mills occurred when he was assaulted by another youth while he was making a peanut butter and jelly sandwich. The youth punched Sean in the face three times. As a result of the assault, Sean's orthodontic braces bent, his tooth chipped, and his forehead and mouth bled.

194.    Sean was taken by staff who cleaned his forehead and gave him a Band-Aid. Sean was removed from Jackson and placed into Tyler that night. John Does 13-20 failed to provide Sean any pain medication or additional medical attention the day of the assault.

195.    That Tuesday, Sean's face and jaw had swollen. In response he was taken to a dentist at Glen Mills. The dentist at Glen Mills gave Sean an X-Ray. Because of the swelling, Sean was given one dosage of ibuprofen for pain. His swelling did not decrease, and he was not given subsequent pain or swelling reducing medication.

196.    On Wednesday and Thursday, Sean's face and jaw remained swollen. Sean remained in excruciating pain. He could not talk, eat, or otherwise move his jaw. John Does 13-20 did not give him any subsequent pain or swelling reducing medication.

197.    On that Friday, four days after the physical assault, Sean was taken to an outside dentist who confirmed that he had a broken jaw. This required Sean's jaw to be wired shut. Sean's jaw would remain wired shut during the remainder of his stay at Glen Mills. Sean still has his jaw wired and it is retightened occasionally to aid recovery of the fracture.

198.    Sean was not allowed, nor capable, of consuming solid food with a broken jaw. At no time did John Does 13-20 attempt to provide Sean a nutritional alternative or provide him a balanced drinkable diet. Instead, Sean was required to drink multiple milks during breakfast, lunch, and dinner to gain any form of caloric and nutritional value. On occasion, Glen Mills staff would allow Sean to substitute Gatorade for milk. The only way Sean was provided nutritional value was through two staff members who risked employment by sneaking in yogurt and applesauce to him.

199.    After the Feb. 2019 *Inquirer* article was published, several staff members informed youth, including Sean, that they were not to speak about Glen

Mills. Specifically, Sean was told if anyone asked him questions or investigated to "don't say anything and be quiet."

200.   During his time at Glen Mills, Sean witnessed roughly 20 youth-on-youth fights. Sean also witnessed roughly five to eight staff-on-youth assaults. At Glen Mills, Sean was afraid and vigilant of other staff and youth and felt he could trust only two staff members in the entire institution.

## III.   PA-DHS FAILED TO ENSURE THE SAFETY OF CHILDREN AT GLEN MILLS

201.   PA-DHS has a duty to ensure the health, safety, and well-being of children in the child welfare and juvenile justice systems.

202.   The juvenile justice system in Pennsylvania and throughout the United States was founded on the recognition that youth who commit delinquent acts are fundamentally different from adults who commit crimes. Youth are less culpable, more vulnerable, and more susceptible to treatment and rehabilitation. The juvenile justice system is therefore designed to provide for the care, supervision and rehabilitation of youth committing delinquent acts. *See, e.g.*, *In re MD.*, 839 A.2d 1116, 1120 (Pa. Super. Ct. 2003).

203.   The Pennsylvania Juvenile Act thus aims "[t]o provide for the care, protection, safety and wholesome mental and physical development of children coming within the provisions of [the Act]." 42 Pa. Cons. Stat. Ann. § 6301(b)(1.1). The Act endeavors to achieve its purposes "in a family environment whenever

possible, separating the child from parents only when necessary for his welfare, safety or health or in the interests of public safety." *Id*. at 6301(b)(3). For youth adjudicated delinquent, the Act is designed to provide "... programs of supervision, care and rehabilitation..." that facilitate "...the development of competencies to enable children to become responsible and productive members of the community." *Id*. at 6301(b)(2). Courts in Pennsylvania have recognized that, while principles and policies underlying the juvenile justice system may have evolved since its creation, "particular importance is still placed upon rehabilitating and protecting society's youth." *In re J.F.*, 714 A.2d 467, 471 (Pa. Super. Ct. 1998); 42 Pa. Cons. Stat. Ann. § 6301(b)(3).

204.    In Pennsylvania, PA-DHS plays a significant role in the protection, rehabilitation, and treatment of young people in the juvenile justice system by licensing child residential facilities.

205.    Pennsylvania courts may only commit delinquent children to such child residential facilities that are approved by PA-DHS. *See* 42 Pa. Cons. Stat. Ann. § 6352(a)(3).[6] PA-DHS approves facilities through a licensing process that is supposed to ensure they meet the minimum standards that are set forth in Chapter 3800 of the Pennsylvania Administrative Code. Each facility must be individually

---

[6] The statute refers to the Department of Public Welfare, which has been redesignated as PA-DHS. *See* 62 P.S. § 103; 62 Pa. Cons. Stat. Ann. § 103 n.2.

inspected at least once per year, and PA-DHS issues a certificate for compliance for each physical structure within a facility that qualifies for a certificate. 55 Pa. Code § 3800.4. PA-DHS's issuance of the certificate of compliance to a facility indicates that the facility follows all applicable statutes, ordinances, and regulations. 55 Pa. Code § 20.53. PA-DHS has the authority to conduct additional announced and unannounced inspections including inspections in response to complaints. 55 Pa. Code § 20.33. If during inspections, PA-DHS finds evidence of "gross incompetence, negligence, misconduct in operating the facility or agency, or mistreatment or abuse of clients, likely to constitute an immediate and serious danger to the life or health of the clients," PA-DHS must take immediate action to remove the clients from the facility. 55 Pa. Code § 20.37.

206.    For other concerns regarding noncompliance with licensure or approval regulations, facilities must submit a written plan to correct the noncompliance items along with a period of time to correct the items. 55 Pa. Code § 20.52. PA-DHS may also deny, refuse to renew, or revoke a certificate of compliance for failure to comply with applicable regulations, failure to submit or comply with an acceptable plan to correct noncompliance of items, mistreatment or abuse of clients, gross incompetence, negligence or misconduct in operating the facility, and fraud and deceit in regards to obtaining or using their certificate of compliance. 55 Pa. Code § 20.71(a).

207. The minimum licensing requirements in Chapter 3800 of the Pennsylvania Administrative Code set forth numerous rights that young people in child residential facilities have. Children in facilities have the right to "rehabilitation and treatment." 55 Pa. Code § 3800.32(l). Children must be treated with "fairness, dignity and respect." 55 Pa. Code § 3800.32(c). They have the right to "appropriate medical, behavioral health and dental treatment." 55 Pa. Code § 3800.32(k). They have a right not to be "abused, mistreated, threatened, harassed or subject to corporal punishment," or subject to "unusual or extreme methods of discipline which may cause psychological or physical harm to the child. 55 Pa. Code § 3800.32(b), (n). Even in instances when physical "restraints" against children are permitted, Chapter 3800 articulates clear guidelines over when and how such restraints may be employed, and the training requirements for staff authorized to restrain young people. *See* 55 Pa. Code §§ 3800.202-205, 211-211a. Any suspected child abuse must be immediately reported, and allegations of child abuse involving facility staff requires the facility to submit and implement a supervision plan. 55 Pa. Code § 3800.15. Upon admission to a child residential facility, children and their parents must be informed of the child's rights, and their right to lodge grievances without fear of retaliation. 55 Pa. Code § 3800.31. Facilities may not deprive children of specific or civil rights or use their rights as an award or sanction. 55 Pa. Code § 3800.33.

208.    For years, PA-DHS Defendants knew about the routine violence against youth at Glen Mills facilities yet failed to take any meaningful action to curtail it and protect the hundreds of youth placed there. DHS continued to license the Glen Mills facilities despite their noncompliance with numerous 3800 regulations, did not issue an emergency removal order until March 2019, and did not revoke its licenses until April 2019.

209.    Since 2012, PA-DHS was aware that the United States Department of Justice was investigating Glen Mills for alleged violations of federal civil rights laws.

210.    Between the period March 10, 2014 to January 12, 2017 there were 21 total documented incidents of abuse at Glen Mills, including youth on youth abuse (3) and staff on youth abuse (18). This equates to a documented incident of abuse every other month. Upon information and belief, substantially more incidents of abuse have been recorded.

211.    In the same period, there were also fifteen documented incidents of "administrative irregularities," which included improper take down trainings, incomplete documentation of incident reports, delayed reporting or not reporting staff on youth abuses, and improper staff to youth ratios which by Pennsylvania law are required to be 1 staff to 8 youth.

212.    Staff on youth abuses accounted for the majority of documented abuse incident reports at Glen Mills. Staff on youth abuse included staff punching, choking, slapping, throwing, and improperly restraining youth. These reports also include verbal harassments which includes instances in which a staff "calls out" a youth, insults a youth, or makes derogatory remarks about a youth or their family. The following incident reports[7] are examples of the violent culture youth at Glen Mills had to endure at the hands of staff.

a.    June 4, 2014 (Jefferson): Staff A told Youth 1 and peers to return to their seats. Youth 1 became disrespectful. Staff A then slapped Youth 1 in the face after Youth 1 was disrespectful. Staff B attempted to remove Youth 1. Youth 1 resisted. Youth 1 was grabbed, pushed, and had head slammed into counter top twice. Violation Report of Jun. 4, 2014 Incident (Exhibit C at C1-3).

b.    September 30, 2014 (Jefferson): Staff A confronted Youth 1 about a comment Staff A assumed Youth 1 made. Youth 1 denied making the comment. Staff A approached Youth 1, grabbed Youth 1's head and face. Staff A pushed Youth 1's head which then hit a fire extinguisher resulting in an injury to Youth 1's head. Violation Report of Sept. 30, 2014 Incident (Exhibit C at C4-6).

---

[7] Attached hereto as Exhibit C.

c.  September 17, 2015 (Jefferson): Staff A restrained Youth 1 by grabbing Youth 1 by the shoulder. Staff A slammed body and head of Youth 1 against a wall. Youth 1 suffered lacerations on right eye, requiring five sutures at external hospital. Violation Report of Sept. 17, 2015 Incident (Exhibit C at C7-9).

d.  March 23, 2016 (McKinley): Staff A told Youth 1 that Youth 1 began to struggle with their behavior. Youth 1 responded by saying "I didn't start to struggle with my behavior I did struggle." Staff A then grabbed Youth 1 by the neck and pushed Youth 1 against a closet door resulting in the closet door breaking. Staff A was instructed to go downstairs to separate Youth 1 and Staff A. Violation Report of Mar. 23, 2016 Incident (Exhibit C at C10-13).

e.  July 26, 2016 (Madison Hall): Youth restrained by Staff by the neck. Nurse reported that there were red marks on the Youth's neck. Violation Report of Jul. 26, 2016 Incident (Exhibit C at C14-16).

f.  December 5, 2016 (Jefferson): Youth 1 was assaulted on two separate occasions resulting in a mild concussion, laceration on eye, and bruised ribs. Youth 1 told Staff A that Youth 1 was afraid of being jumped. Staff A told youth 1 to stop being childish. Staff A admitted that Staff A did not protect Youth 1. Investigation found that Staff B

questioned Youth 2 and did not like Youth 2's response to questions. Staff B put Youth 2 "through a chair." Youth 1 was assaulted by peers at 2:30 P.M. Youth 1 suffered lacerations to eyes. Lacerations to Youth 1's eyes were not treated until 7 P.M. Report notes that Youth 1 continuously bled throughout the day. Youth 1 was sent to the emergency room "a few days later." Youth 1 was diagnosed with a mild concussion, lacerations needing stitches, and an injury to the right hand. Violation Report of Dec. 5, 2016 Incident (Exhibit C at C17-22).

213.    After each staff on youth abuse, an incident report is filed and a Plan of Correction ("P.O.C.") is implemented to "correct the violations…and prevent a similar violation from occurring again." (P.O.C. language). A review of 18 staff abuse incident reports for the years 2014-2017 reveals boiler plate language for all of the P.O.C.'s. The language, exemplified in incidents (a)-(f), does not address the specific severity or address the culture of violence at Glen Mills. Instead the language is often lifted or copied and pasted with general language applicable to all incidents. The P.O.C. does not include concrete actions that would demonstrate a change in behavior that would guard against the recurrence of the violations cited.

214.    For example, in instances involving staff on youth abuse, Glen Mills states in their P.O.C. that they "understand the importance of Pa Code Title 55

3800.32(b) and will not support abuse, mistreatment, threats, harassment, or corporal punishment of a child." No steps are outlined that show how abuse, mistreatment or corporal punishment will be eliminated.

215.   Despite the continuing and prevalent staff on youth violence Glen Mills continued to implement the same strategies to remedy similar issues. Those remedies included terminating the staff member, addressing all staff in a weekly team meeting, and scheduling training with "lead trainers" to perform Behavior Intervention refresher courses.

216.   Continued reports of abuse after these measures demonstrated that these remedies did not work. For example, Jefferson accounted for roughly 27.7% (5) staff on youth physical abuse incidents. After each incident the same remedies were utilized: termination of staff, addressing all staff in a weekly meeting, and scheduling refreshers courses. It should have been clear to PA-DHS and Glen Mills officials that the P.O.C. was not working at Jefferson and Glen Mills generally given repeated instances of staff on youth physical abuse.

217.   Based on the repeated reports of abuse following identical steps for corrective action it was clear to PA-DHS and Glen Mills that the proposed corrective actions were not effective. The fact that the P.O.C.'s were not working at Jefferson should have been particularly disturbing to PA-DHS and Glen Mills because Jefferson accounted for some of the most violent episodes of staff on youth violence.

218.   Several jurisdictions stopped sending youth to Glen Mills due to fears about the abusive treatment there. On or about October 2017, Montgomery County, Pennsylvania removed all its youth from Glen Mills.

219.   Chester and Delaware County, Pennsylvania closed intake—meaning they stopped sending any new youth to Glen Mills—on or about the summer of 2018.

220.   In addition, there were serious incidents of abuse reported in public newspapers in the relevant time period. For example, in August 2018, the *Philadelphia Inquirer* reported that a counselor picked up a youth "by the neck of his sweater, lifted him clear over the back of the couch, and slammed his body onto the floor. Two other counselors held the boy's legs down while Medina choked him with his sweater and punched him in the chin." The boy repeatedly said, "I can't breathe" while this was happening.[8]

221.   On or about August 2018, Philadelphia's Department of Human Services closed intake to Glen Mills in response to this incident. In its corresponding January 2019 Plan of Correction for Glen Mills, Philadelphia Department of Human Services notes several findings: staff did not employ safe crisis management nor use appropriate de-escalation techniques; restraints were used inappropriately as a form of behavior management; staff failed to timely report the incident to authorities;

---

[8] Lisa Gartner, *"I Can't Breathe": Probe Underway at Glen Mills After Staffer Attacks Boy*, THE INQUIRER (Aug. 31, 2018), https://www.philly.com/philly/news/philadelphia-glen-mills-schools-juvenile-abuse-attack-20180831.html-2.

incident report submitted to DHS lacked sufficient detail and omitted portions of the incident; grievance process for students is insufficient and staff do not follow through on youth concerns; timely and robust coordination with medical treatment team was not provided to student; group living management allows a culture of intimidation by staff toward students; group living management allows a culture of intimidation by staff toward students; trauma informed focus on students is deficient; and discipline process for staff is in need of strengthening as punishment does not appear to be commensurate with offenses.

222.   There have also been several wrongful termination suits filed by former Glen Mills employees who claimed they were terminated for reporting child abuse and/or that black and white guards were held to a different standard when it came to reporting incidents to DHS.[9]

223.   In December 2018, Children's Rights, Inc. and Education Law Center-PA, counsel in this case, published a report entitled Unsafe and Uneducated: Indifference to Dangers in Pennsylvania's Residential Child Welfare Facilities,[10]

---

[9]*See, e.g.*, Mari A. Schaefer, *Ex-Glen Mills Staffer: Fired After Reporting Abuse*, THE INQUIRER (Feb. 10, 2014), https://www.philly.com/philly/news/breaking/20140211_Fired_Glen_Mills_staffer_sues_school. html; Noddy A. Fernandez, *Former Glen Mills Schools Employee Claims He Was Wrongfully Terminated*, PENNRECORD (Oct. 31, 2018), https://pennrecord.com/stories/511610647-former-glen-mills-schools-employee-claims-he-was-wrongfully-terminated.

[10] ELISSA GLUCKSMAN HYNE, CHRISTIAN WILSON REMLIN, & MAURA MCINERNEY, UNSAFE AND UNEDUCATED: INDIFFERENCE TO DANGERS IN PENNSYLVANIA'S RESIDENTIAL CHILD WELFARE FACILITIES (2018), https://www.childrensrights.org/wp-

which documented a long history of maltreatment at Glen Mills and other facilities in Pennsylvania and called on PA-DHS to improve its licensing, monitoring, and oversight of these facilities to ensure the safety and wellbeing of youth. Various news outlets brought attention to the report.[11]

224.   On February 11, 2000 Glen Mills staff and Leadership refused access to PA-DHS staff and state police to interview a youth privately regarding allegations of child abuse. The DHS official and state police were "physically obstructed" by the unit leader and several other Glen Mills staff. The youth was placed in the state police officer's vehicle for the youth's safety. In response, Glen Mills staff, including the Chief Executive Officer, began to aggressively and belligerently threaten the police officer and child. The youth was taken to state police barracks for their safety. Six to eight police personnel later arrived at the request of the responding officer to assist "in carrying out statutory duties."

225.   On March 16, 2000 the facility prevented PA-DHS staff and a state police officer access to five youth. Only after threatening to arrest staffers for obstruction did Glen Mills staff allow police to transport the youth off the facility's grounds. Additional investigation by DHS revealed youth routinely felt threatened

---

content/uploads/2018/12/2018_Pennsylvania-Residential-Facilities_Childrens-Rights_Education-Law-Center.pdf.

[11] *See, e.g.*, Caroline Preston, *New Report Underscores Education Problems in Institutions for Foster Youth: Advocacy Groups Call for Pennsylvania State Government to Step Up Oversight of Residential Facilities*, THE HECHINGER REPORT (Dec. 13, 2018), https://hechingerreport.org/new-report-underscores-education-problems-in-institutions-for-foster-youth/.

at Glen Mills. Eight youth reported they were "kicked, punched, chopped in the throat, slapped, pushed, or slammed into walls by 18 different Glen Mills staff from six different living units."

226.  In June 2018, OCYF staff "initiated a targeted site visit focused solely on conducting resident interviews in an effort to assess accusations that an underlying culture of abuse existed within the facility. This visit followed a series of anonymous written complaints alleging staff were mistreating and being aggressive with residents." *See* OCYF Removal Order (Exhibit A at A3).

227.  Despite the completion of a site visit, OCYF did not take any action at that time to protect youth at Glen Mills or ensure their adequate medical care and instead permitted them to remain in the hostile environment.

228.  On June 8, 2017, an OCYF representative concluded that Glen Mills staff failed to report child abuse that resulted in a child receiving a broken jaw. Yet, PA-DHS Defendants permitted Glen Mills to continue operating.

229.  On June 27, 2018, an OCYF representative confirmed that Glen Mills staff had given forced haircuts as punishment in violation of Pennsylvania regulations. Yet, PA-DHS Defendants permitted Glen Mills to continue operating.

230.  Between July 10, 2018 and September 12, 2018, an OCYF representative conducted a complaint investigation at Glen Mills' Johnson Hall and determined that a youth in care was physically abused by Glen Mills staff—the staff

member choked the youth even though there was no threat of the child injuring himself or others, that Defendant Ireson failed to ensure the safety and protection of youth placed at the facility, and that Glen Mills failed to provide or delayed providing medical treatment of the child's injuries sustained at the hands of Glen Mills staff. Yet, despite these grave findings, PA-DHS Defendants permitted Glen Mills to continue operating.

231.   Despite the numerous publicly-documented violations related to physical maltreatment of youth, and the direct knowledge of PA-DHS, PA-DHS did not revoke a single certificate of compliance for a Glen Mills facility or replace a certificate of compliance with a provisional certificate.

232.   PA-DHS Defendants knew that its policies and customs exposed youth at Glen Mills to serious physical, psychological, and emotional harm.

233.   Only after the Feb. 2019 *Inquirer* article ran did PA-DHS announce a formal investigation, which was eventually re-assigned to the State's Inspector General's Office. While the investigation was pending, additional jurisdictions in Michigan, Texas, California, and Pennsylvania removed, collectively, approximately 80 youth from the facility, but PA-DHS permitted Glen Mills to continue operating.

234.   Only on March 25, 2019 did Defendant Utz issue the OCYF Removal Order detailing extensive facts in support of its finding of "gross incompetence,

negligence and misconduct in operating a facility, including mistreatment and abuse of clients, likely to constitute immediate and serious danger to the life or health of the children in care," and requiring removal of all youth from Glen Mills. OCYF Removal Order (Exhibit A at A1).

235.    As a result of the abundant public documentation of abuse of youth at Glen Mills, PA-DHS Defendants knew, or recklessly disregarded, that its policies and customs exposed youth at Glen Mills to serious physical, psychological, and emotional harm.

## IV.    CHILDREN AT GLEN MILLS WERE DEPRIVED OF AN EDUCATION

236.    Youth in the juvenile justice system are among the most educationally at risk of all student populations.[12] Research indicates that nearly half are below grade level in reading and math.[13] Due to the barriers they face, many are unable to

---

[12] *See* THE SOUTHERN EDUCATION FOUNDATION, JUST LEARNING: THE IMPERATIVE TO TRANSFORM JUVENILE JUSTICE SYSTEMS INTO EFFECTIVE EDUCATIONAL SYSTEMS—A STUDY OF JUVENILE JUSTICE SCHOOLS IN THE SOUTH AND THE NATION 14 (2014) [hereinafter JUST LEARNING], https://www.southerneducation.org/wp-content/uploads/2019/02/Just-Learning-Final.pdf. *See also* SOPHIA HWANG ET AL., SUPPORTING THE NEEDS OF STUDENTS INVOLVED WITH THE CHILD WELFARE AND JUVENILE JUSTICE SYSTEM IN THE SCHOOL DISTRICT OF PHILADELPHIA, 5 (2014), http://policylab.chop.edu/sites/default/files/pdf/publications/PolicyLab_Report_Supporting_Stud ents_Involved_with_Child_Welfare_June_2014.pdf.

[13] JUST LEARNING, *supra*, at 14-17 (nearly 2/3 of juveniles entering state residential institutions were below grade level in math and reading and 44% entering local juvenile justice facilities were below grade level in math and reading); HWANG, *supra* note 10, at 13 (only 30% of students with a history of juvenile justice involvement were proficient in reading and math in 8th grade).

read and write at all.[14] Many have had to repeat a grade and struggle with school attendance.[15] It is estimated that two out of three students disengage from school entirely after exiting the juvenile justice system.[16] Ensuring that youth in the juvenile justice system receive a quality education, including the provision of special education services, is a clear imperative. Education closely correlates to long-term well-being, including employment, housing stability, income, and health as well as lower recidivism rates.[17]

237.    Youth at Glen Mills were subject to pervasive intimidation, physical abuse, and traumatizing violence—all of which directly undermined their ability to learn.[18]

238.    In addition, these youth were deprived of an appropriate education. While their same-age peers, including non-resident children in other residential placements for court-placed youth, attend public schools that must meet rigorous state education standards in accordance with a specific curriculum and receive actual instruction to earn credits towards a high school diploma, youth publicly placed at

---

[14] MINDEE O'CUMMINGS ET AL., NDTAC ISSUE BRIEF: THE IMPORTANCE OF LITERACY FOR YOUTH INVOLVED IN THE JUVENILE JUSTICE SYSTEM 1 (2010).
[15] *Id.*
[16] *Just Learning , supra*, at 18.
[17] *See* e.g., JEREMY BURRUS & RICHARD D. ROBERTS, DROPPING OUT OF HIGH SCHOOL: PREVALENCE, RISK FACTORS, AND REMEDIATION STRATEGIES (2012), https://www.ets.org/Media/Research/pdf/RD_Connections18.pdf.
[18] *How Trauma Affects Kids in School*, CHILD MIND INSTITUTE (last visited Apr. 10, 2019), https://childmind.org/article/how-trauma-affects-kids-school/.

Glen Mills received a limited credit recovery program or GED program rather than a high school education.

239.   Glen Mills had a custom, practice and policy of requiring all youth to either (a) forgo a high school education entirely and review a GED book, or (b) rely on a limited self-directed computer-based credit recovery program that provides no in-person instruction or support from qualified teachers.

240.   In both programs, youth who were already educationally at risk languished without direct instruction from qualified teachers, access to a full curriculum, or any of the supports and services they needed and to which they were legally entitled.

### A. The Program at Glen Mills Failed to Provide the Requisite Curriculum and Hours of Instruction, Offered No Live Academic Instruction and Relied on Untrained Unit Staff to Support Students

### (i) Glen Mills is authorized to operate as a PRRI and as a Nonpublic, Nonlicensed school

241.   Glen Mills has two designations under PDE: (1) as a PRRI and (2) as a nonpublic, nonlicensed school. These designations impose certain requirements.

242.   Intermediate units and local school districts have the power to contract with PRRIs for educational services to be provided to children "as part of any rehabilitative program required in conjunction with the placement of a child in any such institution or in a day treatment program of that institution pursuant to a

proceeding under 42 Pa.C.S. Ch. 63 (relating to juvenile matters)." 24 P.S. § 9-914.1-A(a), (c).

243.   As a PRRI, Glen Mills was required to educate juveniles pursuant to the terms of its contract with a school district intermediate unit for the provision of educational services and instruction. The statute governing PRRIs specifically states that it cannot be "construed to alter or limit the educational rights of exceptional children." 24 P.S. § 9-914.1-A(c).

244.   As set forth in the Basic Education Circular on Private Residential Rehabilitative Institutions, contracts with PRRIs must include a statement of assurances by the PRRI that it will "adhere to Chapter 4 curriculum regulations as closely as possible given the educational needs of the students" and outlines "the LEAs monitoring responsibilities and monitoring activities related to these program requirements and consistent with Section 964.1 of the Public School Code." *See* Basic Education Circular Residential Rehabilitative Institutions (1999).[19] In addition, LEAs must adhere to the Department-issued manual entitled "Basic Guidelines for Contract Development between the Intermediate Unit or School District and the Private Residential Rehabilitative Institution." *Id.*

---

[19] Available at
https://www.education.pa.gov/Documents/Codes%20and%20Regulations/Basic%20Education%20Circulars/Purdons%20Statutes/Private%20Residential%20Rehabilitative%20Institutions.pdf.

245.    Pursuant to the PRRI statute, PRRIs are eligible to receive tuition reimbursement on a per student basis by multiplying six thousand four hundred fifty dollars and fifty-nine cents ($6,450.59) times the cumulative percentage change in the Consumer Price Index times the number of Pennsylvania resident full-time equivalent students. *See* 24 P.S. § 9-914.1-A(b)(2). PDE is responsible for effectuating the necessary procedures for the transfer of funds from the school district of residence to the school district or intermediate unit in which the private residential rehabilitative institution is located.

246.    PRRIs are allowed to receive up to 150 percent of the host district's tuition and are eligible to receive 19.3 percent in indirect costs and an "occupancy cost" allowance which was $105.36 per ADM (average daily membership) in FY 2004-05. Additional funding is available for special education students attending PRRIs, paid out of the state special education appropriation.[20]

247.    Nonlicensed nonpublic schools must be operated by a "bona fide church or other religious body." 24 P.S. § 13-1327(b). It is unknown whether Glen Mills was operated by a bona fide church or other religious body. The Pennsylvania Department of Education requires that nonlicensed nonpublic schools register with the Department of Education by submitting a notarized affidavit attesting to the

---

[20] LEGISLATIVE BUDGET & FINANCE COMMITTEE, REIMBURSEMENT FOR EDUCATIONAL SERVICES FOR ADJUDICATED YOUTH IN PRIVATE RESIDENTIAL FACILITIES S-1 (2006), http://lbfc.legis.state.pa.us/Resources/Documents/Reports/111.pdf.

teaching of required courses, the provision of the minimum 180 days or 990 hours of instruction, and "compliance with the provisions of this Act." 24 P.S. § 13-1327(a); AFFIDAVIT, *supra*, n.3; *see also* 22 Pa Code § 4.71; 22 Pa. Code § 57.31; 24 P.S. § 13-1327(b). A nonpublic nonlicensed school must be certified by the Secretary of Education. 22 Pa. Code § 4.71. "Certification" is an affidavit signed by the principal of a nonpublic nonlicensed school, promising that they offer the minimum graduation curriculum as adopted by the State Board of Education, outlined in 22 Pa. Code § 57.31.

248.   At the secondary level, curriculum in nonlicensed nonpublic schools must include English (with literature, language, speech, and composition), science (including biology and chemistry), social studies (including civics, economics, and history of the United States and Pennsylvania), a foreign language, mathematics (including statistics, algebra, and geometry), art, music, physical education, health, and safety education (including regular instruction in the prevention of fires). 24 P.S. § 13-1327(b)(2). Glen Mills was required to, and upon information and belief, did, submit notarized documentation to PDE attesting that these courses are offered to students.

### (ii)   Children at Glen Mills were Denied a Legally Compliant Education and Treated Differently From Other Non-resident Students

249.   Under Pennsylvania law, youth residing in an institution like Glen Mills for the "care or training" of children have a legal right to attend the school district

where the residential facility is located with transportation provided and are to be treated in the same manner as resident children. *See* 24 P.S. § 13-1306(a); 22 Pa. Code § 11.11. If the district does not have facilities to accommodate the students in an institution in its schools, it may, upon approval by PDE, contract with another district to educate the children at another school district. *See* 24 P.S. § 13-1306(a).

250.    Under 24 P.S. § 13-1306, the school district in which the institution is located is also responsible for providing students with disabilities with an appropriate program of special education consistent with state law, 22 Pa. Code Chapter 14, and must maintain contact with the school district of residence of the student for the purpose of keeping the school district of residence informed of its plans for educating the student and seeking the advice of that district with respect to the student. 24 P.S. 13-1306(c). While the student's school district of residence and the school district in which the institution is located may agree to another arrangement of these educational and procedural responsibilities, that can only occur if there is an agreement in writing approved by PDE after notice to and an opportunity to comment by the parents of the student. 24 P.S. § 13-1306(d). These safeguards are intended to ensure a FAPE for every student with disabilities in a residential placement.

251.    Upon information and belief, the CCIU or another LEA entered into a contract with Glen Mills as a PRRI that included Glen Mills' assurances that it would

comply with Chapter 4 curriculum regulations as required and the LEA's monitoring responsibilities and activities related to these program requirements and consistent with Section 964.1 of the Public School Code.

252.   In contravention of these requirements, and as a major diversion from state standards for school-age students, Glen Mills' reliance on GED or limited computer-based credit-recovery programs with worksheets deprived youth placed in that facility of the opportunity to receive a legally compliant education.

253.   Glen Mills students—afforded only a GED book or a limited credit-recovery program—were not provided the course curriculum required by law nor did students receive the requisite number of instruction hours.

254.   When new students were placed at Glen Mills, staff described only two "paths" available for their education: a credit acquisition path or the GED path. These paths were also reflected in "Glen Mills Schools 2018 Educational Playbook: Teacher's Guide to Best Educational Practices" ("PLAYBOOK") which also describes a combination of the two paths. Upon information and belief, other options identified in the Playbook were not actually provided to students.

255.   Students in the GED "path" received a GED prep book (though some copies were several years old) and no further instruction. Upon information and belief, the staff people assigned to the GED study room did not have college degrees in education or training related to preparing students for the GED exam. Glen Mills

did not provide other school services for students after they completed the GED coursebook. Students did not receive any further education services, whether they failed the GED exam or not, even though they were entitled to earn a high school diploma until the semester they turn 21. *See* 22 PA Code § 11.12.

256.  Upon information and belief, students in the limited online credit-recovery program did not receive all state-required curriculum courses, nor did they receive actual instruction from any qualified teachers. The Plato credit-recovery program was comprised of modules with basic tutorials and tests or assessments. There was no qualified instructor available in real-time online or in-person at the facility, to provide instruction to students on all state-required curriculum courses. Upon information and belief, the Plato program was only available in English and English Learners did not receive necessary modifications. Additionally, many students report regularly missing significant school time as they were directed by Glen Mills staff to participate in sports practices instead of being in the classroom during school hours.

257.  Glen Mills' stated "school" hours were 10:00 A.M. – 12:00 P.M. and 1:00 P.M. – 3:00 P.M., or four hours each weekday (twenty hours each week) rather than the requisite 27.5 hours per week. Many students utilized the credit recovery program on their own in their unit where they sleep.

258.   In sum, Glen Mills failed to provide students with the free public education to which they are entitled. Students had no mechanism to challenge this denial of a statutory property interest to receive a public education.

### (iii)   Children were Wrongfully Placed into Glen Mills' GED Program and Denied A High School Education

259.   The GED Path is described in the Playbook as follows:

> A course of study for students who are very far from earning enough credits for a regular high school diploma. Students are assigned GED courses in Plato online learning **which are not readily accepted toward a regular high school diploma**. Each student must have verbal approval from a parent/guardian and written approval (letter or email) from his Probation officer stating that they understand that the student's credits **will probably not be accepted by his former high school**. The letter should also state what the next plan is if the student passes the GED.
>
> *This path may not be suited for low level students*. **GED Path students are not guaranteed to take the GED OR to be enrolled in GED class**. He may be enrolled in GED classes and will be given the GED-Ready [practice test for the GED].

GLEN MILLS SCHOOLS 2018 EDUCATIONAL PLAYBOOK: TEACHER'S GUIDE TO BEST EDUCATIONAL PRACTICES 12 (2018) (emphasis added). Despite the Playbook's reference to "Plato online learning" for the GED, Plaintiffs were provided only a workbook for the GED path.

260.   Upon information and belief, Glen Mills did not facilitate a meaningful conversation with the student and parent about this significant decision and their

own policy requiring "verbal approval from a parent or guardian" and "written approval from [the child's] probation officer" was not followed.

261.    Indeed, Glen Mills offered the GED path to students who are too young under state law to substitute their high school education for a GED. Under state law, a person between 16 and 18 years of age may qualify for GED testing only upon the issuance of a court order or if they have officially withdrawn from secondary school and are able to provide a letter from an employer stating the GED is required to gain employment, or a college or post-secondary training institution stating that a GED is required for enrollment, or the Armed Services require a GED for admission, or a letter from the director of a state institution where the student is a resident. 22 Pa. Code § 4.72(2). The Glen Mills website explains that Glen Mills staff make unilateral determinations regarding placement in their education program.[21]

262.    Significantly, though Glen Mills' educational program purported to prepare students to take the GED—instead of following academic standards to access a high school diploma—it did not actually provide the opportunity to take the GED exam to the vast majority of its students. Most students were left stranded with no meaningful learning, no accumulation of academic credits applicable to a high school diploma *and* no opportunity to take a GED exam. Upon information and

---

[21] *Placement*, THE GLEN MILLS SCHOOLS, http://www.glenmillsschool.org/education/placement (last visited Apr. 9, 2019).

belief, the test was not offered because under state law, a Commonwealth diploma may only be issued to an applicant who at the time the person earns a passing score on the GED is *not enrolled* in a public, licensed private, registered accredited or licensed nonpublic secondary school. *See* 22 Pa. Code § 4.72(2).

    **(iv)**    **Glen Mills' Self-Directed Credit Recovery Program, Unsupported By Teachers, Failed to Provide a High School Education And Set Children Up For Failure**

263.    The Playbook does not describe the "Credit acquisition-Plato curriculum" path. A combined "GED / Credit Path" is described by the Playbook as: "A course of study for students whose primary goal is earning the GED but want to continue to earn credits toward their home [sic] school diploma in case they don't pass the GED or in addition to the GED. Students are assigned regular courses in Plato online learning." PLAYBOOK, *supra*, at 12.

264.    Typically, a Glen Mills student sat at his individual computer and progressed by himself through a pre-designed schedule of online modules. Some students also received worksheets to be completed on their own to earn credit for "Health", "Life Skills" and other non-core subjects.

265.    There were commonly between 30 – 60 other youth sitting at their own computers in the same room. Some students did not leave their housing unit and instead accessed PLATO in a room on their unit. Housing units with fewer youth

may be combined with other units in a classroom in the education building on campus.

266.    Students progressed through self-directed limited academic courses in the PLATO cyber program. Students did not have access to certified teachers or other qualified educators to provide remedial assistance or instruction regarding new concepts. The adults staffing the classroom were the same staff that served as "counselors" or "AM staff" or disciplinarians throughout the rest of the day. Upon information and belief, there were no staff at Glen Mills whose sole responsibility was to provide academic instruction to students.

267.    Upon information and belief, very few, if any, of the staff at Glen Mills had a college or professional degree in education for secondary school or were licensed teachers.

268.    The Playbook lists "GMS diploma" and "home school diploma-Plato curriculum" as other potential "academic paths" but, upon information and belief, these are not real options afforded to young people publicly-placed at Glen Mills.

269.    Upon information and belief, students were not accurately assessed to identify their educational needs and were commonly misidentified as on an inappropriate grade level and tasked with completion of academic work that was either too challenging or too easy. Students often waited months for Glen Mills to

collect their academic records from prior schools. Students often did not receive any education during this time.

270.  Many students were assigned to a "Career Readiness course" such as Graphic Arts and Offset Printing, Golf Course Management, or Indoor/Outdoor Maintenance.[22]

271.  Students who were on Concern were denied access to CTE courses.

272.  Upon information and belief, although Glen Mills characterized these courses as "Career and Technical Education," most of these courses were not staffed with CTE licensed teachers, nor were they accredited or approved by PDE as part of a Career and Technical Center or as CTE approved programs under 22 PA Code Chapter 339 nor did the courses meet the requirements of 22 PA Code § 4.31, thereby depriving youth of a meaningful transferrable certificate viable for employment.

273.  In its reporting to the Department of Education, Glen Mills identified their entire student body as "secondary ungraded."[23] Glen Mills did not identify its students as being in any particular grade level and failed to ensure access to an appropriate grade level curriculum.

---

[22] *See Career & Technical Education*, THE GLEN MILLS SCHOOLS, http://www.glenmillsschool.org/education/careers-technical-education/ (last visited Apr. 9, 2019).
[23] Enrollment Private NonPublic Schools, 2015-16 and 2016-17 available at https://www.education.pa.gov/Documents/Data%20and%20Statistics/Enrollment/Private%20Nonpublic/Enrollment%20Private%20Nonpublic%202017-18.xlsx.

274.    Any time spent on academic material that was outside their grade level was not likely to be accepted for credit transferred to a traditional school after exiting Glen Mills. The time a child spends on material from an inappropriate grade level was lost—the child learned nothing, received no credit toward a high school diploma and he lost the opportunity to learn and receive credit for appropriate course work.

275.    Upon information and belief, unit staff provided no or little academic support to students but provided answers on tests and changed students' grades so that it appeared that students had mastered certain material when they had not and could be perceived as having earned credits.

276.    As the State Education Agency, PDE is obligated "[t]o administer all of the laws of this Commonwealth with regard to the establishment, maintenance, and conduct of the public schools." 71 P.S. § 352(a).

277.    Upon information and belief, PDE provides no monitoring or oversight of PRRIs or nonpublic schools' provision of general education to students.

278.    Upon information and belief, PDE did not monitor or ensure compliance with Glen Mills' sworn obligations to provide courses or instruction hours nor does PDE ensure compliance with its responsibilities as a PRRI.

279.    Glen Mills had been in operation for decades and had pushed thousands of publicly-placed youth—in the custody of county children and youth agencies and

placed by juvenile courts—through its school with no state oversight of its provision of education to ensure any meaningful learning for students.

280.   Glen Mills was licensed as an institution for children under 55 Pa. Code § 3800.11 and is authorized to operate its school through PDE. Yet neither PDE nor PA-DHS evaluated or considered the quality of education provided to thousands of children at Glen Mills.

281.   As a PRRI, Glen Mills served children who were placed into its care by courts with the expectation that children will be educated in a meaningful way and have access to the same public school standards and curriculum available to other public school students. Instead, children placed at Glen Mills were deprived of a public education and forced to languish as ungraded students provided only access to a limited computer-based credit recovery program with no in-person instruction or support from qualified teachers, or they were denied a high school education entirely to review a GED book.

282.   The denial of a public high school education resulted in significant harm to Plaintiffs that must be remedied. These harms include but are not limited to lost months or years of academic instruction, the inability to graduate or graduate on time and limitations on educational and employment opportunities, and earnings.

**B.** **Children with Disabilities at Glen Mills Were Denied a Free Appropriate Public Education in the Least Restrictive Environment and Were Discriminated Against Based on their Disabilities**

**(i)** **Legal Framework Governing the Education of Children with Disabilities**

## Overview of the IDEA, Section 504 and the ADA

283. By law, meeting the educational needs of children with disabilities must occur within a specified process that is designed to ensure that these children receive a free appropriate public education in the least restrictive environment. This process includes written notice, parent participation and consent, a non-discriminatory evaluation, creation and review of evaluations, the development of a plan reasonably calculated to enable a child to make progress, meetings with school staff and parents, and ongoing monitoring to ensure progress—all of which are outlined in the IDEA, 20 U.S.C. § 1400 *et seq.* and its implementing regulations, 34 C.F.R. § 300.1 *et seq.*

284. The IDEA seeks to prepare children with disabilities for further education, employment, and independent living, and specifically delineates the rights of children with disabilities and their parents in the special education IEP process. *See* 20 U.S.C. §§ 1401, 1402, 1412(a)(l)(A), 1414(d), 1415; 34 C.F.R. Part 300. The primary vehicle for implementing these protections is the child's IEP, which must be developed jointly with the parent, the student, and the child's IEP Team. *See* 34 C.F.R. § 300.324(a).

285.   Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability in programs or activities that receive federal financial assistance from the U.S. Department of Education. It mandates that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). A "program or activity" includes "all operations of" the federal funds recipient. 29 U.S.C. § 794(b).

286.   A recipient of federal funds is defined as "any state or its political subdivision, any instrumentality of a state or its political subdivision, any public or private agency, institution, organization, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient." 34 C.F.R. § 104.3(f).

287.   Section 504 requires that recipients of federal funds make reasonable modifications to policies, practices and procedures to avoid discrimination on the basis of disability. A federal funds recipient cannot deny a qualified individual with a disability the opportunity to participate in or benefit from an aid, benefit or service or provide an aid, benefit or service that is not as effective or not equal to others. 34 C.F.R. § 104.4.

288.  In addition, a federal funds recipient may not "directly or through contractual or other arrangements, utilize criteria or methods of administration [ ] that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, [or] . . . the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program." 28 C.F.R. § 42.503(b)(3); 34 C.F.R. § 104.4(4).

289.  Pursuant to the IDEA and Section 504 of the Rehabilitation Act all students with disabilities are entitled to receive a free appropriate public education ("FAPE") tailored to meet their individual needs. 20 U.S.C. § 1400(d)(1)(A); 34 C.F.R. § 300.101(a); 22 Pa. Code § 14.102(a); 34 C.F.R. § 104.33; 22 Pa. Code § 15.1.

290.  Title II of the ADA prohibits discrimination against qualified individuals with disabilities in all programs, activities, and services of public entities. 42 U.S.C. § 12132. It applies to all state and local governments, their departments and agencies, and any other instrumentalities or special purpose districts of state or local governments. The ADA defines a person with a disability as a person who has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1). This includes people who have a record of such an impairment, even if they do not currently have a disability. A "qualified individual with a disability" is defined as "an individual with a disability who, with or without

reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities." 42 U.S.C. § 12131(2).

291.   A public entity may not deny a qualified individual with a disability the opportunity to participate in or benefit from an aid, benefit or service or provide an aid, benefit or service that is not as effective or not equal to others. 28 C.F.R. § 35.130(b)(1)(i), (ii), (iii). The public entity may not "[o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others." 28 C.F.R. § 35.130(b)(1)(vii).

292.   In addition, a public entity "shall make reasonable modifications in policies, practices, or procedures . . . to avoid discrimination on the basis of disability" and may not "utilize criteria or methods of administration [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" or "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program." 28 C.F.R. § 35.130(b)(7), (3).

293.   Students with disabilities are entitled to declaratory, injunctive and compensatory relief, as well as reasonable attorneys' fees and costs, for violations of the IDEA, Section 504 and the ADA. 20 U.S.C. § 1415(i)(2)(C)(iii), (3); 29 U.S.C. § 794a(a)(2); 42 U.S.C. § 12133.

**Role of State Educational Agency**

294.   The IDEA requires each state to establish policies and procedures to ensure that it provides a FAPE to all children with disabilities ages 3 to 21 residing within the State. *See* 20 U.S.C. § 1412(a). Within Pennsylvania, the State interprets the requirements of the IDEA to provide a FAPE to each child with a disability through Chapter 14 of the Pennsylvania School Code, 22 Pa. Code § 14.101 *et seq.* ("Chapter 14"). The State interprets the requirements of Section 504 through Chapter 14 of the Pennsylvania School Code, 22 Pa. Code § 15.1 *et seq.* ("Chapter 15").

295.   Under the IDEA, PDE has the ultimate legal responsibility to ensure: (1) that schools provide the legal entitlements afforded to students with disabilities under the IDEA; and (2) the educational programs for students with disabilities meet State standards and are administered by qualified staff members. 20 U.S.C. § 1412(a)(11)(A). PDE is responsible for ensuring that students with disabilities receive a free, appropriate public education in the least restrictive environment ("LRE"). *See* 34 C.F.R. § 300.114; 24 P.S. § 13-1372; 20 U.S.C. § 1412(a)(11); 34 C.F.R. §§ 104.33-34.

**Role of the Local Educational Agency**

296.   The IDEA requires the applicable local educational agency to provide a FAPE to all children with disabilities ages 3 to 21. A FAPE is defined as an educational program that is individualized to a specific child, meets that child's

unique needs, provides access to the general curriculum, meets the grade-level standards established by the state, and from which the child receives educational benefit. *See* 20 U.S. Code § 1401(9).

297.    A student's Individualized Education Program ("IEP") is the seminal document that is reviewed and revised annually by a team of individuals, including school personnel and the student's parent, in order to ensure that the student is receiving a FAPE that is individualized to his needs, including any related services necessary for the student to benefit from special education. 20 U.S.C. § 1414(d); 22 Pa. Code § 14.131(a)(1); 20 U.S.C. § 1401(26)(1). In order to meet substantive obligation under the IDEA, a school must offer an IEP that is reasonably calculated to enable a child to make meaningful progress appropriate in light of the child's circumstances. *See Endrew F. v. Douglas County School District*, 137 S. Ct. 988, 1001 (2017).

### (ii)    Glen Mills Denied Children with Disabilities a Free, Appropriate Public Education

298.    Upon information and belief, a significant number of children with disabilities under the IDEA were placed at Glen Mills following an adjudication of delinquency. Glen Mills also disproportionately served children with qualifying disabilities under Section 504 and the ADA.

299.   Chester County IU is the Local Educational Agency ("LEA") and Host School District[24] for Glen Mills which qualifies as a children's institution. Accordingly, the CCIU is the legal entity responsible for providing all students with disabilities at Glen Mills with a free, appropriate public education in the least restrictive environment. The CCIU is responsible for conducting and coordinating evaluations, developing and implementing IEPS based on the individual needs of children, and making educational placement decisions for students with disabilities at Glen Mills. As the LEA, Chester County IU has a duty to identify, locate and evaluate all school-eligible children suspected of having disabilities who are residents of Glen Mills. 34 C.F.R. § 300.111. Chester County IU and Glen Mills are both recipients of federal funding.

300.   While CCIU has contracted with Glen Mills Schools to provide special education services, the CCIU fails to participate in IEP meetings, ensure parent participation, develop individualized IEPs, provide related services, ensure implementation of the IEPs, or ensure compliance with other state and federal special education laws for children with disabilities educated at Glen Mills.

---

[24] *See* 24 P.S. § 13-1306; PDE, Basic Educational Circular: Educational Programs for Students in Non-Educational                    Placements,                    available                    at https://www.education.pa.gov/Documents/Codes%20and%20Regulations/Basic%20Education% 20Circulars/PA%20Code/Educational%20Programs%20for%20Students%20in%20Non-Educational%20Placements.pdf (Rev. Jan. 2018).

301.   Upon information and belief, the CCIU, by its policies, practices and procedures common to all students with disabilities failed to convene legally compliant IEP meetings in part by failing to participate in such meetings, failing to ensure the participation of IDEA Parents and all other required IEP Team members.

302.   There was no system for providing a free appropriate public education to the children with disabilities who reside at Glen Mills and children with disabilities are systematically discriminated against based on their disabilities.

303.   The educational program at Glen Mills denied children with disabilities with a FAPE in the LRE in myriad ways: they were not provided with comparable services upon their transition from another school district; they were not provided with individualized, specialized instruction; they were not provided with accommodations and modifications for the general education setting; they were not provided with related services; they were not offered a continuum of educational placements; they are not offered or provided appropriate behavioral interventions; they were not provided with individualized transition planning and support; and they were not identified and evaluated in accordance with applicable laws. In sum, the Glen Mills program lacked a system for providing a FAPE for children with disabilities.

304.   Students with disabilities placed at Glen Mills often arrived with IEPs created by the students' former school districts and were entitled to comparable

services, i.e., continued specialized instruction, related services and a comparable educational placement until a new IEP could be created. Under applicable requirements, a new school must provide "services comparable" to the student's IEP for 30 days until the new school district or local educational agency, in cooperation with the parent, 1) adopts the previous IEP or 2) develops and implements a new IEP. 20 U.S.C. § 1414(d)(2)(C); 34 C.F.R. § 300.323(e)-(f). In order to comply with this requirement, the new local educational agency must promptly obtain educational records, including the IEP, from the previous school district. 20 U.S.C. § 1414(d)(2)(C)(ii); 34 C.F.R. § 300.323(g).

305.  Glen Mills failed to obtain timely records in order to provide comparable services for students with disabilities. Some students were enrolled in the school for months before their IEPs were located and students received no services during this time. During this time, students failed to receive comparable services.

306.   Upon information and belief, once Glen Mills received students' IEPs, the IEPs were routinely revised to remove the previously-provided specialized instruction and related services to conform to the one-size-fits-all schedule of Glen Mills program options.

307.   Upon information and belief, each student's Glen Mills' IEP lists an itinerant level of support and states, "[Student] will participate fully in the regular classroom with a highly structured learning environment."

308.   Upon information and belief, to the extent students with disabilities received any special education services, they were not individualized and consisted of the same one-size-fits-all reading assistance of one hour per week.

309.   Students with disabilities who came from specialized classes or approved private schools that provided full-time special education instruction and related services typically received a high level of specialized academic instruction in those settings. When these students entered Glen Mills, however, the school unilaterally eliminated specialized instruction and removed related services without explanation.

310.   In addition, Glen Mills did not have a policy or practice of providing appropriate placements for children with disabilities who were sent to Glen Mills and failed to offer or provide the continuum of placements as required by law. A continuum of alternative placements meant that Glen Mills had to provide a range of educational environments that offered varying degrees and forms of special education (*e.g.*, in-class one-on-one tutoring, full-time special education class). 34 C.F.R. § 300.115; 22 Pa. Code § 14.145(5).

311.   The Glen Mills program did not have a system to provide placements that offered instruction in accordance with students' IEP goals that was individualized to the students' unique needs. Instead, Glen Mills offered two types of placements to all students: a general education classroom where students complete workbooks for GED preparation; or, exclusive computer-based instruction with limited standardized pull-out to a special education resource classroom to receive reading remediation.

312.   The Glen Mills program did not have a system to provide education to students with disabilities in the least restrictive environment appropriate to meet their needs. 34 C.F.R. § 300.114. The least restrictive environment requirement ensures that young people with disabilities will not be segregated in their education, unless appropriate for the provision of special education services. Glen Mills failed to offer any continuum and also failed to ensure that students were educated in the least restrictive environment.

313.   Upon information and belief, Glen Mills' students with disabilities did not receive instruction from qualified, licensed special education teachers in any setting.

314.   Due to the lack of placement options at Glen Mills, students were unable to receive comparable services as mandated by law. *See* 34 C.F.R. § 300.323(e)-(f). For example, a child may be placed in a GED setting at Glen Mills

after he was previously educated in an approved private school with full-time special education instruction. Such educational services were not "comparable" by any measure to what the child received in his prior educational placement.

315.  The IDEA details a process for evaluating students with disabilities every three years and when necessary based on the students' educational needs. 20 U.S.C. § 1414(a)(2). Upon information and belief, such evaluations were not conducted when and in the manner required.

316.  Upon information and belief, neither the CCIU or another local educational agency identified or evaluated children who are suspected of being students with disabilities or timely reevaluates students, as required by the IDEA and state law. 34 C.F.R. § 300.111.

317.  The Glen Mills program also lacked a system to comply with requirements of the IDEA which required a detailed process for creating the annual IEP, including ensuring the meaningful participation of the parent of a child with a disability, a regular education teacher, at least one special education teacher, a representative of the LEA, an individual who can interpret the instructional implications of evaluation results, and, whenever appropriate, the student with a disability. 20 U.S.C. § 1414(d)(1)(B).

318.  Upon information and belief, IEPs were not developed with the required participants for a compliant IEP. Parents of students with disabilities were

not properly invited or supported to participate in IEP meetings and rarely, if ever, participated in such meetings. In addition, the representative of the LEA, Chester County IU, did not attend IEP meetings. The IEP team also did not include any person who could interpret the results of evaluation data.

319.   Upon information and belief, the IEPs developed through this process were functionally identical.

320.   Upon information and belief, the IEPs developed through this process do not mention that students will receive computer-based credit recovery as the primary source of instruction. As a result, the IEPs do not include necessary specially-designed instruction appropriate for this method of self-directed learning.

321.   Upon information and belief, the IEPs developed through this process do not include present levels of academic and functional performance, measurable annual goals, a plan for how progress on these goals will be monitored, supplementary aids and services and, for children over 14, a transition plan developed based on age-appropriate transition assessments. 20 U.S.C. § 1414(d)(1)(A); 22 Pa. Code § 14.131.

322.   Upon information and belief, positive behavior support plans were not provided for students who need them. *See* 34 C.F.R. § 300.530(d); 22 Pa. Code § 14.104(b)(6).

323.   Compliance with all of these requirements was necessary in order for the Chester County IU as the local education agency to meet is its obligations to provide a FAPE to a student with a disability. 20 U.S.C. § 1413(d); 22 Pa. Code § 14.103; 34 C.F.R. § 104.31; 22 Pa. Code § 15.1.

324.   For students with a disability at Glen Mills, IEPs did not include the required content for compliant IEPs and this information was not considered. Students' "present" levels of academic achievement included a single assessment measure, the Wide Range Achievement Test, that was administered upon enrollment at Glen Mills, which was usually months before the IEP team met. IEPs did not include any other academic tests such as curriculum-based assessments or benchmark assessment or current parent input. IEPs also failed to include goals that were individualized and aligned with the students' needs. Neither CCIU nor Glen Mills undertook any progress monitoring. Students were also deprived of any related services, such as counseling individualized to their needs, even if provided under their prior IEPs, without any explanation about why they were no longer needed. Upon information and belief, neither CCIU nor Glen Mills employed or contracted with any mental health professionals to provide necessary services for students at Glen Mills.

325.   Students' transition plans did not align with the instruction they received. Although Glen Mills purports to have a comprehensive career and

technical education program, transition plans were not designed so that students with disabilities can access those programs aligned to their stated interests. Students completed the Career Scope 8.0 but then did not receive transition services in accordance with this assessment. Instead, IEPs contained vague and meaningless transition plans that would neither identify transition activities nor detailed and ensured that students received the requisite skills to prepare them for further education, employment or independent living. In addition, students were prohibited from participating in CTE programs due to disability-related behaviors.

326. PDE, as state education agency, failed in its duty to ensure a free appropriate public education to children with disabilities as required under the IDEA. PDE monitored Glen Mills only once every six years in accordance with its cyclical monitoring program which relies heavily on self-reporting and review of paper documentation.[25] Due to lack of any adequate monitoring and oversight, PDE failed to ensure compliance with rights and protections mandated by the IDEA and failed to ensure that children with disabilities at Glen Mills Schools received a free, appropriate, public education.

---

[25] *Cyclical Monitoring Documents*, PDE, https://www.education.pa.gov/K-12/Special%20Education/CompMon/Pages/Cyclical-Monitoring.aspx (last visited Apr. 9, 2019).

### (iii) The Glen Mills Program Discriminated Against Children with Qualifying Disabilities in Violation of the IDEA, Section 504 and the ADA and Deprived These Children of a FAPE

327.   In addition to the IDEA's requirements for the education of students with disabilities, Section 504 and its state implementing regulation, Chapter 15 of the Pennsylvania Code, require a local educational agency to provide reasonable "aids, services and accommodations that are designed to meet the educational needs of protected handicapped students as adequately as the needs of nonhandicapped students are met." 22 Pa. Code § 15.1(b). These aids, services, and accommodations must be incorporated into a service agreement. 22 Pa. Code § 15.2. An IEP is one way to provide the services and accommodations due to a 504-eligible student. 34 C.F.R. § 104.33(b)(2).

328.   The ADA and Section 504 also require that young people with qualifying disabilities even if confined cannot be disproportionately burdened by conditions of confinement. Qualified students with disabilities under the ADA and Section 504 are entitled to reasonable modifications so that they can equally participate in and receive the benefits of a program. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(7); 29 U.S.C. § 794(a). The conditions of confinement may not disproportionately burden their ability to participate in and benefit from a program.

329.   The failures of the Glen Mills program to provide individualized, specially-designed instruction that allows students with disabilities to participate in

the education program disproportionately burdened students with disabilities. Because these students failed to receive accommodations to access the general education curriculum, they fell further behind their peers without disabilities and could not make progress.

330.   Glen Mills' computer-based educational program did not allow for an individually-tailored specially designed instruction or modifications to the program reflective of students' IEP or a Section 504 Plan. This placed students with disabilities at a distinct disadvantage for learning in comparison to their non-disabled peers. Students with disabilities were not able to meet the computer-based course expectations, participate in the online program, or make progress towards earning credits in the same manner as their non-disabled peers.

331.   Because there was no individualization of the computer-based program, students with disabilities were often forced to participate in a non-credit bearing GED program if they believed that their learning needs would not be met by the computer-based program.

332.   In addition, upon information and belief, these students were more likely to remain at the Glen Mills facility longer due to their failure to make progress in the educational program.

333.    Students with disabilities were denied a FAPE and disproportionately burdened by the conditions of confinement and the limited educational program at Glen Mills.

334.    As a result, Glen Mills' policies and practices governing the evaluation of students and the creation and implementation of special education programming violated special education laws and denies students with disabilities the opportunity to receive a FAPE.

335.    In addition, the State failed in its duty to ensure a free appropriate public education, as required under the IDEA and Section 504.[26] Due to lack of adequate monitoring and oversight, PDE failed to ensure compliance with procedural safeguards mandated by the IDEA and failed to ensure that children with disabilities at Glen Mills Schools had access to and received a free, appropriate, public education.

**(iv)    Glen Mills' Discipline Policies and Practices Violated the Rights of Students with Disabilities**

336.    Glen Mills' discipline policies and practices violated federal and state education and anti-discrimination civil rights laws in numerous ways.

---

[26] Because Defendants violate the IDEA through its systemic policies and practices, including a failure to maintain an adequate continuum of education placements, the IDEA's administrative exhaustion requirements do not apply. *See Beth V. v. Carroll,* 87 F.3d 80, 89 (3rd Cir. 1996).

337.   There is no exception to the requirement under IDEA, Title II of the ADA, Section 504, and Chapters 14 and 15 of the Pennsylvania Code, that a FAPE must be provided for all students with a disability, even when students' behavior threatens to impede their learning or they are removed from school for disciplinary reasons.

338.   To ensure a FAPE, state law requires that positive behavior support plans must be developed for children who require specific interventions to address behavior that interferes with learning. 22 Pa. Code § 14.133(b). These plans must include "methods that utilize positive reinforcement and other positive techniques." 22 Pa. Code § 14.133(b).

339.   Under federal and state law, if behavior leads to removal from educational services, a child must "continue to receive educational services . . . so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP." 34 C.F.R. § 300.530(d)(1)(i); 22 Pa. Code §14.143.

340.   In addition, students may not be subject to discipline for disability-related behavior. The IDEA and equal access to education requirements under the ADA and Section 504 mandate that schools inquire into whether behaviors leading to discipline are disability-related before disciplining a student.

341. Under the IDEA, if behavior leads to removal from school for more than 10 days or to removal from school for less than 10 days based on behavior that constitutes a pattern, an immediate IEP meeting is required. During this meeting (also known as a "manifestation determination"), the IEP team must determine if the behavior is a manifestation of the student's disability. 34 C.F.R. § 300.530(e); 34 C.F.R. § 300.536(a); 20 U.S.C. § 1415(k). If the behavior is a manifestation of the disability, the IEP team must conduct a functional behavior assessment and implement a positive behavior support plan. 20 U.S.C. § 1415(k)(1)(F). The school cannot punish students for behavior that is a manifestation of their disabilities.

342. Physical restraints may only be used when "(i) [t]he restraint is utilized with specific component elements of positive behavior support; (ii) [t]he restraint is used in conjunction with the teaching of socially acceptable alternative skills to replace problem behavior; (iii) [s]taff are authorized to use the procedure and have received the staff training required; and (iv) [t]here is a plan in place for eliminating the use of restraint through the application of positive behavior support." 22 Pa. Code § 14.133(c)(2).

343. The LEA must notify the parent of the use of restraint and schedule an IEP meeting within 10 days of the use of the restraint to consider the need for a new FBA and PBSP, reevaluation, or change in placement. 22 Pa. Code § 14.133(c)(1).

344.  LEAs may not use restraints in the IEP as part of a predesigned program.[27]

345.  Schools may not use aversive techniques including: corporal punishment; punishment for behavior that is a manifestation of a student's disability; locked rooms or spaces; noxious substances; withholding meals, water or fresh air; treatment of a demeaning nature; and electric shock. 22 Pa. Code § 14.133(e).

346.  Prone restraints, in which a student is held face down on the floor, are prohibited in all educational programs.[28]

347.  Glen Mills failed to provide behavior interventions so that students could learn and ensure educational services when students with disabilities were unable to access school for behavioral reasons.

348.  For example, students with disabilities on Concern due to behavior incidents were denied access to the special education resource room and Career Technical Education ("CTE") program while on that status. Subsequent behavior incidents prolonged a student's time on Concern and, subsequently, removal from

---

[27] PDE, Use of Restraints for Students with Disabilities, BEC (June 2016), Available at https://www.education.pa.gov/Documents/Codes%20and%20Regulations/Basic%20Education%20Circulars/PA%20Code/Educational%20Programs%20for%20Students%20in%20Non-Educational%20Placements.pdf.

[28] PDE, Use of Restraints for Students with Disabilities, BEC (June 2016), Available at https://www.education.pa.gov/Documents/Codes%20and%20Regulations/Basic%20Education%20Circulars/PA%20Code/Educational%20Programs%20for%20Students%20in%20Non-Educational%20Placements.pdf.

the CTE program. Despite this clear impact of behavior on learning, Glen Mills failed to provide positive behavior interventions, revise IEPs, or otherwise intervene.

349.    Upon information and belief, Glen Mills' functional behavior assessments consisted solely of the Functional Assessment Checklist for Teachers and Staff and did not include observations, interviews or behavior data collection. Glen Mills failed to develop positive behavior support plans.

350.    In addition, Glen Mills restrained students with disabilities without following any of the procedures required by state law, including notice to parents, follow up IEP meetings, and revisions to the students' IEPs to prevent future restraints.

351.    Further, Glen Mills implemented a behavior policy with pre-designed use of restraints and aversive techniques, including corporal punishment and demeaning treatment, that were barred from use in Pennsylvania schools.

352.    Youth with disabilities are more vulnerable to the adverse effects of such practices, which can exacerbate their disabilities and lead to additional force, sanctions and loss of privileges and therefore compound Glen Mills' denial of participation in their educational and rehabilitative programs and activities.

353.    Glen Mills also failed to conduct manifestation determinations when behavior led to removal from school for more than 10 days or for behavior that constitutes a pattern.

354.   Because they failed to hold manifestation determinations or conduct functional behavior assessments, Glen Mills never inquired into whether the behavior that led to these students' removal from school or physical restraint was disability-related.

355.   As a result, students whose behavior was disability-related and who required behavior interventions to access school were denied those services or were subject to highly dangerous restraints.

356.   Instead, regardless of whether the behavior is disability-related, students were removed from school and, pursuant to Defendants' policies, could be denied all education in violation of the IDEA. Furthermore, students were not provided with positive behavior support plans that resulted from functional behavior assessments.

357.   Even when the manifestation determination was not required under the IDEA, Glen Mills failed to analyze behavior before disciplining a young person with a disability to determine if the behavior is disability-related, as required by the ADA and Section 504.

358.   In addition to the requirements of the IDEA and state law, the ADA and Section 504 also required that students with disabilities who were detained not be disproportionately burdened by conditions of confinement. Repeated physical restraint exacerbates young people's disabilities, causing them to fall further behind

in education. Compounding the problem, Glen Mills' lack of individually modified instruction made it more difficult for these students to benefit from educational services.

359.   Given Glen Mills' discipline policies and practices, students with disabilities whose behavior resulted from their disabilities, who were subject to repeated physical restraint and removal from education due to disability-related behaviors, were denied equal access to education.

360.   Through lack of oversight and monitoring, PDE failed to fulfill its obligations as a state educational agency to ensure access to education for these students with disabilities who were deprived of education, subjected to restraint and punished for disability-related behaviors.

361.   Glen Mills had been in operation for almost 200 years and pushed thousands of publicly-placed children—in the custody of county children and youth agencies overseen by PDE and DHS—through its substandard school, but failed to provide them with a legally compliant public education or any meaningful access to a diploma.

362.   As the State Education Agency, PDE is obligated "[t]o administer all of the laws of this Commonwealth with regard to the establishment, maintenance, and conduct of the public schools." 71 P.S. § 352(a).

363.   PDE Bureau of Special Education performs only occasional monitoring of residential facilities providing special education. The monitoring consists of a perfunctory review of a small number of files to determine whether the paperwork exists without a substantive review to ensure that special education services are actually provided.

364.   PDE provides no monitoring of nonpublic schools' provision of general education requirements.

365.   Upon information and belief, PDE and the Secretary of Education failed to monitor, verify or ensure that Glen Mills operated by a bona fide church or other religious entity to qualify for a nonlicensed nonpublic school registration.

366.   PDE and the Secretary of Education failed to monitor, verify or ensure that Glen Mills was teaching the curriculum and providing the minimum number of instruction hours required by law and attested by Glen Mills in their affidavit for certificate with PDE.

367.   The CCIU failed to monitor, verify or ensure that Glen Mills was adhering to the Chapter 4 curriculum requirements in its provision of education services as a PRRI pursuant to the contract entered, upon information and belief, between Glen Mills and the CCIU.

368.   PDE and CCIU provided no process to challenge this deprivation of students' statutory property interest in a public education.

## CAUSES OF ACTION

**COUNT ONE—GLEN MILLS AND GLEN MILLS LEADERSHIP DEFENDANTS VIOLATED PLAINTIFFS' EIGHTH AND FOURTEENTH AMENDMENT RIGHTS TO BE FREE FROM EXCESSIVE AND UNREASONABLE USE OF FORCE, TO BE PROTECTED FROM HARM, AND TO RECEIVE ADEQUATE MEDICAL TREATMENT (42 U.S.C. § 1983)**

(By Derrick, Walter, Thomas, and Sean, individually and on behalf of all youth in the General Class, against Glen Mills and Glen Mills Leadership Defendants)

369.    Each of the preceding paragraphs is incorporated herein.

370.    The Eighth and Fourteenth Amendments prohibit Glen Mills and Glen Mills Leadership Defendants from imposing cruel and unusual punishment on Plaintiffs, who are juveniles confined at Glen Mills through the juvenile justice system. This includes prohibiting them from acting (or failing to act) with deliberate indifference to a substantial risk of serious harm to Plaintiffs' health or safety, including the use of excessive and unreasonable force against them, and requiring them to ensure adequate medical care at Glen Mills.

371.    The Fourteenth Amendment to the United States Constitution also protects Plaintiffs' substantive due process rights, including a right to a rehabilitative environment and rehabilitative treatment.

372.    Glen Mills and Glen Mills Leadership Defendants knew or should have known that Glen Mills staff routinely used physical violence and excessive force

110

against youth that was objectively unreasonable, malicious and sadistic, intended to cause harm, and without any legitimate penological purpose.

373.  Glen Mills and Glen Mills Leadership Defendants did not take any reasonable steps to protect youth from the assaults they suffered from Glen Mills staff. Further, Glen Mills and Glen Mills Leadership Defendants adopted and enforced policies and practices such as the Battling Bulls hierarchy that caused and encouraged the pervasive culture of violence and excessive force against youth, and failed to properly train, supervise, and discipline Glen Mills staff. Glen Mills and Glen Mills Leadership Defendants failed to properly train, supervise, and discipline Glen Mills staff, which also caused the pervasive culture of violence and excessive force.

374.  Glen Mills served an exclusively public function and Glen Mills Leadership Defendants acted or failed to act under color of state law.

375.  Glen Mills and Glen Mills Leadership Defendants' acts and omissions amount to deliberate indifference that shocks the conscience, deprived Plaintiffs of their Eighth and Fourteenth Amendment rights to be protected from physical abuse and unreasonable or excessive force, and caused Plaintiffs grave physical, emotional, psychological, and other harm.

376.  Glen Mills and Glen Mills Leadership Defendants also knew or should have known that Plaintiffs were not provided adequate medical care for their injuries

that resulted from the pervasive culture of violence and excessive use of force against Plaintiffs. Glen Mills and Glen Mill Leadership Defendants' acts and omissions amount to deliberate indifference to Plaintiffs' serious medical needs that shocks the conscience. Glen Mills and Glen Mills Leadership Defendants' failure to adequately treat Plaintiffs was a substantial departure from professional judgment, violated Plaintiffs' Eighth and Fourteenth Amendment rights to adequate treatment, and caused physical, emotional, psychological and other harm to Plaintiffs.

377. Glen Mills and Glen Mills Leadership Defendants were also deliberately indifferent to Plaintiffs' serious medical needs that were caused by the pervasive culture of violence and excessive force they created. Glen Mills' and Glen Mills' Leadership Defendants failure to adequately treat Plaintiffs was a substantial departure from professional judgment and caused greater physical, emotional, psychological and other harm to Plaintiffs.

**COUNT TWO—PA-DHS DEFENDANTS VIOLATED PLAINTIFFS' EIGHTH AND FOURTEENTH AMENDMENT RIGHTS TO BE FREE FROM EXCESSIVE AND UNREASONABLE USE OF FORCE, TO BE PROTECTED FROM HARM, AND TO ADEQUATE MEDICAL TREATMENT (42 U.S.C. § 1983)**

(By Derrick, Walter, Thomas, and Sean, individually and on behalf of all youth in the General Class, against Defendants Miller, Dallas, and Utz, in their individual capacities)

378.   Each of the preceding paragraphs is incorporated herein.

379.   The Eighth and Fourteenth Amendments require PA-DHS Defendants to protect youth from excessive and unreasonable force being used against them and to ensure adequate medical care at Glen Mills. Under the Eighth and Fourteenth Amendments, PA-DHS Defendants have an affirmative duty to protect Plaintiffs and youth from harm, including excessive and unreasonable force, and ensure adequate medical treatment, because they took youth into custody through the delinquency system and limited Plaintiffs' freedom to act on their own behalf, establishing a special relationship between them.

380.   The Fourteenth Amendment to the United States Constitution also protects Plaintiffs' substantive due process rights, including a right to a rehabilitative environment and rehabilitative treatment.

381.   PA-DHS Defendants knew or should have known that Glen Mills staff routinely used physical violence and excessive force against youth that was

objectively unreasonable, malicious and sadistic, intended to cause harm, and without any legitimate penological purpose.

382.    Further, PA-DHS Defendants knew or should have known that Glen Mills Leadership Defendants did not protect youth from excessive and unreasonable force imposed by Glen Mills staff and that they adopted and enforced policies and practices that caused and encouraged the pervasive culture of violence and excessive force against youth.

383.    PA-DHS Defendants also knew or should have known that Glen Mills Leadership Defendants and staff did not provide adequate treatment to youth for their injuries.

384.    Yet, PA-DHS Defendants permitted the excessive and unreasonable force, the culture of violence, and the inadequate medical care to persist by repeatedly failing to take sufficient action to ensure Plaintiffs' and other youths' safety.

385.    PA-DHS Defendants' acts and omissions amount to deliberate indifference that shocks the conscience, deprived Plaintiffs of their Eighth and Fourteenth Amendment rights to be protected from physical abuse and unreasonable or excessive force and their right to adequate medical care, was a substantial departure from professional judgment, and caused Plaintiffs grave physical, emotional, psychological, and other harm.

**COUNT THREE—CHESTER COUNTY IU, DEFENDANT RIVERA AND GLEN MILLS VIOLATED THE PROCEDURAL DUE PROCESS RIGHTS OF THE EDUCATION SUBCLASS BY DEPRIVING THEM OF THEIR RIGHT TO AN EDUCATION (42 U.S.C. § 1983)**

(By Derrick, Walter, Thomas, and Sean, individually and on behalf of the Education Subclass Against Defendant Rivera in his official capacity, Chester County IU, and Glen Mills)

386.    Each of the preceding paragraphs is incorporated herein.

387.    The Due Process Clause of the Fourteenth Amendment provides that no State shall deprive any person of life, liberty, or property, without due process of law.

388.    Pennsylvania law establishes the legal right of school-age children to receive a free public education. The Pennsylvania Public School Code of 1949 provides that every student has the right to a free public education in his or her school district of residence until the end of the school year in which he or she turns 21. The right to public education applies equally to nonresident children who are living in a children's institution like Glen Mills.

389.    The right of a school-age child to a free public education in Pennsylvania qualifies as a property interest protected by the Due Process Clause of the Fourteenth Amendment.

390.    Glen Mills served an exclusively governmental function with regard to Plaintiffs and acted or failed to act under color of state law and failed to provide a legally complaint education.

391.   Defendant Chester County IU, contracting with Glen Mills pursuant to its PRRI status, failed to ensure the provision of education to the Named Plaintiffs Derrick, Walter, Thomas, and Sean and all members of the Education Class that complies with curriculum and hours of instruction required under the law and failed to provide any notice of the reasons for the denial or their applicable rights to contest the denial which deprives them of property interests without due process of law in violation of the Due Process Clause of the Fourteenth Amendment.

392.   Defendant PDE has the power and responsibility to administer all laws of the Commonwealth with regard to the establishment, maintenance, and conduct of public schools.

393.   PDE, as the state education agency, has failed to ensure that children at Glen Mills received a legally compliant education. It is clearly established law that all Pennsylvania children have the right to a free public education, and PDE knew or should have known, with the information available to them that Glen Mills was not providing a legally compliant education to publicly placed children in its care.

394.   The CCIU knew or should have known that Glen Mills was not providing a legally compliant public education to children in its care as the public entity contracting with the PRRI.

395.   Reasonable officials in their positions, with the information then available to them, should have known that their actions or omissions violated clearly established law.

396.   Through its actions and inactions, as set forth above, the Defendants deprived the Named Plaintiffs Derrick, Walter, Thomas, and Sean and all members of the Education Class of a state-created right to free public education without providing them with notice or a meaningful opportunity to be heard in violation of procedural protections guaranteed by the Due Process Clause of the Fourteenth Amendment.

397.   As a result of the Defendants' violation of Plaintiffs' right to procedural due process, Named Plaintiffs Derrick, Walter, Thomas, and Sean and all members of the Education Class have suffered injury by being deprived of an education to which they are legally entitled under state law.

398.   Named Plaintiffs Derrick, Walter, Thomas, and Sean and all members of the Education Class have no adequate remedy at law.

399.   Wherefore, pursuant to 42 U.S.C. § 1983, Plaintiffs demand judgment in their favor and against the Defendants for declaratory and prospective injunctive relief, including the provision of compensatory educational services.

**COUNT FOUR—CHESTER COUNTY IU, DEFENDANT RIVERA AND GLEN MILLS VIOLATED THE FOURTEENTH AMENDMENT RIGHTS OF THE EDUCATION SUBCLASS BY DEPRIVING PLAINTIFFS EQUAL ACCESS TO A PUBLIC EDUCATION (42 U.S.C. § 1983)**

(By Derrick, Walter, Thomas, and Sean, individually and on behalf of all youth in the Education Subclass, against Defendant Rivera in his official capacity, Glen Mills and Chester County IU)

400.    Each of the preceding paragraphs is incorporated herein.

401.    The Equal Protection Clause of the Fourteenth Amendment provides that no State shall deny to any person within its jurisdiction the equal protection of the laws.

402.    Defendants acted pursuant to a policy, practice, and custom to deprive Named Plaintiffs Derrick, Walter, Thomas, and Sean and all members of the Education Class of the equal protection of laws by denying these students a free public education which was accorded to other non-resident children placed in other residential homes, group homes, and residential placements for youth adjudicated dependent and/or delinquent as authorized by state law.

403.    There is no legitimate government interest or rational basis for this deprivation of Plaintiffs' education rights.

404.    To the extent that the PRRI Statute, 24 P.S. § 9-914.1-A of Pennsylvania Public School Code of 1949, is construed to authorize the unequal treatment of non-resident children placed in PRRIs, Plaintiffs urge that this statute

be declared unconstitutional on the ground that it violates Plaintiffs' rights under federal constitutional and statutory law.

405.   Through its actions and inactions, as set forth above, Defendants violated the rights conferred upon Named Plaintiffs Derrick, Walter, Thomas, and Sean and all members of the Education Class and all others similarly situated by the Equal Protection Clause of the Fourteenth Amendment.

406.   As a result of the District's violation of Plaintiffs' right to equal protection, Named Plaintiffs Derrick, Walter, Thomas, and Sean and all members of the Education Class have suffered and will continue to suffer injury in the form of the denial of a public education, lack of instruction and services, and equal access to the educational opportunities that are afforded to other nonresident students placed at other children's institutions, resulting in the loss of future educational and employment opportunities.

407.   Named Plaintiffs Derrick, Walter, Thomas, and Sean and all members of the Education Class have no adequate remedy at law.

408.   Wherefore, pursuant to 42 U.S.C. § 1983, Plaintiffs demand judgment in their favor and against the Defendants for prospective injunctive and declaratory relief, including the provision of compensatory educational services.

**COUNT FIVE—CHESTER COUNTY IU AND GLEN MILLS VIOLATED THE RIGHTS OF THE EDUCATION SUBCLASS TO A PUBLIC EDUCATION UNDER PENNSYLVANIA STATE LAW**

(By Derrick, Walter, Thomas, and Sean, individually and on behalf of all youth in the Education Subclass, against Defendants Chester County IU and Glen Mills)

409.    Each of the preceding paragraphs is incorporated herein.

410.    Through its actions and inactions, as set forth above, Defendants violated the rights conferred upon Named Plaintiffs Derrick, Walter, Thomas, and Sean and all members of the Education Class by state education laws, including 24 P.S. § 13-1306 and 24 P.S. § 9-914.1-A, by denying these students a free public education to which they were legally entitled.

411.    As a result of the Defendants' failure to comply with its legal obligations under state law, Named Plaintiffs Derrick, Walter, Thomas, and Sean and all members of the Education Class have suffered and will continue to suffer injury due to lack of education, instruction and services to which they were entitled under state law, including the loss of future educational and employment opportunities.

412.    Named Plaintiffs Derrick, Walter, Thomas, and Sean and all members of the Education Class have no adequate remedy at law.

413.    Wherefore, Plaintiffs demand judgment in their favor and against the Defendants for declaratory and prospective injunctive relief, and compensatory damages.

**COUNT SIX—CHESTER COUNTY IU AND DEFENDANT RIVERA VIOLATED THE RIGHTS OF THE SPECIAL EDUCATION SUBCLASS UNDER THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT**

(By Derrick and Walter, individually and on behalf of all youth in the Special Education Subclass, against Defendant Rivera in his official capacity and Chester County IU)

414.    Each of the preceding paragraphs is incorporated herein.

415.    Named Plaintiffs Derrick and Walter and all members of the Special Education Subclass qualify as "child[ren] with a disability" under the IDEA and "student[s] with a disability" and therefore must be provided with an appropriate education program that is individualized to his needs. *See* 20 U.S.C. §§ 1401(3), 1414(d); *see* 22 Pa. Code § 14-101.

416.    As the LEA, Chester County IU has a duty to provide all school-eligible children with disabilities who are residents of Glen Mills with a FAPE in the LRE and must comply with all federal requirements set forth in the IDEA.

417.    By failing to have any system to ensure the provision of a FAPE to students at Glen Mills with disabilities, the Chester County IU violated the IDEA. Systemic deficiencies include but are not limited to:

    a.    Failing to provide comparable services as required by law upon students' transfer to Glen Mills;

b. Failing to create and implement individualized education programs ("IEP") for students with individualized goals to address all areas of need;

c. Failing to hold meetings to review and revise the IEP;

d. Failing to provide related services that a student with a disability needs in order to benefit from education;

e. Failing to offer a continuum of educational placements;

f. Failing to provide individualized transition services resulting from age-appropriate assessments for students who are over 14;

g. Failing to develop and implement a positive behavior support plan with appropriate behavioral interventions based on a functional behavior assessment when a student's behavior impedes his learning or that of others;

h. Failing to limit the use of restraint to only when the student is acting in a manner as to be a clear and present danger to himself or others and only when less restrictive measures and techniques have been proven to be ineffective;

i. Failing to allow physical restraint only when (1) the restraint is utilized with specific component elements of positive behavior support; (2) the restraint is used in conjunction with the teaching of

socially acceptable alternative skills to replace problem behavior; (3) staff are authorized to use the procedure and have received the staff training required; and (4) there is a plan in place for eliminating the use of restraint through the application of positive behavior support;

j.   Failing to refrain from using aversive techniques of handling behavior;

k.   Failing to refrain from punishing students for behavior that is a manifestation;

l.   Failing to convene legally compliant IEP meetings within 10 days of a student restraint to determine if the following actions are necessary: conducting a new functional behavior assessment; creating or revising the positive behavior support plan; changing the student's placement;

m.   Failing to conduct a manifestation review to determine if behavior that leads to a removal from educational services results due to a student's disability; and

n.   Failing to do the following if a behavior is a manifestation of a disability, (1) conducting a functional behavior assessment and implementing a positive behavior support plan; or (2) reviewing and revising an existing positive behavior support plan;

418.   As the state educational agency, PDE has failed to meet its obligations to oversee Chester County IU in order to ensure compliance with the legal duties alleged above and ensure a FAPE to Named Plaintiffs and members of the Special Education Subclass.

419.   Plaintiffs allege systemic failure by Chester County IU and PDE and seek system-wide reforms that cannot be addressed or remedied through individual due process hearings.

420.   The foregoing actions and inactions by the Chester County IU and PDE constitute a policy, pattern, practice, and/or custom that is depriving Named Plaintiffs Derrick and Walter and all children in the Special Education Subclass of their enforceable right under federal law to receive an appropriate, individualized education program in the least restrictive environment.

421.   Named Plaintiffs Derrick and Walter and all children in the Special Education Subclass have no adequate remedy at law.

422.   Pursuant to the IDEA, Plaintiffs are entitled to declaratory and injunctive relief and to recover from Defendants Chester County IU and PDE the reasonable attorneys' fees and costs incurred in bringing this action.

**COUNT SEVEN—CHESTER COUNTY IU AND DEFENDANT RIVERA VIOLATED THE RIGHTS OF THE SUSPECTED-TO-BE-ELIGIBLE SUBCLASS UNDER THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT**

(By Thomas, individually and on behalf of all youth in the Suspected-to-be-Eligible Special Education Subclass, against Defendant Rivera in his official capacity and Chester County IU)

423.   Each of the preceding paragraphs is incorporated herein.

424.   Named Plaintiff Thomas and members of the Suspected-To-Be-Eligible Special Education Subclass qualify as "child[ren] with a disability" under the IDEA and "student[s] with a disability" and therefore must be provided with an appropriate education program that is individualized to his needs.

425.   As the LEA, Defendant Chester County IU has a duty to identify, locate and evaluate all school-eligible children suspected of having disabilities who are residents of Glen Mills in accordance with the requirements set forth in the IDEA.

426.   Defendant Chester County IU fails to maintain a system to identify, locate and evaluate students suspected of being students with disabilities at Glen Mills.

427.   Through its policies, practices, and systemic failures, CCIU has violated the IDEA and denied Named Plaintiff Thomas and members of the Suspected-To-Be-Eligible Special Education Subclass the right to a free appropriate public education and deprived them educational benefits conferred by federal law.

428.   As the state educational agency, PDE has failed to meet its obligations to oversee Chester County IU in order to ensure compliance with the legal duties alleged above and ensure a FAPE to Named Plaintiff Thomas and members of the Suspected-To-Be-Eligible Special Education Subclass.

429.   Plaintiffs allege systemic failure by Chester County IU and PDE and seek system-wide reforms that cannot be addressed or remedied through individual due process hearings.

430.   The foregoing actions and inactions by the Chester County IU and PDE constitute a policy, pattern, practice, and/or custom that is depriving Named Plaintiff Thomas and members of the Suspected-To-Be-Eligible Special Education Subclass of their enforceable right under federal law.

431.   Named Plaintiff Thomas and members of the Suspected-To-Be-Eligible Special Education Subclass have no adequate remedy at law.

432.   Pursuant to the IDEA, Plaintiffs are entitled to declaratory and injunctive relief and to recover from Defendants Chester County IU and PDE the reasonable attorneys' fees and costs incurred in bringing this action.

**COUNT EIGHT—CHESTER COUNTY IU AND DEFENDANT RIVERA VIOLATED THE RIGHTS OF SPECIAL EDUCATION PARENT SUBCLASS TO MEANINGFUL PARTICIATE IN THE SPECIAL EDUCATION PROCESS UNDER THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT**

(By Tina and Janeva, individually and on behalf of all parents in the Special Education Parent Subclass, Against Defendant Rivera in his official capacity and Chester County IU)

433.   Each of the preceding paragraphs is incorporated herein.

434.   Parent Plaintiffs Tina and Janeva and the Special Education Parent Class qualify as "parents" of a child with a disability as defined by 20 U.S.C. § 1401(23) and 22 Pa. Code § 14.101 and therefore are entitled to meaningful participation in the special education process, including the right to consent or reject special education services for their child.

435.   As the LEA, Defendant Chester County IU has a duty to ensure meaningful participation of the parents of students with disabilities who are residents of Glen Mills in accordance with the requirements set forth in the IDEA.

436.   Defendant Chester County IU failed to develop a system to ensure the meaningful participation of Parent Plaintiffs Tina and Janeva and members of the Special Education Parent Class in the educational planning process for their children, including their right to consent or reject special education services.

437.   Through its policies, practices, and systemic failures, Chester County IU has violated the IDEA and denied Named Plaintiffs Tina and Janeva and members

of the Special Education Subclass the right to meaningfully participate in the educational planning process for their children conferred by federal law.

438.   As the state educational agency, PDE has failed to meet its obligations to oversee Chester County IU in order to ensure compliance with the legal duties alleged above to Named Plaintiffs Tina and Janeva and members of the Special Education Parent Subclass.

439.   Plaintiffs allege systemic failure by Chester County IU and PDE and seek system-wide reforms that cannot be addressed or remedied through individual due process hearings.

440.   The foregoing actions and inactions by the Chester County IU and PDE constitute a policy, pattern, practice, and/or custom that is depriving Parent Plaintiffs Tina and Janeva and members of the Special Education Parent Subclass of their enforceable right under federal law.

441.   Parent Plaintiffs Tina and Janeva and members of the Special Education Parent Subclass have no adequate remedy at law.

442.   Pursuant to the IDEA, Plaintiffs are entitled to declaratory and injunctive relief and to recover from Defendants Chester County IU and PDE the reasonable attorneys' fees and costs incurred in bringing this action.

## COUNT NINE—CHESTER COUNTY IU, PDE AND GLEN MILLS VIOLATED THE RIGHTS OF THE DISABILITY SUBCLASS UNDER SECTION 504 OF THE REHABILITATION ACT

(By Derrick and Walter, individually and on behalf of all youth in the Disability Subclass, against Defendants Glen Mills School, Chester County IU, and PDE)

443.   Each of the preceding paragraphs is incorporated herein.

444.   Plaintiffs Derrick and Walter and the members of the Disability Subclass were at all times relevant to this action, and are currently, otherwise qualified individuals with disabilities within the meaning of Section 504. They have impairments that substantially limit a major life activity and they were residents of Glen Mills Schools qualified to participate in the educational programs and activities of Glen Mills Schools.

445.   Plaintiffs Derrick and Walter and the members of the Disability Subclass were at all times relevant to this action, and are currently, "protected handicapped students" within the meaning of Chapter 15 as they all: (i) are at the age at which public education is offered at Glen Mills Schools; (ii) have impairments that substantially limit or prohibit participation in or access to an aspect of Glen Mills Schools' program; and (iii) are raising claims of discrimination under Chapter 15.

446.   Defendants Glen Mills Schools, Chester County IU, and PDE were at all times relevant to this action, and are currently, recipients of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act and provided

and provide a program or activity, which is defined to include all the operations of the recipient. Defendants' operations include the educational and rehabilitative programs and activities in Glen Mills Schools.

447.    Defendants Glen Mills Schools and Chester County IU were at all times relevant to this action, and are currently, school entities subject to Chapter 15. Defendants' operations include the educational and rehabilitative programs and activities in Glen Mills Schools.

448.    Defendant PDE is obligated to administer all of the laws of this Commonwealth with regard to the establishment, maintenance, and conduct of the public schools.

449.    Defendant Glen Mills knew that Plaintiffs Derrick and Walter and the Disability Class required reasonable accommodations to equally access its educational and rehabilitative programs. Despite this knowledge, Glen Mills intentionally, and with deliberate indifference, discriminated against Plaintiffs Derrick and Walter and the Disability Class based on their disabilities in the following ways:

      a.    Failing to reasonably accommodate its policies, practices, and procedures to account for the disabilities of Plaintiffs Derrick and Walter and the Disability Class and instead subjecting them to

discrimination in the use of physical force, restraint, and disciplinary sanctions;

b.   Failing to reasonably modify its policies, practices, and procedures with respect to the educational program to account for the disabilities of Plaintiffs Derrick and Walter and the Disability Class;

c.   Denying Plaintiffs Derrick and Walter and members of the Disability Subclass equal opportunity to participate in, benefit and achieve the same benefit others achieve from Glen Mills' educational program by using physical force, restraint, and disciplinary sanctions on Plaintiffs Derrick and Walter and members of the Disability Subclass, and withholding privileges and educational services, due to disability-related behavior without appropriately taking disability into account;

d.   Denying Plaintiffs Derrick and Walter and members of the Disability Subclass equal opportunity to participate in, benefit and achieve the same benefit others achieve from Glen Mills' educational program by failing to consider disability-related educational needs;

e.   Utilizing criteria and methods of administration that either purposely or in effect discriminate against Plaintiffs Derrick and Walter and members of the Disability Subclass on the basis of their disabilities and defeat or substantially impair accomplishment of the objectives

of Glen Mills' educational and rehabilitative programs or activities by using physical force, restraint, isolation, and disciplinary sanctions, failing to provide adequate special education and related services, and failing to account for disability in managing behavior.

450.    Defendant Chester County IU knew that Plaintiffs Derrick and Walter and the Disability Class required reasonable accommodations to equally access Glen Mills' educational and rehabilitative programs. Despite this knowledge, Chester County IU intentionally, and with deliberate indifference, discriminated against Plaintiffs Derrick and Walter and the Disability Class based on their disabilities in the following ways:

a.    Failing to reasonably accommodate its policies, practices, and procedures to avoid discrimination on the basis of disability to (a) identify and track Plaintiffs Derrick and Walter and members of the Disability Subclass who require reasonable accommodations; (b) inquire into whether behaviors of Plaintiffs Derrick and Walter and members of the Disability Subclass leading to physical force, restraint, isolation, and disciplinary sanctions are disability-related; (c) account for the disabilities of Plaintiffs Derrick and Walter and members of the Disability Subclass when using physical force, restraint, isolation, behavior management, and education;

b.   Denying Plaintiffs Derrick and Walter and members of the Disability Subclass equal opportunity to participate in, benefit and achieve the same benefit others achieve from Glen Mills' educational program by failing to reasonably modify its policies, practices, and procedures with respect to Glen Mills' educational system to ensure that it (a) identifies and evaluates youth with disabilities; (b) provides adequate special education and related services; and (c) properly responds to school-based behavior;

c.   Failing to provide a free appropriate public education to each qualified student at Glen Mills;

d.   Failing to provide special education and related aids and services that were designed to meet the individual educational needs of students with disabilities as adequately as the needs of students without disabilities are met.

451.   Defendant PDE knew that students with disabilities at Glen Mills were entitled to equal access to the educational programs and services of Glen Mills. Despite this, Defendant PDE intentionally and with deliberate indifference failed to ensure that the students received a free appropriate public education and were free from discrimination on the bases of their disabilities.

452.   Because Defendants Glen Mills, Chester County IU and PDE's discriminatory conduct on the basis of Plaintiffs' disabilities is intentional and ongoing, declaratory relief, injunctive relief, and compensatory damages are appropriate remedies.

453.   Pursuant to Section 504, Plaintiffs are entitled to declaratory, injunctive and compensatory relief and to recover from Defendants Glen Mills, Chester County IU and PDE the reasonable attorneys' fees and costs incurred in bringing this action.

**COUNT TEN—CHESTER COUNTY IU, PDE AND GLEN MILLS VIOLATED THE RIGHTS OF THE DISABILITY SUBCLASS UNDER THE AMERICANS WITH DISABILITIES ACT**

(By Derrick and Walter, individually and on behalf of all youth in the Disability Subclass, against Defendants Chester County IU, Glen Mills, and PDE)

454.   Each of the preceding paragraphs is incorporated herein.

455.   Defendant Chester County IU was, at all times relevant to this action, and currently is a "public entity" within the meaning of Title II of the ADA.

456.   Defendant Glen Mills was, at all times relevant to this action, and currently is a "public entity" within the meaning of Title II of the ADA.

457.   Defendant PDE was, at all times relevant to this action, and currently is a "public entity" within the meeting of Title II of the ADA.

458.   Defendants Chester County IU, Glen Mills and PDE provide "services, programs and activities" including educational programs, services and activities at Glen Mills.

134

459.   Plaintiffs Derrick and Walter and members of the Disability Subclass were, at all times relevant to this action, and are currently "qualified individuals with disabilities."

460.   Defendant Glen Mills knew that Plaintiffs Derrick and Walter and the Disability Class required reasonable accommodations to equally access its educational and rehabilitative programs. Despite this knowledge, Glen Mills, through its policies, practices and procedures common to Class Members, intentionally, and with deliberate indifference, discriminated against Plaintiffs Derrick and Walter and the Disability Class based on their disabilities by:

a.   Failing to reasonably modify its policies, practices, and procedures with respect to physical force, restraint, isolation, and behavior management to account for the disabilities of Plaintiffs Derrick and Walter and the Disability Class;

b.   Failing to reasonably modify its policies, practices, and procedures with respect to the educational program to account for the disabilities of Plaintiffs Derrick and Walter and the Disability Class;

c.   Denying Plaintiffs Derrick and Walter and members of the Disability Subclass equal opportunity to participate in, benefit and achieve the same benefit others achieve from Glen Mills' educational program by using physical force, restraint, and disciplinary sanctions on Plaintiffs

Derrick and Walter and members of the Disability Subclass, and withholding privileges and educational services, due to disability-related behavior without appropriately taking disability into account;

d.   Denying Plaintiffs Derrick and Walter and members of the Disability Subclass equal opportunity to participate in, benefit and achieve the same benefit others achieve from Glen Mills' educational program by failing to consider disability-related educational needs;

e.   Utilizing criteria and methods of administration that either purposely or in effect discriminate against Plaintiffs Derrick and Walter and members of the Disability Subclass on the basis of their disabilities and defeat or substantially impair accomplishment of the objectives of Glen Mills' educational and rehabilitative programs or activities by using physical force, restraint, isolation, and disciplinary sanctions, failing to provide adequate special education and related services, and failing to account for disability in managing behavior.

461.   Defendant Chester County IU knew that Plaintiffs Derrick and Walter and the Disability Class required reasonable accommodations to equally access Glen Mills' educational and rehabilitative programs. Despite this knowledge, Chester County IU, through its policies, practices and procedures common to Class Members intentionally, and with deliberate indifference, discriminated against Named

Plaintiffs Derrick and Walter and the Disability Class based on their disabilities in the following ways:

    a.    Failing to reasonably accommodate its policies, practices, and procedures to avoid discrimination on the basis of disability to (a) identify and track Plaintiffs Derrick and Walter and members of the Disability Subclass who require reasonable accommodations; (b) inquire into whether behaviors of Plaintiffs Derrick and Walter and members of the Disability Subclass leading to physical force, restraint, isolation, and disciplinary sanctions are disability-related; (c) account for the disabilities of Plaintiffs Derrick and Walter and members of the Disability Subclass when using physical force, restraint, isolation, behavior management, and education;

    b.    Denying Plaintiffs Derrick and Walter and members of the Disability Subclass equal opportunity to participate in, benefit and achieve the same benefit others achieve from Glen Mills' educational program by failing to reasonably modify its policies, practices, and procedures with respect to Glen Mills' educational system to ensure that it (a) identifies and evaluates youth with disabilities; (b) provides adequate special education and related services; and (c) properly responds to school-based behavior;

462.    Defendant PDE knew that youth with disabilities at Glen Mills were entitled to equal access to the educational programs and services of Glen Mills. Despite this, Defendant PDE, through its lack of oversight and intervention intentionally and with deliberate indifference failed to ensure that youth were free from discrimination on the bases of their disabilities in the education program.

463.    The foregoing policies and practices of Defendants PDE, Chester County IU, and Glen Mills violate the statutory rights of children in the Disability Subclass under the ADA by denying them the benefits of educational programs supported by federal financial assistance.

464.    Because Defendants Glen Mills, Chester County IU and PDE's discriminatory conduct on the basis of Plaintiffs' disabilities is intentional and ongoing, declaratory relief, injunctive relief, and compensatory damages are appropriate remedies.

465.    Pursuant to the ADA, Plaintiffs are entitled to declaratory, injunctive and compensatory relief and to recover from Defendants Glen Mills, Chester County IU and PDE the reasonable attorneys' fees and costs incurred in bringing this action.

## COUNT ELEVEN—COMMON LAW NEGLIGENCE CLAIM AGAINST GLEN MILLS AND GLEN MILLS LEADERSHIP DEFENDANTS

(By Derrick, Walter, Thomas, and Sean, individually and on behalf of all youth in the General Class, against Glen Mills and Glen Mills Leadership Defendants)

466.    Each of the preceding paragraphs is incorporated herein.

467.    Under Pennsylvania statutes and regulations, Glen Mills and Glen Mills Leadership Defendants owed Plaintiffs an affirmative duty of care to ensure their safety and well-being and provide them with adequate protection and medical care while they were in Defendants' custody. Defendants failed to exercise ordinary care and knew or should have known that their acts and omissions caused harm to youth at Glen Mills.

468.    Defendants' acts and omissions, including and their policies, practices, and customs, breached that affirmative duty by: allowing, authorizing, and encouraging a pervasive culture of violence at Glen Mills; failing to maintain supervision and inspection of activities at Glen Mills; failing to properly investigate and evaluate the fitness of staff members before hiring; failing to properly train, manage, and supervise staff members as to the appropriate policies to be provided in providing services to youth at Glen Mills; failing to properly train, manage, and supervise staff members to identify, act upon, and report signs of abuse; failing to properly monitor and/or supervise their employees for whom they bear supervisory responsibilities and whose actions or inactions contributed to the harms suffered by

Plaintiffs while at Glen Mills; failing to identify and act upon circumstances indicating a risk of harm, abuse, and inadequate care to Plaintiffs while at Glen Mills; failing to evaluate Plaintiffs' physical and mental well-being while at Glen Mills; failing to provide appropriate health services and medical treatment; failing to take timely action to remedy the appropriateness of Plaintiffs' placement and provide appropriate and timely medical care; and failing to prevent grievous and permanent physical, emotional, and psychological harm to Plaintiffs while they were at Glen Mills.

469.    Defendants' breach of duty proximately caused Plaintiffs to suffer physical and emotional injuries which were reasonably foreseeable.

**COUNT TWELVE—GLEN MILLS STAFF DEFENDANTS VIOLATED DERRICK'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS TO BE FREE FROM EXCESSIVE AND UNREASONABLE USE OF FORCE (42 U.S.C. § 1983)**

(By Derrick against Glen Mills staff Defendants Andre Walker and John Does 7-12)

470.    Each of the preceding paragraphs is incorporated herein.

471.    The Eighth and Fourteenth Amendments prohibit Glen Mills staff from using excessive and unreasonable force against youth at Glen Mills.

472.    Glen Mills staff Defendants Andre Walker and John Does 7-12 violated Derrick's Eighth and Fourteenth Amendment rights when they punched him numerous times while he lived in Fillmore, when Andre Walker head-butted him in

Jackson, when they painfully restrained him for not tying his shoes, and when a Glen Mills staff member assaulted him in the classroom.

473.   The force used in each of these instances was objectively unreasonable, malicious and sadistic, intended to cause harm, and without any legitimate penological purpose.

474.   Glen Mills served an exclusively public function and Glen Mills staff Defendants Andre Walker and John Does 7-12 acted or failed to act under color of state law.

475.   Glen Mills staff Defendants Andre Walker's and John Doe 7-12's acts and omissions shock the conscience, deprived Derrick of his Eighth and Fourteenth Amendment rights to be protected from physical abuse and unreasonable or excessive force, and caused Derrick grave physical, emotional, psychological, and other harm.

## COUNT THIRTEEN—DERRICK'S CLAIM AGAINST GLEN MILLS STAFF DEFENDANTS FOR ASSAULT AND BATTERY

(By Derrick against Glen Mills staff Defendants Andre Walker and John Does 7-12)

476.   Each of the preceding paragraphs is incorporated herein.

477.   Glen Mills staff Defendants Andre Walker and John Does 7-12 intentionally inflicted physical abuse on Derrick when they punched him numerous times while he lived in Fillmore, when Andre Walker head-butted him in Jackson,

when they painfully restrained him for not tying his shoes, and when a Glen Mills staff member assaulted him in the classroom.

478.  Defendants' conduct constitutes assault and battery.

479.  As a direct and proximate result of Defendant's actions, Derrick suffered severe and painful physical and emotional injuries which he has and will continue to endure for the rest of his life, and suffered an impairment of his earning capacity.

**COUNT FOURTEEN—GLEN MILLS STAFF DEFENDANTS VIOLATED WALTER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS TO BE FREE FROM EXCESSIVE AND UNREASONABLE USE OF FORCE (42 U.S.C. § 1983)**

(By Walter against Glen Mills staff Defendants Robert Taylor, Sean Doe and Chris Doe 1)

480.  Each of the preceding paragraphs is incorporated herein.

481.  The Eighth and Fourteenth Amendments prohibit Glen Mills staff from using excessive force against youth at Glen Mills.

482.  Glen Mills staff Defendants Robert Taylor, Sean Doe and Chris Doe 1 violated Walter's Eighth and Fourteenth Amendment rights when they hit and slapped him, threw him against a fridge, choked him, dragged him through the bushes, and assaulted him after he tried to run away from the abuse.

483. The force used in each of these instances was objectively unreasonable, malicious and sadistic, intended to cause harm, and without any legitimate penological purpose.

484. Glen Mills served an exclusively public function and Glen Mills staff Defendants Robert Taylor, Sean Doe and Chris Doe 1 acted or failed to act under color of state law.

485. Glen Mills staff Defendants Robert Taylor's, Sean Doe's, and Chris Doe 1's acts and omissions shock the conscience, deprived Walter of his Eighth and Fourteenth Amendment rights to be protected from physical abuse and unreasonable or excessive force, and caused Walter grave physical, emotional, psychological, and other harm.

## COUNT FIFTEEN—WALTER'S CLAIM AGAINST GLEN MILLS STAFF DEFENDANTS FOR ASSAULT AND BATTERY

(By Walter against Glen Mills staff Defendants Robert Taylor, Sean Doe and Chris Doe 1)

486. Each of the preceding paragraphs is incorporated herein.

487. Glen Mills staff Defendants Robert Taylor, Sean Doe and Chris Doe 1intentionally inflicted physical abuse on Walter when they hit and slapped him, threw him against a fridge, choked him, dragged him through the bushes, and assaulted him after he tried to run away from the abuse.

488. Defendants' conduct constitutes assault and battery.

489.    As a direct and proximate result of Defendants' actions, Walter suffered severe and painful physical and emotional injuries which he has and will continue to endure for the rest of his life, and suffered an impairment of his earning capacity.

## COUNT SIXTEEN—GLEN MILLS STAFF DEFENDANT VIOLATED THOMAS'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS TO BE FREE FROM EXCESSIVE AND UNREASONABLE USE OF FORCE (42 U.S.C. § 1983)

(By Thomas against Glen Mills staff Defendant Chris Doe 2)

490.    Each of the preceding paragraphs is incorporated herein.

491.    The Eighth and Fourteenth Amendments prohibit Glen Mills staff from using excessive force against youth at Glen Mills.

492.    Glen Mills staff Defendant Chris Doe 2 violated Thomas's Eighth and Fourteenth Amendment rights when he hit Thomas and jumped on top of him during Townhouse.

493.    The force used by Glen Mills staff Defendant Chris Doe 2 was objectively unreasonable, malicious and sadistic, intended to cause harm, and without any legitimate penological purpose.

494.    Glen Mills served an exclusively public function and Glen Mills staff Defendant Chris Doe 2 acted or failed to act under color of state law.

495.    Glen Mills staff Defendant Chris Doe 2's acts and omissions shock the conscience, deprived Thomas of his Eighth and Fourteenth Amendment rights to be

protected from physical abuse and unreasonable or excessive force, and caused Thomas grave physical, emotional, psychological, and other harm.

## COUNT SEVENTEEN—THOMAS'S CLAIM AGAINST GLEN MILLS STAFF DEFENDANT FOR ASSAULT AND BATTERY

(By Thomas against Glen Mills staff Defendant Chris Doe 2)

496.    Each of the preceding paragraphs is incorporated herein.

497.    Glen Mills staff Defendant Chris Doe 2 intentionally inflicted physical abuse on Thomas when he hit Thomas and jumped on top of him during Townhouse.

498.    Defendant Chris Doe 2's conduct constitutes assault and battery.

499.    As a direct and proximate result of Defendant Chris Doe 2's actions, Thomas suffered severe and painful physical and emotional injuries which he has and will continue to endure for the rest of his life, and suffered an impairment of his earning capacity.

## COUNT EIGHTEEN—GLEN MILLS STAFF DEFENDANTS VIOLATED SEAN'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS BY DENYING HIM ADEQUATE FOOD AND MEDICAL CARE (42 U.S.C. § 1983)

(By Sean against Glen Mills staff Defendants John Does 13-20)

500.    Each of the preceding paragraphs is incorporated herein.

501.    The Eighth and Fourteenth Amendments require Glen Mills staff to provide adequate food and medical care to youth at Glen Mills.

502.   Glen Mills staff Defendants John Does 13-20 denied Sean his Eighth and Fourteenth Amendment rights to adequate medical care when they failed to provide him with sufficient medical attention after his jaw was broken.

503.   Glen Mills staff Defendants John Does 13-20 knew that Sean had been seriously injured when another youth punched him but failed to provide him with adequate medical care until four days later.

504.   Glen Mills staff Defendants John Does 13-20 further denied Sean his Eighth and Fourteenth Amendment right to adequate food when they forced him to subsist on only milk after his jaw was wired shut rather than provide him with any liquid meal replacements.

505.   Glen Mills served an exclusively public function and each John Doe acted or failed to act under color of state law.

506.   Glen Mills staff Defendants John Does 13-20's acts and omissions shock the conscience, demonstrate deliberate indifference, deprived Sean of his Eighth and Fourteenth Amendment rights to adequate food and medical care, and caused Sean grave physical, emotional, psychological, and other harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A.    Assert jurisdiction over this action;

B.    Certify the General Class and all Subclasses as defined herein pursuant to Rule 23.

C.    Award prospective injunctive relief, compensatory and punitive damages.

D.    Declare unconstitutional and unlawful pursuant to Rule 57 of the Federal Rules of Civil Procedure: Policies, procedures, and practices violative of the Eighth Amendment to the United States Constitution, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, including 34 C.F.R. § 300.149; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*; and the Pennsylvania Public School Code of 1949, 71 P.S. § 352(a), 24 P.S. § 13-1306, 24 P.S. § 9-914.1-A, *et seq.*

E.    Award to Plaintiffs the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 and Federal Rule of Civil Procedure 23(h); and

F.    Grant such other further and equitable relief as the Court deems just,

necessary, and proper to protect Plaintiffs from further harm.


Dated: April 11, 2019

                              Respectfully Submitted,

                              Marsha Levick (PA 22535)
                              Katherine E. Burdick (PA 307727)
                              JUVENILE LAW CENTER
                              The Philadelphia Building
                              1315 Walnut Street, 4th Floor
                              Philadelphia, PA 19107
                              Telephone: (215) 625-0551
                              mlevick@jlc.org
                              kburdick@jlc.org




                              Maura McInerney (PA 71468)
                              Kristina A. Moon (PA 306974)
                              EDUCATION LAW CENTER PA
                              The Philadelphia Building
                              1315 Walnut Street, 4th Floor
                              Philadelphia PA 19107
                              Telephone (215) 238-6970
                              mmcinerney@elc-pa.org
                              kmoon@ elc-pa.org

Fred T. Magaziner (PA 23332)
Michael H. McGinley (PA 325545)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Telephone (215) 994-2587
Telephone (215) 994-2463
fred.magaziner@dechert.com
michael.mcginley@dechert.com