## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DERRICK, through and with his next | : | |
| Friend and mother, TINA, et al. | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | Civil Action No. 2:19-cv-01541-HB |
| | : | |
| GLEN MILLS SCHOOLS, et al. | : | (The Honorable Harvey Bartle, III) |
| Defendants | : | |

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANT'S, CHESTER COUNTY INTERMEDIATE UNIT,
## <u>MOTION TO STRIKE AND MOTION TO DISMISS THE PLAINTIFFS' COMPLAINT</u>

Defendant, Chester County Intermediate Unit ("CCIU") presents the following in support of its Motion to Strike and Motion to Dismiss the Plaintiffs' Complaint filed in the above referenced matter:

## I.      INTRODUCTION

The Plaintiffs in this case, four individuals adjudicated delinquent and previously committed to Glen Mills Schools ("Glen Mills") by local juvenile justice systems, together with their parents or guardians, have filed this putative class action against numerous Defendant state and local entities and individuals, among whom include CCIU.

Plaintiffs' Complaint alleges various causes of action including constitutional violations under 42 U.S.C. § 1983 ("Section 1983") (**Counts I, II, III, and IV**); violations of Pennsylvania State Law (**Count V**); violations of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et. seq. ("IDEA") (**Counts VI, VII, and VII**); IDEA violations under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504") (**Count IX**); IDEA violations under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA") (**Count X**); additional

violations of Pennsylvania State Law (**Counts XI, XIII, XV, XVII**); and additional constitutional violations under Section 1983 (**Counts XII, XIV, XVI, XVIII**).

Plaintiffs' claims against CCIU are asserted in **Counts III** through **X** and they should be dismissed for lack of subject matter jurisdiction and failure to state a claim. The entire Complaint should be stricken or dismissed for failure to plead simple, concise, and direct allegations that facilitate a responsive pleading.   The specific claims asserted against CCIU are founded completely in the denial of an appropriate public education under state and federal law, which Plaintiffs must exhaust through an administrative hearing before bringing this action in Court. (Complaint ¶¶ 391, 396, 402, 406, 410-11, 417, 420, 427, 436-37, 450-51, 460-61.)

Because the gravamen of the claims, including those under Section 504 and the ADA are derivative of the IDEA, none of the four individual Plaintiffs can proceed in this Court, at this time, because they have not exhausted any of their administrative remedies under the IDEA. Named Plaintiffs seek to represent hundreds of juveniles at Glenn Mills, yet at no time did any of these named Plaintiffs request an immediate and swift due process hearing to address their alleged concerns.[1]   Consequently, they never presented their claims to an independent hearing officer experienced in deciding claims of past or present denials of an education; never allowed a record to develop, nor afforded CCIU the opportunity to address their claims.  Consequently, at this time, their claims in **Counts III** through **X** are not ripe for adjudication in this Court and they must be dismissed.

Rather than seek prompt administrative relief, Plaintiffs have instead taken a trial and error approach to federal court litigation by making labyrinthine allegations wrapped in multiple claims

---

[1] IDEA regulations require that a final administrative decision be rendered and a copy of the decision mailed to all parties no more than 75 days after receipt of a request for a due process hearing. *See* 34 *C.F.R.* § 300.515(a).

in an attempt to find liability against CCIU where none exists.  The complex nature of the parties and claims cannot, and should not, muddy the waters.  As set forth in greater detail below, clear and distinct bases exist to dismiss not just the claims against the CCIU, but the Complaint in its entirety.  Accordingly, the CCIU respectfully requests dismissal of the Complaint.

## II.      ARGUMENT

### A.      Standard of Review for Ruling on a Motion to Strike and Motion to Dismiss.

Pursuant to the Federal Rules of Civil Procedure, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*.  As the Supreme Court held in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the pleading standard announced in Rule 8 does not require "detailed factual allegations."

In addition, Rule 12(f) of the Federal Rules of Civil Procedure allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter." *Fed. R. Civ. P. 12(f)*. "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters."  *Simmons v. Simpson House, Inc.*, 224 F. Supp. 3d 406, 421 (E.D. Pa. 2016) (quotation and citation omitted); *see also In re Westinghouse Sec. Litig.*, 90 F.3d 696, 703 (3d Cir.1996) ("We see nothing to prevent the district court … from requiring, as a matter of prudent case management, that plaintiffs streamline and reorganize the complaint before allowing it to serve as the document controlling discovery, or, indeed, before requiring defendants to file an answer.")(quotation and citation omitted).

Finally, where claims fall within the ambit of the IDEA and require exhaustion, and further where Plaintiffs fail to satisfy the exhaustion requirement and no exception to the exhaustion requirement applies to the facts presented, the Court must dismiss the claims under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.  *See Batchelor v. Rose Tree*

*Media Sch. Dist.*, 759 F.3d 266, 269, 281 (3d Cir. 2014).  Exhaustion of administrative remedies is jurisdictional in the IDEA context for "the statute to 'grant[ ] subject matter jurisdiction to the district court [ ].'" *Id.* at 272.  ("[I]t is clear from the language of the Act that Congress intended plaintiffs to complete the administrative process before resorting to federal court.")(citation omitted).

> **B.    Plaintiffs have offered a Complaint that trammels the requirement of Fed. R. Civ. P. 8(a)(2) that pleadings consist of a "short and plain statement" of the claim, and the Court should therefore strike the Complaint in accordance with Fed. R. Civ. P. 12(f).**

CCIU is certainly sensitive to the gravity of the harm that Plaintiffs, and the class they purport to represent, allege to have suffered in this case.  However, "[Rule 8] serves the important purpose of requiring plaintiffs to state their claims intelligibly so as to inform the defendants of the legal claims being asserted.  *Mann v. Boatright*, 477 F.3d 1140, 1148 (10th Cir. 2007) ("Something labeled a complaint but written more as a press release, prolix in evidentiary detail, yet without simplicity, conciseness and clarity as to whom plaintiffs are suing for what wrongs, fails to perform the essential functions of a complaint.") (citation omitted).

The righteous anger the affected families may feel cannot excuse the obligation of their attorneys under Fed. R. Civ. P. 8(a)(2) to file a Complaint on their behalf that offers a "short and plain statement" of the basis of their claims, to which the parties named as defendants can formulate a factual and truthful answer to the best of their ability.  "Unnecessary prolixity in a pleading places an unjustified burden on the district judge and the party who must respond to it because they are forced to ferret out the relevant material from a mass of verbiage."  5 *Fed. Prac. & Proc. Civ. § 1281* (3d ed.)  Equally ignored in the Complaint are the related requirements of Fed. R. Civ. P. 8(d) that "[e]ach allegation must be simple, concise, and direct" and Fed. R. Civ. P. 10(b) that each paragraph be "limited as far as practicable to a single set of circumstances."

A lengthy complaint violates this requirement if it is so rambling, unclear, or complicated so as to defy response and is grounds for dismissal.  *See, e.g.*, *Mann v. Boatright*, *supra*, 477 F.3d at 1147-48 (upholding dismissal of 99-page complaint for violation of Rule 8(a)(1)); *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378-79 (7th Cir. 2003) (upholding dismissal of a 400-paragraph, 155-page "distended" complaint for plaintiff's failure to conform complaint to pleading rules and collecting cases).  Parties charged with the duty to file a timely answer—not to mention the Court—should not have to "penetrate a tome approaching the magnitude of *War and Peace* to discern a plaintiff's claims and allegations."  *U.S. ex rel. Cafasso v. General Dynamics C4 Sys., Inc.*, 637 F.3d. 1047, 1058-59 (9th Cir. 2011); *see also Lindell v. Houser*, 442 F.3d 1033, 1035 (7th Cir. 2006) ("District courts should not have to read and decipher tomes disguised as pleadings.")

The 146-page Complaint in this matter sprawls over a staggering 506 paragraphs plainly intended to enhance the media blitz that accompanied its filing.  Although a class action lawsuit intended to address years of alleged abuse in a public institution plainly requires some latitude for elaboration, plaintiffs here have far exceeded the bounds of reasonable notice pleading and entered the realm of long-form investigative journalism, from which they borrow liberally, if not Dickensian prose.  The result is a tome that requires hours to read and that includes adjective-laden detail that is virtually impossible to answer.

We are informed, for example, that although Glen Mills "prided itself on being the oldest 'reform school' in the country, touting its picturesque campus, rigorous athletics, and 'world class' education, … lurking inside its storied halls was a culture of malicious and sadistic abuse." (Complaint ¶ 3).  The alleged acts and omissions of the defendants are described as "reminiscent of the darkest times—real or *imagined*—in our history of maltreatment of youth" and that—

> If it is true that the soul of a nation is revealed through the treatment of its children, the souls of Glen Mills leadership and staff, and of the many complicit state officials, reflect, by analogy, the worst versions of ourselves as a society.

(Complaint ¶ 7)(emphasis added).

We learn that Defendant Dr. Randy Ireson "stepped down" from his position at Glen Mills "'for health reasons' … eight days after the *Philadelphia Inquirer* ran an article entitled "Beaten then silenced: at the oldest U.S. reform school leaders have hidden a long history of violence.'" (Complaint ¶ 28). The article, three paragraphs of which are then block-quoted in the Complaint at paragraph 78 and which is quoted and cited extensively elsewhere as a form of "factual" allegation in the pleading, is also offered, in all 23 pages of its on-line format, as Exhibit B. (Complaint ¶¶ 64; 79; 81; 121; 122; 199; 233). While stirring, and likely to arouse the righteous rage of a jury or an otherwise indifferent public, this purple prose, and the countless examples like it, violate the notice pleading standard embodied in Rule 8 of the Federal Rules of Civil Procedure, as it is neither strictly factual nor a required element of a federal claim. It is quite literally a newspaper article rewritten as a federal court complaint.

Most critical, for current purposes, is that "allegations" such as these are entirely unanswerable. How does a defendant admit or deny whether the "halls" at the Glen Mills School are "storied," or confirm that "a culture of malicious and sadistic abuse" was "lurking" behind them? If a defendant can confirm that Dr. Ireson resigned "for health reasons," does it thereby admit to the skeptical suggestion in the clear wording of the Complaint that the true reason for the retirement was the article that had recently appeared in the *Inquirer*?

Adding to the dramatic and answer-defying prose of the Complaint are paragraphs in which Plaintiffs purport to summarize and cite to bodies of research regarding the deleterious effects of juvenile justice placements on school-age youth in general (*see, e.g.*, Complaint ¶¶ 223; 236; 237);

dozens of paragraphs of legal analysis and citation (*see, e.g.*, Complaint ¶¶ 242-50; 283-97; 338-46); and *twenty-eight* footnotes in which Plaintiffs offer factual sub-points and further citation to various legal and non-legal authorities.  Must a Defendant read all four of the scholarly articles summarized in paragraph 236 to admit or deny in good faith whether they were accurately characterized in that paragraph?  What of the other 27 footnotes?  The Federal Rules of Civil Procedure provide no instruction for responding to legal and non-legal authorities in footnoted allegations.

For the foregoing reasons, CCIU respectfully requests that the Court strike the Complaint as drafted, or in the alternative, afford Plaintiffs the opportunity to submit a pleading with an answerable "short and plain statement" of their claims as required under Rule 8(a)(2) and the related requirements of Rules 8(d) and 10(b).

> **C.     None of the named Plaintiffs have exhausted or pleaded a colorable excuse for failing to exhaust the administrative remedies of the IDEA, a jurisdictional predicate to the assertion of any claim the gravamen of which is based on that Act.**

Class claimants—no less than individual claimants—who assert claims sounding in the IDEA, must satisfy the jurisdictional requirement of exhausting the administrative remedies that Congress established at length in that Act or must plead an adequate excuse for failing to do so. *See Blount v. Lower Merion Sch. Dist.*, 559 F. Supp. 2d 548, 560 (E.D. Pa. 2008), *aff'd*, 767 F.3d 247 (3d Cir. 2014).  Plaintiffs in *Blount* filed a class action lawsuit against Lower Merion School District and the Pennsylvania Department of Education for disability and race discrimination.  *Id.* at 553.  The Court dismissed all individual plaintiffs who did not exhaust administrative remedies. *Id.* at 560.  As in the present case, the plaintiffs in *Blount* argued that they should be excused from administrative exhaustion under the IDEA because they have alleged failures by the defendants on a systemic level and the inability of the administrative remedial process to provide the systemic

relief requested.  *Id.* at 558.  The Court, however, dismissed all individual plaintiffs who had not exhausted administrative remedies because, like here, the complaint at issue centered on the "individualized circumstances of the named students and the … defendants' failure to provide these students with the FAPE to which they are entitled."  *Id.* at 559.  Plaintiffs could not avoid the requirement to exhaust "by including conclusory allegations of some systemic deficiencies." *Id.* ("Allowing plaintiffs to bypass the administrative process by merely including conclusory allegations of systemic deficiencies would permit the exception to the exhaustion requirement to swallow the rule.").

In the present action, **Counts III** (Section 1983 claim), **IV** (Section 1983 claim), **V** (violations of Pennsylvania State Law), **VI** (IDEA claim), **VII** (IDEA claim), **VIII** (IDEA claim), **IX** (Section 504 claim), and **X** (ADA claim) require exhaustion of remedies through the administrative processes and procedures set forth in the IDEA as a prerequisite to filing a lawsuit. *See* 20 U.S.C. § 1415(b)(6)-(7) and 1415(l); 20 C.F.R. § 300.516(e); *Fry v. Napoleon Cmty. Sch.* 137 S. Ct. 743, 752 (2017); *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014).  Section 1415(l) of the IDEA "compels exhaustion when a plaintiff seeks 'relief' that is 'available' under the IDEA."  *Fry*, 137 S. Ct. at 753; *see also Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 131 (3d Cir. 2017)("a plaintiff who seeks relief available under the IDEA must exhaust his administrative remedies before filing a lawsuit, even if he relies on laws other than the IDEA.").  The exhaustion requirement is so jurisdictionally critical to the Congressional statutory scheme that exhaustion is required even in cases where the plaintiffs do not explicitly rely on the IDEA in framing their claim.  IDEA exhaustion is required as long as the "gravamen" of the plaintiff's claims fall within the ambit of the IDEA.  *See* Fry*, 137 S. Ct. at 754; Batchelor*, 759 F. 3d at 272.  Here, of course, the claims in Counts **III, IV, V, VI, VII, VIII, IX and X** rest *explicitly*

in the IDEA and in statutes such as Section 1983, Section 504, and the ADA for which IDEA exhaustion is also required. *See* 20 U.S.C. § 1415(l); M.S. *v. Marple Newtown Sch. Dist.*, 635 F. App'x 69, 71 (3d Cir. 2015) (IDEA exhaustion requirement "'bars plaintiffs from circumventing the IDEA's exhaustion requirement by taking claims that could have been brought under IDEA and repackaging them as claims under some other statute—e.g., section 1983, section 504 of the Rehabilitation Act, or the ADA'").

The IDEA establishes an elaborate administrative review process, the purpose of which is to afford local and state educational agencies to apply their particular expertise in the field of education to resolve disputes prior to submission to "generalists" at the judicial level of review. *See Jeremy H. v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 284 n.23 (3d Cir. 1996) ("Specialized fact finding … is an important function of the IDEA's administrative hearing process"); *Komninos v. Upper Saddle River Sch. Dist.*, 13 F.3d 775, 779 (3d Cir. 1994) (same).

Long ago recognizing the importance of "specialized fact finding to the IDEA scheme, the Supreme Court required that federal district courts afford "due weight" and "due deference" to state administrative proceedings in evaluating claims under IDEA. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982); *see also S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 269-70 (3d Cir. 2003). In *Rowley*, the Supreme Court explained that—

> the provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at naught. The fact that [the IDEA] requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings.

*Rowley*, 458 U.S. 176, 206 (1982).  Thus, "[f]actual findings from the administrative proceedings are to be considered prima facie correct," and the reviewing court "is obliged to explain why" if it "fails to adhere" to those findings.  *S.H. v. State-Operated Sch. Dist.*, 336 F.3d at 270 (quoting with approval from *M.M. v. Sch. Dist. of Greenville County*, 303 F.3d 523, 531 (9th Cir. 2002)); s*ee also Shore Reg'l High Sch. Bd. of Educ. v. P.S.,* 381 F.3d 194, 199 (3d Cir. 2004).  The Supreme Court has strongly cautioned the federal courts to avoid the temptation "to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.

A court should not excuse a plaintiff lightly from the obligation to exhaust the administrative process, based on spurious claims of "futility."  Unquestionably, "plaintiffs ... should not be permitted to 'sit on' live claims and spurn the administrative process that could provide for the educational services they seek, then later sue for damages."  *Polera v. Bd. of Educ.,* 288 F.3d 478, 481 (2nd Cir. 2002). Exhaustion allows for the application of administrative expertise to the fact-finding process to resolve evidentiary disputes and develop a factual record. "'That process offers an opportunity for state and local agencies to exercise discretion and expertise in fields in which they have substantial experience.'"  *Blount v. Lower Merion Sch. Dist.*, 767 F.3d 247, 271 (3d Cir. 2014) (citation omitted).

Allowing Plaintiffs' claims for relief for a denial of FAPE to proceed without requiring exhaustion "would not only render superfluous most of the detailed procedural protections outlined in the [IDEA], but, more important, it would also run counter to Congress' view that the needs of handicapped children are best accommodated by having the parents and the local education agency work together to formulate an individualized plan for each handicapped child's education."  *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 274 (3d Cir. 2014).  Here, contrary to established law,

Plaintiffs ask this Court to be the first fact finder on the issues of (1) whether Plaintiffs received appropriate comparable services upon their placement at Glen Mills; (2) whether appropriate assessment tools and instruments were used to identify Plaintiffs educational needs; (3) whether Plaintiff's IEPs were appropriate; (4) whether the IEPs provided accurate present levels of performance; (5) whether the IEP goals related to the Plaintiffs' areas of need; (6) whether the Positive Behavioral Support Plans and other services were appropriate; (7) whether the academic instruction was sufficiently intensive to address the Plaintiffs' needs; (8) whether appropriate transition assessments and meaningful transition plans were developed for Plaintiffs; and (9) whether the Plaintiffs were educated in the least restrictive environment appropriate for their needs.  (Complaint ¶¶ 269, 305, 308, 311, 312, 314, 315, 320, 321, 322, 324, 325, 348, 349, 417). Ultimately, the need to allow educational experts the opportunity to address such allegations first and develop a record is demonstrated here by the need of Plaintiffs to prepare a 146-page Complaint with 506 paragraphs to lay out individualized facts and circumstances relating to the alleged educational harm experienced by the four named Plaintiffs, all of whom are alleged to have suffered educational harm due to the denial of a legally required individualized educational program.

Plaintiffs offer no excuse for their failure to exhaust the IDEA-mandated expert fact-finding process other than the bald assertion, in footnote 26, that their claims all address "systemic" issues.  In support of this excuse, plaintiffs cite to *Beth V. by Yvonne V. v. Carroll*, 87 F.3d 80, 89 (3d Cir. 1996), a case in which the Third Circuit specifically *declined* to address the issue of exhaustion in remanding the case to the District Court.  *See id.*  The reliance on *Beth V.* is particularly ironic in this case given that the claim of the plaintiffs therein was *not*, as is here, about the individual appropriateness of their children's educational experience, but rather about the *lack*

of an adequate state compliance complaint hearing system. *See id.*, 87 F.3d. at 88. The systemic claim of the *Beth V.* litigants was, in other words, focused on the sufficiency of the state's complaint procedures to ensure that which was ignored here: the availability and application of administrative expertise and oversight of IDEA-based concerns.

Because Plaintiffs here have chosen not to avail themselves of any administrative remedy to investigate and timely resolve IDEA complaints as sought by the litigation in *Beth V.*, Plaintiffs have failed to exhaust the administrative remedies applicable at least to **Counts III, IV, V, VI, VII, VIII, IX and X** of their Complaint. CCIU therefore respectfully requests that the Court dismiss those Counts.

### D.    CCIU is not a "local educational agency" in relation to Glen Mills and, as all claims against it are premised on that status, the Court should dismiss all such claims and release CCIU as a party to this action.

Plaintiffs cite Section 1306 of the Pennsylvania Public School Code Act of 1949, P.L. 30, No. 14, art. XIII, § 1306, *as amended* 24 Pa. Stat. Ann. § 13-1306 (West), in support of their argument that CCIU is the "local educational agency" ("LEA") responsible for the education of students housed at Glen Mills. (Complaint ¶ 299.) They are correct that Section 1306 establishes a *general rule* under which the *school district*—not the Intermediate Unit—in which a residential institution is located (often referred to as the "host district") must educate the school-age residents of that institution as they would students whose parents reside in the district. 24 Pa. Stat. Ann. § 13-1306(a) (West). The host district, under this *general rule*, may charge back to the school districts where the parents of the institutionalized children reside (often referred to as the "resident districts") the cost incurred for such education. *See* 24 Pa. Stat. Ann. § 13-1309 (West). Section 1306 does indeed, as Plaintiffs suggest, render the "host district" fully answerable for the education of the school-age residents of the institution. *See* 24 Pa. Stat. Ann. § 13-1306(a) and (c) (West).

Ultimately, however, Plaintiffs' reliance on Section 1306 must fail as a basis for establishing CCIU as the LEA responsible for the education of students housed at Glen Mills, which, as Plaintiffs correctly allege, is a Private Rehabilitative Residential Institution ("PRRI"). The education of students in PRRIs *is not governed* by Section 1306, but instead is governed by Section 914.1-A of the Public School Code Act of 1949, P.L. 30, No. 14, art. IX-A, § 914.1-A, added Apr. 6, 1980, P.L. 86, No. 30, § 3, *as amended and re-numbered* 24 PA. STAT. § 9-914.1-A. Section 1306 *by its own terms* recognizes that Section 914.1-A controls the education of students housed in PRRIs:

> Nothing in this section is intended to supersede section 914.1-A of this act or any other provision of law applicable to a particular type of placement.

24 Pa. Stat. Ann. § 13-1306(e) (West).

Section 914.1-A is convoluted, but it plainly defines PRRIs as institutions to which juveniles are court-committed "pursuant to a proceeding" under Pennsylvania's Juvenile Act and which provides "educational services as part of a total rehabilitative package." 24 PA. STAT. § 9-914.1-A(c). Much of Section 914.1-A is absorbed with the establishment of a contorted funding scheme under which an intermediate unit or a school district may—but is not required to—contract with a PRRI essentially for purposes of flowing educational funding from the Commonwealth and various resident school districts to the PRRI. Most critically for purposes of the present Complaint is that—

> A private residential rehabilitative institution shall be *exempt from administrative control by the intermediate unit contracting therewith* other than those controls necessary to assure *the proper expenditure of funds* for the maintenance of the minimum education program provided for in the contract. Such contracts shall not require compliance with this act [the School Code] to any extent greater than such compliance existed on the effective date of this amendatory act [April 6, 1980].

*Id.* at § 9-914.1-A(d) (emphasis added). Any reasonable reading of this language—the only language in Section 914.1-A or elsewhere in the School Code governing the educational responsibilities of intermediate units or school districts related to PRRIs—supports the conclusion that intermediate units are limited to the role of fiscal watchdog or monitor.  Intermediate units, like CCIU, are expressly prohibited from exercising administrative control over the PRRI and thus are not authorized to administer an educational program, hire or fire teachers, supervise or design instruction, or determine the level or quality of that instruction.   By denying administrative control to CCIU, the Commonwealth has effectively prevented CCIU from serving as the LEA.  Under the IDEA, for the CCIU to be the LEA over Glenn Mills, CCIU must have administrative control over the school:

> The term "local educational agency" means a public board of education or other public authority legally constituted within a State for either *administrative control* or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools.

20 *U.S.C.* § 1401(19)(a).  Federal implementing regulations use a substantively identical definition.  *See* 34 *C.F.R.* § 300.28.

Instead of being the LEA responsible for education at Glen Mills, CCIU is limited only to assuring to the Pennsylvania Department of Education and, indirectly, the resident school districts whose students are committed to the PRRI that the dollars expended for PRRI-provided instruction meet the minimum educational standards applicable to such instruction as of April 6, 1980.  The exact parameters of those decades-old standards are lost in the annals of time.  They appear, however, to consist of the minimum hour and subject-matter requirements applicable to all instruction for students of compulsory school age, as embodied in Section 1327(a) and (b) of the

School Code. 24 Pa. Stat. Ann. § 13-1327(a) and (b) (West). Not by the wildest stretch of statutory interpretive imagination does this limited fiscal watchdog role endow PRRI-contracting intermediate units with the power and administrative control over education policy and practice of the sort that an LEA necessarily must have, much less render them answerable to third-party lawsuits such as this one challenging the adequacy of the education over which, by law, the PRRI had exclusive administrative control.

The agreement between Glen Mills and CCIU, mentioned in the Complaint and attached hereto as Exhibit A,[2] merely elaborates on the watchdog role of CCIU without rendering CCIU the responsible LEA and without modifying or diminishing the responsibility of Glen Mills. (Complaint ¶¶ 6, 25, 35.) This arrangement is clear in the first two paragraphs of the agreement, the first of which clarifies that "Glen Mills Schools shall be responsible for the provisions of a Minimum Educational Program of Instruction [the term used in Section 914.1-A of the School Code] … and a free appropriate program of education *and due process procedural safeguards as required by state and federal law* for exceptional children who are residents of Glen Mills Schools." (Ex. A, ¶ 1 (emphasis added)). The second paragraph, in turn, defines the role of CCIU as that of a "monitor". (*Id*. at ¶ 2). Other than the monitoring and other peripheral roles assigned to it under the agreement, CCIU is not "responsible in any way for the provision of any part of the Glen Mills Schools' program." (*Id.* at ¶ 46). Glen Mills, on the other hand, is responsible for evaluating student needs, convening IEP team meetings, developing IEPs, implementing IEPs with appropriately-qualified staff, ensuring compliance with the procedural protections available to students and parents under the IDEA and state law, and for implementing all administrative and

---

[2] The exhibit consists of both the 2017-2018 and the 2018-2019 contracts. They are identical, and all citations are to the 2018-2019 version.

judicial orders resulting from special education due process hearings (*Id.* at ¶¶ 3, 4, 8, 9, 11, 12, 13, 16, 22, 45), all roles assigned to a responsible LEA under the IDEA, *see* 20 U.S.C. §§ 1414(b) and (c); and 1415(b).[3]  Indeed, Glen Mills is responsible under this agreement for indemnifying CCIU and holding it harmless against any claim by "any person … relating to or arising from or out of operation by Glen Mills of its facility and/or its program for children who are residents of Glen Mills Schools." (*Id.* at ¶ 26).  Such an assurance would be unheard of were CCIU the responsible LEA in the first place.

Taking the allegations of the Complaint at face value—as the Court and parties must for purposes of this motion—the Plaintiffs here have laid out a claim that CCIU breached the monitoring responsibilities assigned to it under its agreement with Glen Mills.  This alleged breach, however, did not violate a duty that CCIU owed directly to any of the named Plaintiffs or to members of the proffered Plaintiff class, as CCIU is statutorily exempted from responsibility as LEA by virtue of Section 914.1-A of the School Code and contractually exempted from responsibility as LEA by the terms of its agreement with Glen Mills.  If Plaintiffs have a claim based on their status as "third party beneficiaries" of that contract—intended or otherwise—it is not a claim that they have asserted in this action.

---

[3]  Perhaps instructive here is that when a parent cannot be located for a student placed at Glen Mills, the agreement assigns to CCIU the role of appointing a "surrogate parent," as required under the IDEA.  (Ex. A at ¶ 17); *see also* 20 U.S.C. § 1415(b)(2)(A)).  Surrogates cannot "be an employee of the State educational agency, the local educational agency, or any other agency that is involved in the education or care of the child."  20 U.S.C. § 1415(b)(2)(A)).  The agreement provides only that the surrogate appointed by CCIU "shall not be an employee of the PRRI [Glen Mills]." (Ex. A at ¶ 17), suggesting by negative inference that Glen Mills is either the LEA or "an agency that is involved in the education or care of the child" and that CCIU is not.

Because CCIU is not the responsible LEA in relation to students placed at Glen Mills,[4] and because the Complaint, as it applies to CCIU, is premised entirely on that status, CCIU respectfully requests that the Court dismiss all claims against it in this matter.

WHEREFORE, CCIU requests that this Honorable Court grant CCIU's Motion to Dismiss Counts III through X, or in the alternative, to Strike the Plaintiffs' Complaint in its entirety.

SWEET, STEVENS, KATZ & WILLIAMS LLP


Date: <u>May 6, 2019</u>      By:      <u>*/s/ Andrew E. Faust*</u>
                                        Andrew E. Faust, Esquire – PA47367
                                        331 East Butler Avenue, POB 5069
                                        New Britain, Pennsylvania  18901
                                        (215) 345-9111



Date: <u>May 6, 2019</u>      By:      <u>*/s/ Jason D. Fortenberry*</u>
                                        Jason D. Fortenberry, Esquire – PA311397
                                        331 East Butler Avenue, POB 5069
                                        New Britain, Pennsylvania  18901
                                        (215) 345-9111

                                        Counsel for Defendant, Chester County Intermediate Unit

---

[4]   By removing intermediate units from administrative control over PRRIs, the Commonwealth has established a scheme under which either it or the PRRI must be directly and wholly responsible for the education of students placed in PRRIs.  The Commonwealth Department of Education can assume to itself all responsibilities ordinarily delegated to a LEA.  The State of Hawaii, for example, answers as both the state educational agency and the LEA for its school-aged children. *See Michael P. v. Dep't of Educ.*, 656 F.3d 1057, 1067 (9th Cir. 2011). ("Hawaii DOE serves both as the state educational agency, which creates statewide education regulations, and as the local school district, which provides educational services directly to students").