**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DERRICK, by and with his parent and next friend TINA, et al., | |
| Plaintiffs, | Case No. 2:19-cv-01541-HB |
| v. | **ORAL ARGUMENT REQUESTED** |
| GLEN MILLS SCHOOLS, et al., Defendants. | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVES AND CLASS COUNSEL**</u>

Marsha L. Levick
Katherine E. Burdick
Nadia Mozaffar
Malik Pickett
Courtney M. Alexander
Breanne Schuster
Jasmin Randolph-Taylor
JUVENILE LAW CENTER
1800 JFK Blvd., Suite 1900B
Philadelphia, PA 19103
(215) 625-0551

Fred T. Magaziner
Michael H. McGinley
Clare Pozos
Caroline Power
Roger A. Dixon
Rachel Rosenberg
Christopher J. Merken
DECHERT LLP
2929 Arch St.
Philadelphia, PA 19104
(215) 994-4000

***Attorneys for Plaintiffs***

Maura McInerney
Kristina A. Moon
Margaret M. Wakelin
EDUCATION LAW CENTER
1800 JFK Blvd., Suite 1900A
Philadelphia, PA 19103
(215) 238-6970

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

I.    FACTUAL BACKGROUND ...................................................................... 2

      A.    GMS Policies and Practices Fostered Abuse Without Oversight ......... 2

      B.    DHS, Under the Leadership of the DHS Defendants, Failed to Meet its
            Obligations to Inspect and Monitor GMS ............................................ 5

      C.    GMS Failed to Provide Youth an Appropriate Public Education ......... 8

      D.    GMS Discriminated Against Students with Disabilities ..................... 11

      E.    PDE Defendants Failed Meet Their Obligations to Ensure Students
            Received an Appropriate Legally Compliant Education under Federal and
            State Laws ......................................................................................... 14

            1.    PDE Failed to Ensure That All Students Received a Legally
                  Compliant Education. ............................................................... 14

            2.    PDE Failed to Fulfill Its Obligations to Students with Disabilities. ........ 15

II.   LEGAL STANDARD ............................................................................... 17

      A.    Rule 23(a) Factors ............................................................................ 17

      B.    Rule 23(b) Factors ............................................................................ 20

      C.    Issues Class Requirements ................................................................ 22

III.  ARGUMENT ........................................................................................... 24

      A.    Abuse Class Against DHS Defendants .............................................. 24

            1.    The DHS Abuse Class meets the requirements of Rule23(a) ......... 24

            2.    The DHS Abuse Class meets the requirements of Rule 23(b) ......... 26

      B.    Issues Classes Against GMS ............................................................. 30

            1.    Abuse Issues Class Against GMS ............................................. 30

                  a)    The GMS Abuse Issues Class meets the requirements of
                        Rule 23(a) ....................................................................... 30

                  b)    The GMS Abuse Issues Class meets the requirements of
                        Rule 23(b) ....................................................................... 35

                  c)    The *Gates* factors support certification ......................... 37

            2.    Education Issues Class Against GMS ........................................ 39

                  a)    The GMS Education Issues Class meets the requirements of
                        Rule 23(a) ....................................................................... 39

                  b)    The GMS Education Issues Class meets the requirements of
                        Rule 23(b) ....................................................................... 42

# TABLE OF CONTENTS
(continued)

**Page**

|  |  | c) | The *Gates* factors support certification | 44 |

   3.  Disability Discrimination Issues Class ........................... 45

      a)  The GMS Disability Discrimination Issues Class meets the requirements of Rule 23(a) .......................... 45

      b)  The GMS Disability Discrimination Issues Class meets the requirements of Rule 23(b) .......................... 47

      c)  The *Gates* factors support certification .......................... 49

C.  Issues Classes Against PDE .......................... 50

   1.  Education Issues Class against PDE .......................... 50

      a)  The PDE Education Issues Class meets the requirements of Rule 23(a) .......................... 50

      b)  The PDE Education Issues Class meets the requirements of Rule 23(b) .......................... 52

      c)  The *Gates* factors support certification .......................... 53

   2.  Disability Discrimination Issues Class Against PDE .......................... 53

      a)  The PDE Disability Discrimination Issues Class meets the requirements of Rule 23(a) .......................... 533

      b)  The PDE Disability Discrimination Issues Class meets the requirements of Rule 23(b) .......................... 55

      c)  The *Gates* factors support certification .......................... 56

   3.  Special Education Issues Class .......................... 56

      a)  The Special Education Issues Class meets the requirements of Rule 23(a) .......................... 57

      b)  The Special Education Issues Class meets the requirements of Rule 23(b) and the *Gates* factors support certification .......................... 59

   4.  Suspected Special Education Issues Class .......................... 61

      a)  The Suspected Special Education Issues Class meets the requirements of Rule 23(a) .......................... 61

      b)  The Suspected Special Education Class meets the requirements of Rule 23(b) and the *Gates* factors support certification .......................... 62

   5.  Special Education Parents Issues Class .......................... 63

      a)  The Special Education Parents Issues Class meets the requirements of Rule 23(a) .......................... 63

**TABLE OF CONTENTS**
(continued)

Page

       b)    The Special Education Parents Issues Class meets the
requirements of Rule 23(b) and the *Gates* factors support
certification ................................................................................. 65

IV.    CONCLUSION ............................................................................................ 65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.M. v. Luzerne Cty. Juv. Det. Ctr.*,
    372 F.3d 572 (3d Cir. 2004)......................................................................33

*A.R. v. Connecticut State Bd. of Educ.*,
    No. 16-01197, 2020 WL 2092650 (D. Conn. May 1, 2020)......................42, 52, 59

*Allen v. Ollie's Bargain Outlet, Inc.*,
    37 F.4th 890 (3d Cir. 2022) ....................................................................18

*Amchem Prod., Inc. v. Windsor*,
    521 U.S. 591 (1997)...........................................................................28, 36

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013).................................................................................17

*Andrew M. v. Del. Cty. Office of Mental Health & Mental Retardation*,
    490 F.3d 337 (3d Cir. 2007)..................................................................15, 54

*Baby Neal ex rel. Kanter v. Casey*,
    43 F.3d 48 (3d Cir. 1994).....................................................................19, 20

*Barel v. Bank of Am.*,
    255 F.R.D. 393 (E.D. Pa. 2009)................................................................49

*Bistrian v. Levi*,
    696 F.3d 352 (3d Cir. 2012)....................................................................32

*Brian B. v. Pa. Dep't of Educ.*,
    51 F. Supp. 2d 611 (E.D. Pa 1999) .......................................................15, 54

*Bizzarro v. Ocean Cty.*,
    No. 07-5665, 2009 WL 1617887 (D.N.J. June 9, 2009)...............................28

*Byrd v. Aaron's Inc.*,
    784 F.3d 154 (3d Cir. 2015)..................................................................17, 21

*C.P. v. N.J. Dep't of Educ.*,
    No. 19-12807, 2022 WL 3572815 (D.N.J. Aug. 19, 2022) ........................... *passim*

*C.G. v. Pennsylvania Dep't of Educ.*,
    No. 06-1523, 2009 WL 3182599 (M.D. Pa. Sept. 29, 2009)........................... *passim*

## TABLE OF AUTHORITIES
(continued)

*D.L. v. Dist. of Columbia*,
   860 F.3d 713 (D.C. Cir. 2017) ...............................................................58, 62, 64

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
   489 U.S. 189 (1989)..............................................................................................25

*Derrick v. Glen Mills Schs.*,
   No. 19-1541, 2019 WL 7019633 (E.D. Pa. Dec. 19, 2019)...................................21

*Dobson v. Milton Hershey Sch.*,
   356 F. Supp. 3d 428 (M.D. Pa. 2018) ...................................................................32

*Duncan v. Gov. of Virgin Islands*,
   48 F.4th 195 (3d Cir. 2022) ...........................................................................19, 20

*Elias v. Ungar's Food Prod., Inc.*,
   252 F.R.D. 233 (D.N.J. 2008)........................................................................29, 36

*In re FieldTurf Artificial Turf Mktg. & Sales Pracs. Litig.*,
   No. 17-2779, 2023 WL 4551435 (D.N.J. July 13, 2023) .....................................38

*Gates v. Rohm & Haas Co.*,
   655 F.3d 255 (3d Cir. 2011)........................................................................ *passim*

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982)..............................................................................................19

*Graham v. Florida*,
   560 U.S. 48 (2010)................................................................................................32

*Gulf Oil Co. v. Barnard*,
   452 U.S. 89 (1981)................................................................................................17

*Hall v. Midland Grp.*,
   1999 WL 1052003 (E.D. Pa. Nov. 22, 1999) .......................................................29

*Hayes v. Sec'y of Dep't of Pub. Safety*,
   455 F.2d 798 (4th Cir. 1972) ................................................................................20

*Hayes v. Wal-Mart Stores, Inc.*,
   725 F.3d 349 (3d Cir. 2013)...........................................................................22, 63

*Henrietta D. v. Giuliani*,
   No. 95-0641, 1996 WL 633382 (E.D.N.Y. Oct. 25, 1996)...................................46

## TABLE OF AUTHORITIES
(continued)

**Page**

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008), *as amended* (Jan. 16, 2009)................................................48, 59

*J.M. by and Through Mata v. Tenn. Dep't of Educ.*,
    358 F. Supp. 3d 736 (M.D. Tenn. 2018)........................................................................15, 54

*Johnston v. HBO Film Mgmt., Inc.*,
    265 F.3d 178 (3d Cir. 2001)..............................................................................................20

*M.A. ex rel. E.S. v. Newark Pub. Schs.*,
    No. 01-03389, 2009 WL 4799291 (D.N.J. Dec. 7, 2009)................................................41, 58

*Miller v. Alabama*,
    567 U.S. 460 (2012)..........................................................................................................32

*In re Modafinil*,
    837 F.3d 238 (3d Cir. 2016)..........................................................................................18, 24

*In re Nat'l Football League Players Concussion Injury Litig.*,
    821 F.3d 410 (3d Cir. 2016)..........................................................................................18, 35

*Nat'l L. Ctr. on Homelessness & Poverty, R.I. v. New York*,
    224 F.R.D. 314 (E.D.N.Y. 2004) .............................................................................40, 41, 58

*Pittenger v. Union Area Sch. Bd.*,
    356 A.2d 866 (Pa. Commw. Ct. 1976) .............................................................................15

*In re Prudential Ins. Co. Am. Sales Prac. Litig.*,
    148 F.3d 283 (3d Cir. 1998)......................................................................17, 29, 36, 59

*In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*,
    962 F. Supp. 450 (D.N.J. 1997), *aff'd sub nom. In re Prudential Ins. Co. Am.*
    *Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998) .........................................29, 36

*P.V. ex rel. Valentin v. Sch. Dist. of Phila.*,
    289 F.R.D. 227, 233-34 (E.D. Pa. 2013) ..............................................................................28

*Reyes v. Netdeposit, LLC*,
    802 F.3d 469 (3d Cir. 2015)..........................................................................................19, 28

*Roper v. Simmons*,
    543 U.S. 551 (2005)..........................................................................................................32

*Ross v. Gossett*,
    33 F.4th 433 (7th Cir. 2022) ..........................................................................................26, 27

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Russell v. Educ. Comm'n for Foreign Med. Graduates*,
   15 F.4th 259 (3d Cir. 2021) ............................................................................. *passim*

*Serventi v. Bucks Tech. High Sch.*,
   225 F.R.D. 159 (E.D. Pa. 2004)........................................................................46, 47, 55

*Shorter v. United States*,
   12 F.4th 366 (3d Cir. 2021) ........................................................................................32

*Sourovelis v. City of Phila.*,
   515 F. Supp. 3d 321 (E.D. Pa. 2021) .........................................................................29

*Stewart v. Abraham*,
   275 F.3d 220 (3d Cir. 2001)........................................................................18, 20, 25

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir. 2011)........................................................................17, 21

*In re: The Glen Mills Schools Litigation*,
   Dkt. No. 900 (Phila. C.C.P.) ........................................................................29, 36, 43

*V.W. by & through Williams v. Conway*,
   236 F. Supp. 3d 554 (N.D.N.Y. 2017)........................................................41, 51, 54

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)........................................................................19, 35

*Weiss v. York Hosp.*,
   745 F.2d 786 (3d Cir. 1984)........................................................................18

*Wharton v. Danberg*,
   854 F.3d 234 (3d Cir. 2017)........................................................................38

*William Penn School District v. Pennsylvania Dep't of Educ.*,
   294 A.3d 537 (Pa. Commw. Ct. 2023) ........................................................................8

*Williams v. City of Philadelphia*,
   270 F.R.D. 208 (E.D. Pa. 2010)........................................................................46

*Wilson v. Cty. of Gloucester*,
   256 F.R.D. 479 (D.N.J. 2009)........................................................................27

## Statutes

Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ............................ 8, 11, 15, 45, 53-54

**TABLE OF AUTHORITIES**
(continued)

**Page**

Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ....................................8, 11

Section 504 of Rehabilitation Act of 1973, 42 U.S.C. § 794 ....................................................8, 11

Pa. Const. art. III, § 14 ...............................................................................................................8

22 P.S. § 12.6 ............................................................................................................................14

24 P.S. § 9-914.1-A ....................................................................................................................8

24 P.S. § 13-1301 .......................................................................................................................8

24 P.S. § 13-1306 .................................................................................................................8, 14

24 P.S.§ 13-1327 ..................................................................................................................9, 40

71 P.S. § 352 .............................................................................................................................14

42 Pa. Cons. Stat. § 6357 ..........................................................................................................31

**Other Authorities**

28 C.F.R. § 35.130 ....................................................................................................................11

34 C.F.R. §§ 300.340-300.350 ....................................................................................................8

34 C.F.R. § 300.321 ..................................................................................................................60

22 Pa. Code § 11.11 .............................................................................................................8, 14

22 Pa. Code § 11.12 ..................................................................................................................40

22 Pa. Code § 12.8 .....................................................................................................................8

22 Pa Code § 17.1 .....................................................................................................................14

55 Pa. Code §§ 20.51, 20.71, 20.37 ............................................................................................5

55 Pa. Code §§ 3800.4, 3800.11 .................................................................................................5

55 Pa. Code §§ 3800.32, 3800.53 ..............................................................................................31

Fed. R. Civ. P. 1 ........................................................................................................................49

Fed. R. Civ. P. 23 ............................................................................................................. *passim*

**TABLE OF AUTHORITIES**
(continued)

**Page**

Restatement (Second) of Torts § 314A(4) ..................................................................................32

## INTRODUCTION

This class action lawsuit is based on the Defendants' astonishing system-wide failures to provide a safe environment and adequate education to the youth placed in the care of the Glen Mills Schools ("GMS"). Common policies, practices, and systemic deficiencies harmed hundreds of proposed class members in violation of federal and Pennsylvania law and the United States Constitution. To remedy these wide-ranging violations, Plaintiffs request that the Court certify the specific classes set forth below, which relate to the policies and culture of abuse at GMS and the failure to provide an adequate and legally compliant education to former GMS students. Three former students of GMS, Derrick, Thomas and Walter, as well as two parents of former GMS students, Tina and Janeva, bring these claims on behalf of the proposed classes.

Specifically, Plaintiffs seek certification of a Rule 23(b)(3) damages class for abuse claims against the Pennsylvania Department of Human Services Individual Defendants Theodore Dallas, Teresa D. Miller, and Cathy Utz ("DHS Defendants"). Plaintiffs also seek certification of Rule 23(c)(4) issues classes relating to the following: (1) abuse claims against GMS and Randy Ireson ("GMS")[1], (2) education and disability discrimination claims against GMS; and (3) education, disability discrimination and special education related claims against the Pennsylvania Department of Education ("PDE").[2] Class certification is warranted in this case because it will facilitate the fair and efficient resolution of claims of numerous parties which are based on common policies,

---

[1] "GMS" refers to GMS and Defendant Randy Ireson when referencing the abuse claims. The education and disability claims are brought against GMS as an entity alone.

[2] Notably, the education claims against GMS and PDE and the disability discrimination claims against GMS and PDE involve common facts and evidence and these issues could be consolidated for class purposes.

practices, and conduct that impact all members of the proposed classes. Such claims, particularly in this case, would otherwise evade legal enforcement.[3]

## I. FACTUAL BACKGROUND

### A. GMS Policies and Practices Fostered Abuse Without Oversight

GMS fostered an environment of abuse that was so pervasive that DHS eventually ordered a full evacuation of the facility in March 2019, after concluding that simply by being there, students were "at imminent risk and their safety [wa]s in jeopardy." (Ex. 1, Emergency Removal Order, PA-DHS00010588 ("ERO") at 6 (internal pagination)).

That culture of abuse manifested in a multitude of common ways. At its core, the school's behavior management philosophy was a self-proclaimed, confrontation culture policy in which all staff and students were required to enforce amorphous, shifting, and often unwritten norms through threats, intimidation and even force if necessary. (*Cf.* Ex. 2, Program Description, GMS0115964, 6; and Ex. 3, Student Handbook, GMSCA0004545, 17-18 (internal pagination)). Special privileges were reserved for those who confronted peers and enforced campus norms to achieve ███████ ███████ (*See, e.g.,* Ex. 4, Locke Dep. at 133:5-23, 230:8-11). After learning of these norms via ████████████████████████ (Ex. 5, Cosgrove Dep. at 120:17-20), all students and staff were expected to enforce them by "confronting" norm-breaking students. (*Id.* at 144:3-23). ████████ ████████████████████████████████████████████████████████████. (*Id.* at 150:10-151:3). Unsurprisingly, this method bred violence, as student confrontations often resulted in fights and staff confrontations typically became physical. (*Id.* at 147:6-148:4; 149:8-10). In fact, GMS's written policies anticipated and allowed for staff to physically confront

---

[3] While Plaintiffs seek certification of multiple classes as issues classes, we note that several classes could also be certified under Rule 23(b)(3). This Motion provides a legal basis for class certification under that provision in the alternative.

students through manual assists and physical restraints. (*See, e.g.*, Ex. 6, Hayes Hall New Peer Packet, GMSCA0004905, 10; Ex. 7, Ireson Dep. at 80:13-84:4).

At GMS, abuse was systemic, visible, and normalized. David Muhammad, a youth correctional expert with extensive national experience noted the ███████████████████ ████████████████████████████████████████████████████████████ (Ex. 8, Muhammad Rpt. at 6). The same expert noted that the school's records reveal over ████████ ██████████████, which is █████████████ for a youth justice facility. (*Id.* at 9). These same records show that, from 2013 to March, 2019, █████████████████████████ ██████████████. (*See* Ex. 9, GMS's Physical Restraint Log GMSCA0401031).[4] When DHS finally ordered all students to be removed from the facility, it verified a "pervasive" "culture of intimidation and coercion," and determined that "Glen Mills failed to protect the youth entrusted to its care, placed youth at risk of serious physical injury, permitted youth to sustain physical injuries by their acts and failure to act." (Ex. 1, ERO at 5-6). Indeed, Dr. Randy Ireson, who directed GMS for the entire relevant period, admitted point blank that GMS failed for a decade to create an environment that "fully respects and protects the dignity of all [GMS] students" (Ex. 10, Aug. 23, 2018 Ltr from Ireson to Figueroa, PHILA000001-6; Ex. 7, Ireson Dep. at 204:3-205:20).

Yet, despite repeated and ongoing instances of severe violence against students, GMS leadership persisted on this course of violence and intimidation while failing to enact effective accountability mechanisms. (*See* Ex. 8, Muhammad Rpt. at 6). GMS maintained its confrontation policy despite the campus violence it bred. (*Id.*; *see also, e.g.,* Ex. 7, Ireson Dep. at 87:18-88:15;

---

[4] ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████

Ex. 5, Cosgrove Dep. at 158:17-23). GMS also willfully ignored the data it had regarding the many

violent restraints that occurred on campus. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ (*See, e.g.*, Ex. 11, GMS Abuse 30(b)(6), Spriggs Dep. at 137:20-138:2,

149:2-21; Ex. 5, Cosgrove Dep.194:6-7). ████████████

████████████████████████████████████ (*See* Ex.

8, Muhammad Rpt. at 17-18 (citing Ex. 11, GMS Abuse 30(b)(6), Spriggs Dep. at 123:11-124:5;

Ex. 7, Ireson Dep. at 126:11-19)).

████████████████████████████

████████████████████ (*See* Ex. 8, Muhammad Rpt. at 13-14). An investigation by

Pennsylvania's Auditor General covering the period from July 1, 2017 to March 11, 2020

concluded that GMS did not conduct required background checks on staff who closely and

regularly interacted with students and that GMS lacked appropriate training policies and

procedures relating to preventing and reporting child abuse. (Ex. 12, Auditor General Report

("Aud. Rpt.") at 2). GMS had no meaningful process for checking employee references and was

devoid of ████████████████████ (*Id.*; Ex. 5, Cosgrove Dep. at

62:16-63:5). ████████████████████████

████████████████████████████ (*See* Ex 8,

Muhammed Rpt. at 19-21). GMS's deliberate lack of oversight, especially given the violent culture

it promoted, perpetuated a pattern of abuse to which every student was exposed. (*See id.* at 15; Ex.

13, Kinscherff Rpt. at 4).

**B.** **DHS, Under the Leadership of the DHS Defendants, Failed to Meet its Obligations to Inspect and Monitor GMS**

The Pennsylvania Department of Human Services, at the direction and under the control of Secretary Dallas, Secretary Miller, and Deputy Secretary Utz, had the statutory authority to license and monitor GMS and had an obligation to license only those institutions that kept children safe and complied with federal and state laws and regulations. *See, e.g.*, 55 Pa. Code §§ 3800.4, 3800.11, 20.51, 20.71, 20.37. Unfortunately, each DHS Defendant failed in that obligation through policies and practices that caused DHS staff to (i) ignore complaints of physical violence, (ii) adopt licensing practices focused more on completing checklists than monitoring the safety and wellbeing of youth, (iii) accept boilerplate corrective action plans that did not hold GMS accountable, (iv) continually re-license GMS despite knowing the school was harming students, and (v) fail to timely issue an emergency removal order or revoke GMS's license. (*See* Ex. 14, Decker Rpt. at 24-35; Ex. 15, Cahill Dep. at 281:24-282:16; Ex. 16, Prattis Dep. at 281:18-284:5).

The March 2019 ERO acknowledged that "a culture of intimidation and coercion is pervasive at Glen Mills and that youth were told to lie about the care they received and the physical mistreatment they endured while placed at Glen Mills." (Ex. 1, ERO at 6). There was ample evidence of the culture of intimidation and abuse well before 2019, but the DHS Defendants did not take sufficient actions to protect the youth at GMS. At all times, the DHS Defendants had the ability to issue an Emergency Removal Order or revoke GMS's license, but it was not until The Philadelphia Inquirer published its scathing expose of GMS's abusive practices that DHS belatedly concluded that GMS students "have been and continue to be subjected to physical harm as a result of being slapped, punched, and stricken by staff. In addition, youth are encouraged by staff to engage in physical altercations with peers that has resulted in injuries to youth and staff have failed to intervene in these altercations" and took action to remove students from campus. (*Id.*; 55 Pa.

Code § 20.37; 55 Pa. Code § 20.71(a); 62 PS § 1026(b); *see also* Compl. Ex. B, ECF No. 1-1 (Lisa Gartner, Beaten, then Silenced, Phila. Inquirer, Feb. 20, 2019, at B1).

For years, the DHS Defendants received scores of reports of abuse and mistreatment of children at GMS but did not effectively investigate or act to prevent ongoing abuse. ██████████

███████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ *See* Ex. 17, Home and Community Services Information System Incident Management Report Compilation, PA-DHS00020305; *see, e.g.*, Ex. 18, PA-DHS00006536; Ex. 19, PA-DHS00000049; Ex. 20, PA-DHS00000001; Ex. 21, PA-DHS00005565; Ex. 22, PA-DHS00001880; Ex. 23, PA-DHS00007877. In fact, many of the cases cited in DHS's Emergency Renewal Order were previously investigated by DHS. (Ex. 1, ERO at 7-10). On the occasions when DHS did compile data on complaints coming out of GMS, data revealed, for example, ██████████████████████

███████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ (Ex. 24, OCYF Review of Unsafe Uneducated Report, PA-DHS00009893 at 2-4 (internal pagination)).

Despite the voluminous complaints, before March 2019, DHS Defendants failed ██████████

███████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ (*See* Ex. 14, Decker Rpt. at 8-10; 26; Ex. 15, Cahill Dep. at 180:10-24 (citing Ex. 25, PA-DHS00028469 at 73); Ex. 26, Wooters Dep. at 172-73).

DHS staff responsible for reviewing complaints ████████████████████████

████████████████████████████. (*See, e.g.*, Ex. 15, Cahill Dep. at 43:13-

44:18). DHS staff testified that, ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████ (*Id.* at 58:8-59:4; Ex. 26, Wooters Dep. at 105:11-108:20). ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████. (*See*

Ex. 16, Prattis Dep. at 281:18-284:5). ████████████████████████

████████████████████████████ (*See* Ex. 24, OCYF Report, PA-DHS00009893 at 3

(internal pagination)).

DHS Defendants also utilized a defective, non-cumulative complaint review policy,

whereby ████████████████████████████████████████████████████████

████████████████████████████████. (Ex. 14, Decker Rpt. at 26; Ex. 26, Wooters

Dep. at 171:23-73:3). Because of this illogical and faulty practice, DHS ignored the obvious

patterns and culture of abuse present at GMS for years. *See* Ex. 14, Decker Report at 26.

Before March 2019, ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████ (*See id.* at 6-7). ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████ (*Id.* at 25-32). Despite receiving an

enormous volume of complaints involving students at GMS and finding that violations were

occurring, the DHS Defendants ████████████████████████████████████

████████████████████████████ (*Id.* at 26 (emphasis added)). Instead, the DHS Defendants decided to

7

maintain the status quo by allowing GMS to continue operating with its culture of violence and intimidation.

### C.    GMS Failed to Provide Youth an Appropriate Public Education

Youth placed at GMS had a legal entitlement to receive an appropriate meaningful education compliant with applicable Pennsylvania and federal laws. (*See e.g.*, 24 P.S. § 13-1301 (PA residents); 22 Pa. Code § 12.8(a) (same); 24 P.S. § 13-1306 (non-residents); 22 Pa. Code § 11.11(c) (same); 24 P.S. § 9-914.1-A(a)-(c) (governing educational services to private residential rehabilitative institutions for educational services); Individuals with Disabilities Education Act, ("IDEA") 20 U.S.C. § 1400 *et seq.*; 20 U.S.C. §§ 1412(a)(4) and 1414(d) (2)(A); 34 C.F.R. §§ 300.340-300.350; Section 504 of the Rehabilitation Act ("Section 504"), 42 U.S.C. § 794; Title II of the Americans with Disabilities Act ("ADA"), *id.* § 12131 *et seq.*). In addition, Pennsylvania courts have recognized that education is a fundamental right, which cannot be denied to a class of students without a compelling state interest. *See William Penn Sch. Dist. v. Pennsylvania Dep't of Educ.*, 294 A.3d 537, 946-55 (Pa. Commw. Ct. 2023); Pa. Const. art. III, § 14.

GMS violated its statutory obligations and deprived GMS students of their fundamental right to an education by failing to satisfy even the most minimal legal requirements. None of GMS's educational pathways offered students the minimum legally required education to learn and earn credits towards high school graduation. Instead, GMS provided a self-directed program of credit acquisition courses through a one-size-fits-all online tutorial with no live instruction ("Plato"). (*See* Ex. 27, GMS Education 30(b)(6), Power Dep. at 178:20-24). Counselor-teachers were only required to ensure that students behaved and spent their classroom time on Plato and were not required to provide instruction. (*See, e.g.*, Ex. 28, GMSEDU0115596-684 ("2019 Education Playbook") at 3; Ex. 29, Chobany Dep. at 83:4-20; Ex. 5, Cosgrove Dep. at 89:1-3). Multiple GMS employees and experts agreed that Plato was not an effective mode of instruction.

(*See, e.g.,* Ex. 30, Educational Delivery Report, CCIU_0000425 at 6; Ex. 31, Gagnon Rpt. at 30-32). And Plato did not meet the education requirements imposed by Pennsylvania statute. (*Id.* at 21). For example, ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

(*Id.* at 28-29; 24 P.S.§ 13-1327; Ex. 28, 2019 Education Playbook at 11; Ex. 32, McNeal Dep. at 61:3-22). In addition, the education program did not align with Chapter 4 state standards, which details what must be taught in specific subjects at each grade level. (*See* Ex. 28, 2019 Education Playbook at 11; Ex. 31, Gagnon Rpt. at 28-31). GMS administrators and staff repeatedly acknowledged that youth at GMS could not access the curriculum, as it was above their reading level. (*See, e.g.*, Ex. 7, Ireson Dep. at 252:19-253:10; Ex. 33, Powell Dep. at 124:7-25; Ex. 34, Walker Dep. at 137:17-138:2). Yet, counselor-teachers provided no support and students predictably failed to make progress. (*See, e.g.*, Ex. 31, Gagnon Rpt. at 16-20*;* Ex. 34, Walker Dep. 159:8-160:16; Ex. 35, Derrick Dep. Vol. II at 116:7-118:13; Ex. 36, Walter Dep. Vol. II at 464:19-465:10).

The GED program was similarly ineffective. ███████████████████████████

███████████████████████████████████████████████████████████████████████

(Ex. 32, McNeal Dep. at 73:18-75:3). ██████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████ (*See* Ex. 27, GMS Education 30(b)(6), Power Dep. at 133:17-19, 142:15-20, 290:19-292:4). ████████████████████████████████████

████████████████████ (Ex. 37, Student Data, GMSCA0381084; Ex. 38, Educational Path, GMSCA0381090; Ex. 31, Gagnon Rpt. at 33), ████████████████████████████████

████████████████████████████████ (*See, e.g.*, Ex. 38, Educational Path, GMSCA0381090;

Ex. 27, GMS Education 30(b)(6), Power Dep. at 289:24-290:10). Worse, GMS failed to administer the GED program in any meaningful way. ████████████

████████████████████████████████

████████████████████████ (*See, e.g.*, Ex. 27, GMS Education 30(b)(6), Power Dep. at 93:8-10, 165:20-167:19).

Staff at GMS were not qualified nor trained to teach, nor did they provide planned instruction. (*See* Ex. 31, Gagnon Rpt. at 16-20; Ex. 34, Walker Dep. 159:8-160:16; Ex. 35, Derrick Dep. II at 116:7-118:13; Ex. 36, Walter Dep. Vol. II at 464:19-465:10). ████████████

████████████████████████████████

████████████████ (Ex. 27, GMS Education 30(b)(6), Power Dep. at 79:3-7; Ex. 32, McNeal Dep. at 83:18-84:3). ████████████

████████████████████████████████

████████████ (*See, e.g.*, Ex. 27, GMS Education 30(b)(6), Power Dep. at 188:3-189:14). ████████████████████████ (*id.* at 35:23-36:7), ████████████████████████████

████████ (*Id.* at 34:10-19; Ex. 31, Gagnon Rpt. at 22-23).

The education programs offered by GMS were not only facially deficient, but ineffective in educating students. ████████████████

████ (Ex. 31, Gagnon Rpt. 16-18), ████████████████

████████████ (Ex. 32, McNeal Dep. at 125:3-125:14; Ex. 29, Chobany Dep. at 176:24-184:19; Ex. 7, Ireson Dep. at 244:21-245:10, 251:19-252:10, 252:19-253:10).

Finally, the culture of violence and intimidation at GMS created an ████████████

████████████████ that prevented students from engaging with teachers or their

academics. (*See e.g.,* Ex. 39, Osher Rpt. at 10-11). Students who complained about their education or abuses were further abused and retaliated against. (*See, e.g.,* Ex. 35, Derrick Dep. Vol. II at 290:9-293:14).

      **D.**    **GMS Discriminated Against Students with Disabilities**

      Youth with disabilities at GMS likewise had a legal entitlement to receive an appropriate and meaningful education and to be free from discrimination on the basis of their disabilities, as required by applicable federal laws. *See* IDEA, 20 U.S.C. § 1400 *et seq.*; *id.* §§ 1412(a)(4) and 1414(d)(2)(A); Section 504, 42 U.S.C. § 794; ADA, *id.* § 12131 *et seq.*; *id.* § 12102(2) (a disability is an impairment that substantially limits "major life activities," including physical and neurological functions). Approximately 40% of youth placed at GMS were entitled to receive special education services. (Ex. 37, Student Data, GMSCA0381084). Many more were students with qualifying disabilities with a record of a physical or mental impairment that substantially limits one or more major life activities. (*See* Ex. 31, Gagnon Rpt. at 40-41 (detailing students without Individualized Education Programs ("IEPs") for whom GMS had ████████████

██████████████████████████████████████████████████████████

████████████). GMS discriminated against students with disabilities in multiple ways through policies and practices that deprived students of equal access to education and subjected them to discipline due to GMS's systemic failure to provide accommodations to students with qualifying disabilities. *See* 28 C.F.R. § 35.130(b)(7) (discrimination includes failing to make reasonable accommodations that would allow a person with a disability to participate in a service, program, or activity).

      *First,* GMS denied students equal access to education under the ADA and Section 504 based on their disabilities. GMS had no process in place to identify and make accommodations for students with qualifying disabilities and all students were subjected to the same rules. ████████

11

███████████████████████████████████████████████████

███████████████████████ (Ex. 40, GMS Special Ed. 30(b)(6), Pikes Dep. at 61:8-64:21; Ex. 7, Ireson Dep. at 50:8-53:24). ███████████████████

███████████████████████████████████████████████████

███████████████████████████████ (Ex. 40, GMS Special Ed. 30(b)(6), Pikes Dep. at 274:18-21). And GMS failed to take students' disabilities into account when imposing restraints and disciplinary sanctions. (*See, e.g.*, Ex. 5, Cosgrove Dep. at 155:12-156:7, 218:2-11; Ex. 7, Ireson Dep. at 84:7-13, 85:11-24; Ex. 33, Powell Dep. at 86:16-87:19). As a result, students with disabilities faced a greater risk of assault. (Ex. 31, Gagnon Rpt. at 26-27, 56-57). Students with behavioral disabilities were expected either to comply with GMS's "norms" or face the consequences. (Ex. 33, Powell Dep. 191:21-192:4; Ex. 7, Ireson Dep. at 76:4-77:7, 90:9-18).

*Second*, GMS discriminated against students with disabilities by failing to implement any system to identify students who would be eligible for special education services. ███████████

███████████████████████████████████████████████████

███████████████████████████████████ (Ex. 40, GMS Special Ed. 30(b)(6), Pikes Dep. at 263:17-264:4; Ex. 31, Gagnon Rpt. at 45). ████████████

███████████████████████████████████████████████████

███████████████████████ (Ex. 31, Gagnon Rpt. at 38-42; Ex. 40, GMS Special Ed. 30(b)(6), Pikes Dep. at 252:4-254:2, 355:24-356:10; Ex. 7, Ireson Dep. at 50:8-53:24). ██████

███████████████████████████████████████████████████

███████████████████ (*See, e.g.*, Ex. 33, Powell Dep. at 139:24-141:18).

*Third*, GMS discriminated against students with disabilities by failing to ensure their access to education. ████████████████████████

████████████████████████████ (Ex. 32, McNeal Dep. at 49:4-50:24; Ex. 31, Gagnon Rpt. at 31-32). ██████████

████████████████████████████ (Ex. 7, Ireson Dep. at 113:9-114:21; Ex. 33, Powell Dep. at 183:1-184:8). ██████████

████████████████████████████████

████████████████████████████ (Ex. 40, GMS Special Ed. 30(b)(6), Pikes Dep. at 238:20-239:19). ████████████

████████████████████████████████

████████ (*Id.* at 217:8-219:3). ██████████████

████████████████████ (Ex. 31, Gagnon Rpt. at 44). These policies deprived students with disabilities of effective learning.

Moreover, even the minimal special education services that GMS *did* provide were inadequate under the law. ██████████████████████

████████████████████████████████ (Ex. 32, McNeal Dep. at 49:4-50:24). ████████████

████████████████████████████ (Ex. 5, Cosgrove Dep. at 89:1-3; Ex. 40, GMS Special Ed. 30(b)(6), Pikes Dep. at 117:4-119:2; Ex. 33, Powell Dep. at 188:15-190:17). ████████████

████████████████████████████ (Ex. 31, Gagnon Rpt. at 47). ████████████

████████████████████████████████

████ (Ex. 40, GMS Special Ed. 30(b)(6), Pikes Dep. at 261:3-7; Ex. 31, Gagnon Rpt. at 49-51).

**E.   PDE Defendants Failed Meet Their Obligations to Ensure Students Received an Appropriate Legally Compliant Education under Federal and State Laws.**

*1.   PDE Failed to Ensure That All Students Received a Legally Compliant Education.*

PDE categorically failed to oversee GMS's regular education program.[5] PDE did not conduct any on-site monitoring at GMS related to its general education program. (Ex. 42, PDE 30(b)(6), Clancy Dep. at 228:10-14; Ex. 27, GMS Education 30(b)(6), Power Dep. at 265:18-267:7). PDE did not ensure compliance with the state-required number of instruction hours or required courses or ensure access to a secondary education for all students. (Ex. 42, PDE 30(b)(6), Clancy Dep. 221:13-223:6). PDE's monitoring of GMS's provision of general education was ████████████████████████████████████████████████. (*Id.*; Ex. 27, GMS Education 30(b)(6), Power Dep. at 363:8-19).

PDE also failed to monitor Chester County Intermediate Unit ("CCIU") in any way. ████ ████████████████████████████████ (Ex. 42, PDE 30(b)(6), Clancy Dep. at 245:12-249:2), ████████████████████. (*Id.* at 230:6-9, 221:13-225:8). ████████████████████████████ ████████████████████████████████████ (Ex. 43, CCIU 30(b)(6), Ewing Dep. at 290:5-16, 302:6-303:16; Ex. 31, Gagnon Rpt. at 62-64; *see also* Ex. 27,

---

[5] PDE bears the ultimate responsibility to "administer all of the laws of this Commonwealth with regard to the establishment, maintenance, and conduct of the public schools." 71 P.S. § 352(a). Pennsylvania residents between the ages of 6 and 21—and nonresidents living in a Pennsylvania children's institution—are entitled to a "free and full education in the Commonwealth's public schools." 22 P.S. § 12.6; 24 P.S. § 13-1306; 22 Pa. Code § 11.11(c). To safeguard this right, PDE was required to ensure that CCIU was operating in accordance with the Public School Code, 22 Pa Code § 17.1 and that educational services were provided to students at GMS in accordance with 24 P.S. Education § 9-914.1-A.

GMS Education 30(b)(6), Power Dep. at 267:18-268:19). Because of PDE's lack of oversight over CCIU and GMS, it did not detect even GMS's most basic failures. (Ex. 42, PDE 30(b)(6), Clancy Dep. at 221:9-225:8; Ex. 43, CCIU 30(b)(6), Ewing Dep. at 151:13-16, 301:13-19).

> 2.    *PDE Failed to Fulfill Its Obligations to Students with Disabilities.*

PDE failed to meet its obligation to ensure compliance with disability laws, including the IDEA, ADA, and Section 504.[6] With regard to students receiving special education services, PDE failed to conduct effective monitoring activities to ensure that GMS students with disabilities received the free appropriate public education ("FAPE") required by state and federal law. For example, ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████ (Ex. 41, Aug. 5, 2014 Email from Ewing to Pikes, CCIU_0029901-03; Ex. 42, PDE 30(b)(6), Clancy Dep. at 42:15-18, 46:11-14, 264:9-23, 267:13-269:4; Ex. 40 GMS Special Ed. 30(b)(6), Ex. 40, Pikes Dep. at 90:16-91:6). As a result of this lack of oversight applicable to all students, PDE failed to recognize that GMS lacked a system to provide a FAPE to GMS students with disabilities due to common baseline deficiencies, including: (1) ██████████████████████████████████████████████████████████████, (Ex. 43, CCIU 30(b)(6), Ewing Dep. at 92:22-93:1; Ex. 44, CCIU Response to Pls.' Interrogatory No. 11; Ex. 31, Gagnon Rpt. at 42-43); (2) ████████████████████████████████████████ ██████████████████████████, (Ex. 40, GMS Special Ed. 30(b)(6), Pikes at 252:4-254:2, 340:22-

---

[6] PDE is required in part to oversee and ensure the guarantee of education for students, free from discrimination on the basis of disability, per the IDEA, Title II of the ADA, and Section 504. *Andrew M. v. Del. Cty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007); *J.M. by and Through Mata v. Tenn. Dep't of Educ.*, 358 F. Supp. 3d 736, 750-52 (M.D. Tenn. 2018). PDE's oversight includes monitoring local educational agencies that are responsible for providing a free and full education in the Commonwealth's public schools. *See generally Pittenger v. Union Area Sch. Bd.*, 356 A.2d 866, 868 (Pa. Commw. Ct. 1976); *Brian B. v. Pa. Dep't of Educ.*, 51 F. Supp. 2d 611, 619 (E.D. Pa 1999).

343:20, 355:24-356:10; Ex. 31, Gagnon Rpt. at 38-42); (3) █████████████████████████

███████████████████████████████████████████████, (Ex. 32, McNeal Dep.

at 49:4-50:24); (4) █████████████████████████████████████████████, (Ex. 45,

MacLuckie Dep. at 207:9-22; Ex. 40, GMS Special Ed. 30(b)(6), Pikes Dep. at 273:12-19); (5) ████

███████████████████████████████, (Ex. 40, GMS Special Ed. 30(b)(6), Pikes Dep. at

261:3-7); (6) ██████████████████████████████████████████████████████

██████████████████████████, (*Id.* at 263:17-264:4; Ex. 31, Gagnon Rpt. at 45-47); (7) ████

████████████████████████████████████████████████, (Ex. 27, GMS Education

30(b)(6), Power Dep. at 79:3-7, 178:20-24, 189:15-190:6; Ex. 31, Gagnon Rpt. at 21-24); and (8)

██████████████████████████████, (Ex. 31, Gagnon Rpt. at 47-49).

   Moreover, while PDE ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

█████████████████████████████ (Ex. 42, PDE 30(b)(6), Clancy Dep. at 301:17-24; Ex. 46,

Riccio Dep. at 228:13-24; Ex. 46, PDE00000284-409). ███████████████████████████████

(*see, e.g.*, Ex. 46, at PDE0000292); ████████████████████ (*see, e.g.*, *id.* at PDE0000303);

████████████████████████████, (*see, e.g.*, *id.* at PDE0000289); ████████████████████

████, (*see, e.g.*, *id.* at PDE0000390); ████████████████████ (*see, e.g.*, *id.* at PDE0000359). Yet,

PDE did nothing.

   PDE also categorically failed to ensure that students with qualifying disabilities were able

to access education free from disability-based discrimination. █████████████████████████

███████████████████████████████████████████████████████████████████████ (Ex.

42, PDE 30(b)(6), Clancy Dep. at 165:16-188:24), ███████████████████████████████████

████████████ (*id.*; Ex. 43, CCIU 30(b)(6), Ewing Dep. at 133:14-134:6), █████████████████

███████████████████████████████████████

██████████████████████. (Ex. 42, PDE 30(b)(6), Clancy Dep. at 221:13-225:8).[7]

## II.     LEGAL STANDARD

The Supreme Court has explained that "[c]lass actions serve an important function in our system of civil justice." *Gulf Oil Co. v. Barnard*, 452 U.S. 89, 99 (1981). "Rule 23 is designed to assure that courts will identify the common interests of class members and evaluate the named plaintiff's and counsel's ability to fairly and adequately protect class interests." *In re Prudential Ins. Co. Am. Sales Prac. Litig.*, 148 F.3d 283, 308 (3d Cir. 1998) (quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 799 (3d Cir. 1995)). Plaintiffs bear the burden of establishing each of Rule 23's elements by a preponderance of the evidence. *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). The Court must conduct a "rigorous analysis" of the evidence and arguments to determine whether to certify the class. *Id.* As part of that analysis, the court "may inquire into the merits of the claims presented in order to determine whether the requirements of Rule 23 are met, but not in order to determine whether the individual elements of each claim are satisfied." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 305 (3d Cir. 2011). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455, 465-66 (2013). The decision to certify a class is committed to the district court's sound discretion. *Gulf Oil Co.*, 452 U.S. at 100.

### A.     Rule 23(a) Factors

For all classes, Plaintiffs must establish each of Rule 23(a)'s four threshold requirements: (1) each class is so numerous that joinder of all class members is impracticable; (2) there are

---

[7] As described in the Argument below, the Named Plaintiffs experienced all of the harms laid out above.

questions of law or fact common to each class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of each class; and (4) the representative parties will fairly and adequately protect the interests of each class. Fed. R. Civ. P. 23(a); *Russell v. Educ. Comm'n for Foreign Med. Graduates,* 15 F.4th 259, 265-66 (3d Cir. 2021), *cert. denied*, 142 S. Ct. 2706 (2022).

*Numerosity.* To establish numerosity, a class must be "so numerous that joinder of all members is impracticable." *Weiss v. York Hosp.*, 745 F.2d 786, 808-09 (3d Cir. 1984). A class with more than 40 generally satisfies the numerosity requirement. *See Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001); *see also Allen v. Ollie's Bargain Outlet, Inc*., 37 F.4th 890, 896 (3d Cir. 2022) ("We presume joinder is impracticable when the potential number of class members exceeds forty."). Beyond that, courts consider whether joinder of the individual claims would be impractical. *Stewart*, 275 F.3d at 226-27. When determining if joinder is impractical, courts consider "judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of the class members, the geographic dispersion of class members, the ability to identify future claimants, and whether the claims are for injunctive relief or for damages." *In re Modafinil*, 837 F.3d 238, 253 (3d Cir. 2016). Of those factors, "both judicial economy and the ability to litigate as joined parties are of primary importance." *Id*.

*Commonality.* "'A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.'" *In re Nat'l Football League Players Concussion Injury Litig*., 821 F.3d 410, 426-27 (3d Cir. 2016) (quoting *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013)). Plaintiffs must demonstrate that their claims "depend upon a common contention," the adjudication of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-*

*Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "A court's focus must be on whether the defendant's conduct is common as to all of the class members." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015) (cleaned up). "[T]hat bar" to establish commonality "is not a high one." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013).

**Typicality.** Rule 23(a)(3) requires that the named plaintiffs' claims be typical of the claims of the class. *See Duncan v. Gov. of Virgin Islands*, 48 F.4th 195, 207 (3d Cir. 2022). "[T]he typicality prerequisite is intended to 'ensur[e] that the class representatives are sufficiently *similar* to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation—so that certifying those individuals to represent the class will be fair to the rest of the proposed class.'" *Id.* (quoting *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009)). The Third Circuit recently explained that "[i]n a nutshell, typicality guards against class representatives who have 'unique interests that might motivate them to litigate against or settle with the defendants in a way that prejudices the absentees.'" *Id.* (quoting *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 63 (3d Cir. 1994)).

Typicality is a "low threshold." *In re Nat'l Football League*, 821 F.3d at 428. Plaintiffs satisfy the typicality requirement even where there are factual distinctions between their claims and the claims of the class members. *See id.* In assessing typicality, courts consider whether the nature of the named plaintiffs' claims, judged from both a factual and a legal perspective, are such that the named plaintiffs—in litigating their personal claims—can be expected to advance the interests of absent class members. *See Baby Neal*, 43 F.3d at 57-58. The Supreme Court has repeatedly concluded that Rule 23(a) serves to guarantee that the class representative has "the same interest and suffer(s) the same injury as the class members." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (cleaned up). "'[C]ases challenging the same unlawful conduct which affects

19

both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims.'" *Stewart*, 275 F.3d at 227 (quoting *Baby Neal*, 43 F.3d at 58). "Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice." *Baby Neal*, 43 F.3d at 58. Thus, Plaintiffs who have experienced exposure to unlawful policies and procedures in a correctional setting have been permitted to represent others subject to those same conditions. *See Hayes v. Sec'y of Dep't of Pub. Safety*, 455 F.2d 798, 801 (4th Cir. 1972) (collecting cases) ("[P]laintiff has . . . alleged that he is part of an institutional population which must live from day to day under the constant threat of brutality and misconduct. It would seem, therefore, that plaintiff is "injured," is a member of a class which is "injured" and is thus competent to maintain a class action for himself and others similarly situated.").

*Adequacy.* "The adequacy prerequisite demands that 'the representative parties will fairly and adequately protect the interests of the class.'" *Duncan*, 48 F.4th at 209 (quoting Fed. R. Civ. P. 23(a)(4)). The Third Circuit has explained that Rule 23(a)(4)'s "primary purpose is 'to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class.'" *Id*. (quoting *In re Cmty. Bank*, 795 F.3d at 393). So, "for a class representative to be adequate, she must 'have a minimal degree of knowledge about the case and have no conflict of interest with class counsel and members of the class.'" *Id*. (quoting *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig*., 967 F.3d 264, 272 (3d Cir. 2020)) (cleaned up).

## B.    Rule 23(b) Factors

Plaintiffs also must show that these actions qualify for class treatment under at least one of Rule 23(b)'s subdivisions. *See Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 183 (3d Cir.

2001). All classes are seeking certification under Rule 23(b)(3). Plaintiffs bear the burden of establishing each of Rule 23's elements by a preponderance of the evidence. *Byrd*, 784 F.3d at 163. The Court must conduct a "rigorous analysis" of the evidence and arguments to determine whether to certify the class. *Id.* As part of that analysis, the court "may inquire into the merits of the claims presented in order to determine whether the requirements of Rule 23 are met, but not in order to determine whether the individual elements of each claim are satisfied." *Sullivan*, 667 F.3d at 305. As this Court acknowledged in denying Defendants' motions to dismiss, "[a] class seeking monetary relief under Rule 23(b)(3) is not precluded simply because individual class members suffered different injuries in a situation where liability flows from an official policy or widespread practice or custom of the defendant." *Derrick v. Glen Mills Schs.*, No. 19-1541, 2019 WL 7019633, at *9 (E.D. Pa. Dec. 19, 2019).

*Predominance.* Under Rule 23(b)(3), a court should certify a class where it "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

*Superiority.* "Rule 23(b)(3)'s superiority requirement 'asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'" *In re Nat'l Football League*, 821 F.3d at 434 (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533-34 (3d Cir. 2004)). The court must consider (i) the class members' interest in individually controlling the litigation; (ii) the extent and nature of any litigation concerning the claims already begun by the class; (iii) the desirability of concentrating the litigation in this forum; and (iv) the likely difficulties in managing a class action. *See* Fed. R. Civ. P. 23(b)(3)(A)-(D).

21

*Ascertainability.* "[A]scertainability entails two important elements. First, the class must be defined with reference to the objective criteria. Second, there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013) (citing *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593-94 (3d Cir. 2012)).

### C.     Issues Class Requirements

Rule 23(c)(4) provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). Issues class certification allows "issues related to overall liability, particular elements of a claim, or issues that would substantially advance litigation" to proceed in coordinated fashion. *C.P. v. N.J. Dep't of Educ.*, No. 19-12807, 2022 WL 3572815, at *10 (D.N.J. Aug. 19, 2022). Issues classes can be certified even where certain elements of class certification may not be met for the class as a whole. *See, e.g.*, *Russell*, 15 F.4th at 270. The Third Circuit provides a three-step inquiry for courts to follow in certifying an issues class. *Id.*

*First*, the trial court must ask whether the proposed issues class satisfies the requirements of Rule 23(a), laid out above. *Id.*

*Second*, the trial court determines whether the proposed issues class "fits" within one of Rule 23(b)'s categories. *Id.* When considering whether the predominance requirement is met for an issues class, courts in the Third Circuit follow the so-called "broad view" that holds that issues class certification is appropriate "even where predominance has not been (or cannot be) satisfied for the cause of action as a whole." *Id.* at 274. Nevertheless, the predominance inquiry is satisfied with respect to an issues class where each of the proposed issues "would not require 'individualized review' in order to dispose of them." *C.P.*, 2022 WL 3572815, at *12 (citation omitted).

22

*Third*, the court asks whether it is "appropriate" to certify the issues as a class as informed by the factors identified in *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 273 (3d Cir. 2011). Those non-exclusive factors include:

(1)    the type of claim(s) and issue(s) in question;

(2)    the overall complexity of the case;

(3)    the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives;

(4)    the substantive law underlying the claim(s), including any choice-of-law questions it may present and whether the substantive law separates the issue(s) from other issues concerning liability or remedy;

(5)    the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s);

(6)    the potential preclusive effect or lack thereof that resolution of the proposed issue class will have;

(7)    the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues;

(8)    the impact individual proceedings may have upon one another, including whether remedies are indivisible such that granting or not granting relief to any claimant as a practical matter determines the claims of others; and

(9)    the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s).

*Gates*, 655 F.3d at 273.

Together, the *Gates* factors construct a functional framework to aid the district courts tasked with resolving issue-class certification questions. *Russell*, 15 F.4th at 268. As guided by the *Gates* factors, "[D]istrict courts may certify 'particular issues' for class treatment even if those issues, once resolved, do not resolve a defendant's liability, provided that such certification substantially facilitates the resolution of the civil dispute, preserves the parties' procedural and substantive rights and responsibilities, and respects the constitutional and statutory rights of all

class members and defendants." *Id*. at 270. Thus, issues of law or fact such as duty, breach, causation, or damages may be certified and decided separately from each other, and this can allow for an issues class to be certified to decide *only* questions common to the class, rather than questions requiring individualized evidence, inquiries, or findings.

## III.    ARGUMENT

Plaintiffs seek the certification of one Rule 23(b)(3) damages class and seven Rule 23(c)(4) issues classes. Each of Plaintiffs' proposed classes satisfies the requirements of FRCP 23. Each proposed class relates to youth who were adjudicated delinquent and were placed at GMS by a court or state or local agency, and resided at GMS: (a) at any time between April 11, 2017, and April 11, 2019; (b) at any time and who turned 18 years old between April 11, 2017, and April 11, 2019; or (c) at any time and had not yet turned 18 years old by April 11, 2019 (the "Class Period").

### A.    Abuse Class Against DHS Defendants

The Abuse Class against the DHS Defendants comprises all youth at GMS within the Class Period and is a 23(b)(3) damages class. The proposed class representatives are Named Plaintiffs Derrick, Thomas, and Walter. The Abuse Class against the DHS Defendants meets all of Rule 23's requirements and should therefore be certified.

#### 1.    *The DHS Abuse Class meets the requirements of Rule23(a)*

***Numerosity.*** The class proposed here easily meets the numerosity requirement. The Abuse Class consists of all youth at GMS within the class period; there are 1,661 putative class members, and numerosity is satisfied. (Ex. 37, Student Data, GMSCA0381084; Ex. 31, Gagnon Rpt. at 14). Additionally, joinder of the claims at issue are impractical under the *In re Modafinil* factors. 837 F.3d at 253. The sheer size of the proposed classes, as indicated below, would make it extremely difficult for class members to litigate as joined parties and, even if they could, would constitute a significant tax on judicial resources.

*Commonality*. All putative class members in the Abuse Class Against the DHS Defendants share common questions of law or fact regarding whether the DHS Defendants violated their Eighth Amendment rights. Each putative class member's Eighth Amendment claim is predicated on the "special relationship" between themselves and each DHS Defendant, through which DHS Defendants had an affirmative legal duty to keep them safe from harm. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 198-200 (1989). The DHS Defendants failed in their duty and violated the Constitutional rights of each putative class member by maintaining policies, practices, and patterns of consciously disregarding claims of abuse at GMS. DHS's failure to hold GMS accountable through policy changes, licensing penalties, or evacuating of students perpetuated GMS's culture of harm that impacted every member of the putative class. Further, DHS's continual licensing of GMS despite the reports of abuse put every GMS student at risk of harm. The harmful impact of DHS's policies and practices is discernable from evidence common to the class.

*Typicality.* The DHS Defendants' callous disregard for the safety of GMS students affected every proposed class member. The Third Circuit has held that "[c]ases challenging the same unlawful conduct which affects both the named Plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." *Stewart*, 275 F.3d at 227. That is true here. Regardless of any underlying factual differences, all three named Plaintiffs were subject to the same unconstitutional policies and practices of the DHS Defendants as all other GMS students. DHS Defendants' defective policies, including inadequate complaint investigations, failure to monitor, evaluate and respond to data, and their continuing licensing of GMS affected the named plaintiffs, along with all other GMS students.

*Adequacy*. Here, Plaintiffs Derrick, Walter, Thomas, Tina, and Janeva have vigorously pursued litigation of this action over the past four years, including throughout the COVID-19 pandemic. They have appeared at depositions and cooperated with all discovery requests. Named Plaintiffs in this case are fully committed to fulfilling their roles as class representatives and to fully litigating these claims.

Rule 23(a) also "tests the qualifications of class counsel." *In re Nat'l Football League Players*, 821 F.3d at 428. Here, Plaintiffs' counsel at the Education Law Center, Juvenile Law Center, and Dechert LLP have significant experience litigating class action matters, education matters, and institutional abuse claims in a variety of contexts. The Education Law Center and Juvenile Law Center each have more than 45 years of experience litigating these types of claims. Plaintiffs' counsel are more than qualified to represent the proposed classes going forward.

### 2. *The DHS Abuse Class meets the requirements of Rule 23(b)*

Because the Abuse Class against the DHS Defendants seeks damages on a class-wide basis, it is properly evaluated under Rule 23(b)(3).

*Predominance.* The DHS Defendants' policies and practices that violated the class members' Eighth Amendment rights predominate over questions affecting the individual members. Indeed, there are *no* individual questions with respect to the putative class members.

The Seventh Circuit recently affirmed an order granting class certification in an analogous case where a widespread policy violated the class members' Eighth Amendment rights. *See Ross v. Gossett*, 33 F.4th 433 (7th Cir. 2022). In *Ross*, prisoners housed in the Illinois Department of Correction alleged that prison-wide shakedowns violated their Eighth Amendment rights because the shakedowns were "designed to inflict pain and humiliation" and that the shakedowns were executed "pursuant to a common policy or practice implemented, overseen, and encouraged by" the Department of Correction supervisors. *Id.* at 435. In certifying the class, the district court

"recognized that courts have routinely found common questions predominate where the case claims the existence of a widespread or uniform practice," and that "any variation in the particular experiences of class members would primarily impact the type and amount of recoverable damages, and would not defeat predominance." *Id.* at 439 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

On appeal, the defendants argued that individual prisoners' issues would predominate because each prisoner would need to explain which component of the policy he was subjected to. *Id.* at 440. Rejecting that argument, the Seventh Circuit explained that the proposed class related to the plaintiffs' claims regarding the creation and implementation of the policy they alleged violated their Eighth Amendment rights. *Id.* "Even as to damages," the court explained, "the issue would be which of the unconstitutional actions the inmate experienced, but given the agreement that the shakedowns were carried out pursuant to the same procedures, that issue is as likely to be resolved by a determination of the uniform practice at the particular facility that day, rather than one reliant on testimony from an individual." *Id.* at 441.

Courts in the Third Circuit have similarly certified classes where the plaintiffs allege a widespread policy or practice that affects the entire class. For example, a putative class sued the Gloucester County Department of Corrections over its policies and practices regarding the delousing and supervised showers of newly admitted pretrial detainees. *See Wilson v. Cty. of Gloucester*, 256 F.R.D. 479 (D.N.J. 2009). There, the district court concluded the class claims predominated because the pretrial detainees were subject to "the blanket policies and practices" adopted and implemented by Gloucester County. *Id.* at 488. "[I]f the policy is unconstitutional as to any member of the class," the district court reasoned, "Plaintiffs will be entitled to at least some

form of relief, even if the policies and practices, *as applied*, are determined not to violate the constitutional rights of some of the class members." *Id.* at 489 (emphasis in original).

Like *Ross* and *Wilson*, the claims here focus on the DHS Defendants' policies and practices as a whole, not how they were applied to individual students at GMS. Therefore, like *Ross* and *Wilson*, the common issue of whether the DHS Defendants' policies and practices violated GMS students' Eighth Amendment rights predominates over any individual questions about whether individual students suffered specific harms from that unlawful policy. *See P.V. ex rel. Valentin v. Sch. Dist. of Phila.*, 289 F.R.D. 227, 233-34 (E.D. Pa. 2013) (certifying class of students where "the central tenet of Plaintiffs' Complaint alleges a systemic failure, not a failure of the policy as applied to each member individually"); *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 489 (3d Cir. 2015) ("Rule 23 does not require the absence of all variations in a defendant's conduct or the elimination of all individual circumstances. Rather, predominance is satisfied if common issues predominate."); *Bizzarro v. Ocean Cty.*, No. 07-5665, 2009 WL 1617887, at *15 (D.N.J. June 9, 2009) (certifying class of pretrial detainees despite the fact that "some members of the putative class may have suffered more invasive searches, and would therefore be entitled to greater damages than others").

***Superiority.*** A class action is plainly superior to a slew of individual actions here. This factor addresses the central policy question of class actions because class actions seek "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 617 (1997). Accordingly, the superiority requirement is more readily met in cases where, as here, "[t]he individual class members' claims are likely to be relatively small, so that any one class member

would have little interest in prosecuting the case" without the class-action mechanism. *Sourovelis v. City of Phila.*, 515 F. Supp. 3d 321, 334-35 (E.D. Pa. 2021).

Every single GMS student subjected to the horrors of DHS Defendants' policies and practices on a daily basis suffered harm because of those policies and practices. And it makes no difference that other plaintiffs have pursued their claims individually. Even where another litigation concerning the same defendant and similar conduct is ongoing, courts often conclude class-certification is proper. *See, e.g.*, *Hall v. Midland Grp.*, 1999 WL 1052003 (E.D. Pa. Nov. 22, 1999). Here, although a mass tort against GMS is ongoing in the Court of Common Pleas, *In re: The Glen Mills Schools Litigation*, Dkt. No. 900 (Phila. C.C.P.), it is irrelevant because the DHS Defendants are not defendants in that action.

The other relevant factors—the desirability of concentrating the litigation in a particular forum and the likely difficulties of managing a class action, Fed. R. Civ. P. 23(b)(3)(C)-(D)—are often considered together and represent an inquiry into judicial economy and efficiency. Accordingly, these factors "emphasize[] the desirability of the forum selected, not the desirability of claims concentration generally." *In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*, 962 f. Supp. 450, 524 (D.N.J. 1997), *aff'd sub nom. In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998)). In most cases, "[e]fficiency makes it generally desirable to litigate similar, related claims in one forum." *Elias v. Ungar's Food Prod., Inc.*, 252 F.R.D. 233, 252 (D.N.J. 2008).

The Eastern District of Pennsylvania is the most suitable single forum as GMS is physically located within the district, and the district includes those counties of residence for most of the students. (*See* Ex. 48, PA Residents at GMS 2013-2019, CCIU_0000567).

*Ascertainability.* The class is ascertainable. *First*, the class is defined with reference to an objective criterion because it is based on enrollment at GMS during the class period. *Second*, GMS maintains attendance records, which reliably and efficiently permit a determination of whether putative class members fall within the class definition. Multiple experts in this litigation have already been able to rely on GMS enrollment records to ascertain who is in the proposed class. (Ex. 31, Gagnon Rpt. at 14-16; Ex. 49, Belfield Rpt. at 15). *See C.P.*, 2022 WL 3572815 at *14.

## B.   Issues Classes Against GMS

### 1.   *Abuse Issues Class Against GMS*

The GMS Abuse Issues Class consists of all youth at GMS within the class period. The issues proposed for certification under Federal Rule of Civil Procedure 23(c)(4) for this class are: (1) Whether the policies and practices of the GMS Abuse Defendants[8] subjected class members to a substantial risk of serious harm to which the GMS Abuse Defendants were deliberately indifferent in violation of the Eighth Amendment; (2) whether the GMS Defendants undertook or otherwise owed a duty to the class members; and (3) whether the GMS Defendants breached any duty owed to the class members. The class representatives are Plaintiffs Derrick, Thomas, and Walter.

#### a)   The GMS Abuse Issues Class meets the requirements of Rule 23(a)

*Numerosity.* Again, the Abuse Class consists of all youth at GMS within the class period, therefore, there are 1,661 putative class members, easily satisfying numerosity. (Ex. 37, Student Data, GMSCA0381084; Ex. 31, Gagnon Rpt. at 14); *see also supra* § III(A)(1) at 25.

---

[8] The GMS Abuse Defendants consist of GMS as well GMS Executive Director Randy Ireson.

***Commonality.*** Plaintiffs and the putative class share the common contention that GMS had a duty to keep its students safe from harm, and that GMS policies and practices both breached that duty and violated the Eighth Amendment.

Establishing that GMS owed and breached a duty to those in their care requires no individual evidence. In *Russell*, the Third Circuit noted that duty and breach were both issues of law for which only common evidence was required: "[d]uty is an issue of law. Therefore, it must be decided separately from breach, causation, and damages…[l]ikewise, breach would require only common evidence…[n]o absent class member would have anything special to add in her individual trial…these major issues could be resolved on a class-wide basis." *Russell*, 15 F.4th at 273 (internal citations omitted). The putative class can show that applicable Pennsylvania law imposed a duty on the GMS Abuse Defendants to "provide for the care, protection, training, and education, and the physical, mental, and moral welfare of [youth]" over whom they were granted physical custody. 42 Pa. Cons. Stat. § 6357. The class can similarly demonstrate that applicable Pennsylvania regulations created an affirmative duty for the GMS Abuse Defendants to ensure that children were not "abused, mistreated, threatened, harassed or subject to corporal punishment." 55 Pa. Code § 3800.32(b). The class can also show that 55 Pa. Code § 3800.53 created an affirmative duty for GMS, through Executive Director Randy Ireson, to "be responsible for administration and management of the facility, including the safety and protection of the children, implementation of policies and procedures and compliance with [applicable regulations]."

Courts have found a duty of care where a defendant exercises "year-round custody, care, and control over [plaintiff] and functioned as primary caregiver—providing education, housing, food, clothing, and medical, dental, and psychological care." *See, e.g.*, *Dobson v. Milton Hershey*

*Sch.*, 356 F. Supp. 3d 428, 437 (M.D. Pa. 2018); *see also* Restatement (Second) of Torts § 314A(4). Demonstrating that GMS had custody and control over children and youth remanded to their care and that GMS was responsible for the housing, education, and safety of those in their care would require only evidence common to the class.[9]

As the Third Circuit noted, breach similarly would not require any inquiry as to individual facts because what GMS and its officers knew or recklessly disregarded about the culture of abuse created by their own policies and practices, and what they did, or failed to do, in response would not leave class members with "anything special to add in [their] individual trial." *Russell,* 15 F.4th at 273. So too with the Eighth Amendment claim. To succeed on their Eighth Amendment claims against the GMS Abuse Defendants, the putative class would need to show that they were incarcerated under conditions that posed a substantial risk of serious harm. *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012). Then, they need to demonstrate deliberate indifference by which officials disregard a substantial risk of serious harm to youth residents' health or safety.[10] *Id.* This would not require individualized inquiry.[11]

---

[9] In fact, the GMS Abuse Defendants have conceded many of these points. *See* Defs GMS & Ireson Answer, ECF No. 70, at ¶¶ 1, 24-25 (admitting that GMS was a residential facility that housed youth and was licensed as such); *Id.* at ¶ 53 (admitting that youth at GMS were involuntarily placed at the facility via court order after being adjudicated delinquent); *Id.* at ¶ 446 (admitting that GMS operated educational and rehabilitative programs).

[10] Plaintiffs also note that the Eighth Amendment standard as applied to juveniles is more protective than the standard applied to adult convicted prisoners. While Plaintiffs can meet the adult Eighth Amendment standard, the Supreme Court has made clear that juveniles enjoy greater constitutional protections than adults under several constitutional provisions, including the Eighth Amendment. *See, e.g., Miller v. Alabama*, 567 U.S. 460, 489 (2012) (striking down mandatory imposition of life sentences without parole for juveniles); *Graham v. Florida*, 560 U.S. 48, 82 (2010) (striking down life sentences without parole for juveniles convicted of nonhomicide offenses); *Roper v. Simmons*, 543 U.S. 551, 578-79 (2005) (striking down the juvenile death penalty as unconstitutional). Plaintiffs maintain that cases applying the Fourteenth Amendment in juvenile correctional cases are instructive here.

[11] *See Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (holding that an Eighth Amendment deliberate indifference claim has three components: (1) incarceration under conditions posing a substantial risk of serious harm, (2) deliberate indifference to the substantial risk, and (3) the deliberate indifference

The Third Circuit has determined that evidence showing a "lack of established protocols to ensure youth safety, including the management of problematic youth behavior, de-escalation of conflicts, and identification and protection of children at risk of victimization" are sufficient to meet the deliberate indifference standard. *A.M. v. Luzerne Cty. Juv. Det. Ctr.*, 372 F.3d 572, 580, 583 (3d Cir. 2004). This can be demonstrated on a class-wide basis.

The record is replete with evidence demonstrating that GMS's common course of unlawful conduct breached both its legal duty to the putative class and the class members' Eighth Amendment rights. Policies and practices of the GMS Abuse Defendants that were common to all class members include their documented confrontation culture (*see supra* § I(A)); ████████

████████████████████████████████ (*See* Ex. 8, Muhammad Rpt. at 17); ████████████████████████████████████

████████████████ (*see id.* at 15-18; Ex. 11, GMS Abuse 30(b)(6), Spriggs Dep. at 123:11-124:5, 137:20-138:2, 144:15-145:12, 149:2-21; Ex. 5, Cosgrove Dep. at 194:2-7) failure to conduct appropriate background checks and lack of adequate policies on training around child abuse prevention and reporting (Ex. 12, Aud. Rpt. at 2); ████████████████████

████████████████████████ (Ex. 8, Muhammad Rpt. at 19-21); ████████

████████████████████████████████████████████

████████████████ (*See id.* at 13-14). This evidence applies to all members of the putative GMS Abuse Issues Class to establish both the GMS Abuse Defendants' breach of legal duty owed to class members and their violation of applicable Eighth Amendment standards.

---

caused harm). The members of the putative GMS Abuse Issues Class can establish (1) and (2) on a class-wide basis.

*Typicality.* Here, the questions proposed for issues class certification (whether the GMS Abuse Defendants owed or otherwise undertook a legal duty to youth remanded to their care, whether GMS Abuse Defendants breached that duty, and whether the policies and practices of the GMS Abuse Defendants subjected class members to a substantial risk of serious harm to which the GMS Abuse Defendants were deliberately indifferent in violation of the Eighth Amendment) are all questions that the named plaintiffs have raised on behalf of the putative class.[12] Like the putative class, the GMS Defendants owed a duty to each of the named Plaintiffs that they breached through policies and practices that also violated named Plaintiffs' Eighth Amendment rights. This is precisely what named Plaintiffs are alleging on behalf of the putative class as well.

Plaintiff Derrick testified to the regular confrontations he witnessed at Townhouse meetings. (Ex. 50, Derrick Dep. Vol. I at 334:4-12). Plaintiff Thomas similarly witnessed firsthand the GMS practice of staff engaging in violence against students, or even enlisting students to inflict violence against other students. (Ex. 51, Thomas Dep. Vol. I at 151:16-152:20). Plaintiff Walter similarly noted abuse and intimidation at Townhouse meetings. (*See., e.g.,* Ex. 52, Walter Dep. Vol. I at 140:5-141:23). The named Plaintiffs each also suffered violence from staff and other youth at GMS. (*See., e.g.*, Ex. 50, Derrick Dep. Vol. I at 139:12-146:5; Ex. 51, Thomas Dep. Vol. I at 151:16-153:4; Ex. 52, Walter Dep. Vol. I at 141:10-144:2).

---

[12] *See* Compl., ECF 1, at ¶ 139 (alleging "individually and on behalf of all youth" that "Glen Mills and Glen Mills Leadership Defendants owed Plaintiffs an affirmative duty of care to ensure their safety and well-being and provide them with adequate protection and medical care while they were in Defendants' custody"); *Id.* (alleging on behalf of all youth that "Defendants' acts and omissions, including and their policies, practices, and customs, breached that affirmative duty by: allowing, authorizing, and encouraging a pervasive culture of violence at Glen Mills"); *Id.* at 111 (alleging individually and on behalf of all youth that "Glen Mills and Glen Mills Leadership Defendants' acts and omissions amount to deliberate indifference that shocks the conscience, (and) deprived Plaintiffs of their Eighth and Fourteenth Amendment rights").

The putative class representatives' experiences align with those of the Issues Class, ensuring the representatives have and will keep "work[ing] to benefit the entire class through the pursuit of their own goals'" with regard to the proposed issues. *See C.P.*, 2022 WL 3572815, at *11 (quoting *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d at 426-27).

    ***Adequacy.*** Adequacy is satisfied for the reasons set forth in Section III(A)(1) at 25.

        b)    <u>The GMS Abuse Issues Class meets the requirements of Rule 23(b)</u>

A proposed issues classes must "fit" within rule 23(b)'s categories. *Russell*, 15 F.4th at 270. Monetary claims "belong…in Rule 23(b)(3)." *Wal-Mart Stores, Inc.*, 564 U.S. at 362.

    ***Predominance.*** As was discussed when addressing the commonality of the Abuse Issues Class, none of the issues identified will require inquiry into the individual circumstances of the class members. *See supra* § III(B)(1)(a) at 31-34. The questions of the GMS Abuse Defendants' duty to class members, whether that duty was breached, and whether the GMS Abuse Defendants violated the Eighth Amendment through their policies and practices and were deliberately indifferent are "essentially … questions of law." *C.P.*, 2022 WL 3572815, at *12. In essence, these Abuse Class issues predominate precisely because they are the common issues that cut across the abuse claims of all members of the putative class, regardless of individual issues of causation or damages. Because "each of these issues would not require 'individualized review' in order to dispose of them," these common issues predominate. *Id.* (quoting *Buck v. Am. Gen. Life Ins. Co.*, 2021 WL 733809, at *11 (D.N.J. Feb. 25, 2021)).

    ***Superiority.*** *First*, the putative class has an interest in handling the cases collectively as opposed to pursuing individual actions. As independent questions that are essentially questions of law, the resolution of the proposed issues do not "provide the incentive for any individual to bring

a solo action prosecuting his or her rights." *Amchem Prod., Inc.*, 521 U.S. at 617. As a result, this first consideration is met.

*Second*, class certification is permissible despite other litigation implicating GMS. Here, some members of the putative class have commenced individual actions for related claims. *See In re: The Glen Mills Schools Litigation*, Dkt. No. 900 (Phila. C.C.P.). Yet issues class certification is proper regardless of those state court actions. In *C.P.*, some putative class members had filed individual actions based on the NJDOE's same alleged conduct. Nevertheless, the district court determined that the individual actions were not "a bar to finding superiority." 2022 WL 3572815, at *13. Instead, the court held that "[a]nswers on these questions for the 23(b)(3) class would actually streamline those actions resolving a claim likely central to those cases." *Id.* So too here, resolving these issues would increase efficiency, not only for this action, but for those also based on GMS's wrongful conduct.

*Third*, judicial economy favors litigation in this forum. The third and fourth factors of Rule 23(b)(3), often considered together, represent an inquiry into judicial economy and efficiency. First, the court asks whether it is desirable to concentrate litigation to a particular forum. This factor "emphasizes the desirability of the forum selected, not the desirability of claims concentration generally." *In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*, 962 F. Supp. at 524, *aff'd sub nom. In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998). In most cases, "[e]fficiency makes it generally desirable to litigate similar, related claims in one forum." *Elias*, 252 F.R.D. at 252. Plaintiffs here bring multiple claims against GMS—education, discrimination and abuse—that the state court actions will not resolve and are more efficiently addressed both as a class and holistically. Plaintiffs here also bring claims arising

out of the same core facts against multiple Defendants. The Eastern District of Pennsylvania is the most suitable single forum as GMS sits within the District.

*Ascertainability.* Ascertainability is satisfied for the reasons described in Section III(A)(2) at 30.

c)      The *Gates* factors support certification

The *Gates* factors also support certification of the Abuse Issues Class against the GMS Defendants. As discussed with regard to commonality and predominance, the type of claims and issues in question are proper for issues class certification. *See* supra §§ III(B)(1)(a) at 31-34, III(B)(1)(b) at 35-36. For the GMS Abuse Issues Class to succeed on their constitutional claims, each class member will need to show that policies and practices of the GMS Abuse Defendants violated the Eighth Amendment. Each will also need to prove duty and breach to succeed on their negligence claims. Where "the issues proposed for certification here would apply to the class as a whole" this factor is satisfied. *C.P.*, 2022 WL 3572815, at *15. Because these issues are such that they can be resolved collectively, the first *Gates* factor is met for all issues classes.

The second and third *Gates* factors involve an inquiry into the judicial efficiency of the proposed issues class. The present case is undoubtedly complex, with hundreds of putative Plaintiffs and thousands upon thousands of documents produced in discovery. The proposed issues classes will prevent countless courts from being presented with the same common evidence against the GMS Abuse Defendants. Further, the GMS Abuse Defendants will be spared the inconvenience of responding to similar claims and evidence repeatedly. This approach similarly prevents contradictory rulings by ensuring that issues applicable to all putative class members are resolved at once. "Given the complex issues of law and fact that apply to all of the class members, it would be most prudent to marshal them in one action for determination." *Id.*

Both Eighth Amendment law and negligence law separate the proposed class-wide issues about duty and breach from those of liability or remedy, thus satisfying *Gates* factor four. As discussed above, courts may determine whether GMS was deliberately indifferent to a substantial risk of serious harm and whether such deliberate indifference violated the Eighth Amendment separately from determining whether that policy caused an individual injury. *See, e.g.*, *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017) (noting that Eighth Amendment claim against policy of prison overcrowding required "a showing of deliberate indifference *and* causation"). Similarly, as the Third Circuit states in *Russell*, duty and breach are independent elements of a negligence claim, which courts can decide apart from liability (here, causation) and remedy (damages). *Russell*, 15 F.4th at 273.

Factors five through nine (*see supra* § II(C) at 23-24), are often considered collectively as an inquiry into the impact issues class certification will have on later aspects of litigation. *See, e.g.*, *In re FieldTurf Artificial Turf Mktg. & Sales Pracs. Litig.*, No. 17-2779, 2023 WL 4551435, at *10 (D.N.J. July 13, 2023) ("Factors five through nine require the Court to consider the effect that issue class certification will have on later stages of the litigation"); *C.P.*, 2022 WL 3572815, at *15. ("The Court has already implicitly touched on factors five through nine when it discussed the preclusion concerns…[t]he Court here is specifically certifying the class with the understanding that it would be efficient to resolve certain issues in the class action forum and leave damages issues to individual actions.").

As discussed, resolving the common issues proposed by each issues class is a fair and efficient mechanism for litigating future issues. Judgment on these questions would not "extinguish the rights of individual class members to later pursue separate damages actions" but instead streamline individual actions for future adjudication. *C.P.*, 2022 WL 3572815, at *9.

Similarly, the proposed bifurcated approach ensures that relief as to one putative class member on individual claims does not impact another, preventing inconsistent adjudication. Finally, as made clear by discussion in the preceding sections, the proposed issues classes will prevent subsequent triers of fact from needing to re-analyze the crushing volume of evidence produced in this litigation. Once settled, these issues classes allow for resolution of only issues that are unique to individual plaintiffs using only evidence unique to that individual plaintiff.

Certification of the proposed GMS Abuse Issues Class meets the requirements of *Gates* and *Russell.*

### 2. *Education Issues Class Against GMS*[13]

The Education Issues Class against GMS consists of all school-eligible youth at GMS within the class period. Plaintiffs are seeking to certify a Rule 23(c)(4) issues class on the following issues: (1) whether GMS failed to provide an appropriate education program under state and federal law; (2) whether students at GMS were discriminated against based on their placement at the facility which offered an inadequate education; (3) whether students at GMS were discriminated against based on their placement at the facility when they were deprived of a high school education without due process; and (4) whether students subject to the educational programming at GMS were harmed. The proposed class representatives are Plaintiffs Derrick, Thomas, and Walter.

### a) The GMS Education Issues Class meets the requirements of Rule 23(a)

***Numerosity.*** Because the Education Issues Class consists of all youth at GMS within the

---

[13] Plaintiffs do not seek injunctive relief against GMS but seek equitable relief with regard to the education class.

class period, there are at least 1,466 putative class members[14], and numerosity is satisfied under the standards set forth in Section II(A) at 18-19. (*See* Ex. 37, Student Data, GMSCA0381084; Ex. 31, Gagnon Rpt. at 14-16).

   ***Commonality.*** Commonality is satisfied because all members of the class were deprived of an adequate high school education as a result of common policies, practices, and failures of GMS as described above. These policies include but are not limited to: providing all students with a self-directed online asynchronous program and deficient curriculum, (*see, e.g.,* Ex. 28, 2019 Education Playbook at 18; Ex. 31, Gagnon Rpt. at 29-32; Ex. 32, McNeal Dep. at 61:3-61:17; Ex. 27, GMS Education 30(b)(6), Power Dep. at 178:20-24, 189:15-190:6); an inadequate number of instruction hours required by 24 P.S.§ 13-1327 (*see, e.g.*, Ex. 28, 2019 Education Playbook at 11; Ex. 31, Gagnon Rpt. at 28-29); ██████████████████████████████████████ ██████████████████████████████████████ (*see, e.g.*, Ex. 27, GMS Education 30(b)(6), Power Dep. at 178:20-24; Ex. 31, Gagnon Dep. at 34-36) or diverting students entitled to a high school education to a GED program. (*See* Ex. 28, 2019 Education Playbook at 18). The questions common to all class members are whether GMS's educational program was deficient and whether GMS bears liability.

   Where educational policies are at issue, an individual student's circumstances will not defeat commonality. *Nat'l L. Ctr. on Homelessness & Poverty, R.I. v. New York*, 224 F.R.D. 314, 324-25 (E.D.N.Y. 2004) (finding that commonality existed as all plaintiffs were subject to the same educational policies and, furthermore, that factual differences among plaintiffs were

---

[14] This does not include youth on the CTE path, which was limited to students who entered with a high school diploma or GED. (Ex. 28, 2019 Education Playbook, GMSEDU0115614). The actual number of putative class members is higher because students with a GED are still eligible for school enrollment in Pennsylvania. 22 Pa. Code § 11.12.

"irrelevant to the central issue" that defendants failed "to ensure homeless children receive an education"); *V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554, 575 (N.D.N.Y. 2017) (commonality established based on allegations that the county correctional facility and school district "applied a common course of unlawful conduct to the members of the class and subclass" by acting with deliberate indifference to the risk of harm caused by overcrowding and other common courses of conduct which "collectively deprived plaintiffs of the education, special services, and related procedural protections to which they are entitled").

   *Typicality.* The Education Issues Class easily satisfies the typicality requirement because Named Plaintiffs were subject to the same deficient and legally noncompliant education system provided by GMS, as were all students. For example, Walter ███████████████████████ ███████████████████████████████████████████████████████████████████████ ██████████████ (*See* Ex. 36, Walter Dep. Vol. II Dep. at 463:13-464:11; Ex. 53, Janeva Dep. at 251:4-17). "Generally speaking, minor variations in the fact patterns underlying the individual claims will not preclude a finding of typicality." *V.W.* 236 F. Supp. 3d at 576; *see also Nat'l L. Ctr. On Homelessness & Poverty*, 224 F.R.D. at 324-25 (finding factual differences among plaintiffs, including diagnoses of learning disabilities, were "irrelevant to the central issue" that defendants failed "to ensure homeless children receive an education"); *M.A. ex rel. E.S. v. Newark Pub. Schs.*, No. 01-03389, 2009 WL 4799291, at *8 (D.N.J. Dec. 7, 2009) ("[T]he jurisprudence is clear that such factual differences in how the alleged systemic delay affected any particular student, including the named plaintiffs, does not defeat typicality."); *C.G. v. Pennsylvania Dep't of Educ.*, No. 1:06-CV-1523, 2009 WL 3182599, at *6 (M.D. Pa. Sept. 29, 2009) (to satisfy typicality, class representatives need only "demonstrate that the systemic challenge is equally

important to the named Plaintiffs as to the unnamed Plaintiffs"). As such, the typicality requirement is satisfied.

**Adequacy.** Adequacy is satisfied under the standards set forth herein, and as described at Section III(A)(1) at 25, because the Named Plaintiffs were deprived of an adequate education at GMS and have the incentive to vigorously represent the claims of the class as they seek educational services to compensate for their deprivation.

b)   The GMS Education Issues Class meets the requirements of Rule 23(b)

The Education Issues Class against GMS fits within Rule 23(b)(3)'s damages category, satisfying the second element of the Third Circuit's test. *See Russell*, 15 F.4th at 270. Plaintiffs are seeking compensation from GMS for their education claims which may take the form of compensatory damages or compensatory education. Courts have recognized that compensatory education is properly characterized as "equitable relief," and this can be categorized for the purposes of an issues class as "fitting" within Rule 23(b)(3)'s damages class. *Derrick*, 2019 WL 7019633, at *14; *see e.g.*, *A.R. v. Connecticut State Bd. of Educ.,* No. 16-01197, 2020 WL 2092650, at *12 (D. Conn. May 1, 2020) (finding that there is "no reason why the class members' compensatory education claims may not be separately certified under Rule 23(b)(3)"); *see also C.P.*, 2022 WL 3572815, at *2. As in *Russell,* these classes are seeking decisions on the liability elements of their claims, with causation and damages to be resolved separately. *Id*. at *2.

**Predominance.** Common issues predominate over individual issues for the Education Issues Class against GMS. The common issues against GMS are whether students received an inadequate education, whether students were deprived of a legally compliant education, and whether students failed to receive an adequate education in violation of their right to equal protection and due process under constitutional law. These questions focus on the liability of

Defendant GMS, not causation or damages, and review of these issues would not require "'individualized review' in order to dispose of them." *C.P.*, 2022 WL 3572815, at *12. Just as in *C.P.*, where the questions focused on the policies and practices of the NJDOE that affected all class members, the issues classes here focus on the policies and practices of GMS and PDE.

*Superiority.* The Education Issues Class against GMS satisfies the superiority requirement. Proceeding on a class-wide basis will be far more efficient and economical for all parties than for hundreds of class members to undertake individual trials. Repeatedly litigating the same issues regarding GMS's liability for providing an inadequate education in duplicative lawsuits will waste resources, unduly burden the judicial system, and may result in inconsistent results. Accordingly, litigating these issues as a class action is superior to other methods for "fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Particularly in this case, no individual class member would likely have the resources to address these questions on their own, and due to the nature of the issues raised here, the interest of individual members in controlling the prosecution of those questions would be minimal to nonexistent. *C.P.*, 2022 WL 3572815 at *12-13. Claims regarding education and the conduct alleged here have not been raised in any other cases, including the state court mass tort action. *See* Court of Common Pleas, *In re: The Glen Mills Schools Litigation*, Dkt. No. 900.

As to the third factor, consolidation on these issues in this forum would "ensure consistency in the resolution of the questions for all of the class members and significantly streamline litigation on issues in this case that would likely arise in individual actions." *C.P.*, 2022 WL 3572815, at *13. Lastly, as to the fourth factor, because the issues "deal with factual and legal questions that would apply broadly across the class" and the "Court can resolve the asserted claims without directly implicating or impacting claims of individualized damages," there is no issue as to

difficulty of management of the classes, and superiority is satisfied. *Id.* The proposed issues relate to the actions and policies of GMS and do not pertain to individual damages.

***Ascertainability.*** Ascertainability is satisfied because the identity of class members, all former students at GMS, is readily known based on evidence of record. *See supra* § III(A)(2) at 30.

c)   The *Gates* factors support certification

It is appropriate to certify the Education Issues Class against GMS as informed by the *Gates* factors. The type of claim and issues are proper for class certification, as the class claims concern actions and policies of GMS applicable to the entire class. As "the issues proposed for certification here would apply to the class as a whole" this factor is satisfied. *Id.* at *15. The overall complexity of the case and the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives lean in favor of class certification. As discussed in Section III(B)(1)(c) this case is extremely complex and certifying the Education Issues Class would be efficient because litigating the actions of GMS regarding education would focuses on common actions and policies relating to GMS's provision of education services as well as the role of other Defendant PDE. "[E]ven though the resolution of these questions may not resolve certain issues such as individual damages … it would materially advance this litigation to answer the questions presented for consideration," and, therefore, the fourth factor is satisfied. *Id.*

Factors five through nine also favor class certification. The proposed Education Issues Class against GMS will streamline litigation by determining liability while ensuring the resolution remains fair to all parties involved. Judgment regarding GMS's liability will prevent subsequent triers of fact from needing to re-analyze the high volume of education records and testimony produced here and allow for resolution of issues regarding entitlement to relief based on evidence unique to an individual plaintiff.

44

3.      *Disability Discrimination Issues Class*[15]

The Disability Discrimination Issues Class against GMS consists of all youth at GMS after April 11, 2017, who had qualifying disabilities as defined under Section 504 and the ADA, specifically 42 U.S.C. § 12102, either before or during their placement at GMS. Plaintiffs are seeking to certify a Rule 23(c)(4) issues class on the following issues: (1) whether GMS's policies and practices discriminated against students with qualifying disabilities due to the absence of a system to identify, evaluate, and provide accommodations in violation of Section 504 and the ADA; (2) whether GMS owed a duty to students with qualifying disabilities; and (3) whether GMS breached any duty it owed to students with qualifying disabilities. The proposed class representatives are Plaintiffs Derrick and Walter.

a)      <u>The GMS Disability Discrimination Issues Class meets the requirements of Rule 23(a)</u>

**Numerosity.** Here, the numerosity requirement is easily met. The Disability Discrimination Issues Class consists of at least 529 putative class members.[16] (Ex. 37, Student Data, GMSCA0381084; Ex. 31, Gagnon Rpt. at 41). Additionally, numerosity is satisfied for the reasons laid out in Section III(A)(1) at 25.

**Commonality.** Commonality is satisfied for the Disability Discrimination Issues Class because all members of the class were subject to the same harmful policies and practices that failed to take into account their disabilities and they were all discriminated against based on GMS's failure to address students with disabilities or make any accommodations. (*See e.g.,* Ex. 5,

---

[15] Plaintiffs do not seek injunctive relief against GMS but seek equitable relief and damages with regard to disability discrimination claims.

[16] This number reflects students identified by GMS as having IEPs and 504 plans. As GMS has records of students with qualifying disabilities who did not have IEPs or 504 plans, (s*ee, e.g.*, Ex. 54, June 29, 2017 Ltr. From McCoy to Hon. James Anderson, GMSCA0436763; Ex. 31, Gagnon Rpt. at 40-41), the actual number in the Disability Discrimination Class is higher than 529.

Cosgrove Dep. at 133:1-136:14). As explained above, all class members need not suffer the same harm in order to satisfy the commonality requirement if they were all subject to the same harmful policy. *See Williams*, 270 F.R.D. at 215. Despite individual differences in disabilities or diagnoses, the following questions of law or fact, among others, are common among all Disability Discrimination Issues Class members: GMS failed to take students' disabilities into account with regard to policies and practices relating to disciplining students, including requiring students to follow "norms," restraining students, educating students, and permitting staff to facilitate fights among students. (*See e.g.*, Ex. 7, Ireson Dep. at 84:7-13, 85:11-24); *see also supra* § I(D).

All Class members were subject to the same common policies regardless of individual differences in their disabilities. It is well settled that if defendants violate their legal obligations under the ADA and Section 504 to provide services to plaintiffs involving at least one common question of law or fact, plaintiffs have presented a common question to satisfy Rule 23. *See, e.g., Serventi v. Bucks Tech. High Sch.*, 225 F.R.D. 159, 165 (E.D. Pa. 2004) (finding commonality based on common factual and legal questions regarding whether a school modified its policies to avoid discriminating on the basis of disability, per ADA and Section 504); *Henrietta D. v. Giuliani*, No. 95-0641, 1996 WL 633382, at *13 (E.D.N.Y. Oct. 25, 1996) ("Although there may be factual differences among members of the class in that the educational, medical and other needs of the individuals vary, this does not preclude certification. Rather, as long as there is a common question, individual differences do not bar class treatment."). As such, there is commonality among all members of the Disability Discrimination Issues Class.

***Typicality.*** Typicality is easily established because, similar to the commonality analysis, all policies and practices, or lack thereof, that impacted Named Plaintiffs Derick and Walter impacted all members of the Disability Discrimination Issues Class, regardless of individual

diagnoses or experiences. For ADA and Section 504 claims, the specifics of each putative member's disability are irrelevant, as Plaintiffs must only "demonstrate that the systemic challenge is equally important to the named Plaintiffs as to the unnamed Plaintiffs." *C.G.*, 2009 WL 3182599 at *6. Here, Plaintiffs Walters and Derrick's "claims [are] typical of those of [putative] class members since they challenged the same policies and practices and course of conduct as those that gave rise to the claims of the class and were based on the same legal theories." *Serventi*, 225 F.R.D. at 165.

For example, Derrick is a student with a disability of emotional disturbance who was discriminated against by GMS. He was subject to manual assists, restraints, staff violence, and peer violence while at GMS but did not receive modifications to GMS's confrontation policy or an individualized behavior plan despite clear indications of need. (*See, e.g.*, Ex. 31, Gagnon Rpt. at 56). All members of the Disability Discrimination Issues Class experienced that same discrimination. Accordingly, typicality is met.

*Adequacy.* Adequacy is satisfied under the standards set forth above because Named Plaintiffs were subject to the same policies as other students and suffered harm as a result of disability discrimination, creating a strong incentive to vigorously represent the claims of class members. *See supra* § III(A)(1) at 25.

> b)  The GMS Disability Discrimination Issues Class meets the requirements of Rule 23(b)

The Disability Discrimination Issues Class "fits" within Rule 23(b)(3)'s damages category, as Plaintiffs seek compensatory damages for Defendant GMS's failure to protect class members from discrimination on the basis of their disabilities due to common discriminatory policies in violation of the ADA and Section 504 and liability presents common "questions of law and fact" that "predominate over any questions affecting only individual members," making a class action

"superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**Predominance.** Common issues predominate over individual issues as Plaintiffs allege a common course of conduct on the part of the Defendant GMS. *See In re Prudential Ins. Co.*, 148 F.3d at 314-15. The record establishes that this cause of action can be proved "through evidence that is common to the class rather than individual to its members." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2008), *as amended* (Jan. 16, 2009). While members of the class have varying diagnoses and disabilities, Plaintiffs' disability discrimination claims are triggered by Defendants' systemic policies of non-compliance with the ADA and Section 504, common discriminatory practices against all class members, and failure to accommodate students with disabilities which subjected them to harm. For instance, ███████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ (*See e.g.*, Ex. 7, Ireson Dep. at 84:7-13, 85:11-24). GMS did not ██████████████████ ████████████████████████████████████████████████████████████████████████ █████████████████████████████████. (*See e.g.*, Ex. 27, GMS Education 30(b)(6), Power Dep. at 134:6-20; Ex. 40, GMS Special Ed. 30(b)(6), Pikes Dep. at 253:18-254:2). This illustrates that common evidence reflecting GMS's system-wide policies and practices, and the lack of required policies and practices, will be used to prove Plaintiffs' Disability Discrimination Issues Class claims. This evidence speaks to the common factual issues and legal questions of whether GMS's actions constitute systemic violations and class-wide discrimination in violation of the ADA and Section 504.

48

***Superiority.*** Superiority is satisfied because relitigating the same issues regarding GMS's liability for disability discrimination will waste resources, unduly burden the judicial system, and may result in inconsistent results. Requiring each putative class member to start over and bring their own individual suit will not "secure the just, speedy, and inexpensive determination of" the issues presented here. Fed. R. Civ. P. 1; *see Barel v. Bank of Am.*, 255 F.R.D. 393, 400 (E.D. Pa. 2009) ("A class action is superior here because it provides a forum for class members unlikely to bring separate claims.").

***Ascertainability.*** This Class is easily ascertainable because GMS maintained education and health records which reflect (1) number of students with IEPs and 504 Plans, (Ex. 37, Student Data, GMSCA0381084), and (2) whether any student had a record of an impairment known to interfere with major life activities such depression, post-traumatic stress disorder ("PTSD"), and other mental health conditions which are recognized to result in partial or complete disturbance in the person's thinking, feeling, and behavior thereby reducing a person's ability to carry out activities of daily living. (*See, e.g.*, Ex. 55, Health and Safety Screen, GMSCA0000901).

c)   The *Gates* factors support certification

Finally, the Court can certify the Disability Discrimination Issues Class, per the *Gates* factors. First, similar to the commonality and predominance requirements described herein the type of claims and issues in question are proper for issues class certification, as the class claims concern GMS's policies and practices that impacted all students in the Disability Discrimination Issues Class due to the absence of a system to provide accommodations for students with qualifying disabilities. For the same reasons discussed in Sections III(B)(1)(c) and III(B)(2)(c) above, the second and third *Gates* factors are also easily met.

Factor four is also satisfied as to this class because it allows the Court to separate the proposed class-wide issues from the potential individual remedies. "[E]ven though the resolution

49

of these questions may not resolve certain issues such as individual damages, . . . it would materially advance this litigation to answer the questions presented for consideration under the 23(b)(3) class." *C.P.*, 2022 WL 3572815, at *15. With regard to factors five through nine, all factors favor class certification. The proposed Disability Discrimination Issues Class will streamline this complex litigation and ensure a fair resolution to all parties involved based on resolution of common issues. As such, the proposed Disability Discrimination Issues Class is appropriate for certification per the *Gates* factors.

C.     **Issues Classes Against PDE**[17]

1.     *Education Issues Class against PDE*

The Education Issues Class against PDE includes all school-eligible youth at GMS within the Class Period who remained at GMS. Plaintiffs are seeking to certify a Rule 23(c)(4) issues class on the following issues: (1) whether PDE had a duty to provide oversight or monitoring of the education program at GMS; (2) whether the GMS education program failed to meet the requirements of Pennsylvania and federal law; (3) whether PDE discriminated against students at GMS on the basis of their placement at a PRRI by failing to ensure their education; and (4) whether students subject to GMS's education program were harmed. Proposed class representatives are named Plaintiffs Derrick, Thomas, and Walter.

a)     The PDE Education Issues Class meets the requirements of Rule 23(a)

***Numerosity.*** Here, the numerosity requirement is easily met. The Education issues class against PDE consists of all youth at GMS within the class period, numbering 1,661 putative class members, and therefore numerosity is satisfied. (Ex. 37, Student Data, GMSCA0381084; Ex. 31,

---

[17] For purposes of seeking class certification, Plaintiffs' references to "PDE" encompasses Plaintiffs' constitutional claims against the Secretary of PDE in his official capacity.

Gagnon Rpt. at 14-16). Additionally, numerosity is satisfied for the reasons laid out in Section III(A)(1) at 25.

**Commonality.** As discussed above in Section I(C) above, GMS's educational offerings were insufficient to provide the legally compliant education to students at GMS. Just as GMS's education policies applied equally to all students, so did PDE's lack of oversight and supervision to ensure that students received an education. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ (Ex. 42, PDE 30(b)(6), Clancy Dep. at 221:13-225:8, 228:10-14; Ex. 27, GMS Education 30(b)(6), Power Dep. at 265:18-267:7). ████████████████████████████████████████████████████████████████████. (Ex. 42, PDE 30(b)(6), Clancy Dep. 203:6-9, 221:13-225:8). ████████████████████████████████

████████████████████████████████████████████████████████ (Ex. 43, CCIU 30(b)(6), Ewing Dep. at 290:5-16, 302:6-303:16; Ex. 31, Gagnon Rpt. at 62-64; Ex. 27, GMS Education 30(b)(6), Power Dep. at 267:18-268:19). PDE's failure to oversee the education provided by GMS deprived all students of education, ████████████████████████████████████████████████████████ (Ex. 46, Riccio Dep. at 65-70; 146-147; Ex. 43, CCIU 30(b)(6) Ewing Dep 28:24-30:20, 404:1-405:18; Ex. 42, PDE 30(b)(6), Clancy Dep. 231:9-24). The issues class is based on a common course of conduct, satisfying commonality. *V.W.*, 236 F. Supp. 3d at 575 (finding commonality requirement met where plaintiffs alleged that common conduct deprived them of the education, special services, and related procedural protections to which they are entitled, including the district's policy of only sporadically delivering

cell packets in lieu of direct instruction thereby causing systemic deprivation of individualized special education services). *See also supra* § I(E)(1).

**Typicality.** Similar to the Education Issues Class against GMS described above, the Education Issues Class against PDE easily satisfies the typicality requirement because all students, including Named Plaintiffs, were subject to the deficient education program provided by GMS, that was unsupervised by PDE. For these reasons, as well as those listed above in Section III(B)(2)(a) at 41-42, typicality is satisfied here.

**Adequacy.** Adequacy is satisfied because Named Plaintiffs were subject to the same lack of PDE oversight as class members and have a strong incentive to vigorously represent their claims. *See supra* § III(A)(1) at 25.

b)    <u>The PDE Education Issues Class meets the requirements of Rule 23(b)</u>

Like the Education Issues Class against GMS, compensatory education is an "equitable remedy" that "fits" within 23(b)(3). *See supra* § III(B)(2)(b) at 42. *See e.g.*, *A.R.*, 2020 WL 2092650, at *12 (finding that there is "no reason why the class members' compensatory education claims may not be separately certified under Rule 23(b)(3)").

**Predominance.** Like the Education Issues Class against GMS, common issues predominate over individual issues for the Education Issues Class against PDE. The common issues against PDE include whether PDE had a duty to oversee the provision of education services at GMS and whether or not PDE breached that duty by failing to adequately supervise GMS. *See supra* § III(B)(2)(b) at 42-43.

**Superiority.** The proposed issues relate to the common actions and policies of PDE and do not pertain to individual damages. Superiority is satisfied for the Education Issues Class against

52

PDE for the same reasons it is satisfied for the Education Issues Class against GMS, as stated in Section III(B)(2)(b) at 43-44.

*Ascertainability.* Ascertainability is satisfied because the number of school-eligible youth at GMS is based on enrollment records provided by GMS, which include ages, dates of stay, education pathways, and special education status.

c)      The <em>Gates</em> factors support certification

The same *Gates* analysis in Section III(B)(2)(c) applies here against PDE, and favors certification. PDE's policies and practices concern lack of oversight which impacted all students in the Education Issues Class and the proposed issues class separates the class-wide issues from potential individual remedies, and the resolution of common questions relating to liability will materially advance this litigation. *C.P.*, 2022 WL 3572815, at *15.

2.      <em>Disability Discrimination Issues Class Against PDE</em>

The Disability Discrimination Issues Class against PDE consists of all youth at GMS after April 11, 2017, who had qualifying disabilities as defined under Section 504 and the ADA, specifically 42 U.S.C. § 12102, either before or during their placement at GMS. Plaintiffs are seeking to certify a Rule 23(c)(4) issues class on the following issues: (1) whether PDE's common policies and practices of failing to provide any supervision of GMS's program discriminated against class members on the basis of their disabilities; (2) whether PDE owed a duty to students with qualifying disabilities; and (3) whether PDE breached any duty it owed to students with qualifying disabilities. The proposed class representatives are Plaintiffs Derrick and Walter.

a)      The PDE Disability Discrimination Issues Class meets the requirements of Rule 23(a)

*Numerosity.* Here, the numerosity requirement is easily met. Again, the Disability Discrimination Issues Class consists of at least 529 putative class members. (Ex. 37, Student Data,

53

GMSCA0381084; Ex 54, June 29, 2017 Ltr. From McCoy to Hon. James Anderson, GMSCA0436763, Ex. 31, Gagnon Rpt. at 40-41). Additionally, numerosity is satisfied for the reasons laid out in Section III(A)(1) at 25.

*Commonality.* PDE failed to oversee GMS's treatment of students with qualifying disabilities in any way.[18] PDE provided no



, (Ex. 42, PDE 30(b)(6), Clancy Dep. at 165:16-188:24), ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆, (*id.*; Ex. 43, CCIU 30(b)(6), Ewing Dep. at 133:14-134:6), ▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆. (Ex. 42, PDE 30(b)(6), Clancy Dep. at 221:13-225:8). PDE's policies and practices of failing to monitor or oversee GMS or ensure the provision of a free appropriate public education to residents applied equally to all students in the Disability Discrimination Issues Class.

Accordingly, because the issues class is based on PDE's common course of conduct as to all members of the Disability Discrimination Issues Class, commonality is satisfied. *See V.W.*, 236 F. Supp. 3d at 575. *See also supra* § III(B)(3)(a) at 45-46.

*Typicality.* Like the commonality analysis, all of PDE's policies and practices, or lack thereof, impacted Named Plaintiffs Derick and Walter as well as all members of the Disability

---

[18] As previously stated, PDE is required in part to oversee and ensure the guarantee of education for students, free from discrimination on the basis of disability, per the IDEA, Title II of the ADA, and Section 504. *See Andrew M.*, 490 F. 3d at 350; *J.M.*, 358 F. Supp. 3d at 750-52. This includes monitoring local educational agencies that are responsible for providing a free and full education in the Commonwealth's public schools. *See Brian B.*, 51 F. Supp. 2d at 619.

Discrimination Issues Class, regardless of individual diagnoses or experiences. The specifics of each putative member's disability are irrelevant, as Plaintiffs must only "demonstrate that the systemic challenge is equally important to the named Plaintiffs as to the unnamed Plaintiffs." *C.G.*, 2009 WL 3182599 at *6. Typicality is met because Plaintiffs Walters' and Derrick's claims against PDE challenge their lack of supervision over "the same policies and practices and course of conduct as those that gave rise to the claims of the class and were based on the same legal theories." *Serventi*, 225 F.R.D. at 165.

**Adequacy.** Adequacy is satisfied for the reasons set forth in III(A)(1) at 25.

b)     The PDE Disability Discrimination Issues Class meets the requirements of Rule 23(b)

Like the Disability Discrimination Issues Class against GMS, this Disability Discrimination Issues Class against PDE also "fits" within Rule 23(b)(3)'s damages category. Defendant PDE failed to oversee GMS in any way, resulting in a failure to protect the Disability Discrimination Issues Class members from discrimination on the basis of their disabilities, in violation of the ADA and Section 504. This presents common "questions of law and fact" that "predominate over any questions affecting only individual members," making a class action "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**Predominance.** Like the Disability Discrimination Issues Class against GMS, common issues predominate over individual issues for this Issues Class against PDE. The common issues against PDE include whether PDE's common policies and practices of failing to provide any supervision of GMS's program discriminated against class members on the basis of their disabilities, whether PDE owed a duty to students with qualifying disabilities, and whether PDE

breached any duty it owed to students with qualifying disabilities. *See supra* § III(B)(3)(b) at 48-49.

*Superiority.* The proposed issues in the Disability Discrimination Issues Class relate to the actions and policies of PDE, not individual damages. Superiority is satisfied for the Disability Discrimination Issues Class against PDE for the same reasons it is satisfied for the parallel issues class against GMS, as stated in Section III(B)(3)(b) at 49.

*Ascertainability.* Finally, ascertainability is satisfied because the number of GMS students with disabilities per the ADA and Section 504 is based on education and health records provided by GMS, which includes the number of students with IEPs and Section 504 Plans (Ex. 37, Student Data, GMSCA0381084), and whether any student had a record of an impairment known to interfere with major life activities (*see, e.g.*, Ex. 55, Health and Safety Screen, GMSCA0000901).

c)   The <em>Gates</em> factors support certification

The same *Gates* analysis in Section III(B)(3)(c) applies here against PDE and, therefore, the factors are in favor of certification. Like the Education Issues Class against PDE, PDE failed to implement policies and practices for the oversight of GMS, impacting all members of the Disability Discrimination Issues Class. As such, the proposed Issues Class separates the class-wide issues from potential individual remedies, and the resolution of common questions relating to liability materially advances this litigation. *C.P.*, 2022 WL 3572815, at *15.

3.   <em>Special Education Issues Class</em>

The Special Education Issues Class against PDE comprises all school-eligible youth at GMS after April 11, 2017, who had been identified as "child[ren] with a disability" pursuant to the IDEA, either before or during their placement at GMS. This class should be certified with respect to the following issues: (i) whether PDE had a duty to ensure that GMS had a system to provide individualized special education services to students with disabilities; (ii) whether PDE

56

met its obligations under the IDEA; and (iii) whether students with disabilities are entitled to relief from PDE for its failure to provide oversight and ensure the provision of a FAPE as required. Plaintiffs Derrick and Walter are the class representatives. This class meets all of Rule 23's requirements.

a)      <u>The Special Education Issues Class meets the requirements of Rule 23(a)</u>

**Numerosity.** This factor is easily met, as the Special Education Issues Class consists of 524 students, based on student lists produced by GMS. *See also supra* § III(A)(1) at 25.

**Commonality.** As shown in the Factual Background above, GMS's special education policies and practices blatantly violated the IDEA by, among other things: (i) ███████████ ██████████████████████████████, (Ex. 40, GMS Special Ed. 30(b)(6), Pikes Dep. at 252:4-254:2, 340:20-343:20, 355:24-356:10; Ex. 31, Gagnon Rpt. at 38-42); (ii) ████████████████████████, (Ex. 40, GMS Special Ed. 30(b)(6), Pikes Dep. at 263:14-23; Ex. 31, Gagnon Rpt. at 45-47); (iii) ███████████ ██████████████████████████, (Ex. 44, CCIU Response to Pls.' Interrogatory No. 11; Ex. 31, Gagnon Rpt. at 42-43); (iv) ██████████████ ████████████████████████, (Ex. 31, Gagnon Rpt. at 47-49; Ex. 45, MacLuckie Dep. at 207:9-22); (v) ██████████████████████, (Ex. 40, GMS Special Ed. 30(b)(6), Pikes at 261:3-7); and (vi) ██████████ ██████████████████████████████████. (Ex. 32, McNeal Dep. at 49:4-50:24). GMS's IDEA violations applied equally to every student identified as "a child with a disability" under the IDEA.

Similarly, PDE's failure to properly oversee GMS's deficient special education policies and practices also equally affected every student who had been identified as "a child with a

disability" under the IDEA. Therefore, because the Issues Class is based on a common course of conduct, commonality is satisfied. *See D.L. v. Dist. of Columbia*, 860 F.3d 713, 725 (D.C. Cir. 2017) ("IDEA liability does not depend on the reason for a defendant's failure and plaintiffs need not show why their rights were denied to establish that they were."); *C.G.*, 2009 WL 3182599, at *5-6 (finding commonality where "the class members [consisting of disabled students] each were in factually distinct situations in terms of their receipt of FAPE, but the challenge and the desired relief were common to all members"); *see also Nat'l Law Ctr. on Homelessness & Poverty*, 224 F.R.D. at 324 (finding commonality where plaintiffs were "challenging how the practice and policy of the Defendants affects each individual child").

*Typicality***.** The Special Education Issues Class easily satisfies the typicality prong because, just as for commonality, all policies and practices (or lack thereof) and failures to provide oversight that harmed Named Plaintiffs Derrick and Walter also harmed all members of the Class, regardless of individual diagnoses or experiences. *See M.A. ex rel. E.S*, 2009 WL 4799291, at *8 ("[T]he jurisprudence is clear that such factual differences in how the alleged systemic delay affected any particular student, including the named plaintiffs, does not defeat typicality."); *C.G.*, 2009 WL 3182599, at *6-7 (to satisfy typicality, class representatives need only "demonstrate that the systemic challenge is equally important to the named Plaintiffs as to the unnamed Plaintiffs").

For example, despite Derrick's . (*Compare* Ex. 56, Personalized Education Plan Summary, 6/23/18, DERRICK_004717-18 *with* Ex. 57, IEP, 6/6/17, GMSCA000258 ). Plaintiff Walter is also

██████████████████████████. (Ex. 58, GMSCA0000703-19). Nevertheless, upon entering GMS he was inappropriately placed in a GED program without required individualized aids, accommodations, or modifications. (Ex. 59, GMSCA0000609-10). Accordingly, typicality is plainly satisfied.

      ***Adequacy.*** Adequacy is satisfied for the reasons set forth in Section III(A)(1) at 25.

          b)     <u>The Special Education Issues Class meets the requirements of Rule 23(b) and the *Gates* factors support certification</u>

      Compensatory education is an "equitable" remedy that "fits" within 23(b)(3). *See e.g.*, *A.R.*, 2020 WL 2092650, at *12; *supra* §§ III(B)(2)(b) at 42, III(C)(1)(b) at 52.

      ***Predominance.*** Common issues predominate over individual ones for the Special Education Issues Class as Plaintiffs allege a common course of conduct on the part of the PDE Defendants. *See In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d at 314-15. As discussed above, predominance exists if the cause of action "is capable of proof at trial through evidence that is common to the class rather than individual to its members." *In re Hydrogen Peroxide*, 552 F.3d at 311-12. While members of the special education classes had various disabilities and injuries, Plaintiffs' proposed special education class claims are related to PDE's systemic lack of oversight that deprived class members at GMS of their rights under the IDEA and discriminated against all members of the special education classes.

      For example, as described in the Factual Background, ████████████████████ ██████████████████ (*See* Ex. 45, MacLuckie Dep. at 207:9-22). As a result, any student behavior that interfered with learning was not addressed. ████████████████ ████████████████████████████, (*see* Ex. 42, CCIU 30(b)(6), Ewing at 92:22-93:1; Ex. 44, CCIU Response to Pls.' Interrogatory No. 11); thus, to the detriment of all class members, there was no ████████████████████████████████████



████████

████. *See* 34 C.F.R. § 300.321. Plaintiffs will present evidence revealing the nature and consequences of PDE's deficient (or nonexistent) policies and practices, which will be used to prove Plaintiffs' special education class claims. This evidence speaks to the common factual and legal questions of whether Defendants' actions constitute systemic violations and class-wide discrimination under the IDEA.

*Superiority and Ascertainability.* Superiority is satisfied for the reasons stated in Section III(B)(2)(b) at 43. Ascertainability is easily satisfied as the number of students with disabilities is well established. *See supra* § III(B)(3)(a) at 45.

*Gates Factors.* The Court can certify the Special Education Issues Class under the *Gates* factors. Similar to commonality and predominance, the types of claims and issues in question are proper for issues class certification, as the class claims emanate from common GMS policies and practices and PDE's universal lack of oversight affecting all students in the special education classes. Each member of the Special Education Issues Class can show that GMS's policies and practices violated the IDEA by discriminating against them on the basis of their disabilities, and that PDE's lack of oversight of GMS also violated the IDEA. As "the issues proposed for certification here would apply to the class as a whole" this factor is satisfied. *See C.P.,* 2022 WL 3572815, at *15.

For the same reasons discussed in Sections III(B)(1)(c) and III(B)(2)(c) above, the second and third *Gates* factors are also easily met. Factor four is satisfied as certification allows the Court to separate the proposed class-wide issues from the potential remedies. "The [IDEA] claims here are governed by federal law, further underscoring the appropriateness of this forum to dispose of them. In addition, even though the resolution of these questions may not resolve certain issues

such as individual damages, . . . it would materially advance this litigation to answer the questions presented for consideration[.]" *Id.* at *15. Finally, as discussed in Section III(B)(1)(c) above, and for the same reasons, factors five through nine favor class certification. The proposed Special Education Issues Class will streamline this complex litigation and ensure a fair resolution to all parties involved.

### 4.    *Suspected Special Education Issues Class*

The Suspected Special Education Issues Class against PDE comprises all school-eligible youth at GMS after April 11, 2017, who demonstrated documented behavioral, developmental, or academic indicia of being "child[ren] with a disability" such that the youth was entitled to a disability evaluation pursuant to IDEA, and who did not receive one during their placement at GMS. This class should be certified with respect to the following issues: (i) whether PDE's policies and practices failed to ensure that GMS identified, evaluated, or served students with suspected disabilities; and (ii) whether students with suspected disabilities are entitled to relief from PDE for this failure. Plaintiff Thomas is the class representative. This class meets all of Rule 23's requirements.

#### a)    The Suspected Special Education Issues Class meets the requirements of Rule 23(a)

**Numerosity.** Numerosity is easily met. This class consists of 257 students, based on Dr. Gagnon's methodology as applied to GMS-produced student lists for the period after April 11, 2017. (*See* Ex. 31, Gagnon Rpt. at 41). *See also supra* § III(A)(1) at 25.

**Commonality.** In the absence of any system to identify IDEA-eligible youth, students with suspected disabilities remained systematically unidentified and were deprived of required services pursuant to IDEA. (Ex. 40, GMS Special Ed. 30(b)(6), Pikes Dep. at 252:4-254:2, 340:20-343:20, 355:24-356:10; Ex. 31, Gagnon Rpt. at 38-42). PDE's failure to properly oversee GMS's deficient

special education policies and practices equally affected each of these students. Because this class is based on a common course of conduct, commonality is satisfied. *See D.L.*, 860 F.3d at 725; *C.G.*, 2009 WL 3182599, at *5-6. *See also supra* § III (C)(1) at 51-52.

      *Typicality***.** The Suspected Special Education Issues Class easily satisfies the typicality prong because, just as for commonality, the policies and practices (or lack thereof) and oversight failures that harmed Named Plaintiff Thomas also harmed all members of the Class, regardless of individual diagnoses or experiences. *See Newark Pub. Schs.*, 2009 WL 4799291, at *8; *C.G.,* 2009 WL 3182599, at *6-7. For example, despite Thomas's ███████████████████████████████ ████████ (*see, e.g.*, Ex. 60, School Records of Thomas, GMSCA0000503-04), ███████████ ████████████████ (Ex. 61, Michelle Dep. at 170:7-21), ██████████████████████████ ████████ (Ex. 62, Dispositional Review Order, GMSCA0000499), GMS never evaluated Thomas pursuant to the IDEA or provided special education support. (Ex. 61, Michelle Dep. at 286:20-23). Typicality is satisfied here.

      *Adequacy***.** Adequacy is satisfied for the reasons set forth in Section III(A)(1) at 25.

      b)      <u>The Suspected Special Education Class meets the requirements of Rule 23(b) and the *Gates* factors support certification</u>

As with the Education Issues Classes against GMS and PDE, compensatory education is an "equitable remedy" that "fits" within 23(b)(3). *See supra* §§ III(B)(2)(b) at 42, III(C)(1)(b) at 52.

      *Predominance and Superiority***.** These factors are satisfied for the reasons set forth in Sections III(C)(3)(b) at 59-60 and III(B)(2)(b) at 43-44.

      *Ascertainability***.** Both prongs of the ascertainability analysis are satisfied: (1) the class is "defined with reference to objective criteria," and (2) there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class

definition." *Hayes*, 725 F.3d at 355. Here, Plaintiffs' expert has identified objective criteria for identifying members of the class, and GMS-produced education and health records provide a reliable and administratively feasible mechanism for determining class membership. (*See e.g.*, Ex. 31, Gagnon Rpt. at 38-42).

**Gates *Factors*.** The Suspected Special Education Issues Class is appropriate for certification under the *Gates* factors for the reasons described in Section III(C)(3)(b) at 60-61.

### 5.   *Special Education Parents Issues Class*

The Special Education Parents Issues Class against PDE comprises all parents of school-eligible youth at GMS after April 11, 2017, who had been identified as "child[ren] with a disability" pursuant to IDEA, either before or during their placement at GMS. This Class should be certified with respect to the following issues: (i) whether PDE's policies and practices failed to ensure a system that allowed for meaningful parental participation in special educational decision making for students with disabilities at GMS; and (ii) whether parents of students with disabilities are entitled to relief from PDE for this failure. Plaintiffs Tina and Janeva are the class representatives. This Class meets all of Rule 23's requirements.

### a)   The Special Education Parents Issues Class meets the requirements of Rule 23(a)

***Numerosity*.** This factor is easily met. Per GMS-produced student lists, the Special Education Parents Issues Class consists of at least 524 putative members, where one "parent," as defined by the IDEA, is counted for each student with an IEP. *See also supra* § III(A)(1) at 25.

***Commonality*.** As described in the Factual Background, GMS's special education policies and practices violated the IDEA in part by systematically excluding students' parents from every level of the decision-making process. For example, parents (i) ███████████████████████ ████████████████████ (ii) ██████████████████████████████████

███████████████████████████████████████████████████, and
(iii) ████████████████████████████████████████████████████

████████████ PDE's failure to properly oversee GMS's deficient special education policies and practices also equally affected every parent of a student who had been identified as "a child with a disability" under the IDEA. *See supra* § I(D) at 13. Because the Issues Class is based on a common course of conduct, commonality is satisfied. *See D.L.*, 860 F.3d at 725; *C.G.*, 2009 WL 3182599, at *5-6. *See also supra* § III (C)(1) at 51-52.

***Typicality***. The Special Education Parents Issues Class easily satisfies the typicality prong because, just as for commonality, the policies and practices (or lack thereof) and deprivation of oversight by PDE that harmed Named Plaintiffs Tina (Derrick's mother) and Janeva (Walter's mother) also harmed all members of the class, regardless of individual experiences. *See Newark Pub. Schs.*, 2009 WL 4799291, at *8; *C.G.*, 2009 WL 3182599, at *6-7.

For example, after Derrick was placed at GMS, Tina faced repeated barriers when she attempted to advocate for Derrick's educational rights. (Ex. 63, Tina Dep. at 86:4-12, 224:21-225:13). █████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████ (Ex. 63, Tina Dep. at 170:1-171:3, 223:12-224:20, 379:21-380:17, 394:17-395:18). ███████████████████████
███████████████████████████████████████. (*Id.* at 223:23-224:2, 239:21-24, 383:8-390:17).

Similarly, Janeva ████████████████████████████████████████████████
████████████████████████████. (Ex. 53, Janeva Dep. at 380:11-381:13; Ex. 64, Reviewed & Revised ISP, GMSCA0001841-45). Accordingly, typicality is satisfied.

***Adequacy.*** This factor is satisfied for the reasons set forth in Section III(A)(1) at 25.

        b)      The Special Education Parents Issues Class meets the requirements of Rule 23(b) and the *Gates* factors support certification

For the 23(b) factors, as with the Education Issues Classes against GMS and PDE, compensatory education is an "equitable remedy" that "fits" within 23(b)(3). *See supra* §§ III(B)(2)(b) at 42, III(C)(1)(b) at 52. Predominance is satisfied for the reasons set forth in Section III(C)(3)(b) at 59. Superiority is satisfied for the reasons stated in Section III(B)(2)(b) at 43-44. Ascertainability is satisfied as the number of parents of students with IEPs is easily ascertained from the education records maintained by GMS. Finally, the Special Education Parents Issues Class is appropriate for certification under the *Gates* factors for the reasons described in Section III(C)(3)(c) at 60-61.

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully ask the Court to grant their Motion to certify the classes as defined above, appointing Named Plaintiffs as Class Representatives for these same classes, and appointing Juvenile Law Center, Education Law Center, and Dechert LLP as Class Counsel.

Dated: September 15, 2023        BY:  */s/ Marsha L. Levick*
                                      Marsha L. Levick
                                      Katherine E. Burdick
                                      Nadia Mozaffar
                                      Malik Pickett
                                      Courtney M. Alexander
                                      Breanne Schuster
                                      Jasmin Randolph-Taylor
                                    JUVENILE LAW CENTER
                                    1800 JFK Blvd., Suite 1900B
                                    Philadelphia, PA 19103
                                    (215) 625-0551

Maura McInerney
Kristina A. Moon
Margaret M. Wakelin
EDUCATION LAW CENTER
1800 JFK Blvd., Suite 1900A
Philadelphia, PA 19103
(215) 238-6970

Fred T. Magaziner
Michael H. McGinley
Clare Pozos
Caroline Power
Roger A. Dixon
Rachel Rosenberg
Christopher J. Merken
DECHERT LLP
2929 Arch St.
Philadelphia, PA 19104
(215) 994-4000

*Attorneys for Plaintiffs*

**<u>Exhibit List to Plaintiffs' Motion for Class Certification and
Appointment of Class Representatives and Class Counsel</u>**

1.    March 25, 2019 Emergency Removal Order

2.    Program Description, 2018-2019, Glen Mills Schools, GMS0115964-GMS0116044

3.    Glen Mills School Student Handbook, GMSCA0004545-GMSCA0004562 (filed under seal)

4.    January 31, 2023 Deposition of Adam Locke, Former Counselor-Teacher, GMS (filed under seal)

5.    January 25, 2023 Deposition of Sean Cosgrove, Former Group Living Director, GMS (filed under seal)

6.    Hayes Hall New Peer Packet, GMSCA0004905-GMSCA0004919 (filed under seal)

7.    January 27, 2023 30(b)(6) and Individual Deposition of Randy A. Ireson, Ph.D., Former Executive Director, GMS (filed under seal)

8.    March 30, 2023 Expert Report of David Muhammad (filed under seal)

9.    GMS' Physical Restraint Log, GMSCA0401031 (filed under seal and available upon request)

10.   August 23, 2018 Letter from Dr. Randy A. Ireson to Commissioner Cynthia Figueroa, PHILA000001-PHILA000006

11.   November 2, 2022 30(b)(6) Deposition of Dr. Christopher Spriggs, Executive Director, GMS (filed under seal)

12.   Performance Audit Report, Glen Mills Schools, June 2020

13.   March 29, 2023 Expert Report of Robert T. Kinscherff, Ph.D., Esq. (filed under seal)

14.   March 30, 2023 Expert Report of Timothy Decker (filed under seal)

15.   January 18, 2022 Deposition of Colleen Cahill, Former Licensing Technician and Investigator, DHS (filed under seal)

16.   March 28, 2022 Deposition of Alexander Prattis, Former Program Representative and Director of the Southeast Regional Office, DHS (filed under seal)

17.   Home and Community Services Information System Incident Management Report Compilation, PA-DHS00020305 (filed under seal)

18.   Incident Management Report No. 160982, May 8, 2016, PA-DHS00006536-PA-DHS00006539 (filed under seal)

19.   License Packet Tracking, License No. 113030, PA-DHS00000049-PA-DHS00000068 (filed under seal)

20.   License Packet Tracking, License No. 112980, PA-DHS00000001-PA-DHS00000022 (filed under seal)

21.   Incident Management Report No. 134921, January 20, 2015, PA-DHS00005565-PA-DHS00005568 (filed under seal)

22.   Licensing Scoresheet, September 20, 2016, PA-DHS00001880-PA-DHS00001903 (filed under seal)

23.   Incident Management Report No. 193020, October 21, 2017, PA-DHS00007877-PA-DHS00007880 (filed under seal)

24.   OCYF Review of Unsafe Uneducated Report, Education Law Center and Children's Rights, PA-DHS00009893-PA-DHS00009915 (filed under seal)

25.   March 20, 2019 Email from A. Prattis to R. Shamsid-Deen Hampton, PA-DHS00028469-PA-DHS00028475 (filed under seal)

26.   May 13, 2022 Deposition of Sandra Wooters, Former Regional Director of the Bureau of Human Services Licensing, DHS (filed under seal)

27.   November 29, 2022 30(b)(6) Deposition of Liam Power, Education Coordinator and Former Academic Coordinator, GMS (filed under seal)

28.   Glen Mills School 2019 Educational Playbook – Teacher's Guide to Best Educational Practices, GMSEDU0115596-GMSEDU0115684 (filed under seal)

29.   December 15, 2022 Deposition of Robert Chobany, Director of Education and Former Education Coordinator, GMS (filed under seal)

30.   November 18, 2013 Report on the Educational Delivery at Glen Mills Schools, CCIU_0000425-CCIU_0000435 (filed under seal)

31.   March 30, 2023 Expert Report of Joseph Calvin Gagnon, Ph.D. (filed under seal)

32.   January 31, 2023 Deposition of Mary McNeal, Former Academic Coordinator, GMS (filed under seal)

33.   January 30, 2023 Deposition of Aaron Powell, Former Resource Room Teacher and Counselor-Teacher, GMS (filed under seal)

34.   December 7, 2022 Deposition of Andre Walker, Former Counselor-Teacher, GMS (filed under seal)

35.   July 19, 2022 Deposition of Derrick, Plaintiff (filed under seal)

36.   November 22, 2022 Deposition of Walter, Plaintiff (filed under seal)

37.   Student Data Spreadsheet, GMSCA0381084 (filed under seal and available upon request)

38.   Educational Path Spreadsheet, GMSCA0381090 (filed under seal)

39.   March 30, 2023 Expert Report by David Osher, Ph.D., Conditions of Learning and Development at the Glen Mills School (filed under seal)

40.   November 16, 2022 30(b)(6) Deposition of Rema Pikes, Special Education Coordinator, GMS (filed under seal)

41.   August 5, 2014 email from Samuel Ewing to Rema Pikes et al., CCIU_0029901-CCIU_0029903 (filed under seal)

42.   March 30, 2022 30(b)(6) Deposition of Carole Clancy, Director of the Bureau of Special Education, PDE (filed under seal)

43.   March 24, 2022 30(b)(6) Deposition of Samuel Ewing, Director of Student Services, CCIU (filed under seal)

44.   Answers of Defendant, Chester County Intermediate Unit, to Plaintiffs' First Set of Interrogatories

45.   June 29, 2021 Deposition of Michelle MacLuckie, Former Special Education Supervisor, CCIU (filed under seal)

46.   April 19, 2022 Deposition of Anita Riccio, Ed.D, Former Assistant Director of Student Services, CCIU (filed under seal)

47.   Restraint History at Chester County IU 24, PDE00000284-PDE00000409 (filed under seal)

48.  CCIU Student Data, CCIU_0000567 (filed under seal and available upon request)

49.  March 30, 2023 Expert Report of Clive R. Belfield, The Economic Consequences of Failure to Graduate High School: An Analysis of Glen Mills Schools

50.  July 18, 2022 Deposition of Derrick, Plaintiff (filed under seal)

51.  August 15, 2022 Deposition of Thomas, Plaintiff (filed under seal)

52.  November 21, 2022 Deposition of Walter, Plaintiff (filed under seal)

53.  December 9, 2022 Deposition of Janeva, Plaintiff and next friend and mother of Plaintiff Walter (filed under seal)

54.  June 29, 2017 Letter from Roman McCoy to The Honorable James Anderson, GMSCA0436763-GMSCA0436767 (filed under seal)

55.  July 9, 2018 Health and Safety Screen of Donti Jackson, GMSCA0000901(filed under seal)

56.  Glen Mills Schools Personalized Education Plan Summary (6/23/2018), DERRICK_004717-DERRICK_004718 (filed under seal)

57.  June 6, 2017 Individualized Education Plan of Donti Jackson, GMSCA000258 (filed under seal)

58.  October 4, 2017 Individualized Education Program of William Gacutan, GMSCA0000703-GMSCA0000719 (filed under seal)

59.  Glen Mills Schools Personalized Education Plan Summary (5/3/2019), GMSCA0000609-GMSCA0000610 (filed under seal)

60.  School Records of Plaintiff Thomas, GMSCA0000503-GMSCA0000504 (filed under seal)

61.  October 28, 2022 Deposition of Michelle, Plaintiff and next friend and mother of Plaintiff Thomas (filed under seal)

62.  May 8, 2018 Dispositional Review Order, GMSCA0000499 (filed under seal)

63.  September 22, 2022 Deposition of Tina, Plaintiff and next friend and mother of Plaintiff Derrick (filed under seal)

64.  September 5, 2018 Reviewed & Revised ISP - William Gacutan, GMSCA0001841-GMSCA0001845 (filed under seal)