IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| DERRICK, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| GLEN MILLS SCHOOLS, et al. | : | NO. 19-1541 |


MEMORANDUM

Bartle, J.                                          May 13, 2024

This putative class action involves serious and pervasive allegations of widespread abuse, inadequate education, and disability discrimination at the now closed Glen Mills Schools ("Glen Mills"). Before the court is the motion of Plaintiffs, three former Glen Mills residents and two of their parents, to certify against three Defendants, Teresa Miller, Theodore Dallas, and Cathy Utz, a damages class under Rule 23(b)(3) of the Federal Rules of Civil Procedure and to certify against four Defendants, Glen Mills, Randy Ireson, the Pennsylvania Department of Education ("PDE"), and Pedro Rivera, twenty-four issue classes under Rule 23(c)(4). See Fed. R. Civ. P. 23(b)(3), (c)(4).

## I.   Background

Plaintiffs are the following individuals: Derrick, through and with his next friend and mother Tina; Walter, through and with his next friend and mother Janeva; and Thomas,

through his next friend and mother Michelle.[1]  Derrick, Walter, and Thomas are three individuals who were involuntarily placed at Defendant Glen Mills after being adjudicated delinquent in the state courts of Pennsylvania.  They seek class certification on behalf of themselves and other Glen Mills residents who, according to Plaintiffs, suffered physical, oral, and psychological abuse, were deprived of an adequate education, and endured discrimination for their disabilities at the school. Additionally, Derrick's mother Tina and Walter's mother Janeva seek certification on behalf of themselves and other parents and guardians of Glen Mills residents who were excluded from the individualized education process for their children with disabilities.

        Defendants can be divided into three groups.  First, there are the Glen Mills Defendants, which include the school itself and its former Executive Director, Randy Ireson.[2]  Second, there are the Pennsylvania Department of Human Services ("DHS") Defendants.  While Plaintiffs have not named the Department itself as a defendant, they have sued three DHS officials acting in their individual and official capacities.  They are former

_____

1.   The Complaint uses pseudonyms to protect the privacy of the named Plaintiffs and their parents.
2.   Although former Glen Mills staff members Andre Walker and Robert Taylor are Defendants in this action, Plaintiffs do not seek class certification against them.

DHS Secretaries Theodore Dallas and Teresa Miller, and former Deputy DHS Secretary for the Pennsylvania Office of Children, Youth, and Families Cathy Utz.  The third group, the PDE Defendants, include the Department itself and its former Secretary, Pedro Rivera in his official capacity.

Plaintiffs seek to represent a putative class and several putative subclasses of individuals who were involuntarily detained at Glen Mills.[3]  Most residents, including Derrick, Walter, and Thomas, were involuntarily placed there pursuant to orders from various state courts after they were adjudicated delinquent.  Other residents were there involuntarily while awaiting juvenile court proceedings in Philadelphia County.[4]

The individual circumstances of Derrick, Walter, and Thomas were detailed in this court's memorandum dated December 19, 2019.  See Derrick Through Tina v. Glen Mills Sch., No. CV 19-1541, 2019 WL 7019633 at *3-*5 (E.D. Pa. Dec. 19, 2019).  Relevant to the instant motion, Derrick and Walter resided at Glen Mills from March 2018 to March 2019.  Thomas did so from

---

3.    For the sake of brevity, the Court will refer to the putative classes as "classes," the putative class members as "class members," and the proposed class representatives as "class representatives."
4.    Excluded from Plaintiffs' classes is a small number of youth that were voluntarily placed at Glen Mills by their parents or guardians.

May 2018 to March 2019.  According to Plaintiffs, each of them was subjected to recurring physical, oral, and psychological abuse from Glen Mills staff and other residents.  They also assert that they were students with disabilities and received a deficient education.

Glen Mills was established in 1826 as a boarding school for adjudicated juveniles and other troubled youth.  It was neither a traditional private boarding school nor a public school under Pennsylvania law.  Rather, it was licensed by the DHS as a private residential rehabilitative institution.  See 24 Pa. Cons. Stat. § 9-914.1-A(c).  Local education agencies and intermediate units in Pennsylvania and other jurisdictions contracted with Glen Mills to provide rehabilitative and educational services.  See 24 Pa. Stat. §§ 9-914.1-A(a), (c).

Due to its unique status, several state and local agencies were responsible for monitoring the conditions at Glen Mills.  The Chester County Intermediate Unit was the local education agency that contracted with Glen Mills.[5]  DHS, in addition to licensing the school, was tasked with ensuring compliance with the hundreds of regulations for youth residential facilities under 55 Pa. Code Chapter 3800 ("DHS

---

5.   In February 2023, the Chester County Intermediate Unit reached a settlement agreement with Plaintiffs and was dismissed as a party to this suit.

regulations"). On July 1, 2017, these state responsibilities were assigned to the Office of Children, Youth, and Families, one of the program offices of DHS. PDE, on the other hand, monitored compliance with state and federal special education laws and the use of classroom physical restraints.

In June 2018, DHS began investigating Glen Mills in response to anonymous written complaints of staff aggression towards residents. The Philadelphia Inquirer ran an article on Glen Mills in February 2019, in which it exposed the physical, oral, and psychological abuse suffered by residents. Lisa Gartner, "Beaten, Then Silenced," Phila. Inquirer, Feb. 20, 2019, at B1. Defendant Ireson, who had been the school's Executive Director since 2013, resigned a week after the article was published.

On March 25, 2019, DHS concluded its investigation and issued an order revoking the licenses for all fourteen residential halls at the school. As a result, Glen Mills was closed. In its order, DHS detailed numerous incidents of physical, oral, and psychological abuse by staff members and other residents, including:

- . . . staff failed to intervene to protect a child from another resident resulting in the child suffering a broken jaw . . . .

- . . . a child was assaulted by a staff person causing an injury to his eye.

The child was then coerced into saying that his injury was a result of playing basketball.

- . . . a child was choked by three staff and then slammed to the floor . . . .

- . . . a staff person punched a child in the chest . . . .

- . . . a child was assaulted by a staff person causing an injury to his eye . . . .

- . . . a child . . . was asked to sign a document for court stating that he wished to remain at Glen Mills if he could not be sent home.

- . . . an incident occurred where at least one student entered another student's room and took money from the student.

- . . . the youth was subjected to harassment, unreasonable restraint, unusual and an extreme form of discipline by more than one Child Care Residential staff. . . .

- . . . Glen Mills failed to provide or delayed providing the appropriate medical treatment of the child's injuries . . . .

DHS further described Glen Mills as operating under "a culture of intimidation," where "youth were told to lie about the care they received and the physical mistreatment they endured."

DHS linked this culture to risk of injury faced by residents:

> These findings verify that Glen
> Mills failed to protect the youth entrusted
> to its care, placed youth at risk of serious
> physical injury, permitted youth to sustain
> physical injuries by their acts and failure
> to act and Glen Mills engages in a culture
> that instills fear in youth through coercion
> and intimidation.  As a result, we find that
> youth placed at Glen Mills are at imminent
> risk and their safety is in jeopardy.

DHS concluded that conditions at Glen Mills "constitute gross incompetence, negligence and misconduct in operating a facility."

On April 11, 2019, less that one month after DHS issued its order revoking the school's licenses, Plaintiffs filed their 149-page complaint in this court.  They asserted eighteen claims for relief encompassing the following grounds: (a) violations of the Eighth Amendment under 42 U.S.C. § 1983;[6] (b) violations of the right to a public education under Pennsylvania law, 24 P.S. §§ 13-1306, 9-914.1-A; (c) violations of the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. §§ 1401(3), 1414(d); (d) violations of Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794; (e) violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq.; and (f) common law negligence.

---

6.    The court recognizes that the Eighth Amendment is incorporated into the Fourteenth Amendment.  See Derrick, 2019 WL 7019633 at *10.  For ease of reference, the court will refer to the claims as under the Eighth Amendment.

Plaintiffs seek damages as well as equitable relief in the form of compensatory education.

Plaintiffs focus on evidence which they characterize as showing that the culture at Glen Mills was not merely one of intimidation but one of confrontation.  Staff and residents were encouraged to enforce unwritten norms through threats and physical force.  Residents who regularly confronted peers earned "Bull Status" and favored treatment by the staff.  Furthermore, staff at Glen Mills resorted to physical restraints more often than staff at other youth residential facilities to keep residents in line.  According to Plaintiffs, this culture of confrontation can be traced back to April 2017.  They maintain that this culture persisted at the school because of the policies and practices of Glen Mills leadership and state regulators—DHS and PDE—that monitored staff and residents.

Plaintiffs assert that Glen Mills failed to provide residents with an appropriate public education.  Instruction was largely conducted through a self-directed computer program called PLATO/Edmentum.  In-person instruction was limited to infrequent "tutoring" by "counselor-teachers" who were not required to hold any teaching certifications or credentials. Plaintiffs challenge not only the quality of instruction but also the number of hours provided, which they contend were below the Pennsylvania statutory requirements for a private

-8-

residential rehabilitative institution.  They attribute the deficient education at Glen Mills to the school itself and ineffective monitoring by PDE.

Additionally, Plaintiffs point to evidence to support their claim that residents with disabilities, defined as impairments that substantially limit major life activities, were deprived of a free and appropriate public education and suffered discrimination.  According to Plaintiffs, Glen Mills had no process in place to identify residents with disabilities.  Even those residents that were known to have disabilities did not receive IEPs as required under the IDEA, ADA, and Section 504.  Rather, they were either assigned instruction on the same self-directed computer program used by residents without disabilities or assigned packets of worksheets.

Plaintiffs also submit that Glen Mills leadership discriminated against residents with disabilities by failing to provide them with reasonable accommodations.  They cite evidence from which they conclude that PDE failed to monitor compliance with state and federal special education laws.  Finally, they maintain that discovery shows that Glen Mills and PDE excluded parents and guardians from the decision-making process regarding special education for their children.

This massive litigation has progressed through four years of discovery, including significant document production

and depositions of the individual Plaintiffs and a number of other fact witnesses.  Lengthy expert reports were also produced.  Thereafter, Plaintiffs filed the instant motion for class certification of one damages class against Teresa Miller, Theodore Dallas, and Cathy Utz, and twenty-four issue classes against one or more of the remaining defendants, Glen Mills, Randy Ireson, PDE, and Pedro Rivera.  Extensive briefing followed.  The court held oral argument for over three hours on the motion.

The court acknowledges that the factual record is replete with appalling incidents of widespread abuse, inadequate education, and disability discrimination suffered by Plaintiffs and other youth that were placed at Glen Mills.  While the court must go beyond the pleadings in resolving a class certification motion, it is not deciding the action on the merits.  The only issue presently before the court is whether class certification is the proper mechanism to pursue the claims alleged.

II.  <u>Abuse Class Against the DHS Defendants</u>

The court turns first to Plaintiffs' motion to certify the so-called "Abuse Class" against former DHS Secretaries Dallas and Miller and Deputy Secretary Utz (the "DHS Defendants") for damages under Rule 23(b)(3).  <u>See</u> Fed. R. Civ. P. 23(b)(3).

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 348 (2011) (quoting Califano v. Yamasaki, 442 U.S. 682, 700-701 (1979)).  It was created to promote equity and efficiency in situations where a large group of individuals are united in interest.  7A Charles Alan Wright et al., Federal Practice and Procedure § 1751 (4th ed. 2023).  Because final judgment in a class action may bind absent individuals and thus infringe on their substantive rights, Rule 23 of the Federal Rules of Civil Procedure imposes certain procedural safeguards to ensure that class treatment is warranted.  Russell v. Educ. Comm'n for Foreign Med. Graduates, 15 F.4th 259, 265 (3d Cir. 2021).

The Supreme Court has emphasized that "Rule 23 does not set forth a mere pleading standard."  Wal-Mart, 564 U.S. at 350.  A plaintiff seeking class certification bears the burden of proving each applicable requirement of Rule 23 by a preponderance of the evidence.  Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015).  "Class certification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met."  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 (3d Cir. 2008) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161

(1982)).  To conduct this analysis the court "must resolve all
factual or legal disputes relevant to class certification, even
if they overlap with the merits—including disputes touching on
elements of the cause of action."  Id. at 307.

    As a threshold matter, a class representative bears
the burden of establishing Article III standing, that is that he
or she has suffered injuries which are "fairly traceable" to the
defendant's conduct and can be redressed by a favorable judicial
decision.  See Neale v. Volvo Cars of N. Am., LLC, 794 F.3d 353,
362 (3d Cir. 2015);  Mielo v. Steak 'n Shake Operations, Inc.,
897 F.3d 467, 478 (3d Cir. 2018).  The DHS Defendants argue that
the class representatives Derrick, Walter, and Thomas do not
have standing against former Secretary Dallas because he left
his position at DHS in 2017, one year before they had arrived at
Glen Mills.[7]

    Plaintiffs counter that former Secretary Dallas
maintained the same policies and practices which later caused
them injury.  By their logic, they could name as defendants even
distant predecessors of Secretary Dallas who allegedly followed
the same challenged policies.  The causal relationship is too

---

7.   The DHS Defendants present this challenge to typicality
under Rule 23(a)(3).  Circuit courts are split between
considering standing within the context of the Rule 23 inquiry
or separately.  Neale, 794 F.3d at 368.  The precedent of the
Court of Appeals for the Third Circuit, to which this court is
bound, takes the separate inquiry approach.  See id.

tenuous as to the public officials whose tenure in office
expired prior to the time when the alleged harm occurred.
Plaintiffs do not have standing against former Secretary Dallas
and the action will be dismissed as to him.

A.   Ascertainability

A plaintiff seeking class certification must first
establish an ascertainable class.  See Byrd, 784 F.3d at 163.
"The ascertainability inquiry is two-fold, requiring a plaintiff
to show that: (1) the class is defined with reference to
objective criteria; and (2) there is a reliable and
administratively feasible mechanism for determining whether
class members fall within the class definition."  Id. (internal
quotations omitted).

Plaintiffs define the "Abuse Class" as consisting of
all youth at Glen Mills within the "Class Period:"

> [Y]outh who were adjudicated
> delinquent and were placed at [Glen Mills]
> by a court or state or local agency, and
> resided at [Glen Mills]: (a) at any time
> between April 11, 2017, and April 11, 2019;
> (b) at any time and who turned 18 years old
> between April 11, 2017, and April 11, 2019;
> or (c) at any time and had not yet turned 18
> years old by April 11, 2019 . . . .

It is within this court's discretion to remedy a
defective class definition.  Finberg v. Sullivan, 634 F.2d 50,
64 (3d Cir. 1980).  As previously noted, Derrick and Walter had
not arrived at Glen Mills until March 2018 and Thomas not until

-13-

May 2018.  A Plaintiff does not have standing as a class representative for any claim prior to his arrival.  Thus, Plaintiffs do not have standing for any claim prior to the earliest arrival of the class representatives.  Accordingly, the Class Period is amended to begin in March 2018,[8] when the first class representative came to Glen Mills.  See id.

The DHS Defendants challenge ascertainability on the ground that Plaintiffs' class definition is overly broad. According to them, Plaintiffs cannot establish that all class members suffered injury, much less the same type of injury, or that any injury suffered can be linked to the fact of residence at Glen Mills.

However, the ascertainability inquiry only concerns whether the class members can be identified based on Plaintiffs' criteria.  Byrd, 784 F.3d at 163-64.  Plaintiffs do not identify class members in terms of any alleged injury, but rather, enrollment during the Class Period.  Enrollment at Glen Mills over a given period is an objective criterion and the enrollment records make it administratively feasible to determine class membership.  See id. at 163.  Plaintiffs have set forth an ascertainable class as modified.

_____

8.   The parties have not specified the exact dates when Derrick, Walter, and Thomas arrived at Glen Mills.  The specific starting date of the amended Class Period will be determined when those facts are made known.

B.   Rule 23(a) Factors

An ascertainable class can be certified only if a plaintiff can satisfy the four requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  The elements of this four-part test are known as numerosity, commonality, typicality, and adequate representation.  Wal-Mart, 564 U.S. at 349.

i.   Numerosity

Our Court of Appeals "presume[s] joinder is impracticable when the potential number of class members exceeds forty."  Allen v. Ollie's Bargain Outlet, Inc., 37 F.4th 890, 896 (3d Cir. 2022) (internal citations omitted).  Plaintiffs' class of 1,661 members clearly satisfies numerosity.  Even under the amended definition of Class Period, the number of class members would clearly meet this threshold.

ii.  Commonality

The next requirement is commonality, which the Supreme Court addressed in Wal-Mart.  564 U.S. at 349.  There, female

-15-

employees sought class certification against Wal-Mart.  Id. at
338.  They alleged that its general policy of giving local
supervisors considerable discretion in pay and promotion
decisions discriminated against them.  Id.  The Supreme Court
noted that any competent attorney can craft a class
certification motion that literally raises common questions.
Id. at 349.  The standard for commonality, however, is more
stringent.  The common contention "must be of such a nature
that . . . determination of its truth or falsity will resolve an
issue that is central to the validity of each one of the claims
in one stroke."  Id. at 350.

      The Court held that the commonality inquiry
"necessarily overlaps with [a plaintiff's] merits contention."
Id. at 352.  It held that a plaintiff bears the burden of
demonstrating "that the class members 'have suffered the same
injury,'" that is an injury which "depends upon a common
contention."  Id. at 350 (quoting Falcon, 457 U.S. at 157).  A
violation of the same provision of law does not establish a
common contention.  Id.  While mere allegations by employees of
the same company that they suffered a Title VII injury does not
meet the standard, a claim of sex discrimination by the same
supervisor does.  Id.  The Wal-Mart plaintiffs were denied class
certification partly because their claims were based on

"literally millions of employment decisions" made by different supervisors.  Id. at 351.

This court similarly considers Plaintiffs' merits contention under the Eighth Amendment against the DHS Defendants to evaluate commonality.  See Wal-Mart, 564 U.S. at 352;  42 U.S.C. § 1983.  If certification is granted, Plaintiffs would need to show that the DHS Defendants, acting under color of state law, deprived class members of their right under the Eighth Amendment to be free from "cruel and unusual punishment." See Farmer v. Brennan, 511 U.S. 825, 832-34 (1994);  U.S. Const. amend. VIII.  To establish deprivation, Plaintiffs must prove that all class members were detained under conditions that posed a substantial risk of serious harm to which the DHS Defendants were deliberately indifferent, in violation of their duty to provide humane conditions of confinement.  Farmer, 511 U.S. at 534.  It is not disputed that the DHS Defendants acted under color of state law or that they owed the purported class members a duty of care.[9]  For present purposes, Plaintiffs must show that there is a common question of law or fact regarding the deprivation claim of each class member.

---

9.   However, the DHS Defendants argue that they are entitled to qualified immunity.  The court will consider this argument separately on their motion for summary judgment.  See Rouse v. Plantier, 182 F.3d 192, 199 (3d Cir. 1999).

Plaintiffs aver generally that Glen Mills residents faced a substantial risk of "abuse," a generic label for the alleged harm which they repeat seventy-nine times in their brief in support of the instant motion.  They emphasize that the March 2019 DHS Order characterized the conditions at Glen Mills as "likely to constitute immediate and serious danger to the life or health of the children in care" and determined that Glen Mills residents "are at imminent risk and their safety is in jeopardy."  Plaintiffs further point to the report of Dr. Robert Kinscherff,[10] an expert in clinical psychology and juvenile justice, who concluded that "[a]ll youth at Glen Mills . . . were exposed to a significantly increased risk of harm."

"Abuse" and "risk of abuse" are not specific enough terms to state a common issue of law or fact.  Plaintiffs concede that "abuse" took many forms at Glen Mills.  Many different individuals inflicted different harms on over a thousand residents under many different circumstances.  For class certification, the alleged injury must depend on some common contention.  For example, in Hagan v. Rogers, a putative

---

10.  Dr. Kinscherff is the Executive Director for the Center for Law, Brain & Behavior at Massachusetts General Hospital and Professor of Clinical Psychology in the doctoral program at William James College and Professor of Law and Neuroscience at Harvard Law School.

class of inmates established a common injury by alleging that
the exposure of inmates to scabies posed a substantial risk to
their health and safety.  570 F.3d 146, 158 (3d Cir. 2009).
Commonality would have been defeated if the proposed class were
comprised of some inmates who alleged not only exposure to
scabies but also other medical issues such as denial of care for
dental cavities.

The March 2019 DHS Order, which Plaintiffs present as
evidence of "abuse" or "risk of abuse," likewise describes many
factually distinct incidents and types of harm.  Some residents
were physically assaulted, some were denied medical care, and
some were orally threatened.  The perpetrators of the abuse also
differed.  In some instances, the staff members themselves
battered residents.  In others, violent altercations occurred
between residents.  These separate alleged deprivations lack a
common contention that ties them all together.  See Wal-Mart,
546 U.S. at 352;  Hagan, 570 F.3d at 158.

Furthermore, proof of injury may depend on the
individual circumstances of class members.  In Ferreras v.
American Airlines, Inc., airline employees sought certification
on the ground that their employer had not compensated them for
all hours worked.  946 F.3d 178, 185-86 (3d Cir. 2019).  Our
Court of Appeals held that commonality was lacking because
determining whether an employee was entitled to compensation

required individual proof that the employee was actually
working.  Id. at 186.  Similarly, the class members here were of
different ages, came from different backgrounds, attended Glen
Mills for different amounts of time (from just a few days to
over a year), and resided in fourteen different residence halls.
Indeed, according to Plaintiffs, some class members were
perpetrators rather than potential victims of abuse.  These
perpetrators achieved favored treatment or "Bull Status" within
the Class Period.  Under these circumstances, Plaintiffs must
come forward with evidence that each purported class member was
actually deprived of his Eighth Amendment right.  The
individualized inquiry required here negates the notion of a
common injury.

Plaintiffs go on to argue that "Rule 23 does not
require that a putative class has endured precisely the same
injuries," but rather, that they were subjected to the same
injurious conduct.  See In re Cmty. Bank of N. Virginia Mortg.
Lending Pracs. Litig., 795 F.3d 380, 397 (3d Cir. 2015).  They
maintain that the DHS Defendants "violated the Constitutional
rights of each putative class member by maintaining policies,
practices, and patterns of consciously disregarding claims of
abuse at [Glen Mills]."

Plaintiffs' interpretation of Rule 23 is contrary to
the Supreme Court's clear guidance in Wal-Mart.  See 564 U.S. at

352.  There must be "some glue" holding together the various alleged injuries.  Id.  Commonality is established when a plaintiff claims that a uniform behavior or policy created an excessive risk to the class members' health or safety, such as implementing an invasive strip-searching procedure.  See, e.g., Ross v. Gossett, 33 F.4th 433 (7th Cir. 2022);  Wilson v. Cty. Of Gloucester, 256 F.R.D. 479, 488-89 (D.N.J. 2009).

      Plaintiffs here have not identified a specific uniform behavior or policy of the DHS Defendants that is the cause of all of the disparate alleged injuries.  They do not specify which of the hundreds of DHS regulations that it was charged with implementing were not properly enforced by the DHS Defendants.  Instead, they broadly claim that the DHS Defendants ignored existing complaints of "abuse," failed to consider complaints cumulatively, lacked procedures that encouraged residents to file complaints, implemented inadequate corrective action plans, and continually licensed Glen Mills.  There is simply no common issue that can resolve the claims of over a thousand residents "in one stroke."  Wal-Mart, 564 U.S. at 350.

      Alternatively, the Wal-Mart Court suggested that the plaintiffs may have prevailed on the issue of commonality by presenting "significant proof that Wal-Mart operated under a general policy of discrimination."  564 U.S. at 352 (internal quotations omitted).  Merely claiming that an individual

suffered an adverse employment action on discriminatory grounds does not constitute "significant proof" that her employer maintained a general policy of discrimination.  See id.; Falcon, 457 U.S. at 152.

Plaintiffs here likewise bear the burden of presenting "significant proof" that the DHS Defendants had a general policy of deliberate indifference to the various alleged Eighth Amendment violations.  See Wal-Mart, 457 U.S. at 352.  Although Plaintiffs have submitted extensive evidence of abuses suffered by Glen Mills residents, proof of mere negligence, that is that the DHS Defendants should have known that residents were at risk of such abuses, does not meet the standard.  Deliberate indifference requires proof that "the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  Farmer, 511 U.S. at 842 (emphasis added).  To satisfy commonality, Plaintiffs must present significant proof that the DHS Defendants were aware of the risks of the many alleged abuses and that they had the same specific policy of reckless disregard applicable to each of them.  See Wal-Mart, 564 U.S. at 352.  Plaintiffs have not pointed to such a policy and therefore have not provided any proof of a common course of conduct which ties the various claims together.

Without the necessary proof of a common injury or common injurious conduct, Plaintiffs have not established commonality.

### iii. Typicality

The DHS Defendants argue that Derrick, Walter, and Thomas have not met the typicality requirement because they suffered different injuries than their fellow class members.[11] This alone does not necessarily defeat typicality. "Factual differences will not render a claim atypical if the claim arises from the same event or course of conduct that gives rise to the claims of the class members, and if it is based upon the same legal theory." Hoxworth v. Blinder, Robinson & Co., Inc., 980 F.2d 912, 923 (3d Cir. 1992), abrogated on other grounds by White v. Samsung Elecs. Am., Inc., 61 F.4th 334 (3d Cir. 2023) (internal quotations omitted). However, as previously discussed, Plaintiffs have not established commonality. Their legal theories also differ because the variety of abuses inflicted on class members could constitute different Eighth Amendment violations, from denial of medical care to violation

---

11. Defendants further contend that some class members lack standing because they suffered no injury. As previously discussed, standing is an issue separate from the Rule 23 inquiry. Regardless, this argument fails because the class representatives are the ones who must establish Article III standing at this stage, and not the class members. See Neale, 794 F.3d at 362.

of the right to be free from excessive force.  Plaintiffs have not met their burden on typicality.

### iv.  Adequacy of Representation

Finally, the DHS Defendants challenge the adequacy of representation on the ground that the interests of members of the class who suffered actual physical injuries at Glen Mills are in opposition to those who suffered no physical injury. This argument pertains to commonality or predominance.  Adequacy of representation primarily concerns "the interests and incentives of the class representatives, and the experience and performance of class counsel."  In re Cmty. Bank, 795 F.3d at 392.  As our Court of Appeals has explained, "the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class."  Id. (citation omitted).

Here, there is no conflict of interests because Derrick, Thomas, and Walter allege both physical and nonphysical injuries.  Separately, the DHS Defendants do not dispute the performance of class counsel, who have significant experience representing plaintiffs in class actions and in institutional abuse matters.  Plaintiffs have established adequacy of representation.  See id.

C.   Rule 23(b) Factors

Even assuming that Plaintiffs can establish commonality and typicality, they must also satisfy one of the requirements under Rule 23(b).  See Fed. R. Civ. P. 23(b). Plaintiffs seek to certify a damages class for abuse claims against the DHS Defendants under Rule 23(b)(3), which permits class certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  These two elements of Rule 23(b)(3) are known as predominance and superiority.  In re Hydrogen Peroxide, 552 F.3d at 310.

i.   Predominance

Predominance is a "far more demanding" standard than commonality.  Id. at 311 (internal quotations omitted).  This court must consider the essential elements of Plaintiffs' claims and "formulate a prediction as to how specific issues will play out."  Id. (internal quotations omitted).  "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."  Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 172 (3d Cir. 2001).

Even if Plaintiffs are correct and have established commonality under Rule 23(a)(2), they fail to demonstrate predominance under Rule 23(b)(3).  In Baby Neal v. Casey, our Court of Appeals considered whether on similar facts individual issues would have predominated for a Rule 23(b)(3) damages class.  43 F.3d 48, 63 (3d Cir. 1994).  There, a putative class of children claimed that various policies and procedures of the Philadelphia Department of Human Services were deficient in providing legally mandated child welfare services.  Id. at 53.  The Court reversed the denial of class certification for declaratory and injunctive relief under Rule 23(b)(2).  It then cautioned that "the individual differences in the children's circumstances might indeed militate against certification if the action sought certification under 23(b)(3) because a court would need to evaluate those differences in the event that the plaintiffs prevailed and were entitled to monetary damages."  Id. at 63.  Plaintiffs here present this very situation.  They seek class certification for class members with different individual circumstances who suffered different harms.  See id.

If Plaintiffs were granted class certification, this court would then be required to make thousands of individualized decisions regarding each class member's claim, including: What injury did he suffer? Were the DHS Defendants aware of the risk of such an injury? Did a failure to enforce a specific

regulatory provision cause such a risk? Did they disregard the
risk by failing to take additional reasonable measures to abate
it? Were any such corrective measures ineffectual? Under what
legal theory could the class member recover?  In sum, class
certification would require the court to make countless
individualized decisions for essential elements of the claims of
over a thousand of class members.

Plaintiffs contend that their circumstances are
analogous to those in Ross.  33 F.4th at 435.  The Court of
Appeals for the Seventh Circuit granted certification of a class
of prisoners who were subject to a painful and humiliating
strip-searching policy implemented across multiple prisons by
the Illinois Department of Corrections.  Id.

That case is inapposite.  The defendants in Ross
conceded that "the shakedowns were conducted according to a
uniform plan created and implemented by the appellants, and that
the plan was executed in a uniform manner under their
supervision."  Id. at 438.  It was not disputed that the
plaintiff's description of the uniform policy would amount to
cruel and unusual punishment in violation of the Eighth
Amendment.  Id.  Thus, the only issue was whether the policy's
provisions were as the plaintiffs described them.  Id.  The
court's interpretation of the policy was not only a common issue
capable of classwide resolution but also the only issue in

-27-

contention.  As previously discussed, Plaintiffs here have not identified any such uniform behavior or policy that violated all class members' Eighth Amendment rights.

Plaintiffs have not established predominance.

### ii.  Superiority

Finally, the court must decide whether a "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The DHS Defendants point to the 803 individual Mass Tort Cases brought by former Glen Mills residents that are now pending in the Court of Common Pleas of Philadelphia County.[12] The DHS Defendants maintain that the existence of these cases demonstrates that class treatment is not the superior form of litigation.  To resolve the superiority issue, the court must determine whether "in terms of fairness and efficiency, the merits of a class action" outweigh "those of alternative available methods of adjudication."  In re Cmty. Bank, 795 F.3d at 409.  It must analyze the following factors:

> the class members' interest in individually controlling the prosecution of separate actions;
>
> the extent and nature of any similar litigation already commenced by class members;

---

12.  See Phila. Civ. R. 215(A)(4).

>  the desirability of concentrating the
>  litigation in a particular forum; and
>
>  the difficulties likely to be encountered in
>  the management of a class action.

Id. at 408-09 (citing Fed R. Civ. P. 23(b)(3)).

Plaintiffs argue in support of class certification that the DHS Defendants were not named in the Mass Tort Cases. This omission is irrelevant.  The significant point is that in the Mass Tort Cases class members have counsel, have decided to pursue individual actions, and have freely chosen what defendants to sue.  See id. (second factor).

The class action vehicle was created to remedy situations where small individual suits for damages are not economically feasible and leave aggrieved persons without any redress.  E.g., In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 784 (3d Cir. 1995) (citing Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 339 (1980)). In other words, class certification is appropriate when "[t]he realistic alternative . . . is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for [de minimis damages]."  Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) (emphasis in original).  That is clearly not the case here.  See In re Cmty. Bank, 795 F.3d at 409 (third factor).

Class certification, as explained above, would compel many individualized inquiries, amounting to over a thousand mini trials.  See id. (fourth factor).  The overwhelming difficulties likely to be encountered in managing this damages class against the DHS Defendants are manifest.  Given the variety of legal and factual issues involved in the claims of the class members, it would be in the interest of the former residents of Glen Mills to seek relief individually.  See id. (first factor).  Accordingly, Plaintiffs have not demonstrated superiority.

### III. Abuse Issue Classes Against Glen Mills

The court now turns to the first three of twenty-four issue classes which Plaintiffs seek to certify under Rule 23(c)(4).  These are the three "Abuse Issue[] Class[es] Against [Glen Mills]," the school where the class members resided.

Rule 23(c)(4) succinctly provides: "When appropriate, an action may be brought or maintained as a class action with respect to particular issues."  The rule was designed to give courts flexibility in managing lawsuits that would otherwise be ineligible for class treatment.  7AA Charles Alan Wright et al., Federal Practice and Procedure § 1790 (3d ed. 2023).  Even if class representatives cannot establish commonality or predominance for a claim as a whole, class treatment may nonetheless be warranted where commonality and predominance are

-30-

satisfied with respect to one or more elements of a claim.
Russell, 15 F.4th at 273-74.

A plaintiff, of course, still bears the burden of proving that each issue class meets the requirements of Rule 23(a) and fits within one of the categories of Rule 23(b).  Id. at 262.  Furthermore, the plaintiff must show that the nine factors identified by our Court of Appeals in Gates v. Rohm & Haas Co. weigh in favor of issue class certification.  655 F.3d 255, 273 (3d Cir. 2011).

Plaintiffs bring two claims against Defendants Glen Mills Schools and its former Executive Director Randy Ireson (the "Glen Mills Defendants").  First, Plaintiffs allege that the Glen Mills Defendants were negligent.  Second, they allege under 42 U.S.C. § 1983 that the Glen Mills Defendants violated class members' Eighth Amendment rights.  Both claims require Plaintiffs to show among other elements that the Glen Mills Defendants owed class members a duty of care and that they breached that duty.  See Farmer, 511 U.S. at 534;  Dobson v. Milton Hershey Sch., 356 F. Supp. 3d 428, 437 (M.D. Pa. 2018); Restatement (Second) of Torts § 314A(4).

Plaintiffs seek certification of three issue classes concerning the following elements of the Eighth Amendment and negligence claims:

> (1) whether the policies and practices of the [Glen Mills Defendants] subjected class members to a substantial risk of serious harm to which the [Glen Mills Defendants] were deliberately indifferent in violation of the Eighth Amendment;
>
> (2) whether the [Glen Mills] Defendants undertook or otherwise owed a duty to the class members; and
>
> (3) whether the [Glen Mills] Defendants breached any duty owed to the class members.

The first Abuse Issue Class concerns Plaintiffs' Eighth Amendment claim and is characterized by Plaintiffs as involving the issue of breach. The second issue class, it appears, concerns the duty elements of both the Eighth Amendment and negligence claims. Finally, the third issue class, it appears, concerns the breach element of their negligence claim. Plaintiffs suggest that after this court resolves these three issues, which they contend are common to all class members, it could then proceed with individualized determinations on the remaining elements using either a special master or bellwether proceedings.

Mirroring the Rule 23(b)(3) Abuse Class against the DHS Defendants, the Abuse Issue Classes include all Glen Mills residents who were involuntarily enrolled during the Class Period, which Plaintiffs suggest runs from April 11, 2017 to April 11, 2019. But as previously discussed, class

representatives Derrick and Walter do not have standing for claims that occurred before their arrival at Glen Mills in March 2018 and Thomas does not have standing before his arrival in May 2018.  See Neale, 794 F.3d at 362;  Mielo, 897 F.3d at 478. Accordingly, the Class Period is amended to run from March 2018 to April 11, 2019.[13]  See Finberg, 634 F.2d at 64.

A.   Ascertainability

The enrollment records of Glen Mills over a given period are objective and provide an administratively feasible means of ascertaining the members of these issue classes.  See Byrd, 784 F.3d at 163.  Plaintiffs' three Abuse Issue Classes are thus ascertainable.  See id.

B.   Rule 23(a) Factors

Next, Plaintiffs must show that the issue classes satisfy the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Although Defendants challenge only commonality, this court conducts a "rigorous analysis" of each requirement.  See In re Hydrogen Peroxide, 552 F.3d at 309.

---

13.  As previously discussed, the specific starting date will be determined when the exact enrollment dates of the class representatives are made known.

i.   Numerosity

The number of class members clearly satisfies the numerosity prong.  See Allen, 37 F.4th at 896.

ii.   Commonality

In Russell, our Court of Appeals considered whether the District Court had erred in certifying issue classes under Rule 23(c)(4) for only the duty and breach elements of a tort claim.  15 F.4th at 264-65.  There, a putative class of patients brought a claim of negligent infliction of emotional distress against a medical commission that had certified an alleged unqualified, foreign-trained doctor who treated them.  Id. at 262-65.  The Court of Appeals vacated the district court's grant of class certification because it had not rigorously analyzed some of the Gates factors.  Id. at 275.

The Russell Court, however, concluded that the plaintiffs' proposed issue classes satisfied commonality.  It reasoned that "[d]uty is an issue of law" which "must be decided separately from breach, causation, and damages."  Id. at 273.  Furthermore, duty could be determined based on common evidence because "each patient shared the same distanced relationship of trust with the Commission."  Id.  Breach likewise "would require only common evidence" because it concerned the commission's conduct with respect to only one doctor who was alleged to have caused the emotional distress of every patient in the class.

-34-

Id.  Accordingly, "[n]o absent class member would have anything special to add in her individual trial."  Id.

Plaintiffs here propose certification of an issue class concerning "whether the [Glen Mills] Defendants undertook or otherwise owed a duty to the class members."  The issue class appears to address the duty elements of both the negligence and Eighth Amendment claims.  It is uncontested that Glen Mills was a private residential rehabilitative institution, and therefore, that the Glen Mills Defendants were subject to various Pennsylvania laws and regulations that set forth specific duties for such an institution.  See 42 Pa. Cons. Stat. § 6357;  55 Pa. Code §§ 3800.32(b), 3800.53.  Class members cannot add any individualized evidence to the duty inquiry for the negligence claim.  See Russell, 15 F.4th at 275.  Each class member shared the same relationship of "custody, care, and control" with Glen Mills under the Eighth Amendment, much like each patient in Russell shared "the same distanced relationship of trust with the Commission."  See Dobson, 356 F. Supp. 3d at 437;  id. Accordingly, Plaintiffs have established commonality on the issue of duty with respect to both their negligence and Eighth Amendment claims.

Plaintiffs further seek certification of issue classes on the elements of breach, that is whether the Glen Mills Defendants "breached any duty owed to the class members" under

negligence doctrine and whether they "were deliberately indifferent in violation of the Eighth Amendment."  On issues of breach, <u>Russell</u> is inapposite.  Although duty is an issue of law, breach is a fact-intensive inquiry that relates to the specific injuries being alleged.  See <u>Russell</u>, 15 F.4th at 273. In <u>Russell</u>, the plaintiffs claimed that the commission had breached its duty of care to all putative class members when it improperly certified the one specific doctor who treated all class members.  <u>Id.</u>  The breach element satisfied the commonality requirement because the commission's conduct was identical with regard to each class member.  See <u>id.</u>  Thus, the plaintiffs shared a common contention that tied all their claims together.  See <u>id.</u>; <u>Wal-Mart</u>, 564 U.S. at 350.

In contrast, Plaintiffs here challenge various actions and omissions of the Glen Mills Defendants on their negligence claim.  They do not identify which of the hundreds of statutes and regulations applicable to Glen Mills were not enforced or violated by Defendants in breach of their duty.  Instead, they bring evidence of innumerable factually distinct incidents over an extended period of time involving different policies and perpetrators.  They have produced evidence that Defendants maintained a culture of confrontation, permitted the excessive use of physical restraints, stifled reports of abuse from residents, failed to conduct background checks on prospective

-36-

employees, and improperly trained employees.  The evidence shows many different breaches under many different circumstances.

Furthermore, Plaintiffs offer different theories of liability on their Eighth Amendment claim, including deliberate indifference, adverse conditions of confinement, failure to protect, use of excessive force, and inadequate access to medical care.  See Brown v. Haldeman, No. 1:21-cv-2085, 2021 WL 6063220, at *3 (M.D. Pa. 2021);  DeJesus v. Lewis, 14 F.4th 1182, 1195 (11th Cir. 2021).  Each of these theories necessitates different evidence of breach.  For example, evidence that a class member was denied access to medical care is not relevant to a claim of excessive force in violation of the Eighth Amendment, but it is certainly relevant to a claim of inadequate access to medical care in violation of the Eighth Amendment.  Compare Estelle v. Gamble, 429 U.S. 97, 104-05 (1976) with Hudson v. McMillian, 503 U.S. 1, 8-9 (1992).

In short, there is no common course of conduct as to all class members with respect to either the negligence or Eighth Amendment claim.  See Russell, 15 F.4th at 273;  Wal-Mart, 564 U.S. at 350.  Accordingly, Plaintiffs have not satisfied commonality with respect to the breach issue classes against the Glen Mills Defendants.

### iii. Typicality

Typicality is easily established for the issue class concerning duty.  There are no factual differences between the duties that the Glen Mills Defendants owed to class representatives Derrick, Walter, and Thomas, and the duties that they owed to class members.

However, typicality is not established for the issue classes that concern breach.  Derrick, Walter, and Thomas were subjected to some but not all of the many distinct abuses identified in the March 2019 DHS Order.  The class representatives' claims thus do not "arise[] from the same event or course of conduct that gives rise to the claims of the class members" nor are they "based upon the same legal theory."  See Hoxworth, 980 F.2d at 923.  Plaintiffs have not shown typicality on the issue of the Glen Mills Defendants' breach of duty.

### iv.  Adequacy of Representation

No facts of record suggest that the interests of Derrick, Walter, and Thomas are misaligned with the rest of the class.  See In re Cmty. Bank, 795 F.3d at 392.  Defendants do not and this court has no reason to reject the "experience and performance of class counsel."  See id.  Plaintiffs have established adequacy of representation.

C.   Rule 23(b) Factors

Plaintiffs maintain that the three Abuse Issue Classes fit within Rule 23(b)(3).  See Russell, 15 F.4th at 271. Consequently, they must show that the issue classes satisfy predominance and superiority.  See In re Hydrogen Peroxide, 552 F.3d at 310;  Fed R. Civ. P. 23(b)(3).

i.   Predominance

Rule 23(b)(3) requires common issues to predominate over individual ones.  Because duty presents only common issues, this class satisfies the predominance requirement.

However, for the reasons discussed above, individual questions predominate on the issues of breach.  This court would need to determine which of the hundreds of statutory and regulatory duties was breached with regard to each class member's negligence claim.  Likewise, this court would need to decide which of the various Eighth Amendment violations was applicable to each class member and what specific act or omission by Defendants resulted in the breach.  Therefore, these issue classes do not satisfy predominance.

ii.  Superiority

The superiority requirement concerns judicial economy and fairness.  In re Cmty. Bank, 795 F.3d at 409.

The issue classes regarding breach would devolve into likely over one thousand mini trials.  Furthermore, Plaintiffs

have not explained how resolving duty and breach as issue
classes and leaving the more complex elements of injury,
causation, and damages for individualized proceedings would come
close to being efficient.  Russell held that issue class
certification is not limited to issues that are determinative of
liability.  15 F.4th at 270.  The Court, however, expressed
skepticism at certifying issue classes with respect to the duty
and breach elements only, particularly when the other elements
requiring individualized proof are too complex to permit
efficient adjudication.  Id. at 272.  The Russell Court's
analysis is directly relevant to the instant matter as that
action also involved a negligence theory of liability.  Its
skepticism is echoed in the decisions of many other district
courts, including those in the Third Circuit.  Wright et al.,
supra, at § 1790 n. 22 (compiling cases).  Furthermore,
Defendants do not appear to contest that they owed class members
a duty of care, suggesting that establishing duty would not
impose any significant litigation burdens on class members
proceeding individually.

        The 803 Mass Tort Cases in the Court of Common Pleas
of Philadelphia County are also relevant to this inquiry.
Unlike the DHS Defendants, the Glen Mills Defendants are parties
to these cases pending in that court.  These cases demonstrate
that class members have opted to seek individual relief against

Defendants in the state court.  Under the circumstances, issue

class certification in federal court against the Glen Mills

Defendants is an inferior method of adjudication than proceeding

with individual cases in the Court of Common Pleas.  See In re

Cmty. Bank, 795 F.3d at 409.  Accordingly, the Abuse Issue

Classes fail the superiority requirement.

### D.   Gates Factors

Finally, the court considers whether the factors

identified by our Court of Appeals in Gates weigh in favor of

certification.  There, a putative class of property owners

claimed that pollution by a chemical company had decreased their

property values.  Gates, 655 F.3d at 259, 271.  The plaintiffs

sought to certify a Rule 23(b)(3) damages class under various

theories including nuisance, negligence, trespass, and

environmental laws.  Id. at 271.  In the alternative, they

sought certification of a Rule 23(c)(4) class on the issue of

liability.  Id. at 272.  The district court denied certification

under both approaches.  Id. at 272.

Our Court of Appeals affirmed.  Id. at 274.  It

reasoned that "[t]he claims and issues here are complex and

common issues do not easily separate from individual issues."

Id.  Furthermore, an issue class "would not advance the

resolution of the class members' claims" because "the fact of

damages and the amount of damages would remain following the

class-wide determination of any common issues, and further that causation and extent of contamination would need to be determined at follow-up proceedings." Id. at 272.  The court also noted other concerns, including potential prejudice to absent class members.  Id.

The Gates Court identified nine non-exclusive factors to guide the issue class certification inquiry:

> (1) the type of claim(s) and issue(s) in question;
>
> (2) the overall complexity of the case;
>
> (3) the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives;
>
> (4) the substantive law underlying the claim(s), including any choice-of-law questions it may present and whether the substantive law separates the issue(s) from other issues concerning liability or remedy;
>
> (5) the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s);
>
> (6) the potential preclusive effect or lack thereof that resolution of the proposed issue class will have;
>
> (7) the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues;
>
> (8) the impact individual proceedings may have upon one another, including whether remedies are indivisible such that

> granting or not granting relief to any
> claimant as a practical matter determines
> the claims of others; and
>
> (9) the kind of evidence presented on the
> issue(s) certified and potentially
> presented on the remaining issues,
> including the risk subsequent triers of
> fact will need to reexamine evidence and
> findings from resolution of the common
> issue(s).

Id. at 273.  The plaintiff must show that these factors weigh in favor of certifying the proposed issue class.  See id.; Russell, 15 F.4th at 268-69.

Plaintiffs here contend that that the issues of duty and breach "apply to the class as a whole" and promote judicial economy by preventing repetitive discovery and contradictory rulings.  But as previously explained, the breach issue classes would require individualized decisions and the duty issue class would not provide any significant efficiency gains.  See Gates, 655 F.3d at 273 (first factor, third factor).  Furthermore, the issue classes would resolve only a few of the many elements in this highly complex matter.  See id. (second factor). Plaintiffs seek to certify in total one damages class and twenty-four issue classes against various defendants.  The overall complexity of the case suggests that it would be better suited for individual proceedings.

Plaintiffs assert that the issues of duty and breach involve legal determinations that are separate from factual

determinations of liability or remedy.  While this may be true
for the issue of duty, for the reasons previously stated, breach
is an issue of fact that does not easily separate from the
individual issues of injury, causation, and damages.  See id.
(fourth factor).  The comingling of individual and common
evidence on the issues of breach also risks having "subsequent
triers of fact . . . reexamine evidence and findings from
resolution of the common issue(s)."  See id. (ninth factor).

Plaintiffs address the remaining Gates factors
collectively.  They argue that bifurcated proceedings would
"streamline individual actions for future adjudication" without
extinguishing any individual claims.  The court is not persuaded
that much, if any, streamlining would take place.  A plethora of
individual claims against the Glen Mills Defendants have already
been filed in state court.

Significantly, issue class certification may have a
preclusive effect on the element of breach of any individual
claims of absent class members.  See id. at 273-74 (sixth,
seventh, and eighth factors).

All class actions necessarily implicate constitutional
due process rights.  See Russell, 15 F.4th at 265;  see also 7AA
Charles Alan Wright et al., Federal Practice and Procedure
§ 1789.1 (3d ed. 2023).  The potential impact of issue

preclusion on the Eighth Amendment rights of absent class
members is especially concerning here.  See id. (fifth factor).

Accordingly, the nine Gates factors weigh against
certification of the three Abuse Issue Classes against the Glen
Mills Defendants.

IV.  Education Issue Classes Against Glen Mills and Rivera

Plaintiffs move to certify eight "Education Issue[]
Class[es]" which are part of three of Plaintiffs' claims against
the Glen Mills Defendants and Pedro Rivera, the former Secretary
of the Pennsylvania Department of Education ("PDE") acting in
his official capacity.[14]  For these claims, Plaintiffs seek
equitable relief in the form of compensatory education.  Such
relief is awarded as monetary damages which a claimant may use
to obtain the educational services that should have been
provided in the first place.  See, e.g., G.L. v. Ligonier Valley
Sch. Dist. Auth., 802 F.3d 601, 608 (3d Cir. 2015);  Ferren C.
v. Sch. Dist. of Phila., 612 F.3d 712, 717–18 (3d Cir. 2010).

First, Plaintiffs claim via Section 1983 that the Glen
Mills Defendants and Rivera violated class members' Fourteenth
Amendment due process rights.  Defendants allegedly did so by
depriving Glen Mills residents of their right to a free and

---

14.  Although Plaintiffs in the instant motion refer to PDE or
the PDE Defendants, the claims relevant to the Education Issue
Classes are against the Glen Mills Defendants and Rivera.

public education, a property interest that was created by the Pennsylvania Public School Code of 1949, 24 Pa. Cons. Stat. § 1-101, et seq., without notice or an opportunity to be heard.  See Goss v. Lopez, 419 U.S. 565, 572-74 (1975).

Second, Plaintiffs claim that Rivera violated class members' equal protection rights under the Fourteenth Amendment.[15]  Specifically, they allege that Rivera's actions or omissions denied Glen Mills residents access to a free and public education, which was provided to non-resident children placed in other Pennsylvania institutions.  See San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 44 (1973).

Third, Plaintiffs claim that the Glen Mills Defendants violated the rights of class members to a free and public education under a Pennsylvania statute concerning "Non-resident inmates of children's institutions."[16]  See 24 Pa. Cons. Stat. § 13-1306.  The law provides that where a child is placed into a residential facility located in a school district other than the school district in which his or her parents reside, the school district in which the facility is located must allow the child "to attend the public schools in said district either with or

---

15.  The parties agreed to dismiss this claim only as to the Glen Mills Defendants (Doc. #247).
16.  Plaintiffs also cite in their Complaint 24 Pa. Cons. Stat. § 9-914.1-A.  That provision, however, concerns intermediate units.  As previously noted, the Chester County Intermediate Unit was dismissed as a party to this case.

without charge." Id. at § 13-1306(a).  The school district is also responsible for providing eligible children with an appropriate program of special education and training.  Id. at § 13-1306(c).  Plaintiffs aver that the Glen Mills Defendants did not provide these statutorily mandated services.

Plaintiffs do not separate their issue classes under Rule 23(c)(4) by claim but rather by Defendant.  They seek certification of the following Education Issue Classes against the Glen Mills Defendants:

> (1) whether [the Glen Mills Defendants]
>     failed to provide an appropriate
>     education program under state and federal
>     law;
>
> (2) whether students at [Glen Mills] were
>     discriminated against based on their
>     placement at the facility which offered
>     an inadequate education;
>
> (3) whether students at [Glen Mills] were
>     discriminated against based on their
>     placement at the facility when they were
>     deprived of a high school education
>     without due process; and
>
> (4) whether students subject to the
>     educational programming at [Glen Mills]
>     were harmed.

Plaintiffs further seek certification of the following issue classes against Rivera:

> (1) whether [Rivera] had a duty to provide
>     oversight or monitoring of the education
>     program at [Glen Mills];

(2) whether the [Glen Mills] education
program failed to meet the requirements
of Pennsylvania and federal law;

(3) whether [Rivera] discriminated against
students at [Glen Mills] on the basis of
their placement at a [private residential
rehabilitative institution] by failing to
ensure their education; and

(4) whether students subject to [Glen
Mills's] education program were harmed.

Plaintiffs acknowledge that even if this court were to
certify the eight Education Issue Classes, individualized
determinations would remain as to the extent each former
student's education at Glen Mills was deficient and the amount
of compensatory education owed.

Once again, the eight Education Issue Classes include
all Glen Mills students who were involuntarily enrolled during
the Class Period.  For the reasons recited above, the Class
Period for the Education Issue Classes is amended to run from
the date in March 2018 when the first Plaintiff enrolled at Glen
Mills to April 11, 2019.

A.   Ascertainability

The enrollment records at Glen Mills are an objective
criterion and provide a method that is feasible administratively
for identifying the class members.  See Byrd, 784 F.3d at 163.
Plaintiffs' eight Education Issue Classes are ascertainable.

-48-

B.   Rule 23(a) Factors

i.   Numerosity

Plaintiffs have established numerosity for the eight Education Issue Classes as they have for the three Abuse Issue Classes.

ii.   Commonality

Although Plaintiffs need not satisfy commonality as to each claim, they must do so as to each issue class.  Russell, 15 F.4th at 273-74.

Plaintiffs assert that each of the four Education Issue Classes against the Glen Mills Defendants concern the "common policies, practices, and failures of [Glen Mills]." They do not challenge any one specific common policy or practice but rather have provided a laundry list that includes deficiencies in the PLATO/Edmentum computer program, deficiencies in the curriculum, an inadequate number of instruction hours, limited in-person instruction by Counselor-Teachers, hiring Counselor-Teachers without proper certifications or training, maintaining a disruptive culture of confrontation, and diverting students from working toward a high school diploma to a GED program.  Plaintiffs attest that such deficiencies are evidence that "defendants' conduct was common as to all class members."  In re Suboxone (Buprenorphine Hydrochloride and Nalaxone) Antitrust Litig., 421 F. Supp. 3d

12, 47 (E.D. Pa. 2019), aff'd sub nom. In re Suboxone
(Buprenorphine Hydrochlorine and Naloxone) Antitrust Litig., 967
F.3d 264 (3d Cir. 2020) (internal quotations omitted).

Plaintiffs' position that commonality has been
satisfied does not pass muster.  They have failed to come
forward with evidence that all Glen Mills students were harmed
by or even subject to all of the many policies and practices
challenged by Plaintiffs.  The circumstances of students
differed greatly.  They resided at Glen Mills for different
durations, were placed in different educational programs, and
received instruction from different Counselor-Teachers.  Even if
some Counselor-Teachers lacked certain certifications, that does
not necessarily mean that all Counselor-Teachers provided
deficient instruction.  Furthermore, only 15% of students were
placed in the GED track.  Some class members, although
comprising only a minority of students, progressed in their
studies and achieved a high school diploma.  Plaintiffs simply
do not present evidence of a common course of conduct that
affected all class members.  See id.

To show commonality, Plaintiffs must at least
demonstrate that all class members "were subjected to injury or
faced the immediate threat of these injuries."  Id.  Plaintiffs'

own expert, Dr. Joseph Gagnon,[17] excluded from his analysis
students of Glen Mills who had spent fewer than 90 days at the
school because that duration was too short to assess any effect
on their education.  He further noted that most students were
not subjected to aggression, violence, or physical restraints.
And as previously noted, some students succeeded in achieving a
high school diploma.  Thus, Plaintiffs have not even produced
evidence that all class members suffered injury or the threat of
injury.

Finally, each of the four Education Issue Classes
against Rivera is not based on a common course of conduct.[18]
Rivera had numerous oversight responsibilities as the Secretary
of PDE.  The Pennsylvania Public School Code of 1949 contains
hundreds of sections, many of which reference specific duties of
PDE and the Secretary of PDE.  See 24 Pa. Cons. Stat. § 1-101,
et seq.  Plaintiffs have not identified any specific act or
failure to act by Rivera that harmed all class members.  See
Wal-Mart, 564 U.S. at 357.  Whether and how each class member

_____

17.  Dr. Gagnon is a Professor of Educational Sciences at the
University of Helsinki in Finland.  Defendants have subsequently
moved this court to exclude his report under Daubert v. Merrell
Dow Pharmaceuticals Inc., 509 U.S. 579 (1993).  The court does
not need to decide this issue here.
18.  Plaintiffs refer to the alleged failures of PDE, but as
previously discussed, their claims as to these issue classes are
only against Rivera in his official capacity.

was deprived of an education necessitates an individualized
determination.

Accordingly, Plaintiffs' eight Education Issue Classes
do not satisfy commonality.

### iii. Typicality

To reiterate, whether and to what extent each class
member was deprived of an appropriate education will demand
individualized analysis.  The individual circumstances and
claims of class representatives Derrick, Walter, and Thomas are
necessarily different than those of class members.  Furthermore,
Defendants correctly point out that Derrick, Walter, and Thomas
each claim to have been entitled to an IEP and special
education, while almost 70% of Glen Mills students did not have
a disability that entitled them to the IDEA's protections.  The
class representatives' claims cannot "arise[] from the same
event or course of conduct that gives rise to the claims of the
class members" nor can they be "based upon the same legal
theory."  See Hoxworth, 980 F.2d at 923.  Plaintiffs have not
met the typicality prong as to the eight Education Issue
Classes.

### iv.  Adequacy of Representation

Defendants do not and this court has no reason to
challenge the "experience and performance of class counsel."
See In re Cmty. Bank, 795 F.3d at 392.  However, Rivera argues

that the interests of Derrick, Walter, and Thomas are not aligned with those of absent class members because of the class representatives' settlement with the Chester County Intermediate Unit.  He relies on <u>Charlene R. v. Solomon Charter School</u> for the proposition that a plaintiff cannot recover compensatory education from both the local education agency (Chester County Intermediate Unit) and the state education agency (PDE) where the local education agency fell short of its responsibilities. 63 F. Supp. 3d 510, 514 (E.D. Pa. 2014).  According to Rivera, Plaintiffs' settlement with the Chester County Intermediate Unit prohibits them from seeking relief from Rivera or the PDE for their claims and puts them in conflict with class members who could otherwise seek relief from Rivera or the PDE.

However, <u>Charlene R.</u> is easily distinguished from the instant matter because there, the plaintiff brought claims under the IDEA, which delegates the burden of coordinating efforts to the state education agency.  <u>Id.</u>  A plaintiff may seek relief from multiple defendants if each defendant independently violated the plaintiff's Fourteenth Amendment rights. Regardless, the claims against the Chester County Intermediate Unit for its alleged acts and omissions are independent of the claims against Rivera for his alleged acts and omissions. Accordingly, the eight Education Issue Classes satisfy adequacy of representation.

C.   Rule 23(b) Factors

Plaintiffs maintain that the eight Education Issue Classes fit within Rule 23(b)(3).  See Russell, 15 F.4th at 271. They must show that these issue classes satisfy predominance and superiority.  See In re Hydrogen Peroxide, 552 F.3d at 310;  Fed R. Civ. P. 23(b)(3).

i.   Predominance

Rule 23(b)(3) requires common issues to predominate over individual ones.  Again, the issue classes will require thousands of individualized determinations, including:  What provision of Pennsylvania law did the Glen Mills Defendants violate?  What provision of Pennsylvania law did Rivera fail to enforce?  What class members were harmed by this violation of the Glen Mills Defendants?  What class members were harmed by the act or omission of Rivera?  To what extent did each class member suffer harm?  Did the Glen Mills Defendants provide students with notice and an opportunity to be heard regarding alleged violations of their right to a free and public education?  Did Rivera provide students with notice and an opportunity to be heard?  Plaintiffs' eight Education Issue Classes implicate more individualized questions than common ones.  Plaintiffs do not meet the test for predominance.

ii.   Superiority

Although issue classes need not resolve liability or
damages, our Court of Appeals discourages certification of issue
classes when the other elements requiring individualized proof
are too complex to permit efficient adjudication.  Russell, 15
F.4th at 270.  The heart of Plaintiffs' three education claims
concern the extent to which Glen Mills students were deprived of
an education and what if any compensatory education is due.
These are complex questions which involve consideration of each
student's experience and educational progress at Glen Mills.
Even if Plaintiffs' issue classes satisfied the requirements of
Rule 23(a) and the predominance requirement of Rule 23(b), that
would still leave the central issue of compensatory education to
be resolved individually.  Accordingly, the guidance of our
Court of Appeals in Russell cautions against certification.

In addition, for the reasons stated above, the Mass
Tort Cases in the Court of Common Pleas of Philadelphia County
suggest that issue class certification in federal court is an
inferior method of adjudication.  These issue classes fail the
superiority requirement.

D.   Gates Factors

Finally, the court considers whether the Gates factors
weigh in favor of certification.  See 655 F.3d at 273.  The
court reiterates that this is an incredibly complex case that

-55-

involves one damages class and twenty-four issue classes, and yet leaves many elements of liability and the relief sought by Plaintiffs for individualized determinations.  See id. (second factor).  The education claims are multifaceted because they compel this court to decide whether each class member received an appropriate education pursuant to his individual circumstances and many hundreds of Pennsylvania statutes.  See id. (first factor).  Any efficiencies that would be gained from certification are dwarfed by the countless individualized determinations that would be required.  See id. (third factor).

A key issue to be resolved, the entitlement to compensatory education, would require individual consideration. See Russell, 15 F.4th at 270.  That issue does not easily separate from the issue of whether each class member received an appropriate education pursuant to his individual needs.  See Gates, 655 F.3d at 273 (fourth and seventh factors).  This carries the risk that "subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s)."  Id. (ninth factor).

If the court were to make a classwide determination on issues where common and individual evidence are comingled, the danger exists that it could have a preclusive effect on the individual claims of class members.  For example, if the court held based on common evidence that Glen Mills had a general

practice of providing notice and an opportunity to be heard to
students with concerns about their education, that determination
could unfairly preclude the due process claims of students with
individual proof that this practice was not followed as to them.
See id. (sixth and eighth factors).  Issue preclusion would
directly impact the constitutional and statutory rights of class
members because Plaintiffs seek class certification on
constitutional and statutory issues.  See id. (fifth factor).

> The nine Gates factors weigh against certification of
the eight Education Issue Classes against the Glen Mills
Defendants and Rivera.

V.   Disability Discrimination Issue Classes Against Glen Mills
                        and PDE

> The court turns to the six "Disability Discrimination
Issue[] Class[es]" which are part of two claims of Plaintiffs
against the Glen Mills Defendants and the Pennsylvania
Department of Education ("PDE").  First, Plaintiffs claim that
the Glen Mills Defendants violated the rights of class members
under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).
Second, they claim that the Glen Mills Defendants and PDE
violated the rights of class members under the Americans with
Disabilities Act, 42 U.S.C. §§ 12101, et seq.  The class
representatives are Plaintiffs Derrick and Walter.

Although Section 504 and the ADA "may diverge as to the entities they cover and remedies they provide, they impose the same substantive liability standard." Berardelli v. Allied Servs. Inst. of Rehab. Med., 900 F.3d 104, 117 (3d Cir. 2018). Our Court of Appeals has endorsed consideration of "both claims in the same breath." Id. (quoting Chambers ex rel. Chambers v. Sch. Dist. Of Phila. Bd. Of Educ., 587 F.3d 176, 189 (3d Cir. 2009)). Under both Section 504 and the ADA, Plaintiffs must show that each class member: (1) qualified as an individual with a disability, (2) was excluded from participation in or denied the benefits of services, programs, or activities of Glen Mills; and (3) suffered such exclusion, denial, or discrimination because of his disability. See Furgess v. Pa. Dept. of Corr., 933 F.3d 285, 288-89 (3d Cir. 2019). As to the second element, Plaintiffs allege that the Glen Mills Defendants and the PDE failed in their duty to provide a reasonable accommodation necessary to ensure that each class member had meaningful access to an education. See Berardelli, 900 F.3d at 115; 42 U.S.C. § 12182(b)(2)(A)(ii). For both of these claims, Plaintiffs seek compensatory education, which is awarded as monetary damages that each claimant may use to obtain the educational services that should have been provided.

Plaintiffs seek to certify the following Disability Discrimination Issue Classes for the claims against the Glen Mills Defendants:

> (1) whether [the Glen Mills Defendants'] policies and practices discriminated against students with qualifying disabilities due to the absence of a system to identify, evaluate, and provide accommodations in violation of Section 504 and the ADA;
>
> (2) whether [the Glen Mills Defendants] owed a duty to students with qualifying disabilities; and
>
> (3) whether [the Glen Mills Defendants] breached any duty it owed to students with qualifying disabilities.

They further seek to certify the following issue classes for the claims against PDE:

> (1) whether PDE's common policies and practices of failing to provide any supervision of [Glen Mills's] program discriminated against class members on the basis of their disabilities;
>
> (2) whether PDE owed a duty to students with qualifying disabilities; and
>
> (3) whether PDE breached any duty it owed to students with qualifying disabilities.

Plaintiffs' six Disability Discrimination Issue Classes are comprised of "all youth at [Glen Mills] after April 11, 2017, who had qualifying disabilities as defined under Section 504 and the ADA." This class definition, as previously

explained, is amended to begin in March 2018 and end on April 11, 2019.

A.    Ascertainability

The court must first resolve whether the three Disability Discrimination Issue Classes against the Glen Mills Defendants and the three Disability Discrimination Issue Classes against PDE are ascertainable.  See Byrd, 784 F.3d at 163.

Section 504 and the ADA define a qualifying individual as one who suffers a physical or mental impairment that substantially limits one or more of his or her major life activities, has a record of such an impairment, or is regarded as having such an impairment.  See 42 U.S.C. § 12102;  29 U.S.C. § 705(20).  Plaintiffs propose that the education and health records of Glen Mills are an objective and administratively feasible method of ascertaining the class members.  According to Plaintiffs, these records identify students with Individualized Education Programs, students with Section 504 Service Agreements, and students with "a record of an impairment known to interfere with major life activities such [sic] depression, post-traumatic stress disorder . . . and other mental health conditions which are recognized to result in partial or complete disturbance in the person's thinking, feeling, and behavior thereby reducing a person's ability to carry out activities of daily living."

-60-

Plaintiffs submit one document containing a spreadsheet that clearly identifies all Glen Mills students admitted after April 11, 2017 who had either an IEP or a Section 504 Plan.  The court agrees that this record from Glen Mills provides an objective and administratively feasible method to identify individuals with disabilities.  See Byrd, 784 F.3d at 163.

Plaintiffs also reference additional "Health and Safety Screen" documentation.  It is not possible to identify any additional class members from this submission.  Accordingly, the class definition is amended to include only those students who had an IEP or a Section 504 plan.

### B.   Rule 23(a) Factors

#### i.   Numerosity

Plaintiffs have identified 529 students in the records of Glen Mills that were admitted after April 11, 2017, and that were provided an IEP or a Section 504 Plan.  Even under the amended definition of Class Period, the number of class members clearly satisfies numerosity.  See Allen, 37 F.4th at 896.

#### ii.  Commonality

Plaintiffs attest that the three Disability Issue Classes against the Glen Mills Defendants satisfy commonality because all class members were subject to "the same common policies regardless of individual differences in their

disabilities." According to Plaintiffs, the Glen Mills Defendants failed to consider students with disabilities in their policies and practices for disciplining students, restraining students, and educating students. Citing Serventi v. Bucks Tech. High Sch., Plaintiffs contend that this failure constitutes at least one common question of law or fact. See 225 F.R.D. 159, 165 (E.D. Pa. 2004)(quoting Baby Neal, 43 F.3d at 56).

In Serventi, a putative class of students with learning disabilities were denied admission to all but two vocational programs at a technical high school. Id. at 163. The plaintiffs alleged that the high school was denying them admission based on their need for learning support classes and their reading and math levels. Id. They sought declaratory and injunctive relief for violations of the ADA and Section 504. Id. The parties settled and the court approved the settlement. Id. at 169.

Serventi is distinguishable in two respects. First, the Serventi plaintiffs sought declaratory and injunctive relief. Id. at 163. As noted by our Court of Appeals, "injunctive actions by their very nature often present common questions" because they do not "involve an individualized inquiry for the determination of damage awards." See Baby Neal,

43 F.3d at 56.  Plaintiffs here seek damages which require individualized decisions.

Second, the <u>Serventi</u> plaintiffs challenged two specific admissions policies of the defendant high school that were applied uniformly to class members: (1) disqualifying candidates based on their need for learning support classes; and (2) disqualifying candidates based on their reading and math scores.  225 F.R.D. at 163.  Plaintiffs here vaguely challenge "the absence of a system to identify, evaluate, and provide accommodations" and the failure "to take students' disabilities into account."  There is no specific discriminatory policy that Plaintiffs allege was uniformly applied to all class members. <u>See</u> <u>id.</u>

Nor is there evidence of a general policy of the Glen Mills Defendants to discriminate against students with disabilities.  <u>See</u> <u>Wal-Mart</u>, 564 U.S. at 353.  There is evidence that Glen Mills screened each student upon admission and provided some sort of specialized education for students with qualifying disabilities.  Plaintiffs in effect argue that students with disabilities were not adequately accommodated.  Even if they are correct, that is quite different from an allegation of a general policy of discrimination.  In sum, Plaintiffs have not satisfied commonality with respect to the conduct of the Glen Mills Defendants.

Plaintiffs further maintain that they have satisfied commonality with respect to the three Disability Discrimination Issue Classes against PDE.  Citing V.W. by & through Williams v. Conway, they allege that PDE engaged in a common course of conduct of failing to monitor Glen Mills with respect to the education provided to students with disabilities.  236 F. Supp. 3d 554 (N.D.N.Y. 2017).

In V.W., a putative class of juveniles who were detained at a correctional facility for adults and juveniles brought claims under the Eighth Amendment and the IDEA against prison officials and the local school district.  Id. at 564-65. Plaintiffs alleged that the facility frequently and arbitrarily subjected juveniles to solitary confinement where the only educational materials provided were intermittent "cell packets" that included "newspaper clippings, crossword puzzles, and problem worksheets."  Id. at 567.  The court found that common answers to two questions would "drive the resolution of the litigation—whether defendants' conduct violates the Constitution or federal law, and whether defendants should therefore be enjoined from engaging in that course of conduct."  Id. at 575. The court described the School District's common course of conduct as its "policy of only sporadically delivering 'cell packets' in lieu of direct instruction and, relatedly, defendants' alleged failure to conduct manifestation

determinations prior to imposing discipline of a certain duration." Id.

Again, the compensatory education sought by Plaintiffs here would be awarded as individual damages based on the circumstances of each claimant. The relief sought does not present common questions. Furthermore, Plaintiffs do not allege a common course of conduct. They do not identify any particular policy or practice of Glen Mills or PDE that caused harm to all class members. See id. Nor do they cite evidence of a general policy of discrimination. See Wal-Mart, 564 U.S. at 353.

Contrary to their assertions, Plaintiffs' disability discrimination claims are specific to the circumstances of each class member. In Mielo, individuals with disabilities sought class certification against Steak 'N Shake for ADA violations. 897 F.3d at 475. The plaintiffs alleged they had experienced difficulty ambulating in their wheelchairs in steeply graded parking lots. Id. Our Court of Appeals held that the plaintiffs had not established commonality because there were a "wide variety of different ADA violations that any one particular class member might allege to have encountered." Id. at 488. Without a common injury, the proposed class could not achieve a common resolution. Id. at 490.

Plaintiffs here do not allege any specific injury that ties all claims together. See id. at 490. In sum, Plaintiffs'

six Disability Discrimination Issue Classes do not satisfy the commonality requirement.

### iii. Typicality

Whether and how the Glen Mills Defendants and PDE violated the rights of students with disabilities depends on the circumstances of each student in the class.  See id. at 188.  The claims of class representatives Derrick and Walter thus cannot "arise[] from the same event or course of conduct that gives rise to the claims of the class members."  See Hoxworth, 980 F.2d at 923.  Plaintiffs have not established typicality as to these issue classes.

### iv.  Adequacy of Representation

As previously explained, the settlement with the Chester County Intermediate Unit does not put the interests of class representatives in conflict with those of class members.  Plaintiffs have satisfied adequacy of representation.  See In re Cmty. Bank, 795 F.3d at 392.

### C. Rule 23(b) Factors

Plaintiffs maintain that the six Disability Discrimination Issue Classes fit within Rule 23(b)(3).  See Russell, 15 F.4th at 271.  They must show that these issue classes satisfy predominance and superiority.  See In re Hydrogen Peroxide, 552 F.3d at 310;  Fed R. Civ. P. 23(b)(3).

### i.   Predominance

If these issue classes were certified, this court would be required to make hundreds of individualized determinations, including:  Did the class member have a disability?  What reasonable accommodations did he require?  What if any accommodations did the Glen Mills Defendants provide?  Were the accommodations reasonable?  If they were not reasonable, what provision of the ADA or Section 504 did the Glen Mills Defendants violate?  Did any policy of PDE violate the ADA or Section 504 with respect to this accommodation?  To what damages, if any, is he entitled?  Plaintiffs' Disability Discrimination Issue Classes do not predominate because they implicate more individualized questions than common ones.

## ii.  Superiority

Even if issue class certification were granted, many complex elements such as injury, causation, and damages would remain for individualized determinations.  See Russell, 15 F.4th at 270.  Moreover, there is overlap between the class members in the instant action and the plaintiffs in the 803 Mass Tort Cases in the Court of Common Pleas.  Under these circumstances, issue class certification is not the superior method of adjudicating these claims.  See In re Cmty. Bank, 795 F.3d at 409.

## D. Gates Factors

The court must weigh whether the Gates factors favor certification.  See 655 F.3d at 273.  It cannot be disputed that

this is a complex matter involving complex claims.  See id. (first and second factors).  The disability discrimination claims specifically depend on the circumstances of each class member.  See id. (first and third factors);  Mielo, 897 F.3d at 488.  To the extent that there are any common issues of law or fact, those issues are not easily severable from the issues requiring individual decisions.  See Gates, 655 F.3d at 273 (fourth and seventh factors).  For example, whether defendants breached any duty of care depends on the specific injury suffered by each class member, which in turn depends on the accommodations that were denied to him.  This carries the risk that multiple triers of fact will reexamine evidence of any common issues.  See id. (ninth factor).  There is also the risk that any classwide resolution could have a preclusive effect on the individual claims of class members and thus deprive them of their rights under the disability statutes.  See id. (fifth, sixth, and eighth factors).  Even if this court certified the issue classes, the most complex elements of the disability claims——injury, causation, and compensatory education——will remain.  See id. (third factor);  Russell, 15 F.4th at 270.

          In sum, the Gates factors weigh against certification of the six Disability Discrimination Issue Classes against the Glen Mills Defendants and PDE.

VI.   Special Education Issue Classes Against Rivera

        Plaintiffs pursue three "Special Education Issue[]
Class[es]" which pertain to their claim that Rivera, acting in
his official capacity as the Secretary of PDE, violated the
rights of class members to a free appropriate public education
("FAPE") under the Individuals with Disabilities Education Act,
20 U.S.C. §§ 1400, et seq.  Specifically, they allege that
Rivera failed to monitor the Chester County Intermediate Unit to
ensure that Glen Mills students with disabilities received
individualized education programs.[19]  See 20 U.S.C. §§ 1401(3),
1404(d);  22 Pa. Code § 14.101.  Plaintiffs Derrick and Walter
are the class representatives.  They seek compensatory
education, which is a form of equitable relief that is awarded
as monetary damages.

        Plaintiffs move to certify the following Special
Education Issue Classes for their IDEA claim against Rivera:

            (1) whether [Rivera] had a duty to ensure
                that [Glen Mills] had a system to provide
                individualized special education services
                to students with disabilities;

            (2) whether [Rivera] met [his] obligations
                under the IDEA; and

---

19.  Plaintiffs in the instant motion refer to the failure of
PDE to monitor Glen Mills.  However, Count VI of the Complaint
alleges that Rivera failed to monitor the Chester County
Intermediate Unit.  Although it is no longer a party to this
suit, the Chester County Intermediate Unit was the local
education agency tasked with monitoring Glen Mills.

> (3) whether students with disabilities are
>     entitled to relief from [Rivera] for
>     [his] failure to provide oversight and
>     ensure the provision of a FAPE as
>     required.

These issue classes are comprised of "all school-eligible youth at [Glen Mills] after April 11, 2017, who had been identified as children with a disability pursuant to the IDEA, either before or during their placement at [Glen Mills]." Again, this class definition is amended to begin in March 2018 since no Plaintiff resided at Glen Mills before that time.

### A.    Ascertainability

The court must first determine whether the three Special Education Issue Classes against Rivera are ascertainable.  See Byrd, 784 F.3d at 163.  Plaintiffs propose using Glen Mills's records to identify students with IEPs.  The court agrees that these records allow for ascertaining the class.  See id.

### B.    Rule 23(a) Factors

#### i.    Numerosity

Plaintiffs have identified 524 students with IEPs in the records of Glen Mills that were admitted after April 11, 2017.  Even under the amended definition of Class Period, the number of class members clearly satisfies numerosity.  See Allen, 37 F.4th at 896.

ii.   Commonality

Plaintiffs' first Special Education Issue Class concerns whether Rivera owed class members a duty under the IDEA.  Commonality is easily established because duty is an issue of law which can be decided using common evidence.  See Russell, 15 F.4th at 275.  In fact, Rivera acknowledges that he had a general responsibility to monitor local education agencies in the Commonwealth for compliance with the IDEA.

The remaining two Special Education Issue Classes seek to resolve whether Rivera complied with his obligations under the IDEA and whether class members are entitled to relief for his failures under the IDEA.  Rivera contends that these issue classes do not satisfy commonality because the second issue class lacks a common course of conduct and the third issue class lacks a common relief.

With respect to the second issue class concerning IDEA compliance, Rivera cites evidence of many different relevant PDE policies and practices.  The PDE: (1) required each local education agency to produce an annual report detailing IDEA compliance; (2) submitted its own annual report on IDEA compliance for review by the U.S. Department of Education; (3) conducted its own detailed monitoring of each local education agency every six years; (4) as a result of its independent monitoring, requested corrective action plans from

-71-

local education agencies for any deficiencies and tracked implementation; and (5) maintained an administrative dispute process for aggrieved parents and youth.  According to Rivera, Plaintiffs' amorphous characterization does not identify any one or more of PDE's policies and practices and does not point to any omission by himself or PDE that ties together the IDEA claims of all class members.

Plaintiffs counter that they have alleged a common course of conduct for the second issue class because Rivera's "failure to properly oversee [Glen Mills's] deficient special education policies and practices equally affected" every class member.  This sweeping interpretation of "common course of conduct" is wide of the mark to say nothing about the lack of citation to any relevant evidence.  In addition, the causal connection between PDE's conduct and the alleged harm to class members is tenuous given that PDE had responsibilities for overseeing the Chester County Intermediate Unit which in turn was tasked with overseeing Glen Mills.  The circumstances here are vastly different from cases cited by Plaintiffs in which courts were presented with specific policies that were uniformly applied to all class members.

In DL v. D.C. (DL II), for example, the district court had divided the Rule 23(b)(2) class into three subclasses, each relating to a specific function of the state education agency

-72-

under the IDEA, such as providing an initial evaluation to each student within 120 days of referral.  860 F.3d 713, 718-19 (D.C. Cir. 2017).  Thus, the members in each subclass were denied a FAPE because of the same failure to act by the state education agency.  Id. at 725.

Plaintiffs also rely on CG v. Commonwealth of Pennsylvania Dep't of Educ., No. CIV.A 1:06-CV-1523, 2009 WL 3182599 (M.D. Pa. Sept. 29, 2009).  There, the plaintiffs challenged an appropriations statute that created a funding formula limiting certain school districts' ability to provide IEPs to any eligible children.  Id. at *1.  The funding formula was equally harmful to all children with disabilities in those districts because none could receive a FAPE.  Id. at *6.

Finally, Nat'l Law Ctr. on Homelessness & Poverty, R.I. v. New York is inapposite.  224 F.R.D. 314, 317 (E.D.N.Y. 2004).  Plaintiffs there challenged the county's human services department for its failure to transport or enroll homeless children in public schools.  Id. at 316-17.  All children in the class missed school as a result of these systemic failures.  Id. at 324.

Plaintiffs here have identified no uniform policies, practices, or omissions by Rivera.  See Wal-Mart, 564 U.S. at 352-53.  Nor do they cite evidence that PDE had a general policy of neglecting to monitor local education agencies' compliance

with the IDEA.  See id. at 353.  The second Special Education
Issue Class does not satisfy commonality.

The third issue class concerns whether class members
are entitled to relief for Rivera's failure to comply with the
IDEA requirements.  In all of the cases cited by Plaintiffs, the
putative classes sought an injunction under Rule 23(b)(2).  See
DL II, 860 F.3d at 726; CG, 2009 WL 3182599 at *2;  Nat'l Law
Ctr., 224 F.R.D. at 324.  An injunctive action generally
satisfies commonality because enjoining the defendant grants
relief to all class members.  See Baby Neal, 43 F.3d at 56.

However, compensatory education, which is sought here,
is more akin to monetary or individual damages under Rule
23(b)(3).  It requires "a highly individualized inquiry into
that student's unique needs, whether those needs were
met, . . . and the proper amount of compensatory education
necessary to redress any deficiencies."  Blunt v. Lower Merion
Sch. Dist., 262 F.R.D. 481, 490 (E.D. Pa. 2009), aff'd on other
grounds, 767 F.3d 247 (3d Cir. 2014).  Individualized analysis
is especially important in the context of special education
because "[a] focus on the particular child is at the core of the
IDEA."  Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist.
RE-1, 580 U.S. 386, 400 (2017).  Because Plaintiffs seek
individualized relief, the third issue class does not satisfy
commonality.

-74-

### iii.   Typicality

The interests of Plaintiffs Derrick and Walter do not diverge from other class members on the issue class concerning whether Rivera owed them a duty under the IDEA.  However, for the reasons set forth above, whether and how Rivera violated class members' right to a FAPE and what compensatory education each class member is owed depends on his individual circumstances.  The claims of class representatives Derrick and Walter thus cannot "arise[] from the same event or course of conduct that gives rise to the claims of the class members." See Hoxworth, 980 F.2d at 923.  Plaintiffs have not established typicality as to these issue classes.

### iv.   Adequacy of Representation

Again, the settlement with the Chester County Intermediate Unit does not put the interests of class representatives in conflict with those of class members. Plaintiffs have satisfied adequacy of representation.  See In re Cmty. Bank, 795 F.3d at 392.

### C.   Rule 23(b) Factors

Plaintiffs maintain that the three Special Education Issue Classes fit within Rule 23(b)(3).  See Russell, 15 F.4th at 271.  They must show that these issue classes satisfy predominance and superiority.  See In re Hydrogen Peroxide, 552 F.3d at 310;  Fed R. Civ. P. 23(b)(3).

i.   Predominance

If these issue classes were certified, this court
would be required to make hundreds of individualized
determinations, including:  Did the class member have a
disability?  To what education was he entitled?  What special
education services were needed?  Was he deprived of a FAPE?
What caused the FAPE deprivation?  Did a policy or practice of
Rivera or PDE cause the deprivation?  What educational deficit
currently exists?  What compensatory education, if any, is
required?  Only the issue class concerning duty can be
established through common evidence.  Plaintiffs' remaining
Special Education Issue Classes require more individualized
determinations than common ones.  They do not satisfy
predominance.

ii.   Superiority

Issue class certification is not the superior method
of adjudicating class members' IDEA claims.  See In re Cmty.
Bank, 795 F.3d at 409.  While Rivera has conceded that he and
PDE owed class members a duty under the IDEA, the remaining
issue classes would devolve into a plethora of mini-trials.

Even if issue class certification were granted, many
complex elements such as causation and damages would remain for
individualized determinations.  See Russell, 15 F.4th at 270.
Furthermore, there is overlap between the class members in the

instant action and the plaintiffs in the 803 Mass Tort Cases in
the Court of Common Pleas.  They have thus demonstrated their
willingness to seek individualized relief.

### D.   Gates Factors

As with all proposed issue classes, the court must
also determine whether the Gates factors weigh in favor of
certification.  See 655 F.3d at 273.  Again, this is a complex
matter involving complex claims.  See id. (second factor).  In
particular, the IDEA claim requires individual consideration of
each class member because "[t]he adequacy of a given IEP turns
on the unique circumstances of the child for whom it was
created."  See Endrew F., 580 U.S. at 404.  Likewise, any
decision regarding whether compensatory education is owed
requires analysis of many factors that are particular to each
class member.  See Blunt, 262 F.R.D. at 490.  There are no
efficiencies to be gained by lumping together the claims of
different individuals with different special education needs.
See Gates, 655 F.3d at 273 (first and third factors).

Plaintiffs have not identified any conduct by Rivera
or any injury suffered by all class members that can be resolved
using only common evidence.  To the extent that there are any
common issues of law or fact, those issues are not easily
severable from the issues requiring individual resolutions.  See
Gates, 655 F.3d at 273 (fourth and seventh factors).

It is possible that subsequent triers of fact will reexamine evidence of any common issues as the matter proceeds to the remaining individualized elements.  See id. (ninth factor).  For example, even if a jury determined that all class members are entitled to relief, a subsequent finder of fact could determine that certain class members received adequate IEPs for their specific needs and deny them any compensatory education or other equitable relief.  There is also the risk that any classwide determinations could have a preclusive effect on the individual claims of class members.  Such a preclusive effect would deprive them of their rights under the IDEA.  See id. (fifth, sixth, and eighth factors).

In sum, the Gates factors weigh against certification of the three Special Education Issue Classes against the Rivera.

VII. Suspected Special Education Issue Classes Against Rivera

Plaintiff Thomas seeks to have certified two "Suspected Special Education Issue[] Class[es]."  He claims that Rivera, acting in his official capacity as the Secretary of PDE, failed to oversee the Chester County Intermediate Unit's compliance with its obligation under the IDEA that Glen Mills students with suspected disabilities are evaluated for special education.[20]  Thomas alleges that he had a qualifying disability

---

20.  Again, Plaintiff in the instant motion refers to the failure of PDE to monitor Glen Mills.  However, Count VII of the

but that Glen Mills did not evaluate him for special education. He seeks compensatory education for himself and similarly situated students.

The two Suspected Special Education Issue Classes proposed by Plaintiff Thomas are:

> (1) whether [Rivera's] policies and practices failed to ensure that [Glen Mills] identified, evaluated, or served students with suspected disabilities; and

> (2) whether students with suspected disabilities are entitled to relief from [Rivera] for this failure.

These issue classes are comprised of "all school-eligible youth at [Glen Mills] after April 11, 2017, who demonstrated documented behavioral, developmental, or academic indicia of being children with a disability such that the youth was entitled to a disability evaluation pursuant to IDEA, and who did not receive one during their placement at [Glen Mills]." This class definition is amended to begin in May 2018 because Thomas does not have standing for claims that predate his arrival at Glen Mills.  See Neale, 794 F.3d at 362.

---

Complaint alleges that Rivera—not PDE—failed to monitor the Chester County Intermediate Unit—not Glen Mills.  Although the Chester County Intermediate Unit was dismissed from this action, it was the local education agency tasked with monitoring Glen Mills.

A.    Ascertainability

The court must first determine whether the two Suspected Special Education Issue Classes against Rivera are defined using objective and administratively feasible criteria. See Byrd, 784 F.3d at 163.  Plaintiff attests that his expert, Dr. Gagnon, "has identified objective criteria for identifying members of the class," and that the education and health records of Glen Mills provide a reliable and administratively feasible means of determining class members.

Dr. Gagnon's methodology spans four pages of his detailed report.  It comprises three different categories of disabilities, each with their own methodology of ascertaining class members: emotional/behavioral disorders, learning disabilities, and other health impairments.  For example, a class member in the "emotional/behavioral disorders" category is one who experienced multiple instances of any of the following:

> . . . . manual assists, physical escorts, physical restraints, fights with peers, violence against staff, AWOL, drug offenses at Glen Mills, and/or Failure to Adjust.  In addition, students should have been evaluated in cases where previous and/or current psychological and psychiatric screenings, evaluations, and medical professional reports indicate a history of trauma or diagnosed mental disorders. Moreover, academic failure should be considered in conjunction with the aforementioned factors.

His proposed methodologies for identifying students with
"learning disabilities" and those with "other health
impairments" are equally exhaustive.  Using this methodology,
Dr. Gagnon conducted detailed and individualized evaluations of
a subsample of 120 Glen Mills students and found that 42
students should have been evaluated for disabilities.

  Even if Dr. Gagnon satisfies the standard under
Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579
(1993), the class is not ascertainable.  Plaintiff did not
specify which Glen Mills records contain the various
"behavioral, developmental, or academic indicia" referenced in
his briefs or in Dr. Gagnon's report.  He also did not include
examples or descriptions of those records for this court to
review.

  Additionally, Dr. Gagnon's report does not explain how
this court would balance the many potentially relevant factors
to determine members of the class.  His methodology would
require this court to conduct "extensive and individualized
fact-finding or 'mini trials'" which our Court of Appeals has
held are "inappropriate" for a class action.  See Marcus v. BMW
of North America, LLC, 687 F.3d 583, 593 (3d Cir. 2012).  It is
simply not possible to identify the class members from what has
been cited.  See Byrd, 784 F.3d at 163.

B.   Rule 23(a) Factors

i.   Numerosity

Thomas attests that 257 students admitted after April 11, 2017 should have been evaluated for special education.  He does not explain how he arrived at this figure.  It differs significantly from the estimate of his expert, Dr. Gagnon.  He proposes that there are 342 class members based on the proportion of students with suspected disabilities in the subsample of 120 students that he analyzed.

In any event, this court cannot ascertain the members of these issue classes.  The numerosity prong has not been met. See Allen, 37 F.4th at 896.

ii.   Commonality

The first issue class regards whether Rivera failed to ensure that Glen Mills identified, evaluated, or served students with disabilities.  Thomas maintains that commonality exists because "the absence of any system to identify IDEA-eligible youth" was a common course of conduct that harmed all class members.  He cites DL II for the proposition that this alleged failure was a common course of conduct that affected all class members.  See 860 F.3d at 725.

There the parents of young children with disabilities sought class certification on behalf of similarly situated children against the District of Columbia for alleged violations

-82-

of the "Child Find" requirement of the IDEA.  See id. at 717;
20 U.S.C.A. § 1412(a)(3).  The Court of Appeals for the District
of Columbia had previously rejected the district court's
certification of the proposed class.  DL v. D.C. (DL I), 713
F.3d 120 (D.C. Cir. 2013).  It held that commonality was not
satisfied because the proposed class spanned "different policies
and practices at different stages of the District's Child Find
and FAPE process."  Id. at 127.  The District Court's finding
that the state education agency had violated the IDEA as to each
class member was not sufficient to establish commonality without
"a uniform policy or practice that affects all class members."
Id. at 128 (citing Wal-Mart, 564 U.S. at 350).

     As previously discussed, the district court on remand
divided the proposed class into three subclasses based on
specific policies or practices of the state education agency
that were common to all class members.  DL II, 860 F.3d at 724.
The Court of Appeals held that this approach had remedied the
defect and affirmed the District Court's grant of class
certification.  Id.  The subclasses were now "each defined by
reference to a uniform policy or practice" and "cast around
common harms, susceptible to common proof, and curable by a
single injunction."  Id. (internal citations omitted).

     Thomas here faces the same commonality problems as the
plaintiffs in DL I.  He has not identified a common policy or

practice of PDE or a specific failure to act by Rivera.  See
DL I, 713 F.3d at 128.  He also does not allege a common harm.
"For some plaintiffs, for example, the alleged harm suffered is
due to the failure of [PDE] to have an effective intake and
referral process; for others the alleged harm is caused by
[PDE's] failure to offer adequate and timely education
placements to implement [IEPs]; for still others, the cause is
the absence of a smooth and effective transition [to Glen
Mills]."  Id.  Plaintiff has not established commonality for the
first Suspected Special Education Issue Class.

          The second issue class concerns whether class members
would be entitled to relief for Rivera's failure to ensure that
Glen Mills identified, evaluated, and served students with
disabilities.  Again, the plaintiffs in DL I and DL II sought an
injunction under Rule 23(b)(2).  See DL II, 860 F.3d at 726.  In
contrast, Plaintiff here seeks compensatory education which
requires "a highly individualized inquiry."  See Blunt, 262
F.R.D. at 490.  There is no commonality as to this issue class.

                    iii.   Typicality

          Whether and how Rivera violated class members' IDEA
rights and what compensatory education each class member is owed
depends on his individual circumstances.  The claim of class
representative Thomas does not "arise[] from the same event or
course of conduct that gives rise to the claims of the class

members."  See Hoxworth, 980 F.2d at 923.  These issue classes
do not satisfy typicality.

             iv.   Adequacy of Representation

       Again, the interest of class representative Thomas is
not in conflict with those of class members because of the
settlement with the Chester County Intermediate Unit.

       Rivera further argues that Thomas is not an adequate
class representative because he did receive an IDEA evaluation
and was found not eligible for special accommodations.  However,
Plaintiff correctly notes that this evaluation occurred ten
years before his arrival at Glen Mills.  The IDEA provides that
"a local education agency shall ensure that a reevaluation of
each child with a disability is conducted . . . if the child's
parents . . . request a reevaluation."  20 U.S.C.
§ 1414(a)(2)(A).  There is evidence on the record that Thomas's
mother, Michelle, had requested that he be reevaluated at Glen
Mills.  Furthermore, Plaintiff submits an order dated May 8,
2018 from Judge Amanda Cooperman of the Court of Common Pleas of
Philadelphia County (Family Court Division) requiring Glen Mills
to conduct an IDEA evaluation.

       Plaintiff has satisfied adequacy of representation.
See In re Cmty. Bank, 795 F.3d at 392.

C. Rule 23(b) Factors

Plaintiff maintains that the two Suspected Special Education Issue Classes fit within Rule 23(b)(3).  See Russell, 15 F.4th at 271.  He must show that these issue classes satisfy predominance and superiority.  See In re Hydrogen Peroxide, 552 F.3d at 310;  Fed R. Civ. P. 23(b)(3).

i.   Predominance

If these issue classes were certified, this court again would be required to make many individualized determinations, including:  Who is in the class?  Did the class member have a disability?  Was he previously evaluated for a disability?  Did his parents or teachers request an evaluation?  Did a policy or practice of Rivera or PDE prevent his evaluation?  What educational deficit currently exists?  What compensatory education, if any, is required?  The Suspected Special Education Issue Classes do not satisfy predominance because they require more individualized determinations than common ones.

ii.   Superiority

Issue class certification cannot cure the many problems of common adjudication of these IDEA claims.  This court cannot identify who is in the class let alone what common issues they share.  Even if issue class certification were granted, many complex elements such as causation and damages

would remain for individualized determinations.  See Russell, 15
F.4th at 270.  Moreover, there is overlap between the class
members in the instant action and the plaintiffs in the 803 Mass
Tort Cases in the Court of Common Pleas.  The Suspected Special
Education Issue Classes do not satisfy superiority.  See In re
Cmty. Bank, 795 F.3d at 409.

### D. Gates Factors

        The court must also resolve whether the Gates factors
weigh in favor of certification.  See 655 F.3d at 273.  The
Gates analysis of the Special Education Issue Classes applies
equally to the Suspected Special Education Issue Classes because
both groups of issue classes concern similar IDEA claims and
seek compensatory education.  The court has the same concerns of
unnecessary complexity, predominant individual issues, and the
risk that individual claims are extinguished.  The Suspected
Special Education Issue Classes against Rivera do not pass
muster under Gates.

### VIII.   Special Education Parents Issue Classes Against Rivera

        Plaintiffs Tina, the mother of Derrick, and Janeva,
the mother of Walter, move to certify two "Special Education
Parents Issue[] Class[es]" on behalf of similarly situated
parents of Glen Mills students with disabilities.  These
Plaintiffs claim that Rivera, acting in his official capacity as
the Secretary of PDE, violated their right to "meaningful

participation" in the special education process by failing to
oversee the Chester County Intermediate Unit.[21]

The denial of a parents' right to "meaningful
participation" refers to a violation of one or more of the
IDEA's procedural safeguards.  T.R. v. Sch. Dist. of
Philadelphia, 4 F.4th 179, 183-84 (3d Cir. 2021).  The state
education agency must ensure that the parent of a child with a
disability is: (1) included in the team that creates the IEP;
(2) included in the annual review of the IEP; (3) notified in
writing if the agency proposes to change or refuses to change
the provisions of a child's IEP; (4) provided with a copy of the
child's IEP at no cost; and (5) provided with recourse to
challenge the IEP in administrative proceedings.  See id.;  D.S.
v. Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010);  34
C.F.R. § 300.322.  Plaintiffs allege that Rivera had no system
in place to ensure that class members received these procedural
safeguards.  They seek compensatory education, a form of
equitable relief that is awarded as monetary damages.

Plaintiffs move to certify the following two Special
Education Parents Issue Classes against Rivera:

---

21.  Again, although Plaintiffs in the instant motion refer to
the failure of PDE to monitor Glen Mills, Count VIII of the
Complaint alleges that Rivera failed to monitor the Chester
County Intermediate Unit, which in turn had an independent duty
as the local education agency to monitor Glen Mills.

(1) whether [Rivera's] policies and practices
failed to ensure a system that allowed
for meaningful parental participation in
special educational decision making for
students with disabilities at [Glen
Mills]; and

(2) whether parents of students with
disabilities are entitled to relief from
[Rivera] for this failure.

These issue classes are comprised of "all parents of
school-eligible youth at [Glen Mills] after April 11, 2017, who
had been identified as children with a disability pursuant to
IDEA, either before or during their placement at [Glen Mills]."
This class definition is amended to begin in March 2018 because
neither Derrick nor Walter resided at Glen Mills before that
time.

A.   Ascertainability

The court must first determine whether the two Special
Education Parents Issue Classes against Rivera are
ascertainable.  See Byrd, 784 F.3d at 163.  Plaintiffs attest
that the IEP records maintained by Glen Mills identify at least
one "parent," as defined by the IDEA.  See 20 U.S.C. § 1401(23).
The class is ascertainable because these records are an
objective and allow for an administratively feasible method of
identifying class members.  See Byrd, 784 F.3d at 163.

B.   Rule 23(a) Factors

i.   Numerosity

Plaintiffs cite evidence that at least 524 students with IEPS were placed at Glen Mills after April 11, 2017. According to Plaintiffs, there are thus at least 524 individuals who were identified as "parents" on these students' IEP plans. Even under the amended definition of Class Period, the number of class members clearly meets the numerosity requirement. See Allen, 37 F.4th at 896.

ii.   Commonality

Plaintiffs seek to certify an issue class regarding whether Rivera failed to ensure parental participation in special education services at Glen Mills.  They maintain that Rivera's "failure to properly oversee [Glen Mills's] deficient special education policies and practices" equally affected each class member.

On similar facts, our colleague Judge Mitchell Goldberg denied the motion of a group of children with disabilities and their parents for class certification.  T.R. v. Sch. Dist. of Philadelphia, No. CV 15-4782, 2019 WL 1745737 (E.D. Pa. Apr. 18, 2019), aff'd, 4 F.4th at 179.  The plaintiffs in T.R. alleged among other grounds that the school district's translation and interpretation services denied parents with limited English proficiency the opportunity to meaningfully

-90-

participate in their children's special education.  Id. at *1-2.
The Court explained that under the IDEA's framework, "the
'meaningful participation' standard is not subject to common
enforcement."  Id. at *15.  Accordingly, the right to meaningful
participation "does not proscribe a certain course of conduct by
a school district, but rather requires a fact-intensive inquiry
into the individual circumstances."  Id.

        The court explained that significant factual
disparities existed among the translation and interpretation
services that were provided to the named plaintiffs.  Id. at
*16.  One parent was offered interpretation services prior to
every IEP meeting but on occasion declined those services.
Another parent brought her own two interpreters to IEP meetings
but did not request translated IEP documents.  Yet another
parent asked her child's teacher to act as an interpreter.  The
court explained that it must consider these varying
circumstances in its IDEA inquiry.  Id.

        The court also noted that the plaintiffs did not
"challenge a centralized policy enforced by a single decision-
maker, but rather target individualized decisions by various
case supervisors, school principals, and teachers as to what
services are required in each particular case."  Id. at *17.  It
concluded that commonality was not established.  Id.

Rivera likewise highlights factual disparities in the level of participation of the named Plaintiffs.  He points to evidence that Janeva received regular reports regarding Walter's progress toward his IEP goals and notices of IEP meetings by phone and certified mail but did not attend those meetings. Rivera also recounts that Tina visited Derrick several times per week, attended his IEP meetings by telephone, received an IEP progress report, agreed that his prior IEP would remain in effect, and was invited to participate in his Individual Service Plan meeting but was not present.  Additionally, he argues that meaningful participation could not be "the same for every parent given that many of them lived far from [Glen Mills.]"

Rivera is correct that ensuring a parent's meaningful participation in special education services requires consideration of the parent's particular circumstances.  For example, an out-of-state parent's involvement in IEP meetings is considerably more limited than one living near Glen Mills. Furthermore, just as Janeva and Tina were not present for some special education meetings to which they were invited, this court must consider whether individual class members did not attend such meetings because they did not receive notice or because they chose not to attend.  The decisions of the many other actors involved in the IEP process—such as teachers at

Glen Mills and administrators at both Glen Mills and the Chester County Intermediate Unit—are also relevant to this inquiry.

Plaintiffs lack a common thread that ties together the alleged IDEA violations suffered by all class members.  They do not allege that Glen Mills or the Chester County Intermediate Unit failed to provide any opportunity for parental participation.  See T.R., 2019 WL 1745737 at *16.  They also do not challenge a specific policy, practice, or failure to act of PDE or Rivera.  See id. at *17.  Plaintiffs instead broadly allege the "wholesale absence of a legally compliant special education system."  Phrases like "legally compliant" and "special education system" cannot paper over the many fact-intensive and individualized questions involved in their IDEA claim.  See id. at *15.

Plaintiffs further seek to certify an issue class concerning whether the parents of Glen Mills students with disabilities are entitled to relief for Rivera's alleged failure to ensure their meaningful participation in their children's special education.  Again, the court cannot resolve this issue for all class members with common evidence because Plaintiffs seek individualized relief in the form of compensatory education.  See Blunt, 262 F.R.D. at 490.

Plaintiffs' Special Education Parents Issue Classes do not satisfy commonality.

iii.   Typicality

As with other proposed IDEA issue classes, whether and how Rivera violated parents' IDEA rights and what compensatory education each parent is owed depends on his or her individual circumstances.  The claim of class representatives Tina and Janeva do not "arise[] from the same event or course of conduct that gives rise to the claims of the class members."  See Hoxworth, 980 F.2d at 923.

In addition, the evidence that both Tina and Janeva were provided at least some opportunities to participate in the IEP process indicates that they may be subject to defenses that do not apply to other class members, for instance, parents that were not notified of any IEP meetings.  Typicality is not established when a class representative is subject to unique defenses.  See Fed. R. Civ. P. 23(a)(3);  Beck v. Maximus, Inc., 457 F.3d 291, 300 (3d Cir. 2006).

The two Special Education Parents Issue Classes fail this requirement.

iv.   Adequacy of Representation

For the reasons discussed above, the interests of Tina and Janeva are not in conflict with those of class members because of the settlement with the Chester County Intermediate Unit.  Defendants do not and this court has no reason to challenge the adequacy of class counsel.  Plaintiffs have

satisfied adequacy of representation.  See In re Cmty. Bank, 795
F.3d at 392.

C.   Rule 23(b) Factors

Plaintiffs maintain that the two Special Education
Parents Issue Classes fit within Rule 23(b)(3).  See Russell, 15
F.4th at 271.  They must show that these issue classes satisfy
predominance and superiority.  See In re Hydrogen Peroxide, 552
F.3d at 310;  Fed R. Civ. P. 23(b)(3).

i.  Predominance

If these issue classes were certified, this court
would be required to make over a thousand individualized
determinations, including:  Was the parent notified of special
education meetings?  Was the parent notified of decisions
affecting their child's special education?  Did the parent
attend any meetings?  To what extent was the parent involved in
decisions affecting their child's special education?  Did
teachers, counselors, administrators, or other actors exclude
the parent from these meetings or decisions?  Did policies or
practices of the Chester County Intermediate Unit exclude the
parent from meetings and decisions?  Did policies or practices
of Rivera or PDE exclude the parent from these meetings and
decisions?  What if any compensatory education is owed to the
parent?  The issue classes require more individualized

determinations than common ones.  Plaintiffs have not satisfied
predominance.

### ii.  Superiority

Plaintiffs' IDEA claim implicates many individualized
issues that cannot be avoided by issue class certification.  It
is highly doubtful that any efficiencies can be gained by class
treatment.  Even if certification were granted, many complex
elements such as causation and damages would remain for
individualized determinations.  See Russell, 15 F.4th at 270.
The Special Education Parents Issue Classes do not meet the
superiority test.  See In re Cmty. Bank, 795 F.3d at 409.

### D.   Gates Factors

The court must also determine whether the Gates
factors weigh in favor of certification.  See 655 F.3d at 273.
This matter is incredibly complex, spanning one damages class,
twenty-four issue classes, five defendants, and five different
permutations of class members.  See id. (second factor).  The
claim at issue is not suitable for class treatment.  For the
reasons discussed above, evaluating parental participation for
IDEA compliance is an individualized inquiry that cannot be
circumvented by class treatment.  See T.R., 2019 WL 1745737 at
*15-17;  id. (first and third factors).

To the extent that there are common questions of law
and fact, they do not easily separate from the individual

issues.  See Gates, 655 F.3d at 273 (fourth and seventh
factors).  Nor do issues of liability easily separate from the
relief sought.  The same facts that are relevant to the
determination of whether a parent's participation was
"meaningful" are relevant to what if any compensatory education
is owed.  See id. (fourth factor).  The comingling of common and
individual issues presents the risk that multiple triers of fact
will reexamine the same evidence.  See id. (ninth factor).
There is also the risk that any classwide determinations could
have a preclusive effect on the individual claims of class
members, robbing them of their rights under the IDEA.  See id.
(fifth, sixth, and eighth factors).

         In sum, the Gates factors weigh against certification
of the two Special Education Parents Issue Classes against
Rivera.

IX.  Conclusion

         The Complaint contains a plethora of disturbing
allegations as to what happened to a large number of residents
at Glen Mills over a span of several years.  In April 2019, the
Pennsylvania Department of Human Services ordered the school to
be closed based on its findings of pervasive wrongdoing.  While
the court must go beyond the allegations in the Complaint in
determining class certification, the merits of this action and
the legal responsibilities, if any, of the various Defendants

are not now before the court for resolution.  The only pending issue is the proper mechanism for the adjudication of the pleaded claims——proceeding by individual actions or under Rule 23 of the Federal Rules of Civil Procedure with one certified class and twenty-four issue classes.

The Supreme Court has cautioned that individual actions are generally preferable for a number of compelling reasons and that class actions are the exception.  See Wal-Mart, 564 U.S. at 348.  Plaintiffs here are seeking monetary relief. One compelling reason for class actions under Rule 23(b)(3) is to provide relief when the damages for each class member are so small as to make individual actions impracticable.  E.g., In re Gen. Motors Corp., 55 F.3d at 784.  That does not appear to be the case here.

After four years and after extensive discovery, Plaintiffs have not met their burden to fit within the exception for class and issue class certification.  The class mechanism is designed, among other purposes, to promote efficiency.  This lofty goal could never be achieved here.  After a rigorous analysis, the motion of Plaintiffs for class and issue class certification will be denied.  Over 800 former residents of Glen Mills have rightly recognized that individual actions are the proper and indeed the more expeditious pathway forward.

-98-